CHARLES N. FREIBERG
BRIAN P. BROSNAHAN
DAVID A. THOMAS
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
101 California Street, Suite 2050
San Francisco, CA  94111
Telephone: (415) 421-6140
Facsimile:  (415) 398-5030

BRUCE H. NAGEL
NAGEL RICE LLP
103 Eisenhower Parkway
Roseland, NJ 07068-1031
Telephone:  (973) 618-0400
Facsimile:  (973) 618-9194

HARVEY R. LEVINE
CRAIG A. MILLER
LEVINE STEINBERG MILLER & HUVER
550 West C Street, Suite 1810
San Diego, CA 92101-8596
Telephone:  (619) 231-9449
Facsimile:  (619) 213-8638

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEVERLY CLARK AND JESSE J. PAUL, on behalf of themselves and all others similarly situated,<br><br>                                        Plaintiffs,<br><br>               v.<br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation,<br><br>                                        Defendant. | Civil Action No.:<br><br><u>CLASS ACTION</u><br><br><u>COMPLAINT</u><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiffs, on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege, upon knowledge as to their own acts and otherwise upon information and belief, as follows:

## INTRODUCTION

1.      This class action seeks to redress the unlawful, deceptive and unconscionable commercial practices of Defendant Prudential Insurance Company of America ("Prudential" or "Defendant") with respect to certain of its individual health insurance policies.  Prudential sold an individual health policy, known as the Comprehensive Health Insurance Policy ("CHIP"), to individuals throughout the United States from 1973 through 1981.  In 1981, Prudential ceased selling CHIP to new policyholders (it "closed the block").  Prudential did not disclose to its policyholders that it closed the block and that the block closure would eventually and inevitably result in a "death spiral," a phenomenon which is discussed further below, in which premiums would increase to exorbitant levels.  Prudential also did not disclose that if policyholders developed medical conditions and then were forced to drop CHIP because of exorbitant premiums, policyholders might not be able to secure new health coverage for their pre-existing conditions.

2.      CHIP is a major medical insurance policy designed to provide policyholders with coverage for medical expenses, including high or unexpected medical expenses.  The risk of high medical expenses is managed by Prudential through the creation of a risk pool, where a group shares the risk that certain policyholders will generate higher than expected claims.  Large premium increases are generally not necessary in a functioning risk pool since the premiums of healthy low cost members subsidize the higher costs of less healthy members.

3.      Prudential was fully aware that its block closure would make exorbitant premiums inevitable.  The block closure prevented new policyholders from entering into the CHIP risk pool. New policyholders are generally healthier, and their premiums subsidize the premiums of less healthy policyholders, who have higher rates of claims.  Prudential knew the result of closing the CHIP block would be that the CHIP risk pool would face an "anti-selection crisis" where healthy

policyholders who could secure alternative coverage terminated CHIP.  With CHIP closed to new entrants, and an insufficient percentage of healthy policyholders remaining to subsidize the costs of unhealthy policyholders, Prudential knew the result would be an inevitable "death spiral."  In a death spiral, a cycle of higher premiums and a shrinking number of healthy policyholders cause premiums ultimately to become so high that they force insureds to drop their policies.

4.     Prudential knew, at the time it closed the block, that the design features of the CHIP policy made a death spiral inevitable after the block was closed.  John K. Kittredge, executive vice president of Prudential, stated that Prudential should replace CHIP and "go back to the drawing board" in designing new policies.  In particular, Prudential knew that flawed design features of the CHIP policy would accentuate the dynamics of the death spiral.  Though Prudential knew the experience of CHIP policyholders would continue to deteriorate and that future massive premium increases were inevitable, it concealed these facts from policyholders.  Prudential did not disclose to CHIP policyholders that it closed their block and pushed their policies into a death spiral.

