# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEVERLY CLARK AND JESSE J. PAUL, on behalf of themselves and all others similarly situated, ) ) ) ) ) | **DOCUMENT ELECTRONICALLY FILED** |
| ) ) | Honorable Dickinson R. Debevoise Civil Action 08-6197 (DRD-MAS) |
| Plaintiffs, ) ) | |
| v. ) ) | |
| ) | Motion Return Date: July 13, 2009 |
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation, ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendant. ) | |

---

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

---

**NAGEL RICE LLP**
103 Eisenhower Parkway
Roseland, NJ 07068-1031
973.618.0400

**KASOWITZ, BENSON, TORRES & FRIEDMAN LLP**
101 California Street, Suite 2050
San Francisco, CA 94111
415.421.6140

**LEVINE, STEINBERG, MILLER & HUVER**
550 West C Street
Suite 1810
San Diego, CA 92101-8596
619.231.9449

*Attorneys for Plaintiffs*
*Beverly Clark and Jesse J. Paul,*
*on behalf of themselves and all others similarly situated*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

STATEMENT OF FACTS ...................................................................7

ARGUMENT ....................................................................................10

I.    New Jersey Consumer Fraud Act Claims................................10

    A.    New Jersey Law Governs................................................ 11

        1.    New Jersey's Most Significant Relationship Test for Torts ...................................................................... 11

        2.    New Jersey Law Applies to Plaintiffs' NJCFA Claims........... 14

            a.    An Actual Conflict Exists............................................. 14

            b.    Restatement § 148 Supports Application of New Jersey Law to Plaintiffs' NJCFA Claims ...................... 17

            c.    New Jersey Has the Most Significant Relationship with Plaintiffs' NJCFA Claims Under the Restatement § 6 Analysis ............................................. 21

                i.    Contacts Identified Through Application of Restatement § 145(2) ..........................................21

                    (a)    The Place Where the Injury Occurred ...... 21

                    (b)    The Place Where the Conduct Causing the Injury Occurred.................... 22

                    (c)    The Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties ............................. 23

                    (d)    The Place Where the Relationship, if Any, Between the Parties Is Centered ...... 23

        ii.    Evaluation of Contacts Under § 6 Considerations ......................................................25

                (a)    Interests of Interstate Comity ................... 25

                (b)    Interests of the Parties .............................. 31

                (c)    Interests Underlying the Field of Tort Law, and States' Competing Interests ...... 31

                      (i)    Deterrence ....................................... 33

                      (ii)   Compensation ................................. 33

                      (iii)  Other Considerations ...................... 36

                (d)    Interests of Judicial Administration .......... 38

        d.    The Authorities Prudential Cites in Opposing Application of New Jersey Law Are Distinguishable or Otherwise Unpersuasive ................ 39

    B.    Plaintiffs Have Stated Claims Under the NJCFA ............................. 41

II.    Breach of Fiduciary Duty Claim .................................................................45

    A.    New Jersey Law Governs .................................................. 45

    B.    Plaintiffs Have Stated Claims for Breach of Fiduciary Duty Under New Jersey Law .................................................. 49

III.    Breach of the Implied Covenant of Good Faith and Fair Dealing Claim .....51

    A.    New Jersey Law Governs .................................................. 51

        1.    Contacts Identified Through Application of Restatement § 188(2) ................................................................... 54

        2.    Evaluation of Contacts Under § 6 Considerations ................... 55

B.   Plaintiffs Have Stated Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Under New Jersey Law ................................................................................................. 58

CONCLUSION ....................................................................................60

# **TABLE OF AUTHORITIES**

<u>Cases</u>

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988
   (2d Cir. 1983) ................................................... 48

*Agostino v. Quest Diagnostics, Inc.*, 2009 U.S. Dist. LEXIS 10451
   (D.N.J. Feb. 11, 2009) ........................................ 30, 35, 39, 40, 47, 48

*Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157 (Ind. 2002)................. 52, 60

*Allen v. Metro. Life Ins. Co.*, 44 N.J. 294 (1965) ................................... 50

*Alvarez v. Ins. Co. of N. Am.*, 2008 U.S. App. LEXIS 5182
   (3d Cir. Mar. 11, 2008)................................................. 43, 44

*Am. Family Mut. Ins. Co. v. Dye*, 634 N.E.2d 844 (Ind. Ct. App. 1994) .............. 47

*April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805 (1983) ..................................... 51

*Atlass v. Mercedes-Benz USA, LLC*, 2007 U.S. Dist. LEXIS 72603
   (D.N.J. Sept. 25, 2007) ....................................................... 28

*Beegal v. Park West Gallery*, 394 N.J. Super. 98 (App.Div. 2007) ...................... 41

*Bloch v. Prudential Ins. Co. of Am.*, 2005 WL 6141292
   (C.D. Cal. Aug. 9, 2005) ...................................................... 60

*Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543
   (D.N.J. 1998) .................................................. 5, 11, 25, 27

*Brandt v. State Farm Mut. Auto. Ins. Co.*, 693 F. Supp. 877
   (E.D. Cal. 1988)............................................................... 38

*Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912 (2009)............. 14

*Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)........................................................ 38

*Cooper v. Samsung Elecs. Am., Inc.*, 2008 U.S. Dist. LEXIS 75810
    (D.N.J. Sept. 29, 2008) .................................................................. 40, 41

*Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994) .................................... 41

*CSX Transp., Inc. v. Appalachian Railcar Servs., Inc.*, 509 F.3d 384
    (7th Cir. 2007) ............................................................................... 15

*Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872 (N.D. Iowa 1999) ............. 23

*Dal Ponte v. Am. Mortgage Express Corp.*, 2006 U.S. Dist.
    LEXIS 57675 (D.N.J. Aug. 17, 2006) ................................... 5, 26, 28, 33

*Diamond v. Oreamuno*, 248 N.E.2d 910 (N.Y. 1969) ........................... 49

*Dickerson v. Cent. United Life Ins. Co.*, 932 F. Supp. 1471 (D. Ga. 1996) ............. 3

*Doiron v. Doiron*, 241 A.2d 372 (N.H. 1968) ...................................... 23

*Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001) .......................... 27

*Drewen v. Bank of Manhattan Co. of City of N.Y.*, 31 N.J. 110 (1959) ........... 53, 57

*Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233 (D.N.J. 2008) ....... 5, 25, 27, 28

*Erny v. Estate of Merola*, 171 N.J. 86 (2002) ........................................ 13

*F.G. v. MacDonell*, 150 N.J. 550 (1997) ........................................ 46, 47

*Fed. Ins. Co. ex rel. Associated Aviation Underwriters v.*
    *Purex Indus., Inc.*, 972 F. Supp. 872 (D.N.J. 1997) ............................ 31

*Filip v. Block*, 879 N.E.2d 1076 (Ind. 2008) ...................................... 47

*Fink v. Ricoh Corp.*, 365 N.J. Super. 520 (Law Div. 2003) ........... 29, 30, 36, 40, 41

*Fu v. Fu*, 160 N.J. 108 (1999) ........................................................ passim

*Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1 (2004) ................................. 26

*Gantes v. Kason Corp.*, 145 N.J. 478 (1996) ........................................................... 34

*Gennari v. Weichert Co. Realtors*, 288 N.J. Super. 504
  (App.Div. 1996) ..................................................................................................... 45

*Grisham v. Philip Morris USA*, 40 Cal. 4th 623 (2007) ......................................... 14

*Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101
  (S.D. Iowa 1998) ................................................................................................... 23

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) .................................. 37

*Havens v. Ritchey*, 582 N.E.2d 792 (Ind. 1991) ...................................................... 30

*Heaton & Eadie Prof'l Servs. Corp. v.*
  *Corneal Consultants of Ind., P.C.*, 841 N.E.2d 1181
  (Ind. Ct. App. 2006) ....................................................................................... 47, 51

*Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004) .................... 28, 29, 36, 41

*Huffmaster v. Robinson*, 221 N.J. Super. 315 (Law Div. 1986) ...............................5

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.*, 2008
  U.S. Dist. LEXIS 73690 (D.N.J. Sept. 3, 2008) ........................................... 35, 36

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
  174 F.R.D. 332 (D.N.J. 1997) ....................................................................... 35, 36

*In re Mercedes-Benz Tele Aid Contract Litig.*, __ F. Supp. 2d __, 2009
  U.S. Dist. LEXIS 35595 (D.N.J. Apr. 27, 2009) .......................................... passim

*In re Northwestern Mut. Life Ins., Co. Sales Practices Litig.*,
  70 F. Supp. 2d 466 (D.N.J. 1999) ........................................................................ 49

*In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61 (S.D.N.Y. 2002) ......................... 36

*In re Tri-State Armored Servs. Inc.*, 332 B.R. 690 (Bankr. D.N.J. 2005) .............. 49

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v.*
  *Merck & Co., Inc.*, 192 N.J. 372 (2007) .................................................... 5, 17, 19

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v.*
    *Merck & Co., Inc.*, 384 N.J. Super. 275 (App.Div. 2006) .......................... passim

*Intarome Fragrance & Flavor Corp. v. Zarkades*, 2009 U.S. Dist.
    LEXIS 25793 (D.N.J. Mar. 30, 2009) ......................................................... passim

*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003)................. 32

*Kugler v. Romain,* 58 N.J. 522 (1971) .................................................................... 17

*Lettenmaier v. Lube Connection, Inc.*, 162 N.J. 134 (1999) .................................. 26

*Levin v. Lewis*, 179 N.J. Super 193 (App.Div. 1981)............................................. 26

*Liebman v. Prudential Fin., Inc.*, 2003 U.S. Dist. LEXIS 21048
    (E.D. Pa. Nov. 14, 2003) ........................................................................... 27

*Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685 (D. Ariz. 2006)................. 23

*McKelvey v. Pierce*, 173 N.J. 26 (2002) ................................................................ 49

*Nafar v. Hollywood Tanning Sys.*, 2007 U.S. Dist. LEXIS 26312
    (D.N.J. Apr. 5, 2007)................................................................................. 42

*Nat'l Sec. Sys., Inc. v. Iola*, 2007 U.S. Dist. LEXIS 71470
    (D.N.J. Sept. 26, 2007) ............................................................................. 51

*New Mea Constr. Corp. v. Harper,* 203 N.J. Super. 486
    (App.Div. 1985).......................................................................... 26, 33, 45

*Nichols v. Minnick*, 885 N.E.2d 1 (Ind. 2008)....................................................... 49

*NN&R, Inc. v. One Beacon Ins. Group*, 362 F. Supp. 2d 514 (D.N.J. 2005)......... 14

*Nolan v. First Colony Life Ins. Co.,* 345 N.J. Super. 142 (App.Div. 2001) ........... 42

*Ochs v. Fed. Ins. Co.*, 90 N.J. 108 (1982)............................................................... 30

*P.V. v. Camp Jaycee*, 197 N.J. 132 (2008) ..................................................... passim

*Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634 (Ind. Ct. App. 2007) .............. 32

*Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141 (2005) ........................ 51

*Reck v. Prudential Ins. Co. of Am.*, 116 N.J.L. 444, 184 A. 777 (N.J. 1936)......... 54

*Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160
    (3d Cir. 1999) ..................................................................................................... 11

*Rose v. United Equitable Ins. Co.*, 632 N.W.2d 429 (N.D. 2001).................... 15, 46

*Russo v. S. Developers, Inc.*, 868 N.E.2d 46 (Ind. Ct. App. 2007)........................ 30

*Seidenberg v. Summit Bank*, 348 N.J. Super. 243 (App.Div. 2002)................ 57, 59

*Smith v. Alza Corp.*, 400 N.J. Super. 529 (App.Div. 2008).................... 5, 16, 31, 34

*Snapp & Associates Ins. Servs., Inc. v. Robertson*, 96 Cal.
    App. 4th 884 (2002)............................................................................................ 14

*Sparks v. St. Paul Ins. Co.*, 100 N.J. 325 (1985) .................................................... 50

*State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28 (1980) .. 52, 53, 54

*Tusa v. Prudential Ins. Co. of Am.*, 825 F.2d 69 (5th Cir. 1987) ............................3

*Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617
    (App.Div. 2002)............................................................................................. 43, 44

*Vai v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 56 Cal. 2d 329 (1961).................... 46

*Wang v. Allstate Ins. Co.*, 125 N.J. 2 (1991) ........................................................ 42

*Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840 (Ind. 1992) ................................ 15

*Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377 (D.N.J. 1998) .................... 36

<u>Statutes</u>

Cal. Bus. & Prof. Code § 17200 ............................................................. 14