5.     Prudential never disclosed the ramifications of the block closure to CHIP policyholders.  Prudential knew that the block closure would inevitably cause premiums to increase to unaffordable levels.  Though policyholders were informed when premiums increased, they had no reason to know that the premium increases were a result of the block closure.  Prudential made uniform written representations to policyholders about individual rate increases but in such documents it never disclosed that the reason for the rate increase was CHIP's closed block status or that the closed block status made future extreme rate increases inevitable.  Policyholders reasonably relied on the expert and superior knowledge of Prudential and had no reason to suspect that further, extremely large premium increases were inevitable due to the block closure.  For example, with respect to named plaintiff Beverly Clark, from 2002-2004, Ms. Clark's premiums increased from $1,458.71 per month to $4,217.65 per month (or from $17,504.52 to $50,611.80 per year).  By way of further example, with respect to named plaintiff Jesse Paul, from 2002-2006 Prudential increased Mr. Paul's premiums from $715.99 per month to $4,284.11 per month (or from $8,591.88 to $51,409.32 per year).

6.     Prudential also did not disclose that the result of the block closure was that policyholders might be unable to secure comparable coverage for later developing medical conditions by the time death spiral premium increases forced them to drop the CHIP policy. Policyholders were not informed that if they developed medical conditions after the block was closed, and later were forced to switch medical coverage due to CHIP premium increases, they might not be able to secure coverage for such pre-existing conditions or might only be covered at higher premiums.

7.     Prudential failed to disclose that closing the CHIP block would produce a death spiral, which inevitably would result in astronomical and unaffordable premium levels. Because Prudential failed to disclose this material information, policyholders were unable to make an informed choice whether to renew CHIP or search for alternative health insurance.

8.     Policyholders reasonably expected that they would not be forced to search for alternative health insurance since Prudential strictly limited its right to discontinue the CHIP policy. The CHIP policy states that policyholders "may continue this Policy in force…by payment of premiums." Prudential represented to CHIP policyholders that it retained a narrow and limited right to discontinue the policy "only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where you reside." This representation was false and misleading since no reasonable policyholder would expect that Prudential could effectively discontinue the CHIP plan by a decision to create a closed block death spiral.

9.     Plaintiffs allege Prudential's conduct in failing to disclose the block closure and its implications violates the New Jersey Consumer Fraud Act since it is an unconscionable commercial practice and constitutes misrepresentation and omission of material facts with intent that others rely upon such concealment. As a result of Prudential's consumer fraud, Plaintiffs and the Class have incurred damages, including higher premiums than could have been otherwise obtained and medical costs for conditions that would have been covered by other insurance if the ramifications of the block closure had been disclosed. Plaintiffs also allege that Prudential breached its fiduciary duty, and its duty of good faith and fair dealing, to Plaintiffs and the Class

by failing to disclose the closing of the block and the negative ramifications of this decision for policyholders.

## JURISDICTION AND VENUE

10.     The United States District Court for the District of New Jersey has subject matter jurisdiction over this class action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because one or more members of the classes defined herein are citizens of a State different from one or more defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

11.     Venue in this district is proper because Prudential transacts business in this district and Prudential is domiciled in New Jersey, and because, on information and belief, class members are located in this district. Additionally, a substantial part of the events, acts, and omissions constituting consumer fraud was carried on within this district.

## THE PARTIES

12.     Plaintiff Beverly Clark ("Clark") is currently a resident of Vancouver, British Columbia. Clark purchased CHIP from Prudential, with a policy date of September 13, 1978, in San Diego, California, where she then resided. Her premium in 1982 was $149.66 per month. Prudential did not inform her that it had closed the block and that this would make her policy vulnerable to an inevitable death spiral; that the reason for her premium increases was the closed block status of her policy; or that she might be unable to secure coverage for medical conditions developed subsequent to the block closure if she was forced to terminate CHIP due to high prices. Clark terminated her policy in 2005 when Prudential raised her premiums to $5,699.43 per month ($68,393.16 per year).