Cal. Bus. & Prof. Code § 17203 ............................................................. 16

Cal. Ins. Code § 10176.10 ..................................................................... 38

Ind. Code § 24-5-0.5-4 .......................................................................... 16

N.J.S.A. § 17B:18-3 ............................................................................... 24

N.J.S.A. § 17B:18-19 ................................................................... 10, 20, 24

N.J.S.A. § 56:8-2 .......................................................................... 11, 41, 42

N.J.S.A. § 56:8-2.11 ............................................................................... 16

N.J.S.A. § 56:8-19 .................................................................................. 16

<u>Restatement (Second) of Conflict of Laws (1971)</u>

§ 6 ............................................................... 12, 21, 25, 52, 53, 54

§ 6(2) ..................................................................................................... 54

§ 145 .......................................................................................... 22, 32, 52

§ 145(2) ............................................................................................ passim

§ 145, cmt. c ................................................................................... 22, 32

§ 145, cmt. e ......................................................................................... 22

§ 146 .......................................................................................... 12, 13

§ 148 ............................................................................................... passim

§ 148(1) ................................................................................................. 48

§ 148(2) ............................................................................................. 13, 19

§ 188 ................................................................................................... 52, 54

§ 188(2) .......................................................................................... 52, 53, 54

§ 188, cmt. e ........................................................................................... 54

§ 192 ........................................................................................................ 52

§ 192, cmt. *l* ........................................................................................... 52

## <u>INTRODUCTION</u>

Defendant Prudential Insurance Company of America ("Prudential"), a New Jersey corporation headquartered in New Jersey, "closed the block" on its Comprehensive Health Insurance Policy ("CHIP"), ending sales to new consumers and forcing its over 270,000 existing CHIP policyholders into what the insurance industry terms a "death spiral."  Prudential did not just deliberately fail to tell its policyholders that it had closed the block.  Prudential knew but did not disclose that the block closure would necessarily produce a death spiral with two insidious consequences:  (1) its policyholders' premiums inevitably would increase to astronomical and unaffordable levels; and (2) if its policyholders did not abandon CHIP for another health insurance policy before CHIP became unaffordable, and in the meantime developed a costly medical problem, other health insurers might refuse to sell them insurance on the ground that they had a pre-existing condition.

Prudential's failure to disclose this crucial information deprived over a quarter-million CHIP policyholders, including plaintiffs Beverly Clark and Jesse Paul, of their ability to make a rational choice about how best to maintain their health insurance coverage and safeguard their financial well-being.  CHIP policyholders nationwide lost their healthcare and enormous sums of money because Prudential chose silence instead of truth, and profits instead of ethics.  The New Jersey Consumer Fraud Act was intended to remedy and deter exactly this

1

type of reprehensible business conduct emanating from within the state's borders.

The experiences of plaintiffs Beverly Clark and Jesse Paul illustrate some of the effects of Prudential's conduct.  Each purchased a CHIP policy from Prudential around thirty years ago.  Plaintiffs' CHIP policies promised that plaintiffs could continue them in force for life by monthly payment of premiums, which Prudential could adjust annually on limited terms specified in the policies, and that Prudential could discontinue their policies only under certain restricted circumstances.

Unbeknownst to plaintiffs, after they purchased their policies, Prudential closed the block of CHIP business in 1981.  One federal court has explained the dynamics of a health insurance block closure and the resulting death spiral:

> It is widely known throughout the insurance industry, but not to the general public, that closing a block of business, by ensuring that no new insureds will enter the pool covered by the policy, inevitably leads to a decrease in the size of the pool as healthy insureds switch to cheaper policies.  This in turn leads to increased premiums, as the risks and costs associated with the pool are shared by fewer and fewer people.  As the premiums increase, more healthy insureds flee the policy, leaving only those unhealthy insureds who cannot find insurance elsewhere, and leading to even higher premiums.

> This vicious circle of higher premiums and a shrinking pool to share the increased costs is known in the insurance industry as a "death spiral" and is most common in those sectors of the industry that sell policies covering small groups and individuals.  In a death spiral situation, eventually the premiums increase to the point where they become unaffordable to the vast majority of policyholders, at which point the insured fails to pay the premium and the policy lapses.  Once the pool shrinks to a mere fraction of what it was, the reserves set aside by the insurance company to pay for claims filed by the pool are

no longer needed, and can be retained by the company as unallocated
cash assets.

*Dickerson v. Cent. United Life Ins. Co.*, 932 F. Supp. 1471, 1473 (D. Ga. 1996).

One former Insurance Commissioner of Georgia has described the

consequences of a death spiral, which are frequently ruinous to policyholders who,

lacking knowledge of the block closure and its implications, did not procure

alternative health insurance before they incurred a substantial claims history:

> The death spiral is a practice under which health insurers open a book
> of business (a pool), sell a certain number of policies, then close the
> book of business.  In insurance trade talk, insurers let the book of
> business "run off."  As insureds age, claims experience and premiums
> rise accordingly.  Eventually, premiums reach a level few consumers
> can afford; consequently, consumers terminate their policies and seek
> new coverage elsewhere.  If they are among the lucky ones with few
> claims, new insurance is probably available . . . ; however, chances
> are that policyholders who filed significant numbers of claims or who
> received treatment for certain diseases or disorders are uninsurable.

Tim Ryles, *The Death Spiral: It's Time to Kill It*, RHA Review, Vol. 4, No. 1

(1997).

Although it knew that these consequences would occur, Prudential did not

tell plaintiffs or its other CHIP policyholders about the block closure or its

ramifications.  In 1987, the Fifth Circuit Court of Appeals concluded that the

dramatic premium increases that a Louisiana policyholder had been forced to pay

to maintain his family's CHIP policy were the direct and inevitable consequence of

Prudential's block closure.  *Tusa v. Prudential Ins. Co. of Am.*, 825 F.2d 69, 70-71

(5th Cir. 1987).  Yet even after the Court of Appeals confirmed what Prudential

knew and had expected, Prudential still did not disclose the eventual disaster that it

knew would befall its policyholders because of its decision to close the block.

The effects of the CHIP death spiral crashed down on plaintiffs Jesse Paul

and Beverly Clark.  Mr. Paul's annual premium reached $36,689 in 2006, having

jumped drastically in the prior few years.  In 2007, when his premium reached

$51,409 per year, Mr. Paul ceased making payments, thereby terminating his

policy.  Ms. Clark's annual premium reached $50,618 in 2005.  She allowed her

policy to lapse when she received the bill for the following year — $68,388.

Prudential's failure to disclose the block closure and its consequences to its

CHIP policyholders was deceptive and unconscionable, and it constituted breaches

of its obligations under and arising out of the CHIP contracts it sold.  Plaintiffs

bring this nationwide class action against Prudential under New Jersey law to

obtain relief on behalf of themselves and others similarly situated for harm

suffered as a result of Prudential's conduct.  Plaintiffs assert claims for Prudential's

omissions, misrepresentations, and unconscionable commercial practices under the

New Jersey Consumer Fraud Act (NJCFA), a claim for breach of fiduciary duty,

and a claim for breach of the implied covenant of good faith and fair dealing.

Defendant's Motion to Dismiss the Complaint (the "Motion to Dismiss" or

the "Motion") asserts that California and Indiana law, not New Jersey law, applies

to Ms. Clark's and Mr. Paul's claims, respectively, and that plaintiffs' claims must be dismissed under such law.  Yet Prudential's Motion does not even attempt to undertake the thorough choice-of-law analysis mandated by the New Jersey Supreme Court under the state's "most significant relationship" test.  Prudential further omits to mention, let alone distinguish, any of the at least a half-dozen authorities issued before it filed its Motion that apply New Jersey law to NJCFA claims asserted by out-of-state plaintiffs.[1]  Instead, Prudential relies on distinguishable, inapplicable, or unpersuasive authorities with little explanation.

Plaintiffs provide below the comprehensive choice-of-law analysis that New Jersey law demands and Prudential eschewed.  That analysis strongly points to application of New Jersey law on all of plaintiffs' claims.  As will be discussed, New Jersey has the most significant relationship to this case given that, among other things, Prudential is a New Jersey-domiciled corporation, Prudential's headquarters are located in New Jersey, and Prudential's misconduct principally took place in and emanated from New Jersey.

Any doubt that might remain as to whether New Jersey law applies is

---

[1] *E.g.*, *Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233, 247-48 (D.N.J. 2008); *Dal Ponte v. Am. Mortgage Express Corp.*, 2006 U.S. Dist. LEXIS 57675, at *21-*22 (D.N.J. Aug. 17, 2006); *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 548 (D.N.J. 1998); *Smith v. Alza Corp.*, 400 N.J. Super. 529, 552 (App.Div. 2008); *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 384 N.J. Super. 275, 305 (App.Div. 2006), *rev'd on other grounds*, 192 N.J. 372 (2007); *Huffmaster v. Robinson*, 221 N.J. Super. 315, 320 (Law Div. 1986).

dispelled by this Court's recent decision in *In re Mercedes-Benz Tele Aid Contract Litigation*, __ F. Supp. 2d __, 2009 U.S. Dist. LEXIS 35595 (D.N.J. Apr. 27, 2009) (Debevoise, J.).  In *Mercedes-Benz*, the Court ruled that New Jersey law applied to NJCFA and other claims asserted by a nationwide class of consumers based on the misrepresentations and omissions of a corporation headquartered (but not domiciled) in New Jersey whose misconduct was planned and coordinated in New Jersey.  As shown below, much of the same choice-of-law analysis applies here.

Under New Jersey law, all of plaintiffs' claims are sufficient to state a claim upon which relief can be granted.  Prudential's failure to tell plaintiffs about the block closure and its consequences constituted unconscionable commercial practices and actionable omissions with intent that plaintiffs rely thereon under the NJCFA.  Prudential also made misrepresentations that are actionable under the NJCFA because, among other things, they falsely and misleadingly suggested that Prudential would not increase premiums for discretionary reasons (e.g., a block closure), and they failed to disclose that, due to the block closure, the policies were guaranteed eventually to become unaffordable.  Plaintiffs also state claims for breach of fiduciary duty because Prudential was in a dominant position in their relationship and plaintiffs placed trust and confidence in Prudential, and Prudential had a duty to advise plaintiffs regarding critical facts about Prudential's discretionary management of that relationship.  Finally, plaintiffs state claims for

breach of the implied covenant of good faith and fair dealing because Prudential abused its discretion in managing the insurance pool by failing to tell plaintiffs about the block closure and its consequences.

The Court should deny Prudential's Motion.

## STATEMENT OF FACTS[2]

In 1978 and 1980, respectively, plaintiffs Beverly Clark and Jesse Paul each purchased a CHIP policy from Prudential.  Compl. ¶¶ 12-13.  CHIP is an individual health insurance policy that provides comprehensive medical coverage. *Id.* ¶ 2.  CHIP was guaranteed "continuable" subject to Prudential's right, as of each Policy Anniversary, to discontinue the policy "only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the state where [the policyholder] reside[s]."  *Id.* ¶ 19.  Premiums may be raised only as a result of increases in age or where "a new table of rates becomes applicable" to a particular CHIP policy, but Prudential may change a table of rates only on a "class basis."  Middleton Cert. Ex. A at A-1, Ex. B at B-1.  Prudential separately made representations suggesting that future premium increases would be due only to increases in the policyholder's age and general levels of medical costs.

---

[2] Some of the facts set forth below are not alleged in plaintiffs' Complaint. Plaintiffs are informed and believe that these facts are true and correct.  If the Court determines that plaintiffs must allege these additional facts in a complaint in order for the Court to conclude that plaintiffs have stated viable claims under New Jersey law, plaintiffs respectfully seek leave to file an amended complaint to allege these facts.

In 1981, Prudential "closed the block," or stopped selling CHIP to new members. *Id.* ¶ 1. Despite closing the block, Prudential decided to keep its more than 270,000 outstanding CHIP policies in force. But Prudential knew that the block closure would have severe repercussions for the owners of these policies. It was certain to produce a "death spiral" resulting from accelerated deterioration of the risk pool that would eventually generate astronomical premium increases. *Id.* ¶¶ 1-7, 21-30. These massive increases would ultimately make premiums unaffordable, forcing policyholders to give up their CHIP policies at a time when many of them would be unable to procure new insurance due to pre-existing conditions or other claims history. *Id.* ¶¶ 4-6, 9, 26-27, 29. Despite this awareness, Prudential management in New Jersey decided that Prudential would not apprise CHIP policyholders of the block closure or its ramifications. *Id.* ¶ 5. With the CHIP block closed, the risk pool steadily shrank as healthy policyholders switched to alternative coverage and no new policyholders were accepted. *Id.* ¶¶ 21-23. Premiums began to rise as the death spiral unfolded. *Id.* ¶¶ 1-9, 21-30.