13.     Plaintiff Jesse J. Paul ("Paul") is a resident of Indiana. Paul purchased CHIP from Prudential, effective July 2, 1980, in Indianapolis, Indiana, where he then resided. His initial premium was $25.50 per month. Prudential did not inform him that its closure of the block would make his policy vulnerable to an inevitable death spiral; that the reason for his premium increases was the closed block status of his policy; or that he might be unable to secure coverage for medical conditions developed subsequent to the block closure if he was forced to terminate CHIP due to

high prices.  He terminated his policy in 2007 when Prudential raised his premiums to $4,284.11 per month ($51,409.32 per year).

14.     Defendant Prudential is, and at all relevant times was, a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey.  On information and belief, Prudential Insurance Company of America is, and at all relevant times was, licensed to do business in the District of Columbia and all of the United States.

## PRUDENTIAL'S CHIP POLICY

15.     Plaintiffs are informed and believe and based thereon allege that, at all relevant times, Prudential was an issuer of health insurance policies.  Its policies included both individual and group health insurance.  Prior to 2001, Prudential was a mutual life insurance company.

16.     Health insurance generally refers to a form of insurance that pays for a range of medical expenses.  The purpose of health insurance is to offset the cost of medical bills and provide policyholders with coverage for high or unexpected medical expenses.  Health insurance is designed to shift the risk of loss from the insured to the insurer, which can better manage risk through the creation of insurance risk pools.  Such pools spread the risk that any individual insured will have above average costs.  Insurers also can manage risk by reinsuring and/or by investing premiums now to pay later claims.

17.     Plaintiffs are informed and believe and based thereon allege that, in 1973, Prudential developed, marketed, and sold an individual health insurance product known as CHIP ("Comprehensive Health Insurance Policy").  CHIP is a major medical insurance policy that pays benefits for expenses incurred for care and treatment of illnesses.  Eligible expenses under the CHIP policy include hospital room and board; hospital services and supplies; doctor's services; anesthetics and their administration; ambulance service; professional nursing services; restoratory or rehability speech therapy; treatment by a physiotherapist; x-ray and laboratory examinations; and a variety of other costs related to medical care.  CHIP also provides separate benefits for mental illness and functional nervous disorders, as well as convalescent nursing home benefits.

18.     Plaintiffs are informed and believe and based thereon allege that, at all relevant times, Prudential developed, marketed, and sold CHIP in the District of Columbia and all of the 50

United States.

19.     Prudential sold and renewed the CHIP policy, which was meant to provide coverage for illness and medical care when the need arose, to the Class with the contractual term that Prudential could discontinue the policy only under certain conditions. The CHIP policy stated that policyholders could continue the policy at their election and, as such, Prudential strictly limited its right to discontinue the CHIP policy. The policy states:

> "You may continue this Policy in force for successive premium periods of one month each by payment of the premiums as specified in the following paragraphs. However, Prudential may refuse to continue this Policy as of any Policy Date anniversary, but <u>only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where you reside.</u> If Prudential takes this action you will be notified not less than 31 days before the Policy Date anniversary."

## THE CHIP CLOSED BLOCK DEATH SPIRAL

20.     The CHIP policy clearly states that policyholders may continue the CHIP policy in force at their election and that Prudential could only discontinue the policy under extremely limited circumstances. No reasonable policyholder would foresee that Prudential could effectively discontinue its policy by creating a closed block death spiral.

21.     Prudential's premium increases were a direct result of the composition of the medical insurance pool under CHIP's closed block. In a dynamic, well underwritten individual insurance pool, a group of insureds shares the risk of both this year's claims and the future risk that poor health of some policyholders will generate above average costs. The healthy members of the insurance pool subsidize the unhealthy members.

22.     In 1981, Prudential stopped selling CHIP to new members. Stopping sales to new members is referred to in the insurance industry as "closing the block." Closing the block caps the pool of insureds under the policy. With no new entrants, the size of the pool shrinks whenever a policyholder drops the policy because no new policyholders are accepted.

23.     Prudential knew that closing the CHIP block would result in an "anti-selection crisis," especially given the design features of the policy including that the CHIP policy lacked inside limits on specific policy benefits, allowing very ill policyholders to incur massive claims. A lack of inside limits accentuates the dynamics of a death spiral.