While Prudential had access to relevant actuarial data regarding the CHIP policy and knew that future dramatic premium increases were inevitable, CHIP policyholders were not similarly informed. *Id.* ¶¶ 25-26. They did not know that Prudential's block closure guaranteed that they eventually would no longer be able to afford their CHIP policies. *Id.* ¶¶ 1, 3-5, 7, 23, 25, 27, 29-30. They also

remained unaware that if they stayed with CHIP until it became too costly for them and developed medical problems in the interim, they might be unable to obtain alternative coverage for those medical conditions, forcing them to "go bare" and incur huge medical costs. *Id.* ¶¶ 1, 6-9, 26, 29-30. As a result, policyholders continued their CHIP policies in force by paying premiums. *Id.* ¶ 26.

Plaintiffs were among the thousands of such policyholders. Ms. Clark's premium in 2001 was $1,823.39 per month (or $21,880.68 per year). *Id.* ¶¶ 31-32. By 2004, her premiums had shot up to $4,217.65 per month (or $50,611.80 per year). *Id.* ¶ 32. While Ms. Clark was paying premiums after the block closure, she resided in California and Arizona. When Prudential notified her in 2005 that her rate was scheduled to increase to $5,699 per month (or $68,388 per year) that fall, Ms. Clark stopped making payments. *Id.* ¶ 33. Her CHIP policy was terminated on September 12, 2005. *Id.*

Mr. Paul had a similar experience. The premium for his CHIP policy in 2002 was $715.99 per month (or $8,591.88 per year), nearly thirty times what he paid when he purchased the policy in 1980. *Id.* ¶¶ 34-35. Over the next five years, Mr. Paul's premiums skyrocketed, reaching $4,284.11 (or $51,409.32 per year) in 2007. *Id.* ¶¶ 35-36. Shortly after the last increase, in 2007, Mr. Paul stopped making payments, and his policy was terminated. *Id.* ¶ 36.

Ms. Clark did not learn about the block closure and that it was guaranteed to

produce the consequences described above until less than four years before the

commencement of this action.  Mr. Paul did not learn this information until less

than six years, but more than two years, before this action was filed.  Prior to

learning about the consequences of a block closure, neither of them had any reason

to know that their premium increases were attributable to a block closure.

At all relevant times, Prudential was incorporated in New Jersey and had its

principal place of business in Newark, New Jersey.  *Id.* ¶ 14.  Prudential was a

New Jersey mutual life insurance company, with six public directors appointed by

the Chief Justice of the New Jersey Supreme Court, until its demutualization in

2001.  *Id.* ¶ 15; Middleton Cert. Ex. A at A-16; N.J.S.A. § 17B:18-19.  At the time

of the block closure, and continuing to the present, key decisions regarding

Prudential's health care insurance business were controlled by executives in its

New Jersey offices.  The significant decisions regarding the closure of the CHIP

block and the failure to disclose to policyholders the closure and its ramifications

were made by senior Prudential executives in New Jersey.

<u>**ARGUMENT**</u>

## I.   **New Jersey Consumer Fraud Act Claims**

Plaintiffs' First Cause of Action, brought under the NJCFA, is based on

Prudential's omissions, misrepresentations, and unconscionable commercial

practices in failing to disclose to CHIP policyholders the block closure and its

consequences.  *See, e.g.*, Compl. ¶¶ 48-50; N.J.S.A. § 56:8-2.

## A.    New Jersey Law Governs

New Jersey applies a "most significant relationship" test for determining

choice of law for torts.  *P.V. v. Camp Jaycee*, 197 N.J. 132, 142-43 (2008).  The

test's analytical framework is based heavily on the Restatement (Second) of

Conflict of Laws (1971) (the "Restatement").  A thorough application of this test

establishes that New Jersey law applies to plaintiffs' NJCFA claims.

### 1.    New Jersey's Most Significant Relationship Test for Torts

The choice-of-law analysis under New Jersey's most significant relationship

test is a three-step process.  The first step is to determine whether an "actual

conflict" exists.  *Id.*  An "actual conflict" is a distinction between two states' laws

that is outcome-determinative.  *See id.* at 143-44 (actual conflict existed where

dismissal of case turned on which state's law applied); *Robeson Indus. Corp. v.*

*Hartford Accident & Indem. Co.*, 178 F.3d 160, 169 (3d Cir. 1999) (no choice-of-

law analysis needed where both states' laws mandated dismissal).  If no actual

conflict exists, the forum state's law applies.  *Boyes v. Greenwich Boat Works, Inc.*,

27 F. Supp. 2d 543, 547 (D.N.J. 1998).

If an actual conflict does exist, the second step is to weigh the factors or

rules detailed in the section of the Restatement that specifically corresponds to the

relevant tort cause of action or issue, if any such section exists.  *See Camp Jaycee*,

11

197 N.J. at 144-45.  For example, § 146 of the Restatement applies to personal injury claims, *id.*, and § 148 applies to, *inter alia*, common-law fraud and negligent misrepresentation claims, *Intarome Fragrance & Flavor Corp. v. Zarkades*, 2009 U.S. Dist. LEXIS 25793, at *17-*18 (D.N.J. Mar. 30, 2009) (Debevoise, J.).

The third and final step is to turn to the remaining contacts set forth in Restatement § 145(2) and the cornerstone principles of Restatement § 6 to determine whether another state has a more significant relationship than the state indicated in the second step (if any).[3]  *Camp Jaycee*, 197 N.J. at 144-45.  This analysis is qualitative, not quantitative.  *Id.* at 143.  The contacts specified in § 145(2) are:  "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil [*sic*], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  Restatement § 145(2). "These contacts are to be evaluated according to their relative importance with respect to the particular issue."  *Id.*  This evaluation is conducted under the principles of Restatement § 6.  Section 6 specifies seven factors that guide the analysis, which New Jersey courts have distilled to five essential considerations:

---

[3] Prudential characterizes the analysis as comprised of two steps, with the first being the actual conflict determination and the second the substantive choice-of-law analysis.  MTD at 9.  This characterization is accurate.  *See, e.g.*, *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *14-*15.  Plaintiffs, however, believe it is more useful to describe the analysis as having three steps given that the second step produces a default choice of law, while the third step is dispositive of the analysis.

"(1) the interests of interstate comity; (2) the interests of the parties; (3) the

interests underlying the field of tort law; (4) the interests of judicial administration;

and (5) the competing interests of the states." *Camp Jaycee*, 197 N.J. at 147.

Courts are to evaluate the significance of the contacts identified under § 145(2) by

reference to these five considerations. *See id.* at 147-56. The fifth consideration,

the competing interests of the states, is the most important. *Erny v. Estate of

Merola*, 171 N.J. 86, 101 (2002); *Fu v. Fu*, 160 N.J. 108, 125 (1999).[4]

The second step does not dictate the outcome of the third step. *See Camp

Jaycee*, 197 N.J. at 155; *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *75-

*80. Although courts sometimes characterize the law of the state indicated by the

second step as the one that "presumptively" applies, the "presumption" is in the na-

ture of a default:  it applies only if the third step does not point to a different state

as having a more significant relationship. *See Camp Jaycee*, 197 N.J. at 155. The

result from the third step trumps any result from the second step. *See id.* at 155-56.

---

[4] Where Restatement § 148(2) applies in the second step, this Court has
previously applied the § 6 principles in the third step to both the § 148(2) and
§ 145(2) contacts jointly, *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *24-*27, or
has applied them to the § 148(2) contacts alone while bypassing § 145(2).
*Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *75. Plaintiffs' best reading of
*Camp Jaycee* (which addressed § 146, not § 148) is that the third step entails
application of the § 6 principles to the § 145(2) contacts alone. *See* 197 N.J. at
145-47. However, all of these approaches should produce the same result, as the
states identified under § 148(2) will typically be the same as those under § 145(2).

## 2.   New Jersey Law Applies to Plaintiffs' NJCFA Claims

### a.   An Actual Conflict Exists

Prudential has identified only certain supposed differences between the limitations periods applicable to claims under the NJCFA and to its California and Indiana analogs as actual conflicts warranting a full choice-of-law analysis.  Mem. in Support of Def.'s Mot. to Dismiss Compl. ("MTD") at 9-10.  Plaintiffs agree that differences in limitations periods can qualify as actual conflicts.

Plaintiffs disagree, however, that there is necessarily an actual conflict between the limitations period that would be applicable under California law and the period applicable to Ms. Clark's NJCFA claims.  Such differences may not be outcome-determinative because the "discovery rule," which prevents the running of the limitations period until she learned that Prudential had closed the block and that it would have material negative consequences, applies under New Jersey law and may apply under California law, thus rendering her claims timely.[5]

---

[5] Under New Jersey law, the discovery rule applies to plaintiffs' NJCFA claims.  *See, e.g.*, *NN&R, Inc. v. One Beacon Ins. Group*, 362 F. Supp. 2d 514, 521 (D.N.J. 2005).  Prudential misstates California law when it contends that the discovery rule does not apply to claims under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (the "UCL").  MTD at 14.  The California Supreme Court has not resolved whether the discovery rule applies to UCL claims, *Grisham v. Philip Morris USA*, 40 Cal. 4th 623, 635 n.7 (2007), and the California Court of Appeal recently concluded that the better view was that the discovery rule does apply to UCL claims, *Broberg v. Guardian Life Ins. Co. of Am.*, 171 Cal. App. 4th 912, 920-21 (2009); *but see Snapp & Associates Ins. Servs., Inc. v. Robertson*, 96 Cal. App. 4th 884, 891 (2002) (contrary view).

As for Mr. Paul's NJCFA claims, plaintiffs disagree with Prudential's characterization of the Indiana discovery rule as being based on "discovery of the injury," MTD at 21, rather than on knowledge of facts establishing accrual of the cause of action.[6]  Plaintiffs also disagree with Prudential's unsupported assertion that the sharp increases in premiums should have tipped off Mr. Paul, Ms. Clark, or any other CHIP policyholder that he or she had a cause of action against Prudential under the NJCFA or any other state's consumer fraud statutes, much less that the increases were attributable to Prudential's closure of the block.  *Rose v. United Equitable Ins. Co.*, 632 N.W.2d 429, 434 (N.D. 2001) (premium increase, by itself, is not notice of claim for consumer fraud or other claims based on insurer's closing of the block so as to commence running of limitations period under discovery rule).  Nevertheless, because Mr. Paul was informed more than two years before he filed this action that Prudential's closure of the CHIP block caused his premium increases, plaintiffs do not contest that his consumer protection claims would be time-barred if Indiana's two-year statute of limitations applied to them.

In any event, actual conflicts exist between the relief Ms. Clark seeks under

---

[6] The case Prudential cites, *CSX Transportation, Inc. v. Appalachian Railcar Services, Inc.*, 509 F.3d 384 (7th Cir. 2007), *cited in* MTD at 21, itself cited *Wehling v. Citizens National Bank*, 586 N.E.2d 840 (Ind. 1992), which held that "the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained *as a result of the tortious act of another*."  586 N.E.2d at 843 (emphasis added), *cited in CSX*, 509 F.3d at 388 n.2.

the NJCFA and that available under pertinent California law.  *Compare* N.J.S.A.

§§ 56:8-2.11, 56:8-19 *with* Cal. Bus. & Prof. Code § 17203; *see Int'l Union of*

*Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 384 N.J.

Super. 275, 294 (App.Div. 2006), *rev'd on other grounds*, 192 N.J. 372 (2007)

(noting variations in the award of damages between the NJCFA and other states'

consumer protection laws) [hereinafter, "*Merck*"].  Similar conflicts exist between

the NJCFA and the Indiana statute Prudential references.  *Compare* N.J.S.A.

§§ 56:8-2.11, 56:8-19 *with* Ind. Code § 24-5-0.5-4; *see Boyes*, 27 F. Supp. 2d at

548 (distinction between mandatory and discretionary nature of award of treble

damages under different states' statutes constituted "genuine conflict[]"); *Smith v.*

*Alza Corp.*, 400 N.J. Super. 529, 551 (App.Div. 2008).