24.     The inevitable negative ramifications of the decision to close the block were never disclosed to CHIP policyholders. An anti-selection crisis occurs when low risk healthy individuals terminate their policy. When low risk policyholders switch to alternative coverage, an insufficient percentage of healthy policyholders remain to fully subsidize the costs of unhealthy policyholders. With CHIP closed to new entrants and low risk individuals opting out, Prudential knew a "death spiral" inevitably would result. In a "death spiral," less healthy individuals who cannot obtain coverage elsewhere are disproportionately represented in the risk pool, leading eventually and inevitably to astronomical premium increases, until the plan becomes unaffordable.

25.     Prudential had access to the relevant actuarial data related to the CHIP policy and the risk pool, and policyholders relied on Prudential's actuarial expertise in managing the pool. Prudential did not disclose to policyholders that it closed the block and that it knew, based on expert actuarial knowledge, that the block closure inevitably would result in massive premium increases.

26.     Since Prudential did not disclose to policyholders that the closed block was the cause of the premium increases, that future massive premium increases were inevitable, and that serious potential problems could be created by the potential uninsurability of pre-existing conditions, policyholders continued to renew their policies. Expert information and actuarial knowledge concerning the existence and ramifications of the block closure was in the sole possession of Prudential and, since it was not disclosed, policyholders continued to renew their CHIP policies rather than look for alternative health insurance coverage.

27.     As the death spiral intensified, more policyholders were forced to discontinue their CHIP policies because of high premiums. Contrary to Prudential's uniform written representations that it had a "limited right to discontinue the policy," requiring Prudential to "refus[e] to continue all policies with the same provisions," CHIP was effectively discontinued due to the death spiral. With Prudential seeking premium increases above an astronomical $5,000 per month, it became financially impossible for policyholders to continue premium payments. This ultimate collapse of the risk pool and discontinuance of the policy is the result of a death spiral and well known to Prudential.

28.     As a result of the block closure, and Prudential's misrepresentations and failure to disclose, policyholders paid higher premiums when renewing their CHIP policies than they would have paid if they had been told about the block closure and its implications and had secured alternative coverage.

29.     Policyholders who were forced to discontinue their CHIP coverage due to its cost faced financial and medical difficulties finding comparable coverage; many CHIP policyholders developed medical conditions over the lifetime of the policy; such individuals found it difficult, if not impossible, to find coverage for their pre-existing conditions on the open market; to the extent they were able to find coverage at all, they were forced to pay premium rates in excess of the rate they would have paid if they purchased prior to the development of their medical conditions; former CHIP policyholders who were unable to find equivalent coverage for their conditions, or those who "went bare" as a result of being forced to drop their CHIP policy, incurred huge medical costs as a result.

30.     Prudential failed to disclose to the Class the "closed" status of the block and its negative ramifications for policyholders.  At the time the block was closed, Prudential knew a death spiral would inevitably ensue.  Prudential nevertheless classified CHIP as a "discontinued" or "run-off" operation without disclosing this material information to the Class.  As a direct and proximate result of Prudential's unlawful and unconscionable course of conduct, the Class suffered ascertainable loss since class members were forced to pay higher premiums than could have been otherwise obtained and paid medical costs for conditions that would have been covered by other insurance if the ramifications of the block closure had been disclosed.

## PLAINTIFFS' PURCHASE AND RENEWAL OF CHIP POLICIES

### Plaintiff Beverly Clark

31.     On or about September 13, 1978, plaintiff Beverly Clark applied to purchase a CHIP policy from Prudential Insurance Company of America.  Ms. Clark's premium was $149.66 per month on June 30, 1982.

32.     In 2002, Prudential increased Ms. Clark's monthly premium from $1,823.39 to $2,141.02 (or $25,692.24 per year), a 17.42% increase.  In 2003, Prudential again hiked her

premiums, from $2,141.02 to $2,967.99 per month (or $35,615.88 per year), a 38.63% increase. In 2004, premiums were yet again raised from $2,967.99 to $4,217.65 per month (or $50,611.80 per year), a 42.1% increase. This represented a 131% increase in premiums over a three-year period.