On these bases, plaintiffs agree that actual conflicts exist with respect to

their NJCFA claims between New Jersey law and the relevant California and

Indiana consumer protection laws.  The Court should proceed to apply the

remaining parts of New Jersey's most significant relationship test to determine

which state's law governs.  And although Prudential has pointed only to statutes of

limitations for the purported actual conflicts, given the differences in substantive

law and the nature of New Jersey choice-of-law analysis, the Court will need to

consider the relevant policies and interests underlying the substantive consumer

protection laws of the three states.  *See Gantes v. Kason Corp.*, 145 N.J. 478, 485-

98 (1996); *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *26-*28.

### b.   Restatement § 148 Supports Application of New Jersey Law to Plaintiffs' NJCFA Claims

Prudential contends that Restatement § 148, entitled "Fraud and Misrepresentation," applies to plaintiffs' claims under the NJCFA.  *See* MTD at 11.  This Court has applied § 148 to NJCFA claims similar to those asserted by plaintiffs under similar factual circumstances.  *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *62-*75.  Plaintiffs submit that the most appropriate mode of analysis for their NJCFA claims is to bypass § 148 and proceed directly to an analysis of the § 145(2) contacts under the § 6 considerations, the third step in New Jersey's most significant relationship test.[7]  Nevertheless, given that both avenues lead to the same result — New Jersey law applies — plaintiffs will assume *arguendo* that § 148 applies to their claims.

Two highly relevant and significant cases applying § 148 to NJCFA claims,

---

[7] Section 148 appears inapplicable for several reasons.  First, both subsections of § 148 apply only to claims where the plaintiff has "reli[ed]" on the defendant's false representations.  But plaintiffs have not alleged that they relied on any false representations of Prudential or, for that matter, on any of its omissions.  They need not do so, as a private action under the NJCFA requires only a "causal nexus."  *See, e.g.*, *Merck*, 384 N.J. Super. at 289.  Second, both subsections require "false representations."  But plaintiffs' omissions claim under the NJCFA is not based on false representations.  Third, § 148 applies to "Fraud and Misrepresentation," but plaintiffs' claim for unconscionable commercial practices under the NJCFA is not a claim for fraud or misrepresentation.  *See Kugler v. Romain,* 58 N.J. 522, 543 (1971) (unconscionable commercial practice "is an amorphous concept obviously designed to establish a broad business ethic").

*Mercedes-Benz* and *Merck*, are similar in many material respects to this case and strongly support application of New Jersey law here. In *Mercedes-Benz*, this Court, in granting a motion for certification of a nationwide class, determined that New Jersey law applied to the class's NJCFA and unjust enrichment claims under, *inter alia*, New Jersey's choice-of-law rules. The plaintiffs' claims arose out of Mercedes' marketing an optional service for its vehicles called Tele Aid after it learned that the technology on which it relied would be discontinued in five years. 2009 U.S. Dist. LEXIS 35595, at *4. Mercedes allegedly made misrepresentations about Tele Aid and omitted to advise prospective purchasers of its impending obsolescence. *Id.* at *4, *17-*19. Plaintiffs alleged that Mercedes had engaged in a single course of conduct that had affected large numbers of consumers. *Id.* at *22. The putative class members were located nationwide; Mercedes was a Delaware corporation with its principal place of business in New Jersey; and the Mercedes team that was responsible for informing Tele Aid customers about the upcoming obsolescence of the service was located in New Jersey. *Id.* at *3, *22.

After conducting an exhaustive analysis under Restatement § 148, the Court concluded that § 148 strongly pointed to application of New Jersey law to the class's NJCFA claims. *Id.* at *62-*75. Initially, the Court determined that subsection (2) of § 148 governed the analysis, rather than subsection (1), because the plaintiffs' action in reliance took place in whole or in part in a state other than

that where the false representations were made. *Id.* at \*68-\*69. The Court then identified and evaluated the six contacts specified in § 148(2). *Id.* at \*70-\*75. Although it determined that four of the six contacts favored application of the law of each class member's home state, it concluded that New Jersey law applied. *Id.* The Court found that the third contact, "the place where the defendant made the representations," which was New Jersey because the misrepresentations and omissions were planned and coordinated there, outweighed the contacts supporting application of the law of each class member's home state. *Id.* at \*42-\*43, \*71, \*74. The Court viewed as paramount New Jersey's interests in "deter[ring] wrongful activity on the part of corporations operating in New Jersey" and in fixing the liability of a corporation headquartered within its borders. *Id.*[8]

In *Merck*, the Appellate Division conducted an analysis under § 148 and concluded that New Jersey law governed the putative plaintiff class's claims under the NJCFA.[9] The court emphasized that Merck was incorporated and head-quartered in New Jersey and that the alleged misconduct was conceived, planned, and executed from New Jersey. *Id.* at 297. "Thus," the court found, "the claimed misrepresentations and omissions in the marketing and advertising of the drug all

---

[8] The Court subsequently performed an analysis under the factors specified in Restatement § 6 and confirmed that New Jersey law applied. *Id.* at \*75-\*80.

[9] The New Jersey Supreme Court left this conclusion undisturbed when it reversed the Appellate Division's affirmance of class certification on other grounds. *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 388 n.3 (2007).

19

emanated largely from New Jersey." *Id.*  In contrast, the only contacts the class

members' home states had to the litigation related to receipt of the allegedly

fraudulent communications and the resulting loss, which the court viewed as much

less significant. *See id.* at 297-98.  It therefore concluded that "New Jersey's inte-

rests in this litigation . . . far outweigh the interests of all other states." *Id.* at 298.

This case is similar to both *Mercedes-Benz* and *Merck*.  Prudential is a New

Jersey corporation that is also headquartered in New Jersey.  At the time it closed

the block on CHIP and refrained from informing policyholders of the closure and

its consequences, Prudential was a mutual life insurance corporation governed by

New Jersey law, with six public directors appointed by the Chief Justice of the

New Jersey Supreme Court.  Middleton Cert. Ex. A at A-16; N.J.S.A. § 17B:18-19.

It was in New Jersey that Prudential made the decision not to tell CHIP

policyholders that it had closed the block and that the block closure would cause

premiums to skyrocket to unaffordable levels, and that if policyholders delayed

abandonment of their CHIP policies until they could no longer afford them, and in

that time developed costly medical problems, they might find it impossible to

obtain alternative insurance.  Prudential engaged in a uniform course of conduct in

New Jersey that affected large numbers of policyholders nationwide.  The only

relevant contacts that California and Indiana have to plaintiffs' NJCFA claims are

as places where plaintiffs received annual premium increase notices for their CHIP

policies — effectively reaffirming the false and misleading statements in their

policies after the block closure — and where plaintiffs resided when they were

deprived of making an informed decision whether to continue paying premiums.

Under both *Mercedes-Benz* and *Merck*, New Jersey law applies.

          **c.**    **New Jersey Has the Most Significant Relationship with Plaintiffs' NJCFA Claims Under the Restatement § 6 Analysis**

The third step of the choice-of-law analysis, which requires identification of

the contacts specified in Restatement § 145(2) and their evaluation under the five

considerations derived from the § 6 factors, is dispositive.  As shown below, this

step demonstrates that New Jersey law governs plaintiffs' NJCFA claims.

          **i.**    **Contacts Identified Through Application of Restatement § 145(2)**

          **(a)**    **The Place Where the Injury Occurred**

It is difficult to determine where plaintiffs' injuries took place, as there was

pecuniary loss, not physical injury.  *See Intarome*, 2009 U.S. Dist. LEXIS 25793,

at *20.  Arguably the places of injury were where plaintiffs resided while they

continued to pay CHIP premiums, as their injuries resulted from Prudential's

failure to inform them about the block closure and its deleterious consequences.

For Ms. Clark, those places were California and Arizona.  For Mr. Paul, it was

Indiana.

But this Court has concluded that it would be "absurd" to apply the laws of

the states where multiple plaintiffs reside simply because, as here, the "alleged wrongdoing — which emanated from New Jersey — was so widespread as to affect individuals throughout the United States." *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *48. The place of injury also plays a minor role in the choice-of-law analysis for claims subject to Restatement § 148. Restatement § 145, cmt. e.

### (b) The Place Where the Conduct Causing the Injury Occurred

The place where Prudential primarily engaged in the conduct that caused plaintiffs' injuries is New Jersey. That was where Prudential made the decision not to disclose the block closure and its potentially devastating consequences to its policyholders. This contact is especially important here because "[w]hen the injury occurred in two or more states, or when the place of injury cannot be ascertained . . . , the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." Restatement § 145, cmt. e. Moreover, "[i]f the primary purpose of the tort rule involved is to deter or punish misconduct, . . . the state where the conduct took place may be the state of dominant interest and thus that of most significant relationship." *Id.* § 145, cmt. c. As discussed in greater detail in Part I.A.2.c.ii(a) below, the NJCFA, with its treble damages provision and other punitive features, has a strong deterrent purpose. *See, e.g.*, *Merck*, 384 N.J. Super. at 301-02.

22

        **(c)**     **The Domicile, Residence, Nationality, Place of Incorporation, and Place of Business of the Parties**

California and Arizona are the relevant domiciles and residences of plaintiff Beverly Clark because she resided in those places at the time Prudential engaged in its tortious conduct. *See Doiron v. Doiron*, 241 A.2d 372, 374-75 (N.H. 1968). This place is Indiana for Mr. Paul. The place of incorporation and business of Prudential is New Jersey. However, since Ms. Clark and Mr. Paul resided in different states, "the contacts with [New Jersey] become even more significant, and the importance of the non-[New Jersey] contacts is diluted." *Cunningham v. PFL Life Ins. Co.*, 42 F. Supp. 2d 872, 883-84 (N.D. Iowa 1999) (evaluating contacts identified in § 145(2) under § 6 factors); *see also Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1106-07 (S.D. Iowa 1998).

        **(d)**     **The Place Where the Relationship, if Any, Between the Parties Is Centered**

New Jersey is the state where the parties' relationship is centered for two reasons. First, courts considering NJCFA or other claims where a contractual relationship exists have concluded that the parties' relationship is centered where the corporate defendant primarily engaged in the wrongful conduct or otherwise where the corporate defendant is located. *E.g.*, *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *46-*47, *77-*78; *see also Mann v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685, 691-92, 696 (D. Ariz. 2006) (relationship was centered in

23

Illinois where plaintiffs were based in Arizona and defendants were based in Illinois and provided advisory services in Arizona and Illinois).  Under these criteria, the plaintiffs' relationship with Prudential was centered in New Jersey.

Second, at the time Prudential closed the block and first failed to disclose this fact to policyholders, and continuing for many years thereafter, Prudential was a mutual life insurance company incorporated under the laws of New Jersey with its principal place of business in New Jersey.  This meant that Prudential was subject to New Jersey's mutual insurance company laws and that its policy-holders, including Ms. Clark and Mr. Paul, were co-owners of the company and were responsible for electing Prudential's governing body.  N.J.S.A. § 17B:18-3. In addition, New Jersey law required that out of Prudential's twenty-four directors, there were "six public directors appointed by the Chief Justice of the Supreme Court of New Jersey . . . ."  Middleton Cert. Ex. A at A-16, Ex. B at B-16; N.J.S.A. § 17B:18-19.  Since its demutualization in 2001, Prudential has remained a New Jersey corporation with its principal place of business in New Jersey.  Plaintiffs' relationship with Prudential thus was inextricably connected to New Jersey.

*                    *                    *

In summary, the contacts in (a) are California and Arizona for Ms. Clark and Indiana for Mr. Paul; the contact in (b) is New Jersey; the contacts in (c) are California and Arizona for Ms. Clark, Indiana for Mr. Paul, and New Jersey for

24

Prudential; and the contact in (d) is New Jersey.  The next step is to evaluate these

contacts in light of the cornerstone principles of Restatement § 6.  Because

Prudential has not contended that Arizona law should apply, plaintiffs will address

only New Jersey, California, and Indiana law.

### ii.    Evaluation of Contacts Under § 6 Considerations

#### (a)    Interests of Interstate Comity

The first § 6 factor, the interests of interstate comity, "considers 'whether

application of a competing state's law would frustrate the policies of other

interested states.'"  *Camp Jaycee*, 197 N.J. at 152 (quoting *Fu*, 160 N.J. at 122).

Consideration of this factor firmly supports application of New Jersey law.

Application of California and Indiana's less stringent consumer protection

laws will undermine New Jersey's "very strong policy" embodied in the NJCFA

"to deter wrongdoing and encourage truth and fair dealing in the market place."

*Merck*, 384 N.J. Super. at 302 (internal quotation marks and citations omitted).