33.     Ms. Clark paid these exorbitant premiums in 2005, until Prudential notified her that her rate was scheduled to increase to $5,699 per month (or $68,388 per year) in September, 2005. At this point, Ms. Clark stopped making payments. Ms. Clark's CHIP policy was terminated on September 12, 2005.

**Plaintiff Jesse J. Paul**

34.     On or about July 2, 1980, Plaintiff Jesse J. Paul purchased a CHIP policy from Prudential Insurance Company of America. Mr. Paul's initial monthly premium was $25.50.

35.     In 2003, Prudential drastically increased Mr. Paul's monthly premium. In 2002, his monthly premium was $715.99 (or $8,591.88 per year). In 2003, Prudential raised his monthly premium from $715.99 to $1,036.66 (or $12,439.92 per year), a 45% increase. In 2004, Prudential again raised Mr. Paul's monthly premium from $1,036.66 to $1,501.28 (or $18,015.36 per year), a 45% increase. In 2005, Prudential increased his premium from $1,501.28 to $2,156.29 (or $25,875.48 per year), a 44% increase. In 2006, Prudential again raised the monthly premium from $2,156.29 to $3,057.45 (or $36,689.40 per year), a 42% increase.

36.     Finally, in 2007, Prudential informed Mr. Paul that his premium would increase from $3,057.45 to $4,284.11 (or $51,409.32 per year), a 40% increase. Shortly after this increase, Mr. Paul stopped making payments and the policy was terminated. Prudential increased Mr. Paul's premiums by 498% over a five-year period.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3). The class which Plaintiffs seek to represent (the "Plaintiff Class" or the "Class") is composed of and defined as follows:

a.          The Plaintiff Class includes all persons who renewed a CHIP policy after

the time that Defendants stopped selling the policy to new policyholders ("closed the block") in 1981.

b.        Specifically excluded from the Plaintiff Class are past or present officers, directors or employees of the Defendant; any agents or others who sold CHIP policies for the Defendant; any entity in which the Defendant has a controlling interest; the affiliates, legal representatives, attorneys or assigns of the Defendant; any judge, justice or judicial officer presiding over this matter and the staff and immediate family of any such judge, justice or judicial officer.

38.    As more fully set forth below, this action is appropriately brought as a class action pursuant to Rule 23(b)(2) and 23(b)(3) because: the class is so numerous that joinder of all members is impracticable; there are questions of law and fact common to the class; the claims of the representative Plaintiffs are typical of the claims of the class; and the representative Plaintiffs will fairly and adequately protect the interests of the class.

**Numerosity**

39.    The Plaintiff Class is so numerous that the individual joinder of all members is impracticable under the circumstances of this case.  Plaintiffs are informed and believe that the Class has approximately 270,000 members, whose identities can be determined from the records of Prudential.

**Common Questions Predominate**

40.    Common questions of law and fact exist as to all members of the Class and predominate over any possible questions which might affect only individual Class Members. These common questions of law and fact include, among others:

a.        Whether Prudential failed to disclose to the Class the implications of the block closure for policyholders.

b.        Whether Prudential's failure to disclose the implications of the block closure was material to the decision to renew the policy.

c.        Whether Prudential's practices and its failure to disclose that a death spiral would result in exorbitant premiums and an inability to secure alternative coverage for those with

pre-existing conditions, as alleged herein, violate the New Jersey Consumer Fraud Act.

d.        Whether Prudential's practices as alleged herein violate its fiduciary

obligation to its insureds.

e.        Whether Prudential's practices as alleged herein violate its duty of good

faith and fair dealing to its insureds.

**Typicality**

41.    Plaintiffs' claims are typical of those of the members of the Plaintiff Class.

Plaintiffs' claims are based on the same legal theories as the claims of the other class members and

are based on the same act, use or employment by Prudential of an unconscionable commercial

practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing

concealment, suppression, or omission of any material fact with the intent that others rely thereon.