This policy is particularly attuned to deterring misconduct committed by New

Jersey businesses.  *See Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233, 248

(D.N.J. 2008); *Boyes*, 27 F. Supp. 2d at 547.[10]

---

[10] This Court has explicitly rejected Prudential's unfounded contention that the NJCFA has no purpose of "regulat[ing] the behavior of New Jersey businesses," MTD at 13.  *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *59 ("[T]he NJCFA is designed to serve two purposes:  compensating victims of

There can be no doubt about the NJCFA's emphasis on deterrence.  The

NJCFA is "one of the strongest consumer protection laws in the nation."  *New Mea*

*Constr. Corp. v. Harper,* 203 N.J. Super. 486, 497 (App.Div. 1985) (internal

quotation marks and citation omitted).  "[I]ts provisions are construed liberally in

favor of the consumer to accomplish its deterrent and protective purposes."

*Lettenmaier v. Lube Connection, Inc.*, 162 N.J. 134, 139 (1999); *see also Levin v.*

*Lewis*, 179 N.J. Super 193, 200 (App.Div. 1981).  The remedies available under

the NJCFA reflect its strong deterrent goal:

> The [NJCFA] punishes wrongdoers with mandatory 'treble damages.'
> Unlike punitive damages in tort actions, which can only be awarded
> upon proofs establishing that a defendant's conduct was malicious or
> wanton and willful, any ascertainable loss under the Act is trebled.
> Obviously, the trebling of damages is not designed to fairly
> compensate an injured party. . . . The Act also awards attorney's fees,
> filing fees, and costs.  These awards are additional evidence of the
> strong deterrent goal present in the Act.

*Merck*, 384 N.J. Super. at 301-02 (internal quotation marks and citation omitted);

*see also Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *59; *Furst v. Einstein*

*Moomjy, Inc.*, 182 N.J. 1, 18 (2004).

Moreover, if any claims plaintiffs could assert under California and Indiana

consumer protection laws would be dismissed, applying such laws will frustrate

New Jersey's "strong interest" in "compensating consumers who are victims of"

---

consumer fraud and regulating companies within New Jersey."); *accord Dal Ponte*,
2006 U.S. Dist. LEXIS 57675, at *20; *see also Merck*, 384 N.J. Super. at 302.

fraudulent conduct committed by its domestic businesses, an interest that extends to "consumers outside New Jersey." *Elias*, 252 F.R.D. at 247.

At the same time, applying New Jersey law will not frustrate the public policies of California or Indiana.  That the NJCFA generally affords consumers greater protection than do the consumer protection statutes of California and Indiana does not reflect divergent policy interests.  *See Boyes*, 27 F. Supp. 2d at 548 (application of New Jersey law did not offend Pennsylvania public policy despite potential for greater damages awards; difference in law did "not represent competing or conflicting resolutions of a particular policy issue"); *see also Intarome*, 2009 U.S. Dist. LEXIS 25793, at *27 ("California and New Jersey have similar policies regarding their statutes of limitations and general tort laws, so the application of New Jersey law would not frustrate the policy of California.").

Nor would California and Indiana's public policies be offended if plaintiffs can pursue a consumer fraud claim if New Jersey law applies but cannot do so under California and Indiana law.  "No state has an interest in denying its own citizens recovery while protecting a foreign New Jersey corporation when the conduct at issue took place, to a significant degree, in New Jersey." *Merck*, 384 N.J. Super. at 298; *see also Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1006-07 (9th Cir. 2001) (notion that Hawaii would wish to prevent its residents from recovering under California law was "pure fancy"); *Liebman v. Prudential Fin.*,

27

*Inc.*, 2003 U.S. Dist. LEXIS 21048, at *13-*15 (E.D. Pa. Nov. 14, 2003).  Since

plaintiffs will receive no less protection under the NJCFA than they would receive

under their own states' laws, neither California's nor Indiana's interests are thwart-

ed.  *See Elias*, 252 F.R.D. at 247; *Dal Ponte*, 2006 U.S. Dist. LEXIS 57675, at *20.

      Prudential is wrong that courts have "repeatedly . . . rejected" the notion that

no state has an interest in having a narrower consumer protection law apply to its

citizens.  MTD at 13.  The three cases it cites are distinguishable or unpersuasive:

- *Atlass v. Mercedes-Benz USA, LLC*, 2007 U.S. Dist. LEXIS 72603 (D.N.J.
  Sept. 25, 2007), did not, as Prudential maintains, "reject[] [the] argument
  that 'Pennsylvania has no interest in preventing its citizens from taking
  advantage of New Jersey's consumer protection laws[.]'"  MTD at 13 (citing
  *Atlass*, 2007 U.S. Dist. LEXIS 72603, at *17).  Indeed, *Atlass* acknowledged
  that this argument "may be true[.]"  2007 U.S. Dist. LEXIS 72603, at *17.
  *Atlass* applied Pennsylvania law instead because "the injury and the conduct
  causing the injury both occur[red] in Pennsylvania," a fact *Atlass* considered
  dispositive.  *Id.*  That is not the case here:  the conduct causing the injury
  occurred in New Jersey, not in California or Indiana.

- *Heindel v. Pfizer Inc.*, 381 F. Supp. 2d 364 (D.N.J. 2004), addressed the
  policy interests behind a common-law *defense*, the learned intermediary
  doctrine, which circumscribes the liability of prescription drug manufac-

28

turers where a physician makes treatment decisions. *Id.* at 377-78. It was Pennsylvania's interests in applying this doctrine — not any interest in applying a narrower consumer protection law — that *Heindel* concluded trumped New Jersey's interests. *Id.* As *Merck* later noted, *Heindel*'s conclusion turned on its conviction that physicians played an indispensable role in the transaction at issue. *See Heindel*, 381 F. Supp. 2d at 378, *cited in Merck*, 384 N.J. Super. at 298-99. No similar defense has been asserted here.

- *Fink v. Ricoh Corp.*, 365 N.J. Super. 520 (Law Div. 2003), lacks coherent reasoning. *Fink* concluded that application of New Jersey law to the putative class members' claims would frustrate the public policies of their respective states of residence merely because the analogous statutes of these states "reflect the public policies of the states[] which have enacted them." *Id.* at 585-86. *Fink*'s fatal flaw, which Prudential replicates, was its failure to identify the policies that supposedly were served by the narrowing of consumer protection and to explain how they would be frustrated. A limitation on recovery does not necessarily reflect a divergent policy, especially when that limitation serves only to benefit an out-of-state defendant. *See Boyes*, 27 F. Supp. 2d at 548; *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *27. *Fink* also rejected New Jersey law largely because New Jersey's sole relevant contact to the case was as the defendant's principal place of

29

business.  *See Fink*, 365 N.J. Super. at 585-86, 591-92.  In contrast, New Jersey is not only the place of Prudential's principal place of business, but also its place of incorporation and the place where its misconduct occurred.

Prudential's reliance on *Agostino v. Quest Diagnostics, Inc.*, 2009 U.S. Dist. LEXIS 10451 (D.N.J. Feb. 11, 2009), for the proposition that application of New Jersey law will offend California and Indiana public policy, *see* MTD at 11-12, also is unpersuasive.  *Agostino* provided no explanation for its conclusion that the interests of interstate comity favored application of the law of each class member's state of residence; it merely cited *Fink*, which Prudential also cites.  *Agostino*, 2009 U.S. Dist. LEXIS 10451, at *65; MTD at 13.

Application of New Jersey law also will not offend the policies underlying the relevant California and Indiana statutes of limitations.  In New Jersey, California, and Indiana, the purposes of statutes of limitations are to stimulate litigants to pursue a right of action within a reasonable time, to confer repose, to ensure the ability of defendants to answer the allegations against them, and to spare the courts from stale claims.  *See Intarome*, 2009 U.S. Dist. LEXIS 25793, at *27-*28; *Ochs v. Fed. Ins. Co.*, 90 N.J. 108, 112 (1982); *Havens v. Ritchey*, 582 N.E.2d 792, 794 (Ind. 1991); *Russo v. S. Developers, Inc.*, 868 N.E.2d 46, 48 (Ind. Ct. App. 2007).  California and Indiana can have no plausible interest in imposing their shorter limitations periods for conduct committed in New Jersey by a New

Jersey corporation in an action not filed in their courts, especially where doing so would bar their own citizens from obtaining redress.  *See Fed. Ins. Co. ex rel. Associated Aviation Underwriters v. Purex Indus., Inc.*, 972 F. Supp. 872, 879 (D.N.J. 1997) (California had no interest in applying its shorter limitations period to counterclaims filed in New Jersey federal court); *Smith*, 400 N.J. Super. at 547.

### (b)    Interests of the Parties

The second factor, the interests of the parties, considers the parties' justified expectations and their needs for predictability of results.  This factor is of lesser importance in the field of torts.  *Fu*, 160 N.J. at 123.

Consideration of this factor points to New Jersey law.  Given that Prudential was and is headquartered in New Jersey and conducted the relevant business activities out of New Jersey, Prudential would not be justified in assuming that it could avoid liability under New Jersey law for conduct within New Jersey simply by directing that conduct to individuals located outside of New Jersey.  *See Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *77-*78.  At the same time, a Prudential CHIP policyholder living in another state would, if he thought about it at all, expect to be able to avail himself of the protections under New Jersey law if Prudential engaged in misconduct at and from its offices in New Jersey.

### (c)    Interests Underlying the Field of Tort Law, and States' Competing Interests

The third and fifth factors overlap in this case.  *See Camp Jaycee*, 197 N.J. at

31

148; *Intarome*, 2009 U.S. Dist. LEXIS at 25793, at *27-*28.  The third factor, the

interests underlying the field of tort law, "require[s] courts to consider the degree

to which deterrence and compensation, the fundamental goals of tort law, would be

furthered by the application of a state's local law." *Fu*, 160 N.J. at 123 (citing

Restatement § 145, cmt. c).  Where the tort rule primarily serves a deterrent

purpose, the state where the harmful conduct took place will likely have the

dominant interest; where the rule primarily serves to compensate the victim, the

state of injury may have the greater interest.  *Id.*

The fifth factor, the competing interests of the states, is the most important

one in the § 6 analysis.  *Id.*  at 125.  It requires "courts to consider whether

application of a competing state's law under the circumstances of the case will

advance the policies that the law was intended to promote."  *Id.*  (internal quotation

marks and citation omitted).  "[T]he initial focus should be on what [policies] the

legislature or court intended to protect by having that law apply to wholly domestic

concerns, and then, whether those concerns will be furthered by applying that law

to the multi-state situation."  *Id.*  (internal quotation marks and citation omitted)

(second alteration in original).

Both the NJCFA and its California and Indiana analogs serve to compensate

victims and to deter wrongful conduct.  *Merck*, 384 N.J. Super. at 287; *Korea*

*Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1147-48 (2003); *see Perry*

*v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 646-47 (Ind. Ct. App. 2007).  Both purposes would be better served through application of New Jersey law.

### (i)  Deterrence

As discussed in Part I.A.2.c.ii(a) above, the NJCFA embodies and promotes a "very strong policy to deter wrongdoing and encourage truth and fair dealing in the market place."  *Merck*, 384 N.J. Super. at 302 (internal quotation marks and citations omitted).  "New Jersey's interest in regulating its domestic businesses and in deterring fraudulent business practices is especially strong given this state's significant contacts to this litigation."  *Dal Ponte*, 2006 U.S. Dist. LEXIS 57675, at *20.  Not only are Prudential's headquarters and place of incorporation in New Jersey, but Prudential's decision not to inform policyholders of the block closure and its insidious consequences — the key misconduct — took place within the state's borders.  The NJCFA will be more effective at deterring such abusive conduct because it is "one of the strongest consumer protection laws in the nation." *New Mea*, 203 N.J. Super. at 497 (internal quotation marks and citation omitted). The deterrent effect of New Jersey law would only be heightened if, as Prudential contends, plaintiffs' claims are barred if California law and Indiana law apply.

### (ii)  Compensation

The interests of the three states' consumer protection laws in compensating victims of tortious conduct also will be better advanced by application of New

Jersey law, which affords greater relief.  *See Smith*, 400 N.J. Super. at 552 (any interest of Alabama in compensating its domiciliary was better served by NJCFA due to heightened recovery).  And if plaintiffs' claims would be barred if California and Indiana law applies but their claims would proceed if New Jersey law applies, New Jersey law would best serve compensation interests.  *Cf. Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *78-*79.