Plaintiffs and members of the Plaintiff Class sustained harm arising out of Prudential's common

course of conduct as complained of herein.

**Adequacy**

42.    Plaintiffs will fairly and adequately protect the interests of the members of the

Plaintiff Class.  Plaintiffs and the other members of the Plaintiff Class were injured by the same

unlawful, deceptive, and unconscionable consumer trade practices addressed herein and Plaintiffs

have no interests which are adverse to the interests of absent class members.  Plaintiffs have

retained counsel who have substantial experience and success in the prosecution of complex class

actions, consumer protection litigation and litigation challenging the practices of insurance

companies.

**Additional Class Allegations**

43.    This action is appropriate as a class action under Rule 23(b)(2) and 23(b)(3).

Questions of law and fact common to the members of the Plaintiff Class predominate and a class

action is superior to any other possible method for the fair and efficient adjudication of the

controversy.

a.        Common questions of law and fact predominate, and individual joinder of

all members of the Plaintiff Class is impracticable.  Thus, class action treatment will permit a large

number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

b.          Members of the Plaintiff Class have little interest in individually controlling the prosecution of separate actions.  In light of the substantial cost of challenging Prudential's unlawful, unfair and deceptive consumer practices and the comparatively modest, although significant, damages suffered by individual members of the Plaintiff Class, it would not be feasible or desirable for individual members of the Plaintiff Class to prosecute separate actions against the Defendant.

c.          It is desirable to concentrate the litigation of the claims of the Plaintiff Class in this forum.  Prudential is a New Jersey corporation with its principal place of business in Newark, New Jersey.  A large number of the events constituting the claims in this case occurred in New Jersey.  In addition, claims of the Plaintiff Class are asserted under the New Jersey Consumer Fraud Act.

d.          There are no difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.  Rather, the expense and burden of litigation would make it difficult or impossible for individual class members to maintain individual actions.  Moreover, even if such individual litigation were practicable, the cost to the court system of adjudication of individualized litigation would be substantial.  This action will result in an orderly and expeditious administration of class claims.  Economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

## FIRST CAUSE OF ACTION

## (FOR VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT)

44.     Plaintiffs reallege paragraphs 1-43, above, and incorporate them as if fully set forth herein.

45.     The New Jersey Consumer Fraud Act prohibits unconscionable practices, misrepresentation, and omissions including:

"the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been mislead, deceived or damaged thereby, is declared to be an unlawful practice"

N.J. Stat. Ann. 56:8-2.

46.     The CHIP policy sold by Prudential constitutes "merchandise" under the New Jersey Consumer Fraud Act.

47.     Prudential used and continues to use unconscionable commercial practices, misrepresentations, and omissions of material facts with intent that others rely upon such, in connection with the sale and renewal of the CHIP policy.

48.     Prudential's unconscionable commercial practices are described in paragraphs 1-36, above, and include the following, without limitation:

a.     Prudential did not inform, disclose to, or advise policyholders that it closed the CHIP block and that doing so would cause a death spiral. Though Prudential knew that closing the CHIP block would cause a death spiral, it concealed the fact that the block was closed from policyholders.

b.     Prudential did not inform, disclose to, or advise policyholders of the ramifications of Prudential's decision to close the block. Prudential did not disclose that the inevitable result of the block closure was exorbitant premiums. Nor did Prudential disclose that exorbitant premium increases were likely to occur after many policyholders developed medical conditions that would not be insurable under other health insurance or, if insurable, would only be covered at very high premium rates.