At the very least, California's and Indiana's interests in ensuring compensation for their residents will not be undermined by affording redress under New Jersey law.  *Gantes v. Kason Corp.*, 145 N.J. 478 (1996), compels this conclusion.  In *Gantes*, a products liability wrongful death action, the issue was whether to apply the relevant New Jersey statute of limitations, under which the plaintiff's claim would have been timely, or Georgia's statute of repose, which would have barred the claim.  *Id.* at 481-82.  The *Gantes* court concluded that application of New Jersey law did not undermine Georgia's interest in ensuring fair compensation because the policy interest underlying the Georgia statute of repose, protecting Georgia manufacturers from liability, was not implicated given that the defendant was a New Jersey corporation.  *Id.* at 497-98.  Here, Prudential has not identified *any* California or Indiana policy interest that could possibly be harmed by affording plaintiffs compensation under the NJCFA.

Prudential is incorrect that "numerous New Jersey cases involving consumer

protection laws" have concluded that the law of the state of each plaintiff's residence should apply in lieu of New Jersey's because each such state has an interest in "delineating the scope of recovery."  MTD at 12.  The handful of cases it cites are inapposite, lack coherent reasoning, or are otherwise distinguishable:

- *Agostino* merely mimicked the conclusion in *In re Ford Motor Co. Ignition Switch Products Liability Litigation*, 174 F.R.D. 332 (D.N.J. 1997) [hereinafter, "*Ignition Switch*"], that each state's law should apply because it has an interest in delineating the scope of recovery; *Agostino* provided no independent analysis.  2009 U.S. Dist. LEXIS 10451, at *66.  *Ignition Switch* is unpersuasive because it failed to consider, let alone determine, whether application of each putative class member's home state's law would *advance* the tort-law interests of compensation and deterrence, as required by the § 6 analysis.  174 F.R.D at 348.  *Merck* concluded that *Ignition Switch* was not compelling.  384 N.J. Super. at 302-03.  *Agostino* is not either.

- *In re Ford Motor Co. E-350 Van Products Liability Litigation*, 2008 U.S. Dist. LEXIS 73690 (D.N.J. Sept. 3, 2008) [hereinafter, "*Ford Van Products*"], is equally unpersuasive.  That case quoted the relevant passage from *Ignition Switch* without providing any independent explanation.  *See id.* at *7-*8.  Moreover, in contending that Michigan law should apply nationwide, the only argument the plaintiffs made for nationwide application

of such law was that the defendant was headquartered in Michigan.  *Id.*
New Jersey's contacts to this case are far more extensive.

- *Heindel* is distinguishable for reasons previously discussed.  *See* I.A.2.c.ii(a) above.  Also, the quoted portion of *Heindel*, MTD at 12, originated in *In re Rezulin Products Liability Litigation*, 210 F.R.D. 61 (S.D.N.Y. 2002), yet another case that *Merck* rejected as inapposite.  384 N.J. Super. at 302-03.

- *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377 (D.N.J. 1998), is also distinguishable.  *Weikel* did not concern statutory consumer protection laws and never addressed whether the compensation interests of other states' consumer protection laws would be better served, or at least would not be hindered, by application of the NJCFA.  In addition, in *Weikel*,  "[a] significant portion of Lead Plaintiffs['] allegations . . . concern[ed] the activities of an Israeli corporation and statements emanating from Israel."  183 F.R.D. at 401.  That is radically different from the facts in this case.

- Finally, *Fink* merely quoted the portion of *Ignition Switch* referenced above without any independent analysis.  365 N.J. Super. at 593-94.

### (iii)    Other Considerations

The interests served by the applicable statutes of limitations of New Jersey, California, and Indiana are similar:  to confer repose, to ensure the ability of defendants to answer the allegations against them, and to spare the courts from

stale claims.  *See* Part I.A.2.c.ii(a) above.  Applying the shorter limitations periods

under California and Indiana law to plaintiffs' NJCFA claims would not advance

those interests given that the defendant is a New Jersey citizen, the offending

conduct was primarily committed in New Jersey, and plaintiffs are not prosecuting

their claims in California or Indiana courts.  *See id.*  Moreover, it is doubtful that

California or Indiana has any interest in applying such a "liability-denying rule"

where there could have been no justifiable reliance on such a rule.  *See Fu*, 160

N.J. at 123.  Here, Prudential, as a New Jersey corporation engaging in conduct in

New Jersey, could not justifiably have relied on the shorter limitations periods of

the other states' laws to avoid complying with obligations imposed by New Jersey

law.  *See Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *77-*78.

Prudential's claim that "each state's strong interest in regulating insurance

relationships involving its citizens" points to application of California and Indiana

law, MTD at 12, is not supported by the authorities it cites.  *Hammersmith v. TIG*

*Insurance Co.*, 480 F.3d 220 (3d Cir. 2007), concerned states' interests in

regulating *contractual relations* between parties to an insurance contract, not

states' interests in applying certain tort rules.  *See id*. at 233-35.  It did not consider

the public policy interest of deterring deceptive and unconscionable dealings in

connection with sales of goods and products *generally*, which the NJCFA

addresses.[11]  Similarly, *Brandt v. State Farm Mutual Automobile Insurance Co.*,

693 F. Supp. 877 (E.D. Cal. 1988), concerned *insurance settlement practices*, not

general commercial misconduct.  *See id.* at 881.  *Brandt* also did not address

whether application of another state's law affording greater consumer protection

undermined the policy interests of the state of the policyholder's residence.

### (d)     Interests of Judicial Administration

The fourth factor, the interests of judicial administration, "require[s] the

courts to consider the relative ease in determination and application of the choice

of law regarding a specific issue, a factor that in turn furthers the values of

uniformity and predictability of result."  *Fu*, 160 N.J. at 124.  "Here, the

application of New Jersey law would be slightly easier than the application of

California [or Indiana] law, as this court sits in New Jersey and is accustomed to

applying the State's law."  *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *29.  In

addition, if California law applied to Ms. Clark's claim and Indiana law applied to

Mr. Paul's claim, "there is a danger that [plaintiffs] — [both] of whom suffered the

same harm based on the same alleged wrongdoing — would have their claims

---

[11] Prudential notes that the California Insurance Code requires an insurer to disclose its closure of a block of business to the Insurance Commissioner but is silent about disclosing such information to policyholders.  MTD at 16 (citing Cal. Ins. Code § 10176.10).  This statutory provision does not reflect a policy decision to permit health insurers not to inform policyholders of block closures.  Conduct may be actionable under the UCL even if a separate statute that addresses the subject does not prohibit the conduct.  *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999).

decided inconsistently." *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *80. Indeed, Prudential's approach might require Ms. Clark's case to be split up into two claims, to be decided according to California law or Arizona law. These concerns support application of New Jersey law to their claims. *See id.*

*            *            *

All five of the § 6 factors decisively point to application of New Jersey law. Accordingly, New Jersey law governs plaintiffs' claims under the NJCFA.

> **d.   The Authorities Prudential Cites in Opposing Application of New Jersey Law Are Distinguishable or Otherwise Unpersuasive**

Prudential claims with little or no analysis that "numerous" cases applying New Jersey choice-of-law rules have rejected New Jersey law in favor of the consumer protection laws of the home states of non-New Jersey residents. MTD at 8-9. All of these cases are distinguishable or otherwise unpersuasive.

*Agostino*, the case on which Prudential primarily relies, is inapposite and unconvincing for several reasons. First, *Agostino* conducted its § 148 analysis under subsection (1). 2009 U.S. Dist. LEXIS 10451, at *64. Subsection (1) does not apply here because Prudential's misrepresentations were made and received in different states. *Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *65-*68. Second, in *Agostino*, only one of the defendants was headquartered in New Jersey; the other defendants were based in four different states. 2009 U.S. Dist. LEXIS

39

10451, at \*64-\*65.  Here, Prudential is the only defendant, and it is both headquartered and incorporated in New Jersey.  Third, several of the conclusions *Agostino* reached in applying the § 6 analysis lacked any explanation or were based on authorities that are unpersuasive.  For example, *Agostino* did not explain its conclusion that "[t]he interests of interstate comity clearly favor the application of the law of each prospective class member's state of residence." *Id.* at \*65.  It merely cited *Fink*, which is not compelling for reasons previously discussed.

Fourth, *Agostino* distinguished New Jersey choice-of-law cases that had found that New Jersey law applied to out-of-state plaintiffs' NJCFA claims on the ground that, in the case before it, numerous plaintiffs "would actually receive less protection under the NJCFA" than they would under their home states' consumer protection laws.  *Id.* at \*67 n.12.  In contrast, here, there is no suggestion that Ms. Clark or Mr. Paul would receive greater protection under their own states' laws.[12]

*Cooper v. Samsung Electronics America, Inc.*, 2008 U.S. Dist. LEXIS 75810 (D.N.J. Sept. 29, 2008), is distinguishable and unpersuasive for at least two reasons.  First, *Cooper* considered only the remedial interests of the New Jersey and Arizona consumer protection laws and failed even to note, let alone weigh, the

---

[12] *Agostino* concluded that because numerous named plaintiffs had failed to allege that they had suffered an "ascertainable loss," these plaintiffs would receive less protection under the NJCFA than that under the consumer fraud statutes of 17 states that did not have an ascertainable loss requirement.  *Id.*  Here, plaintiffs have alleged that they suffered an ascertainable loss.  Compl. ¶ 52.

strong deterrent interests of the NJCFA. *Id.* at \*21-\*22. Second, the plaintiff's claim was based on affirmative misrepresentations received in his home state prior to the purchase. *See id.* at \*2-\*3, \*22-\*23. Here, the thrust of plaintiffs' NJCFA claims is Prudential's post-purchase scheme, which it conceived of and executed *in New Jersey*, *not to disclose* to plaintiffs the block closure and its consequences.

      *Heindel* and *Fink* should be disregarded for reasons previously discussed.

      *Beegal v. Park West Gallery*, 394 N.J. Super. 98 (App.Div. 2007), is distinguishable because New Jersey apparently had no connection to the dispute other than as the residence of the putative class representatives. *See id.* at 106.

### B.   Plaintiffs Have Stated Claims Under the NJCFA

      Plaintiffs have asserted three different bases for their NJCFA claims: Prudential's unconscionable commercial practices, *e.g.*, Compl. ¶ 48; its omissions, *e.g.*, *id.* ¶ 49; and its misrepresentations, *e.g.*, *id.* ¶ 50. Each of these is an independent ground for bringing suit under the NJCFA. N.J.S.A. § 56:8-2.

      Prudential does not contest that plaintiffs have adequately alleged an NJCFA claim based on Prudential's unconscionable commercial practices. MTD at 22 n.10 (addressing only plaintiffs' "nondisclosure claim" and their "misrepresentation claim"). This alone is sufficient to prevent dismissal. *See Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 19 (1994) (unlawful practices in N.J.S.A. § 56:8-2 phrased in disjunctive; violation of one sufficient to establish NJCFA violation).

With regard to plaintiffs' omissions claim, plaintiffs allege Prudential knew that closing the CHIP block would result in a death spiral that would eventually render premiums unaffordable and could make it impossible for policyholders to obtain alternative insurance due to pre-existing conditions if they developed medical problems in the meantime.  Compl. ¶¶ 4-7, 22-30.  Plaintiffs also allege Prudential was aware that knowledge of the block closure and its consequences was material to policyholders' decisions whether to renew CHIP or to search for alternate health insurance, and that policyholders would rely on Prudential's nondisclosures.  *Id.* ¶¶ 7-8, 25-26, 49(a).  These allegations are sufficient to state a claim for actionable omissions under the NJCFA.  N.J.S.A. § 56:8-2.

Prudential's sole argument for dismissal of plaintiffs' omissions claim is that "an insurer owes no general duty of disclosure to insureds."  MTD at 22 n.10.  But Prudential's cases do not involve claims brought under the NJCFA and solely concern *common-law* duties to disclose.  *Nolan v. First Colony Life Ins. Co.,* 345 N.J. Super. 142, 145 (App.Div. 2001); *Wang v. Allstate Ins. Co.,* 125 N.J. 2, 11-12 (1991).  The NJCFA does not require Prudential to have had a common-law duty to disclose but instead will impose liability if Prudential omitted a material fact with intent that others rely upon such concealment.  N.J.S.A. § 56:8-2; *Nafar v. Hollywood Tanning Sys.*, 2007 U.S. Dist. LEXIS 26312, at *15-*23 (D.N.J. Apr. 5, 2007).  Plaintiffs' Complaint contains such allegations.  Compl. ¶ 49(a)-(c).