49.     Prudential's omissions are described in paragraphs 1-36, above, and include the following, without limitation:

a.     Prudential did not inform, disclose to, or advise policyholders that it closed the CHIP block. In failing to disclose such information, Prudential intended that policyholders would rely on such nondisclosures in deciding whether to renew CHIP.

b.     Prudential did not inform, disclose to, or advise policyholders of the ramifications of Prudential's decision to close the block. Prudential knew that closing the block would inevitably result in massive premium increases, but Prudential did not disclose this information to policyholders. Prudential also knew that many policyholders would develop medical conditions after the block closure that would not be covered by other health insurance, or would only be covered at very high premium rates, when policyholders were later forced to terminate CHIP due to the astronomical premiums they were charged. In failing to disclose the implications of CHIP's closed block status for the premiums of policyholders, Prudential intended that policyholders would rely upon the omission in deciding whether to renew CHIP.

c.     Prudential did not inform, disclose to, or advise policyholders as to the fact that the CHIP policy block was in a death spiral that guaranteed future, massive premium increases. In failing to disclose such information, Prudential intended that policyholders would rely on such nondisclosures in deciding whether to renew CHIP.

50.    Prudential's misrepresentations are described in paragraphs 1-36, above, and include the following, without limitation: Prudential made uniform written representations that CHIP could only be discontinued under certain limited circumstances. As Prudential knew that closing the block would force policyholders to discontinue CHIP, such promises were false and misleading.

51.    The New Jersey Consumer Fraud Act provides that "any person violating the provisions of the [New Jersey Consumer Fraud Act] shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful." The New Jersey Consumer Fraud Act confers a right for such a refund to be recovered in a private action.

52.    As a result of Prudential's use of the above-referenced unconscionable commercial practices, misrepresentations, and omissions, Plaintiffs and members of the Plaintiff Class have suffered ascertainable loss of an amount to be proved at trial.

53.    The New Jersey Consumer Fraud Act confers a right on any person injured by a violation of the Consumer Fraud Act to bring a civil action. In such an action under the New Jersey Consumer Fraud Act "the court shall, in addition to any other appropriate legal or equitable

relief, award threefold the damages sustained by any person in interest…the court shall also award reasonable attorneys fees, filing fees and reasonable costs of suit." Plaintiffs and members of the Plaintiff Class are therefore entitled to bring a civil action and seek appropriate relief against Prudential.

## SECOND CAUSE OF ACTION
## (FOR BREACH OF FIDUCIARY DUTY)

54.    Plaintiffs reallege paragraphs 1-43, above, and incorporate them as if fully set forth herein.

55.    The CHIP insurance contract between Prudential and Clark, Paul, and the Class imposed a fiduciary obligation on Prudential to act in the utmost good faith and protect the interests of Clark, Paul, and the Class.

56.    CHIP policyholders relied on Prudential to inform them about material facts such as the closed block and its ramifications. Prudential had sole knowledge and control of the facts concerning the closed block, due to its superior knowledge and actuarial expertise, and policyholders relied on Prudential's integrity, fairness, and honesty in disclosing such expert matters.

57.    Prudential breached its fiduciary duty to Clark, Paul, and the Class by acting in bad faith and contrary to the reasonable expectations of Clark, Paul, and the Class.

58.    Prudential's failure to fulfill its fiduciary duty and protect the interests of Clark, Paul, and the Class are described in paragraphs 1-36, above, and include the following, without limitation:

a.    Prudential did not disclose that it had closed the block and that this would result in massive premium increases and the effective discontinuance of the CHIP plan. Rather than acting to protect the interests of the Class, who could have made informed decisions regarding renewal of coverage if the facts were disclosed, Prudential did not disclose these matters.

b.    Prudential knew that comprehending the ramifications of the block closure required expert actuarial knowledge and facts in its possession but not that of its policyholders. Prudential's failure to disclose that the block closure would eventually and inevitably result in

exorbitant premiums was contrary to its duty to protect the interests of policyholders. Similarly, Prudential's failure to disclose that policyholders might be forced to drop CHIP due to exorbitant premiums after they developed medical conditions, and that such conditions might be uninsurable by other health insurance or only insurable at higher rates, was contrary to its fiduciary obligation to policyholders.

      c.      Prudential made uniform written representations that it had only a limited right to discontinue the policy. This misled policyholders, who never expected that Prudential could also discontinue the policy by causing a death spiral. Prudential frustrated the reasonable expectations of policyholders, who believed that they had the right to continue the policy at their election.