42

Finally, plaintiffs have stated a misrepresentation claim under the NJCFA. The CHIP contract strictly limited Prudential's right to discontinue the policy. Compl. ¶ 8. The CHIP policy was guaranteed "continuable" on each policy date anniversary subject to Prudential's right to discontinue the policy only "if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the state where you reside." *Id.* ¶ 16. This commitment was misleading on each policy anniversary after the block closure because premiums were guaranteed eventually to become unaffordable. Prudential has never "refus[ed] to continue all policies with the same provisions and premium rate basis" in any state. Since no reasonable policyholder could foresee that Prudential would effectively discontinue the policy by causing a death spiral, the annual representation was actionable because it had "the capacity to mislead the average consumer." *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617, 644 (App.Div. 2002).

Defendants cite an unpublished Third Circuit decision, *Alvarez v. Insurance Co. of North America*, 2008 U.S. App. LEXIS 5182 (3d Cir. Mar. 11, 2008), which did not involve the NJCFA, and argue that plaintiffs' misrepresentation claims fail because "the contract terms on which plaintiffs rely cannot be read as promising not to take actions that would result in raising premiums." MTD at 22 n.10. *Alvarez* is distinguishable. The policy in *Alvarez* contained no limitations on the *reasons* for premium increases, advising only that "'premiums are subject to

change at any time after payment of the first premium.'"  2008 U.S. App. LEXIS

5182, at *1 (brackets omitted).  In contrast, whereas plaintiffs' CHIP policies

stated similarly that "[p]remiums are expected to increase each year," Middleton

Cert. Ex. A at A-1, Ex. B at B-1, Prudential made additional representations

outside of the policy suggesting that the reasons for any increases would be limited

to policyholder age and general increases in medical costs, *not discretionary acts*

*by Prudential such as block closure.*  These representations, which plaintiffs can

allege if necessary in an amended complaint, clearly had "the capacity to mislead

the average consumer."  *Union Ink*, 352 N.J. Super. at 644.

　　　In addition, the theory advanced in *Alvarez* for why the representations were

misleading is materially different from the theory plaintiffs advance here.  In

*Alvarez*, the plaintiff claimed that the representations about premium increases and

the guaranteed renewability of the policy were misleading because they suggested

that the premiums "would never increase[] or that they would only increase by a

limited, affordable amount."  2008 U.S. App. LEXIS 5182, at *10; *see also id.* at

*8-*9, *11.  Here, Prudential's representations were misleading not because they

suggested there would never be premium increases or that any increases would be

affordable.  Rather, Prudential's representations were misleading because they

failed to disclose that Prudential had made a deliberate business decision, which

fundamentally altered the nature of the insurance plaintiffs had purchased, that

guaranteed that the policy would eventually be unaffordable and, hence, not continuable, and that placed policyholders at risk of future uninsurability if they developed medical problems in the meantime.

Whatever the merits of Mr. Alvarez's claim, it cannot be the case that, under the NJCFA, Prudential had license to continue representing that CHIP was guaranteed continuable after it had closed the block, even though it was no longer continuable, just because the policy stated that premiums would increase. The NJCFA was enacted to protect the public from "sharp practices and dealings" that lure consumers into purchasing "merchandise," including insurance, through deceptive marketing, *Gennari v. Weichert Co. Realtors*, 288 N.J. Super. 504, 533 (App.Div. 1996), and courts are to construe it broadly, *New Mea*, 203 N.J. Super. at 502.

## II.    Breach of Fiduciary Duty Claim

The choice-of-law analysis for plaintiffs' breach of fiduciary duty claim is very similar to the analysis applicable to plaintiffs' NJCFA claims. Under that analysis, New Jersey law governs plaintiffs' breach of fiduciary duty claim. Because plaintiffs can establish that Prudential had a fiduciary duty under New Jersey law to disclose the block closure and its devastating consequences to plaintiffs, they have stated a claim upon which relief can be granted.

### A.    New Jersey Law Governs

Plaintiffs agree with Prudential, MTD at 23, that the New Jersey choice-of-

45

law rules generally applicable to torts apply to plaintiffs' breach of fiduciary duty

claim.  However, Prudential has not shown that a dispositive conflict exists

between New Jersey law, on the one hand, and California law.  Prudential cites

only the differences in applicable statutes of limitations as the actual conflicts.  *Id.*

at 22.  With respect to Ms. Clark, Prudential does not contest that she may avail

herself of the discovery rule under California law, *id.* at 24, and it has not

demonstrated that her breach of fiduciary duty claim would be time-barred under

the discovery rule.  As previously discussed, Prudential is incorrect that the

increases in her premiums, standing alone, were sufficient to commence the

running of the limitations period.  *Rose*, 632 N.W.2d at 434.  Because the outcome

of Ms. Clark's fiduciary duty claim would be the same if either state's statute of

limitations applied, the differences do not present an actual conflict.  With respect

to the substance of her claim, even if a fiduciary relationship did not exist under

California law, California recognizes a confidential relationship between parties

that arises under a standard similar to that of a fiduciary relationship under New

Jersey law.  *Compare Vai v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 56 Cal. 2d 329,

337-38 (1961), *with F.G. v. MacDonell*, 150 N.J. 550, 563 (1997).  Thus, the

substantive law of California and New Jersey is similar.  Nevertheless, plaintiffs

will assume *arguendo* that an actual conflict exists with regard to the substantive

law of Ms. Clark's breach of fiduciary duty claim.

As for Mr. Paul, although plaintiffs disagree that the limitations period on his breach of fiduciary duty claim commenced when he received notice of substantial premium increases, plaintiffs do not contest that his claim would be time-barred if Indiana's statute of limitations applied to it because he was informed more than two years before he filed this action that Prudential's closure of the CHIP block caused his premium increases.  Prudential is wrong, however, that the standard for establishing a fiduciary relationship under Indiana law is materially different from that under New Jersey law.  *See* MTD at 25.[13]

Turning to the substance of the choice-of-law analysis, Prudential is incorrect that Restatement § 148 applies to plaintiffs' claim for breach of fiduciary duty.  Section 148 is entitled "Fraud and Misrepresentation," indicating that it is intended to apply to fraud and misrepresentation claims — not breach of fiduciary duty claims.  Nor does *Agostino* say or even suggest that § 148 applies to breach of

---

[13] In New Jersey, "[t]he essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position.  A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  *F.G. v. MacDonell*, 150 N.J. 550, 563 (1997).  Indiana law is similar:  "For a fiduciary relationship to exist, there must be confidence by one party in another, and the party reposing the confidence must also be in a position of inequality, dependence, weakness or lack of knowledge."  *Heaton & Eadie Prof'l Servs. Corp. v. Corneal Consultants of Ind., P.C.*, 841 N.E.2d 1181, 1189 (Ind. Ct. App. 2006).  The cases Prudential cites concern only claims for breaches of the duty of an *insurance agent* to advise about *insurance coverage*.  *See Filip v. Block*, 879 N.E.2d 1076, 1085 (Ind. 2008); *Am. Family Mut. Ins. Co. v. Dye*, 634 N.E.2d 844, 848 (Ind. Ct. App. 1994), *cited in* MTD at 25.

fiduciary duty claims.  2009 U.S. Dist. LEXIS 10451, at *62, *cited in* MTD at 23.
Indeed, in recently conducting a New Jersey choice-of-law analysis with respect to
a breach of fiduciary duty claim based on misrepresentations, this Court did not
even mention § 148.  *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *34-*42.

Even if § 148 did apply, Prudential is incorrect that the states in which
plaintiffs supposedly acted in reliance are presumed to have the predominant
relationship to the litigation.  MTD at 23.  That principle, for which Prudential
cites *Agostino*,  MTD at 23, actually harks back to subsection (1) of § 148.  *See*
*Agostino*,  2009 U.S. Dist. LEXIS 10451, at *64.  But § 148(1) cannot apply here
because the misrepresentations were not made and received in the same state.
*Mercedes-Benz*, 2009 U.S. Dist. LEXIS 35595, at *42-*43, *68-*69.

Because § 148 does not apply, the court should proceed directly to an
evaluation of the contacts specified by § 145(2) under the cornerstone principles of
§ 6.  The § 145(2) contacts described with regard to plaintiffs' NJCFA claims in
Part I.A.2.c.i above are similarly applicable to plaintiffs' breach of fiduciary duty
claim.  So are all essential aspects of the § 6 analysis.  *See* Part I.A.2.c.ii above.

Significantly, a major purpose, if not the principal purpose, of breach of
fiduciary duty claims is deterrence.  "An action for breach of fiduciary duty is a
prophylactic rule intended to remove all incentive to breach—not simply to
compensate for damages in the event of a breach."  *ABKCO Music, Inc. v.*

*Harrisongs Music, Ltd.*, 722 F.2d 988, 995-96 (2d Cir. 1983); *see also Nichols v. Minnick*, 885 N.E.2d 1, 5 (Ind. 2008); *Diamond v. Oreamuno*, 248 N.E.2d 910, 912 (N.Y. 1969). Given this emphasis on deterrence, New Jersey has a substantial, if not the dominant, interest in having its law govern because it is the state where Prudential's harmful conduct primarily took place. *See Fu*, 160 N.J. at 123. New Jersey also is the place where the fiduciary is incorporated and headquartered. In light of these and the other § 6 considerations, New Jersey law applies.

### B. Plaintiffs Have Stated Claims for Breach of Fiduciary Duty Under New Jersey Law

Prudential argues that plaintiffs' fiduciary duty claim under New Jersey law fails because "an insurer owes no fiduciary duty to policyholders absent a special relationship." MTD at 27 n.11. But, due to the nature of the parties' relationship and Prudential's conduct, a special relationship did exist here.[14] A fiduciary relationship arises between two parties when (1) one party places trust and confidence in another who is in a dominant or superior position, and (2) when one party is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. *McKelvey v. Pierce*, 173 N.J. 26, 57 (2002).

---

[14] The cases Prudential cites do not advance its argument. *In re Tri-State Armored Servs. Inc.*, 332 B.R. 690, 735-36 (Bankr. D.N.J. 2005), concerned only benefits or claims analysis, and it acknowledged that a fiduciary relationship can arise between an insurer and an insured "in special circumstances." *In re Northwestern Mutual Life Insurance Co. Sales Practices Litigation*, 70 F. Supp. 2d 466, 489 (D.N.J. 1999), concerned the fiduciary duties of an agent, not an insurer.

Prudential was in a dominant position since plaintiffs did not relate to

Prudential on equal terms, and plaintiffs, lacking knowledge of the insurance

industry, relied on Prudential's superior knowledge and actuarial expertise.

Compl. ¶ 2, 20, 25-26, 56; *Sparks v. St. Paul Ins. Co.*, 100 N.J. 325, 414 (1985).

As the New Jersey Supreme Court has recognized:

> The [insurance] company is expert in its field and its varied and
> complex instruments are prepared by it unilaterally whereas the
> assured or prospective assured is a layman unversed in insurance
> provisions and practices.  He justifiably places heavy reliance on the
> knowledge and good faith of the company and its representatives and
> they, in turn, are under correspondingly heavy responsibility to him.

*Allen v. Metro. Life Ins. Co.*, 44 N.J. 294, 305 (1965).

Prudential also was responsible to advise for the benefit of its policyholders

on critical matters within the scope of their insurance relationship.  Prudential had

a discretionary power over whom to allow into the insurance risk pool, including

whether to stop admitting new members altogether.  CHIP policyholders did not

just "rel[y] on Prudential's actuarial expertise in managing the pool," Compl. ¶ 25,

they "relied on Prudential to inform them about material facts such as the closed

block and its ramifications," *id.* ¶ 56.  "Prudential had sole knowledge and control

of the facts concerning the closed block, due to its superior knowledge and

actuarial expertise, and policyholders relied on Prudential's integrity, fairness, and

honesty in disclosing such expert matters."  *Id.*  Policyholders could not have

reasonably expected that Prudential would effectively doom the pool by closing the

50

block and not tell them about the block closure or its consequences.