59.      As a result of Prudential's misrepresentations, nondisclosures and acts of bad faith concerning its creation of an undisclosed death spiral as set forth herein, Prudential violated its fiduciary duty toward the Class and has wrongfully received substantial benefits consisting of premium increases paid by the Class that class members otherwise would not have paid. Clark, Paul, and the Class are entitled to disgorgement and punitive damages for Prudential's violation of its fiduciary duty.

## THIRD CAUSE OF ACTION
## (FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING)

60.      Plaintiffs reallege paragraphs 1-43, above, and incorporate them as if fully set forth herein.

61.      Contained in the CHIP policy contract between Prudential and Clark, Paul, and the Class was an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing required Prudential to refrain from any action that had the effect of destroying or injuring the right of its policyholders to receive the full benefit of the CHIP policy.

62.      The duty of good faith and fair dealing proscribes Prudential from discontinuing the CHIP policy except in the limited circumstances listed in the policy, and requires it to fully disclose material facts concerning the block closure and its implications for policyholders.

63.     Prudential's failure to act in good faith and protect the interests of the Class are described in paragraphs 1-36 and 58, above, and include the following, without limitation:

a.      Prudential did not inform, disclose to, or advise policyholders that it had closed the block and that doing so would cause a death spiral.  Though Prudential knew the block closure would inevitably cause massive premium increases, and that policyholders might be forced to drop CHIP due to such exorbitant premiums after they developed medical conditions, and that such conditions might be uninsurable or only insurable at higher rates, it did not disclose this material information.

b.      Prudential did not inform, disclose to, or advise policyholders that despite its limited contractual right to discontinue CHIP, and despite policyholders' right to keep CHIP in force at their election, Prudential knew that CHIP would effectively be discontinued as a result of the block closure and subsequent death spiral.

64.     As a direct and proximate result of Prudential's bad faith conduct, class members will, have, and/or continue to suffer economic losses, requiring compensatory, and/or equitable relief to be determined by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Prudential, as follows:

a.      For an Order determining that this action may be maintained as a class action and certifying the Plaintiff Class;

b.      For a refund of all moneys acquired by means of Prudential's unlawful practices;

c.      For compensatory damages for ascertainable loss according to proof at trial;

d.      For exemplary damages for breach of fiduciary duty;

e.      For mandatory trebling of all damages under the New Jersey Consumer Fraud Act;

f.      For a permanent injunction against Prudential enjoining Prudential from engaging in the unconscionable, fraudulent, and deceptive practices alleged herein;

g.      For declaratory relief regarding the unconscionable, fraudulent, and deceptive practices alleged herein;

h.      For reasonable attorneys fees, and all costs and disbursements, including, without

limitation, filing fees and reasonable costs of suit; and

   i. For such other and further relief as this Court deems just and proper.

Dated: December 17, 2008   Respectfully submitted,

        NAGEL RICE LLP

        By: _____
          BRUCE M. NAGEL (BN6765)

        KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
         CHARLES N. FREIBERG
         BRIAN P. BROSNAHAN
         DAVID A. THOMAS

        LEVINE STEINBERG MILLER & HUVER
         HARVEY R. LEVINE
         CRAIG A. MILLER

        Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

BEVERLY CLARK AND JESSE J. PAUL, on behalf of themselves and all others similarly situated, demand a trial by jury of all issues that may be so tried as of right.

Dated: December 17, 2008      Respectfully submitted,

NAGEL RICE LLP

By: _____
    BRUCE H. NAGEL (BN6765)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
    CHARLES N. FREIBERG
    BRIAN P. BROSNAHAN
    DAVID A. THOMAS

LEVINE STEINBERG MILLER & HUVER
    HARVEY R. LEVINE
    CRAIG A. MILLER

Attorneys for Plaintiffs

Document #: 8015828v3

20