These facts describe exactly the kind of relationship that gives rise to a fiduciary duty under New Jersey law, pursuant to which Prudential was obligated to advise CHIP policyholders about the block closure and its ramifications. This relationship is strengthened by two additional facts: it continued over many years; and because Prudential was a mutual company, its stockholders were the policyholders, so policyholders had even more reason to trust Prudential. Accordingly, plaintiffs have stated a fiduciary duty claim under New Jersey law.[15]

## III.    Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

### A.    New Jersey Law Governs

Plaintiffs agree with Prudential, MTD at 27-28, that New Jersey's most significant relationship test applicable to contract claims applies to their claim for breach of the implied covenant of good faith and fair dealing. Plaintiffs disagree, however, that an actual conflict exists between New Jersey law and California law with respect to Ms. Clark's claim for breach of the implied covenant. Ms. Clark's claim would be timely under either state's law by virtue of the discovery rule.[16]

_____

[15] Indiana law is similar to New Jersey law, *see Heaton & Eadie*, 841 N.E.2d at 1189, and California law appears to recognize a claim for breach of fiduciary duty based on a confidential relationship between the parties, *see Persson v. Smart Inventions, Inc.*, 125 Cal. App. 4th 1141, 1160-61 & n.8 (2005).

[16] *Compare Nat'l Sec. Sys., Inc. v. Iola*, 2007 U.S. Dist. LEXIS 71470, at *19-*20 (D.N.J. Sept. 26, 2007) (applying discovery rule to implied covenant claim under New Jersey law), *with April Enters., Inc. v. KTTV*, 147 Cal. App. 3d

Nor does Prudential identify any actual conflict as to the substantive law.[17]

With respect to Mr. Paul, plaintiffs agree that his breach of the implied covenant claim would be untimely if Indiana law applied.  *See* Part I.A.2.a above. However, Prudential is incorrect that his CHIP policy did not contain an implied covenant of good faith and fair dealing under Indiana law.  *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157, 1162 (Ind. 2002) ("Indiana law recognizes an implied duty of good faith in all insurance contracts requiring that an insurer will act in good faith with its insured.").  Thus, an actual conflict exists, but only with respect to the limitations period, and not as to the substantive law.

Where an actual conflict in contract laws exists, New Jersey requires courts to refer to Restatement § 188, the contract law analog to Restatement § 145.  *See State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 84 N.J. 28, 34-35 (1980).[18] Like § 145(2), § 188(2) specifies relevant contacts, and a court is to evaluate their significance under the factors listed in Restatement § 6.  Restatement § 188(2);

---

805, 832-33 (1983) (applying discovery rule to breach of contract claim under California law where "breach[] . . . [was] committed in secret and . . . where the harm flowing from [the] breach[] [would] not be reasonably discoverable by plaintiffs until a future time").

[17] Although Prudential contends that plaintiffs' theory for breach of the implied covenant is not cognizable under California law, it does not intimate that California law is materially different from New Jersey law.  MTD at 29.

[18] Restatement § 192 does not apply to plaintiffs' breach of implied covenant claims.  *See* MTD at 28.  Plaintiffs' CHIP policies are not "noncancellable disability insurance contracts," as Prudential had the right to discontinue them if it complied with certain requirements.  Restatement § 192, cmt. *l*.

*State Farm*, 84 N.J. at 34-35.  Before reaching that analysis, as a logical matter it is difficult to perceive why California or Indiana law should apply here.  There is no actual conflict as to the substantive law.  Nor will the public policy interests underlying California and Indiana's statutes of limitations be undermined by application of a longer limitations period since the defendant is domiciled and headquartered in a foreign state, the relevant conduct took place out of state, and the action is not proceeding in California or Indiana courts.  *See* Part I.A.2.c.ii(a) above.  At the same time, the contract-law interest in enforcing promises, *see Drewen v. Bank of Manhattan Co. of City of N.Y.*, 31 N.J. 110, 123 (1959), will be promoted by allowing plaintiffs' implied covenant claims to proceed.

Turning to the formal analysis, the § 188(2) contacts are:  "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil [*sic*], residence, nationality, place of incorporation and place of business of the parties."  New Jersey courts do not appear to have distilled the Restatement § 6 factors to five essential considerations for contract issues as they have done for tort issues.  Accordingly, the § 6 factors to be applied are:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement § 6(2); *see also State Farm*, 84 N.J. at 34.

As shown below, an evaluation of the contacts identified through § 188(2) under the Restatement § 6 factors points to application of New Jersey law to plaintiffs' claim for breach of the implied covenant of good faith and fair dealing.

### 1.   Contacts Identified Through Application of Restatement § 188(2)

Contact (a), "the place of contracting[,] is the place where occurred the last act necessary, under [New Jersey's] rules of offer and acceptance, to give the contract binding effect . . . ."  Restatement § 188, cmt. e.  New Jersey is probably that place.  Under New Jersey law, delivery or even issuance of the policy is not required to render a contract for insurance binding; retention of the premium payment may be sufficient.  *See Reck v. Prudential Ins. Co. of Am.*, 116 N.J.L. 444, 446, 184 A. 777, 778 (N.J. 1936).  Here, plaintiffs' policies expressly acknowledge receipt of payment in advance of the "Initial Premium" for their CHIP policies. Cert. Ex. A at A-1; *id.* Ex. B at B-1.  It may be reasonably inferred that the decisions to retain plaintiffs' premium payments were made or authorized at Prudential's principal office in Newark, New Jersey.  The place of contracting would thus appear to be New Jersey.  Nevertheless, "[s]tanding alone, the place of contracting is a relatively insignificant contact."  Restatement § 188, cmt. e.

Contact (b) is inapplicable, as plaintiffs did not negotiate over their policies.

Contact (c), the place of performance, is probably where Ms. Clark and Mr. Paul resided while they maintained their CHIP policies in force. That is because the CHIP policies obligated Prudential to pay for covered medical services, which generally would take place where plaintiffs resided. For Ms. Clark, those places were California and Arizona; for Mr. Paul, it was Indiana.

Contact (d), the location of the subject matter of the contract, may be said to be where Ms. Clark and Mr. Paul resided while their policies were in force because those places are where they would receive medical care that the policies covered. However, this contact might also be considered New Jersey because the contract made plaintiffs owners of a mutual insurance company based in New Jersey.

Finally, the contacts in (e), the "domicil [*sic*], residence, nationality, place of incorporation and place of business of the parties," are identical to those in the corresponding provision of § 145(2). For Ms. Clark, they would be California and Arizona; for Mr. Paul, Indiana; and for Prudential, New Jersey.

The foregoing contacts point to New Jersey, California, Arizona, and Indiana law. We address only New Jersey, California, and Indiana law below.

### 2.    Evaluation of Contacts Under § 6 Considerations

Under the circumstances of this case — where the defendant is a New Jersey corporation, the claim is being prosecuted in courts other than California's or

Indiana's, and the conduct constituting the breach primarily emanated from New Jersey — New Jersey has the most significant relationship to plaintiffs' claim for breach of the implied covenant.  Factor (a), the needs of the interstate and international systems, does not point to application of either New Jersey law or California and Indiana law.  The substantive law of the implied covenant in New Jersey would not produce any different outcome than if California and Indiana law applied, so no policy of any of these three states will be offended if that state's law does not apply.  As for statutes of limitations, as discussed in Part I.A.2.c.ii(a) above, neither California nor Indiana can have an interest in enforcing their shorter limitations periods where, as here, the implied covenant claim is being asserted by an out-of-state defendant in an out-of-state court for conduct occurring out of state.

With regard to factors (b) and (c) — the relevant policies of the forum and other interested states and the relative interests of those states in the determination of the particular issue — the policies underlying New Jersey's statutes of limitations are similar to those underlying California's and Indiana's.  *See* Part I.A.2.c.ii(a) above.  Those policies will not be advanced by applying California's and Indiana's shorter applicable limitations periods under the circumstances of this case.  *See id.*

As to factor (d), the protection of justified expectations, it is difficult to tell which state's law a CHIP policyholder would have expected to govern the terms of

56

his or her policy.  On the one hand, policyholders applied for the policies in their states of residence, and each policy was delivered to each plaintiff in his or her state of residence.  On the other hand, the policies repeatedly reference "Newark, New Jersey" as Prudential's principal office.  *See, e.g.*, Middleton Cert. Ex. A at A-16, A-18, A-22–A-26, A-28–A-31, A-33–A-34, A-36–A-37.  As for Prudential, it was subject to laws in New Jersey and the states in which it sold the policy, so it could not reasonably expect that it could violate the contractual obligations of good faith and fair dealing imposed by New Jersey law.

However, CHIP policyholders probably would assume that they could avail themselves of the state law affording the longest limitations period.  Prudential would not be justified in assuming it could take refuge behind a shorter period. This factor thus points to no particular state's law or, perhaps, to New Jersey law.

For factor (e), the basic policies underlying the particular field of law, contract law embodies a "policy which favors the enforcement of promises for which valuable consideration has been received."  *Drewen*, 31 N.J. at 123.  The implied covenant of good faith and fair dealing furthers that goal by ensuring that no contracting party denies the other party the bargained-for fruits of their agreement.  *See Seidenberg v. Summit Bank*, 348 N.J. Super. 243, 253 (App.Div. 2002).  Allowing plaintiffs to pursue their breach of implied covenant claims due to New Jersey's longer limitations period will advance these policy goals.

Factor (f) — certainty, predictability, and uniformity of result — probably favors application of New Jersey law.  Given that Prudential issued materially identical CHIP policies nationwide, Prudential was headquartered and incorporated in New Jersey, Prudential engaged in the conduct constituting a breach of the implied covenant in New Jersey, and such conduct was effectively uniform with respect to all policyholders, it makes sense that CHIP policyholders throughout the country asserting such claims should be subject to the same limitations period.  The limitations period should not turn on the state of residence of each policyholder.

Finally, since this Court is generally familiar with New Jersey law, factor (g) — ease in the determination and application of the law to be applied — slightly favors New Jersey law.  *Intarome*, 2009 U.S. Dist. LEXIS 25793, at *29.

Collectively, these § 6 factors point to application of New Jersey law.  New Jersey law thus governs plaintiffs' breach of implied covenant claim.

### B.    Plaintiffs Have Stated Claims for Breach of the Implied Covenant of Good Faith and Fair Dealing Under New Jersey Law

Prudential argues in a footnote that plaintiffs have failed to state a claim for breach of the covenant of good faith and fair dealing under New Jersey law because the covenant "cannot be used to vary or alter the terms of a written contract" and therefore cannot be used to alter Prudential's contractual right to raise premiums each year.  MTD at 31 n.12.  But plaintiffs do not seek to alter the terms of their CHIP policies.  They merely seek to enforce their implied

contractual right to have Prudential act in good faith and deal fairly with them with respect to:  (1) Prudential's disclosures relating to its management of the risk pool; and (2) Prudential's disclosures with respect to its limited right to discontinue the policy.  These are sufficient grounds for an implied covenant claim under New Jersey law.  *Seidenberg*, 348 N.J. Super. at 260 (implied covenant applies "when the contract expressly provides a party with discretion regarding its performance").

Plaintiffs allege that Prudential exercised its discretionary authority in managing the risk pool in an improper fashion by not disclosing the block closure or its consequences to policyholders.  Compl. ¶ 63(a).  Plaintiffs also allege that Prudential acted improperly in failing to disclose that it was discontinuing CHIP outside of the limited circumstances provided in the policy.  *Id.* ¶ 63(b).  Moreover, while the CHIP policy does state that "premiums are expected to increase each year," Prudential made additional representations in connection with the policy suggesting that premiums would increase only because of policyholder age and general increases in medical costs, not because of discretionary acts by Prudential such as block closure.  *See* Part I.B above.  Imposing a duty of good faith in no way alters the terms of the policy.  *See Seidenberg*, 348 N.J. Super. at 258 ("[I]nstead of altering or overriding an express term, the implied covenant requires that a contracting party act in good faith when exercising either discretion in performing its contractual obligations, or its right to terminate.").

59

A federal district court in California has ruled that a claim for breach of the covenant of good faith and fair dealing was stated on these facts in another CHIP "death spiral" case against Prudential.  *Bloch v. Prudential Ins. Co. of Am.*, 2005 WL 6141292, at *4 (C.D. Cal. Aug. 9, 2005).  Although *Bloch* applied California law, Prudential does not identify any material difference in the substantive law of California and New Jersey concerning the implied covenant.  MTD at 31 n.13.[19]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Prudential's Motion to Dismiss.

Dated:  May 19, 2009        Respectfully submitted,

NAGEL RICE LLP


By:  /s/ Bruce H. Nagel
       BRUCE H. NAGEL (BN6765)
       ROBERT H. SOLOMON

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
       CHARLES N. FREIBERG
       BRIAN P. BROSNAHAN
       DAVID A. THOMAS
       JACOB N. FOSTER

LEVINE STEINBERG MILLER & HUVER
       HARVEY R. LEVINE
       CRAIG A. MILLER

---

[19] Nor is Indiana law dissimilar.  *See Allen*, 766 N.E.2d at 1162.