<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

BEVERLY CLARK AND JESSE J. PAUL,

           Plaintiffs,

    v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

          Defendant.

Civ. No. 08-6197 (DRD)

**O P I N I O N**

*Appearances by:*

NAGEL RICE LLP
Bruce Nagel, Esq.
Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, N.J. 07068

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Charles N. Freiberg, Esq.
Brian P. Brosnahan, Esq.
David A. Thomas, Esq.
Jacob N. Foster, Esq.
101 California Street, Suite 2050
San Francisco, CA 94111

LEVINE, STEINBERG, MILLER & HUVER
Harvey R. Levine, Esq.
Craig Miller, Esq.
550 West C Street, Suite 1810
San Diego, CA 92101

    *Attorneys for the Plaintiffs, Beverly Clark and Jesse J. Paul*

LOWENSTEIN SANDLER PC
Douglas S. Eakeley, Esq.
Maureen A. Ruane, Esq.
John R. Middleton, Jr., Esq.
65 Livingston Ave.
Roseland, N.J. 07068

GOODWIN PROCTOR LLP
John D. Aldock, Esq.
Richard M. Wyner, Esq.
Mark S. Raffman, Esq.
901 New York Ave., N.W.
Washington, D.C. 20001

*Attorneys for the Defendant, The Prudential Insurance Company of America*

**DEBEVOISE, Senior District Judge**

On December 17, 2008, Beverly Clark and Jesse J. Paul ("Plaintiffs") filed a putative

class action complaint against Prudential Insurance Company of America ("Prudential") alleging

violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 et. seq, ("NJCFA") ,

breach of fiduciary duty, and breach of the duty of good faith and fair dealing.  Prudential moves

to dismiss all counts of the complaint.  The motion is directed at the Plaintiffs' individual claims

for relief as the Plaintiffs have yet to move for class certification.  For the reasons set forth

below, Prudential's motion to dismiss will be granted in part and denied in part.

## I.  BACKGROUND

**A.      The Allegations of the Complaint**

The following are the allegations of the complaint, which are, for the purpose of this

motion only, accepted as true and construed in the light most favorable to the Plaintiffs.  Phillips

v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

### i.    Prudential

Prudential is, and at all relevant times was, a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey. (Compl. ¶ 14.)  Prior to 2001, Prudential was a mutual life insurance company.  (Id. ¶ 15.)

Prudential sold an individual health policy, known as the Comprehensive Health Insurance Policy ("CHIP"), to individuals throughout the United States from 1973 through 1981. (Id. ¶ 1.)  CHIP is a major medical insurance policy designed to provide policyholders with coverage for medical expenses, including high or unexpected medical expenses.  (Id. ¶ 2.)  The risk of high medical expenses is managed by Prudential through the creation of a risk pool, where a large group shares the risk that certain policyholders will generate higher than expected claims.  (Id.)  Large premium increases are generally not necessary in a functioning risk pool because the premiums of healthy low-cost members subsidize the higher costs of less-healthy members.  (Id.)  Prudential developed, marketed, and sold CHIP in the District of Columbia and all 50 states of the United States.  (Id. ¶ 18.)

The CHIP stated the following regarding continuation or termination of the policy:

> You may continue this Policy in force for successive premium periods of one month each by payment of the premiums as specified in the following paragraphs.  However, Prudential may refuse to continue this Policy as of any Policy Date anniversary, but only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where you reside.  If Prudential takes this action you will be notified not less than 31 days before the Policy Date anniversary.

(Id. ¶ 19.)

### ii.    Prudential "Closes the Block"

In 1981, Prudential ceased selling CHIP to new policyholders (it "closed the block").  (Id. ¶ 1.)  Prudential did not disclose to its policyholders that it had closed the block.  (Id.)  The block

closure prevented new policyholders from entering into the CHIP risk pool.  (Id. ¶ 3.)  New

policyholders are generally healthier, and their premiums subsidize the premiums of less-healthy

policyholders, who have higher rates of claims.  (Id.)  Prudential knew that the result of closing

the CHIP block would be that the CHIP risk pool would face an "anti-selection crisis" where

healthy policyholders who could secure coverage elsewhere terminated their CHIP.  (Id.)  With

CHIP closed to new entrants, and an insufficient percentage of healthy policyholders remaining

to subsidize the costs of unhealthy policyholders, Prudential knew the result would be what is

called a "death spiral."  (Id.)  In a death spiral, repeated cycles of higher premiums and a

continually shrinking number of healthy policyholders cause premiums to eventually become so

high that they force policyholders to drop their policies.  (Id.)

Prudential knew at the time it closed the block that the design features of the CHIP policy

made a death spiral inevitable after the block was closed.  (Id. ¶ 4.)  For example, the CHIP

policy lacked inside limits on specific policy benefits, which allowed very ill policyholders to

incur massive claims.  (Id. ¶ 23.)  A lack of inside limits accentuates the dynamics of a death

spiral.  (Id.)  Prudential had access to the relevant actuarial data related to the CHIP and the risk

pool, and policyholders relied on Prudential's actuarial expertise in managing the pool.  (Id.

¶ 25.)  Although Prudential knew that massive increases in premiums in the future were

inevitable because it had closed the block, it concealed these facts from policyholders.  (Id. ¶ 4.)

Policyholders were informed when premiums increased, but they had no reason to know that the

premium increases were a result of closing the block.  (Id. ¶ 5.)  Prudential made uniform written

representations to policyholders about individual rate increases, but in such documents it never

disclosed that the reason for the rate increase was that the CHIP block had closed or that such

closure made extreme rate increases inevitable.  (Id.)  Prudential also did not disclose that, by the

time the inevitable massive increases in the premiums forced them to drop their policies, the policyholders might be unable to secure comparable coverage for medical conditions that they developed later.  (Id. ¶ 6.)   Because Prudential failed to disclose that closing the CHIP block would inevitably result in unaffordable premiums, policyholders were unable to make an informed choice whether to renew CHIP or search for alternative health insurance.  (Id. ¶ 7.) Expert information and actuarial knowledge concerning the existence and ramifications of the block closure was in the sole possession of Prudential and, because it was not disclosed, policyholders continued to renew their CHIP policies rather than look for alternative health insurance coverage.  (Id. ¶ 26.)

Plaintiffs allege that policyholders expected that they would not be forced to search for alternative health insurance because Prudential limited its right to discontinue the CHIP policy. (Id. ¶ 8.)  The CHIP policy states that policyholders "may continue this Policy in force . . . by payment of premiums," and that Prudential retained the right to discontinue the policy "only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where [the policyholder] reside[s]."  (Id.)

### iii.      Ms. Clark

In 1978, Ms. Clark, who is currently a resident of Vancouver, British Columbia, purchased CHIP from Prudential in San Diego, California, where she then resided.  (Id. ¶ 12.) Ms. Clark also lived in Arizona for a period of time during which she had her CHIP.  Her premium in 1982 was $149.66 per month (or $1,795.92 per year).  (Id.)  Prudential did not inform Ms. Clark that (1) it had closed the block for CHIP, (2) the closure would eventually force her policy into a death spiral, (3) her premiums were increasing because the block was closed, or (4) she might be unable to secure coverage for medical conditions she developed

subsequent to the closure of the block if she were forced to terminate her CHIP due to high

premiums.  (Id.)  From 2002 to 2004, Ms. Clark's premiums increased from $1,458.71 per month

to $4,217.65 per month (or from $17,504.52 to $50,611.80 per year).  (Id. ¶ 5.)  In September

2005, Prudential notified Ms. Clark that her premium was scheduled to increase to $5,699 per

month (or $63,388 per year).  (Id. ¶ 33.)  Ms. Clark then stopped making her payments and

Prudential terminated her policy on September 12, 2005.  (Id.)

> ### iv.      *Mr. Paul*

In 1980, Mr. Paul, who was then and is currently a resident of Indiana, purchased CHIP

from Prudential.  His initial premium was $25.50 per month (or $306 per year).  (Id. ¶ 13.)

Prudential did not inform him that (1) its closure of the block would make his policy vulnerable

to an inevitable death spiral, (2) his premiums were increasing because the block was closed, or

(3) he might be unable to secure coverage for medical conditions he developed subsequent to the

closure of the block if he were forced to terminate his CHIP due to high premiums.  (Id.)  From

2002 to 2006, Mr. Paul's premiums increased from $715.99 per month to $3,057.45 per month

(or from $8,591.88 to $36,689.40 per year).  (Id. ¶ 35.)  In 2007, Prudential notified Mr. Paul that

his premium was scheduled to increase to $4,284.11 per month (or $51,409.32 per year).  (Id.

¶ 36.)  Shortly after this increase, Mr. Paul stopped making payments and his policy was

terminated.  (Id.)

## B.      Relief Sought

The Plaintiffs seek to maintain this action as a class action, though they have not yet

moved for certification of the class.  They also seek (1) a refund of all moneys acquired by

means of Prudential's unlawful practices; (2) compensatory damages; (3) exemplary damages;

(4) trebling of damages under the NJCFA; (5) a permanent injunction against Prudential

enjoining them from engaging in the practices alleged in the complaint; (6) declaratory relief;

and (7) reasonable attorneys fees and costs.

## II.  DISCUSSION

### A.      Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for

failure to state a claim upon which relief can be granted.  In considering a motion to dismiss

under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint

in the light most favorable to the plaintiff, and determine whether, under any reasonable reading

of the complaint, the plaintiff may be entitled to relief."  Phillips v. County of Allegheny, 515

F.3d 224, 233 (3d Cir. 2008).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases: Ashcroft v.

Iqbal, 129 S. Ct. 1937 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The

decision in Bell Atlantic abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46

(1957), that "a complaint should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would

entitle him to relief."  In contrast, Bell Atlantic, 550 U.S. at 545, held that "[f]actual allegations

must be enough to raise a right to relief above the speculative level."  Thus, the assertions in the

complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570,

meaning that the facts alleged "allow[] the court to draw the reasonable inference that the

defendant is liable for the conduct alleged."  Iqbal, 129 S.Ct. at 1949; see also Phillips, 515 F.3d

at 234-35 (to survive a motion to dismiss, the factual allegations in a complaint must "raise a

reasonable expectation that discovery will reveal evidence of the necessary element," thereby

justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S.Ct. at 1949. Although, for the purpose of a motion to dismiss, the court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

It is not necessary, however, for a complaint to allege specific facts that conclusively establish a right to relief. Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (citing Bell Atl., 127 S. Ct. at 1964). A complaint is adequately pled as long as it includes facts sufficient to "give the defendant fair notice of what the claim is and the grounds upon which it rests." Id. (internal citations omitted). In evaluating a motion to dismiss, the court must consider what is alleged in the complaint and "may consider documents that are attached to or submitted with the complaint and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (citing Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002) and 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004) (internal quotation marks and citation omitted)).

**B.      Choice of Law**

When, as here, a federal court hears a case pursuant to its diversity jurisdiction, it must

apply the conflict of laws rules of the state in which it sits.  Klaxon Co. v. Stentor Elec. Mfg.

Co., 313 U.S. 487, 496 (1941); Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975)

(citing Klaxon).  "The New Jersey Supreme Court has held that choice-of-law determinations are

made on an issue-by-issue basis, with each issue receiving separate analysis."  Thabault v. Chait,

541 F.3d 512, 535 (3d Cir. 2008) (citing Warriner v. Stanton, 475 F.3d 497, 500 (3d Cir. 2007);

Erny v. Estate of Merola, 171 N.J. 86, 94 (2002)).  Where the conflict of laws analysis results in

the application of the substantive law of another jurisdiction, New Jersey also "borrows" the

statute of limitations from that jurisdiction.  Warriner, 475 F.3d at 500 n.2 (citing Heavner v.

Uniroyal, Inc., 63 N.J. 130, 141 (1973)).

Until recently, the conflict of laws analysis that was applied in New Jersey to tort claims

was the "governmental interest" test.  See Warriner, 475 F.3d at 500; Fu v. Fu, 160 N.J. 108, 118

(1999).  Under that test, a court would first determine if an actual conflict existed between the

states involved; if so, the court would next "identify the governmental policies underlying the

law of each state and how those policies are affected by each state's contacts to the litigation and

to the parties."  Warriner, 475 F.3d at 501 (citing Veazey v. Doremus, 103 N.J. 244, 247-48

(1986)).

In P.V. v. Camp Jaycee, 197 N.J. 132 (2008), the Supreme Court of New Jersey adopted

a new framework for resolving conflict of laws disputes for tort claims.  In Camp Jaycee, the

parents of a mentally disabled resident of New Jersey filed suit on her behalf against a New

Jersey charity, alleging that she was sexually assaulted at the charity's summer camp in

Pennsylvania.  Id. at 136-37.  The complaint alleged that Camp Jaycee and its employees were

negligent and careless in the supervision of P.V. at the camp in Pennsylvania.  Id. at 137.  The

trial court granted the charity's motion for summary judgment based on New Jersey's charitable

immunity statute.  Id.  The Appellate Division found that Pennsylvania had a greater

governmental interest in regulating the conduct of entities operating within its borders than New

Jersey had in immunizing not-for-profit corporations, and thus applied Pennsylvania law, which

did not confer immunity on Camp Jaycee.  P.V. ex rel. T.V. v. Camp Jaycee, 393 N.J. Super. 19,

26-27 (App. Div. 2007).  The trial court and the Appellate Division each applied New Jersey's

flexible "governmental interests" test, but reached different results.  On November 24, 2008, the

New Jersey Supreme Court issued an opinion in which it affirmed the decision of the Appellate

Division to apply Pennsylvania law, but declined to apply the governmental interest test to the

tort claim; rather it applied the "most significant relationship" test of the Restatement (Second)

of Conflict of Laws (1971) (the "Restatement").  The Court reasoned that although it had

continued "to denominate our standard as a kind of governmental interest test, we now apply the

Second Restatement's most significant relationship standard in tort cases."  Camp Jaycee, 197

N.J. at 142-43 (citing Erny, 171 N.J. at 95-97 and Fu, 160 N.J. at 119-39).  Thus, the Court

adopted the most significant relationship test and the corresponding choice of law factors

included in the Restatement for analysis of conflict of laws for tort claims.  Id.

New Jersey's most significant relationship test has two steps.  The first step is to examine

the substance of the potentially applicable laws to determine whether an actual conflict exists.

Id. at 143 (citing Lebegern v. Forman, 471 F.3d 424, 430 (3d Cir. 2006)).  If there is no

distinction between the potentially applicable laws, there is no choice-of-law issue to be resolved

and the court will apply the law of the forum state.  Id.  If an actual conflict exists, the second

step of the most significant relationship test is to weigh the factors enumerated in the section of

the Restatement that corresponds to the cause of action.  For example, in <u>Camp Jaycee</u>, where the plaintiff's claim was for personal injury, the relevant section of the Restatement was § 146, which recognizes that the state in which a personal injury occurs is likely to have the predominant relationship to the parties and issues in the litigation.  <u>Id.</u> at 144.  It is from the vantage point of the relevant section of the Restatement that "we turn to the remaining contacts set forth in sections 145 and the cornerstone principles of section 6" of the Restatement to determine whether another state has a "more significant relationship . . . [with] the occurrence and the parties" than the state dictated by the relevant section of the Restatement.  <u>Id.</u>

### i.    NJCFA

Plaintiffs' first claim, that Prudential committed fraud under the NJCFA by failing to disclose the closing of the block of insurance and the death spiral that it knew would result from the closure, implicates conflicting state laws.  Although Prudential and the Plaintiffs disagree as to the proper characterization of the conflict, they do agree that an actual conflict exists between the potentially applicable consumer protection statutes of New Jersey, California and Indiana. (Def.'s Mtn. to Dismiss 9-10; Plts.' Opp'n Br. 14-16.)  At the very least, the three states apply different statutes of limitations to their consumer fraud statutes.  In New Jersey, the statute of limitations for the NJCFA is six years, N.J. Stat. Ann. § 2A:14-1; <u>DiIorio v. Structural Stone & Brick Co.</u>, 368 N.J. Super. 134, 142 (App. Div. 2004); in California the statute of limitations for its unfair competition law is four years, Cal Bus. & Prof. Code § 17208; and in Indiana the statute of limitations for the Deceptive Consumer Sales Act is two years, Ind. Code Ann. § 24-5-0.5-5(b) (2009).  Because there is a conflict between the potentially applicable laws, the court must apply the choice of law rules of New Jersey, which utilizes the "most significant relationship" test for torts, including consumer fraud claims.

Prudential contends that, for the purpose of the choice of law analysis, § 148 of the Restatement, entitled "Fraud and Misrepresentations," applies to the Plaintiffs' claims under the NJCFA.  (Def.'s Mtn. to Dismiss 11.)  Plaintiffs, on the other hand, argue that the most appropriate mode of analysis for the choice of law for the NJCFA claims is to bypass § 148 and proceed directly to an analysis of the contacts under § 145(2) in light of the considerations of § 6. (Plts.' Opp'n Br. 17.)  Plaintiffs, however, contend that either mode of analysis will lead to the same result.  (Id.)  While the court recognizes that § 148 contemplates fraud or misrepresentation in which the plaintiff <u>relies</u> on the defendant's false representation, and the NJCFA does not require <u>reliance</u> on a misrepresentation, § 148 is still the section of the Restatement most relevant to the NJCFA and will be the starting point for the "most significant relationship test."  <u>See</u> <u>In re Mercedes Benz Tele-Aid Contract Litig.</u>, 257 F.R.D. 46, 64-65 (D.N.J. 2009).

### a.      Analysis Under Restatement § 148

Section 148 of the Restatement states:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

> (2) When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

>> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement (Second) of Conflict of Laws § 148 (1971).

Thus, the Restatement distinguishes between, on the one hand, fraud claims in which a defendant's alleged misrepresentations and a plaintiff's reliance on those statements took place in the same state, and on the other hand, those in which the misrepresentations and reliance occurred in different jurisdictions.  In the former situation, the state in which both the misrepresentations and reliance occurred is presumed to have the "most significant relationship" with the litigation.  Id. § 148(1); Agostino v. Quest Diagnostics, Inc., 256 F.R.D. 437, 462-63 (D.N.J. 2009).  In the latter scenario, however, the court must weigh the factors enumerated in § 148(2) in order to determine which state has the greatest ties to a plaintiff's fraud claim.  See, e.g., Levin v. Dalva Bros., Inc., 459 F.3d 68, 74-75 (1st Cir. 2006) (using Restatement § 148(2) to find that New York law applied to a fraud claim involving misrepresentations regarding the value of antiques by a New York corporation even though the goods were purchased through a local dealer in Massachusetts and the plaintiffs resided in that state); Palmer v. Beverly Enter., 823 F.2d 1105, 1112 (7th Cir. 1987) (applying Restatement § 148(2) to a fraud claim brought by plaintiff residing in Illinois against a California corporation based on alleged misrepresentations

made in meetings in California, Illinois, and Mississippi, and reliance – in the form of acceptance of an offer of employment – that took place in Illinois); <u>Inacom Corp. v. Sears, Roebuck & Co.</u>, 254 F.3d 683, 688 (8th Cir. 2001) (applying Restatement § 148(2) to a fraud claim involving merger negotiations between corporations which took place in both Illinois and Nebraska).

Prudential argues that Restatement § 148(1) applies because the alleged misrepresentations were contained in the terms of the policies themselves, which were issued in the Plaintiffs' home states, and the Plaintiffs received and relied on those misrepresentations in their home states.  (Def.'s Reply Br. 6, 15.)  Thus, Prudential argues, the laws of the Plaintiffs' home states should presumptively apply.

The Plaintiffs argue that the appropriate choice of law analysis here involves Restatement §§ 145 and 6 and does not include Restatement § 148, but, if the analysis is to include § 148, it should be conducted under § 148(2) rather than § 148(1).  The Plaintiffs allege that Prudential "used and continued to use unconscionable commercial practices, misrepresentations, and omissions of material facts with intent that others rely upon such, in connection with the sale and renewal of the CHIP policy."  (Compl. ¶ 47.)  The Plaintiffs do not allege in the Complaint where Prudential used the alleged unconscionable business practices, but they argue in their opposition papers to the motion to dismiss that Prudential's actions occurred in New Jersey. (Plts.' Opp'n Br. 10).  Prudential argues that the alleged misrepresentations occurred in either each Plaintiff's home state or in Florida, from where Prudential sent the letters to the Plaintiffs to inform them of the increases in their premiums.[1]  (Def.'s Reply Br. 6, 15.)  The Plaintiffs do not claim that they relied upon Prudential's misrepresentations, as reliance is not a necessary element to prove a claim under the NJCFA, but the Plaintiffs undoubtedly received the

---

[1] The Plaintiffs referenced the premium increases contained in these letters in ¶ 5 of the Complaint, so the letters may be considered on a motion to dismiss.  <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 221 n.3 (3d Cir. 2004).

misrepresentations in their home states.[2]  Because it is unclear where the misrepresentations were made, the court will assume that they were made and received in different states and will use § 148(2) to determine which state has the most significant relationship to the occurrence and the parties.

Section 148(2) enumerates six factors to consider in determining which state has the most significant relationship.  Two factors of § 148(2) do not weigh in favor of or against the application of a particular state's law.  First, because reliance is not an element of Plaintiffs' claim under the NJCFA, the place "where the plaintiffs acted in reliance upon defendant's representations" does not weigh in favor of or against the application of one state's law.  Restatement (Second) of Conflict of Laws § 148(2)(a) (1971).  Second, because there is no "tangible thing" that is the subject of the transaction between Prudential and the Plaintiffs, an additional factor, "the place where a tangible thing which is the subject of the transaction between the parties was situated at the time," also does not weigh in favor of or against the application of a particular state's law.  Id. § 148(2)(e).

Three of the factors under § 148(2) weigh in favor of the application of the laws of the Plaintiffs' home states.  Because the Plaintiffs presumably received and relied on Prudential's alleged misrepresentations in their home states, the factors regarding "the place where the plaintiff received the representations," and "the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant" weigh in favor of applying the law of the Plaintiffs' home states.  Id. § 148(2) (b), (f).

---

[2] Plaintiffs need not demonstrate reliance in order to prevail on their claims under the NJCFA. See N.J. Stat. Ann. § 56:8-2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 391 (2007) ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover.").

The consideration of "the domicil, residence, nationality, place of incorporation and place of business of the parties," does weighs slightly in favor of the application of the law of the Plaintiffs' home states.  Prudential is incorporated and has its principal place of business in New Jersey, while the Plaintiffs were domiciled in California and Indiana at the time they bought their CHIPs.  See id. § 148(2)(d).  Under the analysis of § 148, "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant."  Id. cmt. i.

The other consideration articulated in Restatement § 148(2) may support the application of New Jersey law.  The Plaintiffs argue that all of the conduct underlying Plaintiffs' consumer fraud claims took place in that state, and thus consideration of "the place where the defendant made the representations" strongly supports application of the law of New Jersey to Plaintiffs' consumer fraud claims.  See id. § 148(2)(c).  Prudential argues that the alleged misrepresentations, if they were not made in the Plaintiffs' home states, emanated from Florida. Prudential cites the letters to Ms. Clark that informed her of the increase in her CHIP premiums; those letters were sent from a Prudential address in Florida.

The general approach is to apply the law of a particular state if two or more of the contacts listed in Restatement § 148(2) are located wholly within that state.  Id. § 148(2) cmt. j. The fact that three of the six considerations articulated by § 148(2) weigh in favor of applying the law of each Plaintiff's home state, and only one factor may weigh in favor of applying New Jersey law, however, does not automatically mean that the law of New Jersey should not apply to Plaintiffs' consumer fraud claims.  It is well-established that the "most significant relationship" test is not a mechanical process in which the court simply tallies up the factors enumerated in the Restatement and applies the law of the jurisdiction supported by the majority of them.  See, e.g.,

Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 467 (3d Cir. 2006) (discounting certain factors due to their "minor importance to the issue"); David B. Lilly Co., Inc. v. Fisher, 18 F.3d 1112, 1119 (3d Cir. 1994) ("The factors enumerated in [the Restatement] should be evaluated on a qualitative rather than a quantitative basis.").  The relative importance of each of the considerations articulated by Restatement § 148(2) varies depending on the circumstances underlying the claim asserted.  See Restatement (Second) of Conflict of Laws § 148, cmt. f-j (1971) (discussing importance of factors under various scenarios).

In the choice of law analysis for fraud, the place of loss does not play as important a role as does the place of injury in the case of injury to persons or tangible goods.[3]  Restatement (Second) of Conflict of Laws § 148 cmt. c.  Rather, the place where the defendant made the false representation "is as important as, and occupies a position wholly analogous to, the place of conduct that results in injury to persons or tangible things."  Id. cmt. h.  In elucidating that analogy, the Comments to § 148(2) incorporate those from Restatement § 146.  Id.  The Comments to the latter section state that, in tort cases in which the conduct at issue and the injury for which the plaintiff seeks relief occurred in different states:

> [A]n important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved. If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries.

Id. § 146 cmt. e .  The importance of considering the policies underlying the various states' laws is also emphasized by the Comments to § 148(2), which instruct courts to take into account "the

---

[3] As acknowledged in comment (c) to § 148, when, as here, the claimed loss is pecuniary in nature, the place of loss is often difficult to determine (as opposed to when damage consists of physical injury to persons or tangible things).  The place of loss is even more difficult to determine when the plaintiff's reliance on a misrepresentation takes the form of non-action.

choice-of-law principles stated in [Restatement] § 6 with emphasis upon the purpose sought to be

achieved by the relevant tort rules of the potentially interested states, the particular issue and the

tort involved" when balancing the choice of law factors applicable to fraud claims.  Id. § 148

cmt. e.

   In light of these provisions, the court finds that, if the misrepresentations were indeed

made in New Jersey, the third consideration articulated by Restatement § 148(2) – "the place

where the defendant made the representations" – may outweigh those that support applying the

law of each Plaintiff's home state because the NJCFA is not designed primarily to compensate

the victim for his injuries.  "Although one purpose of the legislation is clearly remedial in that it

seeks to compensate a victim's loss, the [NJCFA] also punishes the wrongdoer by awarding a

victim treble damages, attorneys' fees, filing fees, and costs.  In that sense, the [NJCFA] serves

as a deterrent."  Cox v. Sears Roebuck & Co., 138 N.J. 2, 21 (1994).  The remedies available

under the NJCFA reflect that ones of its main goals is deterrence:

> The [NJCFA] punishes wrongdoers with mandatory "treble
> damages."  Unlike punitive damages in tort actions, which can
> only be awarded upon proofs establishing that a defendant's
> conduct was malicious or wanton and willful . . . any ascertainable
> loss under the [NJCFA] is trebled.  Obviously, the trebling of
> damages is not designed to fairly compensate an injured party.
> Instead, the [NJCFA] reflects a very strong policy to deter
> wrongdoing and encourage truth and fair dealing in the market
> place.  The [NJCFA] also awards attorney's fees, filing fees, and
> costs.  These awards are additional evidence of the strong deterrent
> goal present in the [NJCFA].

Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., 384 N.J. Super.

275, 302 (App. Div. 2006) (internal quotations and citations omitted); see also Furst v. Einstein

Moomjy, Inc., 182 N.J. 1, 11 (2004) ("The [New Jersey] Legislature passed the Consumer Fraud

Act in 1960 to give consumers relief from fraudulent practices in the marketplace and to deter

merchants from employing those practices.") (citing <u>Cox v. Sears Roebuck & Co.</u>, 138 N.J. 2, 21 (1994)).  That deterrent effect could be compromised if Prudential were allowed to avail itself of the law of states which have shorter statutes of limitations or provide for more limited recovery in consumer fraud actions because its alleged wrongful activity, which Plaintiffs claim took place within New Jersey, had effects in the states where the policyholders resided.  For example, while the NJCFA provides for punitive damages in the form of treble damages, under the consumer fraud provision of California's state law, "prevailing plaintiffs are generally limited to injunctive relief and restitution."  <u>In re Tobacco II Cases</u>, 46 Cal.4th 298, 207 P.3d 20 (Cal. 2009) (quoting <u>Korea Supply Co. v. Lockheed Martin Corp.</u> (2003) 29 Cal. 4th 1134, 1144, 131 Cal.Rptr.2d 29, 63 P.3d 937 (Cal. 2003) (internal quotations and citation omitted)).

Although the law of New Jersey may be the appropriate law to be applied according to the factors of Restatement § 148(2), under the analysis set forth by the Supreme Court of New Jersey in <u>Camp Jaycee</u>, from here the analysis must "turn to the remaining contacts set forth in sections 145 and the cornerstone principles of section 6" of the Restatement to determine whether another state has a "more significant relationship . . . [with] the occurrence and the parties" than the state dictated by § 148.  <u>Camp Jaycee</u>, 197 N.J. at 144.

### b.    Analysis Under Restatement § 145

Under § 145(2) of the Restatement, the contacts to be taken into account in applying the principles of § 6 are:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  Restatement (Second) of Conflict of Laws § 145(2).  For claims of fraud and misrepresentation, the place where the injury occurred does not play an important role in the

choice of the applicable law because there is "little reason in logic or persuasiveness to say that one state rather than another is the place of injury." Id. § 145 cmt. e.  When the place of injury cannot be ascertained, the place where the conduct occurred "will usually be given particular weight in determining the state of the applicable law." Id.  As discussed supra, the Plaintiffs argue that the alleged misrepresentations and omissions of material facts in this matter were all made in New Jersey, though they did not plead such in the Complaint.  Also as discussed supra, the factor regarding domicil, residence, nationality, place of incorporation and place of business of the parties involves contacts with each Plaintiff's home state (California for Ms. Clark; Indiana for Mr. Paul) and New Jersey (Prudential's place of incorporation and principal place of business).  The last factor under § 145(2) – the place where the relationship between the parties is centered – does not clearly implicate a state, as Prudential operated in New Jersey while the Plaintiffs purchased their policies in their home states.  In sum, considering the factors of § 145(2) of the Restatement does not drastically change the result after the analysis conducted under the factors of § 148(2).  It is at this point that the analysis turns to § 6 of the Restatement to determine whether the considerations in that section "gin up or diminish the values to be ascribed to the contacts relative to the issues presented." Camp Jaycee, 197 N.J. at 147.

### c.      Analysis Under Restatement § 6

"Reduced to their essence, the section 6 principles are:  (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." Id. (quoting Erny, 171 N.J. at 101-02 (internal quotations omitted)).

The interest of interstate comity seeks "to further harmonious relations between states and to facilitate commercial intercourse between them."  Restatement (Second) of Conflict of

Laws § 6 cmt. d (1971).  "It considers 'whether application of a competing state's law would frustrate the policies of other interested states.'"  Camp Jaycee, 197 N.J. at 152 (quoting Fu, 160 N.J. at 122).  In this case, the factors related to the interest of interstate comity and the competing interests of the states overlap.

Both California and Indiana have strong interests in regulating the insurance policies issued in their states.  Indeed, both California and Indiana have comprehensive regulations that apply to insurance policies issued in their states.  See generally Cal. Ins. Code; Id. § 41 ("All insurance in this State is governed by the provisions of this code.")  For example, California law requires the submission of the terms of a policy to the Insurance Commissioner before that insurance policy may be issued or delivered to any person in California to ensure that the policy is not fraudulent or unsound and that certain rules on cost are followed.  Id. §§ 10290, 10291.5 California's regulations also cover the required provisions in insurance policies, and regulate the premiums charged.  Id. §§ 10320, 10293(a).  Additionally, California law regulates the communications between an insurer and a policyholder whose policy was issued in California. See e.g., id. §§ 10113.9 (change in premium rate or coverage), 10123.19 (arbitration), 10278(b) (termination of dependent coverage).  And relevant to the issue in this case, Cal. Ins. Code § 10176.10 addresses the situation where an insurance company closes a block of business.  That regulation, which became effective January 1, 1994, requires that an insurer notify the Insurance Commissioner within 30 days of its decision to close a block or within 30 days of its determination that the block has been effectively closed.  Id. § 10176.10(d).  The notification "must include a plan to permit an insured to move to any open block providing comparable benefits" or "alternatively, the insurer shall be required to pool the closed block's experience with all appropriate open forms for purposes of renewal rate determination, with no rate penalty

or surcharge, beyond that which reflects the experience of the combined pool." Id. The

regulation does not require that the insurer send a notification of the closure of the block to the

policyholders, but it directs that "[n]o insurer shall offer or sell any form nor provide misleading

information about the active or closed status of its business for the purpose of evading this

section." Id. § 10176.10(e). While § 10176.10(f) requires that an insurer bring any blocks of

business closed prior to the effective date of the section into compliance with the terms of the

section, Plaintiffs allege that Prudential had ceased selling any new health insurance policies at

all by 1994, so there was no open block to which to move the CHIP policyholders.[4]

Indiana also heavily regulates insurance policies issued in its state. Indiana's law

specifies the terms to be included in insurance policies and prohibits policies from being issued

or delivered to any person in Indiana until a copy of the policy has been filed with and reviewed

by the Insurance Commissioner. Ind. Code §§ 27-8-5-1, 27-8-5-1.5, 27-8-5-2. The Insurance

Commissioner may disapprove of a policy if "the benefits provided under the policy form are not

reasonable in relation to the premium charged" or if the policy "contains provisions that are

unjust, unfair, inequitable, misleading, or deceptive, or that encourage misrepresentation of the

policy." Id. § 27-8-5-1.5(l). Indiana law also regulates the premiums to be charged under

insurance policies issued in the state. Id. § 27-8-5-1(b). Additionally, Indiana law regulates the

communications between an insurer and a policyholder whose policy was issued in Indiana. See

e.g., id. §§ 27-8-5-2.7 (waiver of coverage for specified conditions); 27-8-5-20 (right to return

policy); 27-8-5-26 (coverage for certain types of care); 27-8-28-13 (grievance procedures).

Indiana has also specified that its DCSA does not apply to claims involving "policies or contracts

of insurance." Id. § 24-5-0.5-2(1).

---

[4] Plaintiffs support this allegation through the submission of a declaration, which they claim sets
out facts that they "can and would allege in an amended complaint if necessary." (Plts.' Sur-
Reply Br. 7, n.5.)

Through their comprehensive insurance statutory regimes, California and Indiana have made clear their strong interest in regulating the insurance relationship created by policies issued in their respective states. The interests of interstate comity weigh in favor of allowing the state where the policy is issued to be able to regulate all aspects of the insurance relationship.

Additionally, the Court of Appeals has held that the state where an insurance policy is issued has a "paramount" interest in having its law applied to disputes related to the insurance contract. In Hammersmith v. TIG Insurance Co., 480 F.3d 220 (3d Cir. 2007), the Court held that "New York's interest in regulating an insurance contract issued to a New York insured, negotiated by New York brokers, delivered in New York, and entitled 'New York Coverage Plus Umbrella Liability Policy'" outweighed Pennsylvania's interest in having its law applied where the plaintiff resided in Pennsylvania and the accident occurred in Pennsylvania. Id. at 235. The Plaintiffs correctly point out that the choice-of-law analysis in Hammersmith was for a contract-based claim, but the Court of Appeals was assessing the "interests and policies that may be validly asserted by each jurisdiction" when it concluded that New York had the greater policy interest. Id. at 235; see also Melville v. Am. Home Assurance Co., 584 F.2d 1306, 1313-14 (3d Cir. 1978) ("[A] a state has a significant interest in prescribing the standards that will govern the insurance contracts purchased by its residents to ensure that the insured and their beneficiaries will be accorded the coverage deemed adequate by the state."); Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co., 880 F.2d 685, 691-92 (3d Cir. 1989) (recognizing the significant interest of a state in having its laws applied to a dispute regarding an area over which it exercises regulatory oversight). The conclusion by the Court in Hammersmith regarding the "interests and policies that may be validly asserted by each jurisdiction" is analogous to the consideration of the interests of interstate comity.

The Plaintiffs note that the <u>Hammersmith</u> opinion cites <u>American Contract Bridge</u> <u>League v. Nationwide Mutual Fire Insurance Co.</u>, 725 F.2d 71 (3d Cir. 1985), where the Court of Appeals, under Pennsylvania's "policy, interests and contacts test," applied Pennsylvania law to an issue related to an insurance contract (the duty to defend the insured in another law suit).  The policy was issued, negotiated and delivered in Tennessee, and the insured's principal place of business was in Tennessee.  <u>Id.</u> at 74-75.  The Court held that Pennsylvania law should be applied because the defendant-insurers were licensed to do business in Pennsylvania, the case involved the Pennsylvania Contract Bridge Association as well as several residents of Pennsylvania, and the other law suit that was the subject of the dispute was both filed in Pennsylvania and concerned a harm that allegedly occurred in Pennsylvania.  <u>Id.</u>  The application of Pennsylvania law in the <u>American Contract Bridge</u> case, however, does not diminish the importance attributed to the interest of a state in having its law applied to disputes involving insurance.  Rather, it is simply another example of a case in which there were various factors weighing in favor and against application of a certain state's law and, in that situation, the Court found that Pennsylvania had the greater interest in the matter.

Courts in other jurisdictions have also held that consumer fraud claims involving insurance should be governed by the law of the state where the policy was issued.  In <u>Reicher v.</u> <u>Berkshire Life Insurance Co. of America</u>, 360 F.3d 1 (1st Cir. 2004), the Court of Appeals for the First Circuit held that Maryland had the most significant relationship to the insurance policies and parties because the plaintiffs (policy holders) were domiciled in Maryland; "[t]he policies were delivered, the premiums paid, and the benefits distributed in Maryland;" and, "[a]lthough the insurers were incorporated or headquartered in other states, they were licensed by Maryland to sell insurance."  <u>Id.</u> at 6.  While the <u>Reicher</u> Court also stated that its decision was also based,

24

"perhaps most compellingly," on a Maryland law that "expressly states that health insurance policies delivered in Maryland . . . may not be covered by the laws of any state other than Maryland," <u>id.</u>, that law does not diminish the importance of the other factors relied upon by the court, all of which are relevant to this case.  Various District Courts have reached similar conclusions.  The Western District of Washington addressed this issue when it, applying the Restatement's most significant relationship test, rejected a Washington plaintiff's attempt to apply the law of Illinois, where the insurer was headquartered, to her consumer fraud claim. <u>Sadler v. State Farm Mut. Auto Ins. Co.</u>, Civ. No. C07-995Z, 2007 WL 2778257, at *7 (W.D. Wash. Sept. 20, 2007) (noting also that "[i]mporting the punitive remedies of an insurer's 'home' state might prevent out-of-state insurers from offering lower rates to Washington residents, might adversely affect competition within Washington between insurers domiciled in different states with varying laws, and would run contrary to Washington's general denunciation of punitive damages").  In <u>Mear v. Sun Life Assurance Co. of Canada (U.S.)</u>, Civ. No. 06-12143, 2008 WL 245217 (D. Mass. Jan. 24, 2008), the transaction occurred in Arizona; the plaintiff was a citizen and resident of Arizona; the insurance company's salesman was located in Arizona; Arizona law controlled the regulation of plaintiff's insurance contract; the alleged fraud consisted of the failure by the salesman to disclose "the risks and shortfalls" in "offering and selling" the annuity to the plaintiff in Arizona; and the plaintiff would likely receive the benefits of the annuity in Arizona.  <u>Id.</u> at *4.  "The only link to Massachusetts, other than that it [was] the location of the defendant corporation, [was], according to plaintiff, the Commonwealth's 'interest in regulating the actions of its resident corporation.'"  <u>Id.</u>  The court held that this interest, however, was "secondary to Arizona's interest in protecting its citizens from fraud and in regulating the sale of insurance products in the state."  <u>Id.</u>  The court further noted that "a

citizen of Arizona purchasing a product in her own home state from a local agent would expect to be protected by the laws of her state, not a far distant state with which she has had no contact." Id.  Similarly, here, the only link to New Jersey is that Prudential is headquartered in New Jersey; although the Plaintiffs argue that the alleged fraud was hatched in New Jersey, they do not allege any facts in the Complaint to support this allegation.  As was true in the cases discussed above in this section, even assuming the alleged fraud emanated from Prudential's headquarters in New Jersey, California and Indiana's interests in regulating the sale of insurance products in their state are stronger than New Jersey's interest in regulating its resident corporations.  As Plaintiffs note, the New Jersey Supreme Court has noted that "[t]he interest in deterrence has been recognized as a relevant factor to be considered in choice-of-law decisions." Gantes v. Kason Corp., 145 N.J. 478, 489 (1996).  Here, New Jersey undoubtedly has an interest in deterring corporations operating within its borders from committing wrongdoing.  In this case, however, the interest that California and Indiana have in having their laws applied to disputes involving the heavily regulated area of insurance is greater.[5]

   The Plaintiffs attempt to cast Prudential's argument regarding the strong interests of California and Indiana in having their own laws applied to disputes related to insurance policies issued in their states as a theory of "field preemption."  (Plts.' Sur-Reply Br. 5-6.)  The Plaintiffs argue that "the Third Circuit has recognized [that] the New Jersey Supreme Court has rejected Prudential's theory of 'field preemption' of insurance law in the context of its own consumer fraud statute."  (Id. at 5 (citing Weiss v. First Unum Life Ins. Co., 482 F.3d 254, 265-66 (3d Cir. 2007).)  But preemption is not the issue here.  The issue is which state has the greater interest in having its law apply to the dispute between the Plaintiffs and Prudential.  The question is one of

---

[5] The Plaintiffs' argument that they were former owners of Prudential before demutualization is not relevant to this case because their claims arise out of their status as policyholders, not out of any previous ownership interest.

choice-of-law, not pre-emption.  The case on which the Plaintiffs rely, <u>Weiss</u>, discussed "whether allowing a cause of action for fraud in the sale of insurance would conflict with the New Jersey regulatory scheme regarding insurance."  <u>Weiss</u>, 482 F.3d at 265.  The issue here is not whether a regulatory scheme preempts the consumer fraud act of any of the possible states involved, but which state has the greater interest in having its law applied.

More relevantly, the Plaintiffs also argue that the natural extension of Prudential's argument would be that "there could <u>never</u> be any instance in which a court applied the law of a state other than that of the policyholder's residence to a tort claim involving an insurance product." (Plts.' Sur-Reply Br. 6.)  While this argument addresses the correct issue – choice of law – it takes Prudential's argument to an unnecessary extreme.  It is not true that there could <u>never</u> be a case in which a court applied the law of a state other than that of the policyholder's residence to a tort claim involving an insurance product; indeed, the Plaintiffs cite several cases from other districts in which those courts applied the law of a state other than that of the policyholder's residence to a tort claim involving an insurance product.  Some of those cases used the same choice-of-law analysis while others did not and, of course, all had facts different than those in this case.  The analysis in this case, however, is not changed because the analysis of the facts in those cases led those courts to apply a certain state's law.  This court is bound to apply New Jersey's choice-of-law analysis to the facts of this case, and, under the allegations in the complaint, the interests of California and Indiana outweigh the interests of New Jersey in applying their own state's laws.

The remaining principles of Restatement § 6 do not strongly affect the analysis.  The second principle of § 6 – the interests of the parties – is "a factor of extreme importance in the

field of contracts," but generally "plays little or no part in a choice-of-law question in the field of torts." <u>Fu</u>, 160 N.J. at 123.

The third principle is the interests underlying the field of tort law.  As discussed <u>supra</u>, New Jersey, California and Indiana apply different statutes of limitations to claims under their consumer fraud statutes.  The policies underlying New Jersey's statutes of limitations are that of repose, <u>Galligan v. Westfield Ctr. Serv ., Inc.</u>, 82 N.J. 188, 191-92 (1980); "to ensure the defendants' 'ability to answer the allegations against them;'" and "to spare the courts from the burden of stale claims." <u>Jaworowski v. Ciasulli</u>, 490 F.3d 331, 334 (3d Cir. 2007) (quoting <u>Galligan</u>, 82 N.J. at 192).  The public policy underlying California's statutes of limitations is "to ensure 'prompt assertion of known claims.'" <u>McCoy v. Superior Court of Orange County</u>, 157 Cal. App. 4th 225, 231 (Cal. Ct. App. 2007) (quoting <u>Beal Bank, SSB v. Arter & Hadden, LLP</u>, 42 Cal. 4th 503, 512 (Cal. 2007)).  Under Indiana law, "the general purpose of statutes of limitations is to encourage the prompt presentation of claims and to spare the courts from litigation of stale claims." <u>Mercantile Nat. Bank of Hammond v. Underwood</u>, 906 N.E.2d 881, 887 (Ind. Ct. App. 2009) (citing <u>Perryman v. Motorist Mut. Ins. Co.</u>, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006)).  While the general purposes behind the statutes of limitations of New Jersey, California and Indiana are similar, Indiana's and California's purposes of ensuring the prompt assertion of claims by their citizens against companies conducting business in their states could be frustrated by the application of the longer statute of limitations under New Jersey law (six years, compared to two in Indiana and four in California).

Finally, the fourth factor – the interests of judicial administration – requires the court to consider "issues such as practicality and ease of application." <u>Camp Jaycee</u>, 197 N.J. at 154. Here, the application of New Jersey law would be slightly easier than the application of

California or Indiana law, as this court sits in New Jersey and is accustomed to applying the State's law, but this factor is not significant enough to outweigh the strong interests that Indiana and California have in this matter.

Taking into account the initial analysis based on the factors in Restatement § 148(2), combined with the subsequent analysis under §§ 145 and 6, the court finds that the Plaintiffs' home states at the time they purchased their CHIPs – California for Ms. Clark and Indiana for Mr. Paul – have the greatest interest in having their laws applied to the consumer fraud claims in this case.  Because the Plaintiff have admitted that Mr. Paul's consumer fraud claim would be time-barred if Indiana's statute of limitations applied to it, Mr. Paul's consumer fraud claim will be dismissed with prejudice.  (Plts.' Opp'n Br. 15.)  Ms. Clark's consumer fraud claim, which was pled only under the NJCFA, will be dismissed without prejudice with leave to re-plead under the appropriate law.

### ii.      Breach of Fiduciary Duty

Plaintiffs' second claim is that Prudential breached its fiduciary duty to the Plaintiffs by failing to disclose the closing of the block of insurance and the death spiral that it knew would result from the closure.  Again, the relevant states apply different statutes of limitations for claims of breach of fiduciary duty.  Under New Jersey's law, the statute of limitations for breach of fiduciary duty is six years.  N.J. Stat. Ann. 2A:14-1.  The statute of limitations under California's law is four years, Cal. Code Civ. P. § 343, and is two years under Indiana's law, Del Vecchio v. Conseco, Inc., 788 N.E.2d 446, 451 (Ind. Ct. App. 2003).  The Plaintiffs admit that this difference creates a conflict between the laws of New Jersey and Indiana regarding their claim for breach of fiduciary duty.

Plaintiffs argue that there is not a conflict between the laws of New Jersey and California regarding their claims for breach of fiduciary duty – neither with respect to the statutes of limitation nor to the substantive laws.  Plaintiffs argue that because Ms. Clark can avail herself of the discovery rule under California law, her statute of limitations did not begin to run until less than four years ago and her claim is therefore not time barred.  Thus, they argue, there is no difference in the statutes of limitations of New Jersey and California because Ms. Clark's claim is time barred under neither.  There is no dispute that California applies the "delayed discovery rule" to claims of breach of fiduciary duty.  Charnay v. Cobert, 145 Cal. App. 4th 170, 183, 51 Cal. Rptr. 3d 471, 482 (Cal. Ct. App. 2006) (citing April Enters., Inc. v. KTTV, 147 Cal. App. 3d 805, 827 (Cal. 1983)).  "[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the facts essential to his claim." Cleveland v. Internet Specialties W., Inc., 171 Cal. App. 4th 24, 31 (Cal. Ct. App. 2009) (citing Gutierrez v. Mofid, 39 Cal.3d 892, 897 (Cal. 1985)).  When the issue, however, is accrual, belated discovery is usually a question of fact; it may be decided as a matter of law where reasonable minds cannot differ.  Blanks v. Shaw, 171 Cal. App. 4th 336, 375 (Cal. Ct. App. 2009) (citing E-Fab, Inc. v. Accountants, Inc. Servs., 153 Cal. App. 4th 1308, 1320 (Cal. Ct. App. 2007)).  Because reasonable minds could differ here as to when Ms. Clark learned or should have learned the facts essential to her claim, the court will assume that a conflict exists between the applicable laws of California and New Jersey and will conduct a choice of law analysis accordingly.

Prudential is correct that New Jersey treats breach of fiduciary duty as a tort, see DiMisa v. Acquaviva, 400 N.J. Super. 307, 315 (App. Div. 2008), so New Jersey's choice-of-law principles applicable to tort claims – i.e., the "most significant relationship test" – will apply to

this claim.  (Def.'s Mot. to Dismiss 23.)  Prudential is incorrect, however, that "because [P]laintiffs' breach of fiduciary duty claims are based on supposed non-disclosure" Restatement § 148 applies.  As the title of the section indicates, Restatement § 148 applies to claims for fraud and misrepresentation.  A claim for breach of fiduciary duty is a separate cause of action and there is not a specific section of the Restatement that applies to such a claim, so the evaluation begins with the factors of § 145(2).  See, e.g., Herbal Care Sys., Inc. v. Plaza, No. 06-2698, 2009 WL 692338, at *2 (D. Ariz. Mar. 17, 2009) (applying the factors of Restatement § 145 for application of the most significant relationship test for a claim of breach of fiduciary duty); Valentino v. Bond, No. 3:06-cv-504, 2008 WL 3889603, at *5 (N.D. Fla. Aug. 19, 2008) (same); E. Me. Baptist Church v. Union Planters Bank, N.A., 244 F.R.D. 538, 547 (E.D. Mo. 2007) (same).

As both Prudential and the Plaintiffs admit, the factors under Restatement §§ 145(2) and 6 analyzed above with respect to the consumer fraud claims are similarly applicable to the Plaintiffs' claims for breach of fiduciary duty.  (Plts.' Opp'n Br. 45; Def.'s Reply Br. 23.)  Thus, the court will apply California law to Ms. Clark's claim for breach of fiduciary duty and Indiana law to Mr. Paul's claim for breach of fiduciary duty.

Under California law, "The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) its breach, and (3) damage proximately caused by that breach."  Mendoza v. Rast Produce Co., Inc., 45 Cal. Rptr. 3d 525, 533 (Cal. Ct. App. 2006) (citing City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445, 483 (Cal. 1998)).  Thus, the first question to address is whether Ms. Clark has pled sufficient facts to establish the existence of a fiduciary relationship between her and Prudential.

California law draws a distinction between a true fiduciary and the fiduciary-like duties of an insurance company.  Under California law, the insurer-insured relationship "is not a true 'fiduciary relationship' in the same sense as the relationship between trustee and beneficiary, or attorney and client."  Vu v. Prudential Property & Casualty Ins. Co., 26 Cal. 4th 1142, 1150-51 (Cal. 2001).  Because it is "a relationship often characterized by unequal bargaining power" where "the insured must depend on the good faith and performance of the insurer," California courts have imposed "special and heightened" duties on the insurer; "these 'special' duties are akin to, and often resemble, duties which are also owed by fiduciaries, [but] the fiduciary-like duties arise because of the unique nature of the insurance contract, not because the insurer is a fiduciary."  Id. at 1151 (citing Love v. Fire Ins. Exch. 221 Cal. App. 3d 1136, 1148 (Cal. Ct. App. 1990) (internal quotations and other citations omitted)).  "For example, a true fiduciary must first consider and always act in the best interests of its trust and not allow self-interest to overpower its duty to act in the trust's best interests."  Griffin DeWatering Corp. v. N. Ins. Co. of N.Y., --- Cal. Rptr. 3d ---, 2009 WL 2344762, at *19 (Cal. Ct. App. July 31, 2009) (citing Love, 221 Cal. App. 3d 1136).  An insurance company, on the other hand, "retains the power to give its interests 'consideration equal to that it gives the interests of its insured' and 'is not required to disregard the interests of its shareholders and other policyholders when evaluating claims,'" and "is not required to pay noncovered claims even though payment would be in the best interests of its insured."  Id.

It is possible for an insured to state a cause of action for breach of fiduciary duty against his insurer, but in order to do so the insured must plead facts to show that a special relationship—distinct from the usual relationship between an insurer and insured—i.e., a relationship fiduciary in nature, was created between the insured and insurer.  For example, in

32

the case In re National Western Life Insurance Deferred Annuities Litigation, 467 F. Supp. 2d

1071, 1087 (S.D. Cal. 2006), an insurance company was selling deferred annuities, allegedly

complex financial instruments that the average person cannot understand, to senior citizens (a

protected class in California), and the sales agents allegedly held themselves out as objective

financial planners who acted in the plaintiffs' best interests.  The court held that "[t]aken

together, these allegations provide a basis for finding a fiduciary-like duty in that 'the insured

must depend on the good faith and performance of the insurer' when deciding whether to

purchase [the] deferred annuity."  Id. (quoting Vu, 26 Cal. 4th at 1151); see Estate of Migliaccio

v. Midland Nat'l. Life Ins. Co., 436 F. Supp. 2d 1095, 1107-08 (C.D. Cal. 2006) (finding that

plaintiffs had adequately pled a relationship which may entail a fiduciary duty where the

complaint contained "extensive allegations that defendants trained their sales agents to lure

seniors citizens into their confidence by offering assistance with estate and financial planning,

ultimately to sell them improper annuities using standardized marketing materials and annuity

contracts that defendants supplied.")  Without special circumstances such as those in the

Defferred Annuities Litigation and Estate of Migliaccio the relationship between the insured and

the insurer under California law is simply fiduciary-like.

Absent a fiduciary relationship between the insurer and insured, "an insurer's breach of

its 'fiduciary-like duties' is adequately redressed by a claim for breach of the covenant of good

faith and fair dealing implied in the insurance contract."  Tran v. Farmers Group, Inc., 104 Cal.

App. 4th 1202, 1212 (Cal. Ct. App. 2003); Alta Bates Summit Med. Ctr. v. United of Omaha

Life Ins. Co., No. 07-04224, 2009 WL 57108, at *4 (N.D. Cal. Jan. 8, 2009) (same, citing Tran).

Here, Ms. Clark has not pled facts that would elevate her relationship with Prudential beyond the

normal insured-insurer relationship, which involves only fiduciary-like duties.  The complaint

alleges that

> Prudential had access to the relevant actuarial data related to the
> CHIP policy and the risk pool, and policyholders relied on
> Prudential's actuarial expertise in managing the pool.  Prudential
> did not disclose to policyholders that it closed the block and that it
> knew, based on expert actuarial knowledge, that the block closure
> inevitably would result in massive premium increases.

(Compl. ¶ 25.)  There are no allegations, however, that Prudential or its agents held themselves

out to Ms. Clark as objective financial planners acting in her best interest.  Rather, the

relationship alleged between Ms. Clark and Prudential is the standard relationship between an

insured an insurer – one that involves only fiduciary-like duties.  Ms. Clark's allegations of the

breach of these fiduciary-like duties are properly addressed under her claim for breach of the

implied covenant of good faith and fair dealing.  Her claim for breach of fiduciary duty will

therefore be dismissed without prejudice.

Because the Plaintiffs have admitted that Mr. Paul's claim for breach of fiduciary duty

would be time-barred if Indiana's statute of limitations applied to it, Mr. Paul's breach of

fiduciary duty claim will be dismissed with prejudice.  (Plts.' Opp'n Br. 47.)

### iii. *Breach of the Duty of Good Faith and Fair Dealing*

Plaintiffs' third claim is that Prudential breached the implied covenant of good faith and

fair dealing by failing to disclose material facts concerning the block closure and the implications

of that closure for policyholders.  Again, the relevant states apply different statutes of limitations

for claims of breach of the implied covenant of good faith and fair dealing.  Under New Jersey's

law, the statute of limitations for breach of the implied covenant of good faith and fair dealing is

six years.  N.J. Stat. Ann. 2A:14-1.  The statute of limitations under California's law is four

years, Cal. Code Civ. P. § 343, and is two years under Indiana's law, Del Vecchio, 788 N.E.2d at

451.  The Plaintiffs admit that this difference creates a conflict between the statute of limitations of New Jersey and Indiana regarding their claim for breach of the implied covenant of good faith and fair dealing, but argue that there is no conflict of the substantive law.  Plaintiffs argue that there is no conflict at all between the laws of New Jersey and California regarding their claims for breach of the implied covenant because Ms. Clark's claims would not be time barred under California law due to the delayed discovery rule.

Under New Jersey law, the "most significant relationship test" applies to the conflict of laws analysis for the claim of breach of the implied covenant of good faith and fair dealing.  See State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 34 (1980).  The starting point for the conflict of laws analysis will be Restatement § 188.  That section states:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

Restatement (Second) of Conflict of Laws § 188 (1971).

As used in § 188(2)(a) of the Restatement, "the place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the

contract binding effect." Id. cmt. e.  Plaintiffs argue that "[u]nder New Jersey law, delivery or even issuance of the policy is not required to render a contract for insurance binding; retention of the premium payment may be sufficient."  (Plts.' Opp'n Br. 54 (citing Reck v. Prudential Ins. Co. of Am., 116 N.J.L. 444, 446 (N.J. 1936).)  The Reck case cited by Plaintiffs, however, dealt with the question of whether an insurance contract was valid, not where the place of contracting occurred for purposes of a choice of law analysis.  There is no question here that the Plaintiffs' insurance policies were valid.  Considerably more recent authority indicates that the last act necessary to give an insurance policy binding effect is the countersignature on the policy.  See Armotek Indus., Inc. v. Employers Ins. of Wausau, 952 F.2d 756, 760 (3d Cir. 1991) (citing Appleman, Ins. Law and Practice § 7133 at 508 (1991)); Nat'l Starch & Chem. Corp. v. Great Am. Ins. Cos., 743 F. Supp. 318, 325 (D.N.J. 1990).  Because Ms. Clark and Mr. Paul's policies were executed in their home states, California and Indiana were the places of contracting.

Part (b) of Restatement § 188 is inapplicable here because the parties did not negotiate the terms of the insurance policies.

The parties agree that the place of performance of the contracts – part (c) of § 188 – was where the Plaintiffs resided.  (Plts.' Opp'n Br. 55; Def.'s Reply Br. 27.)  The parties also seem to agree that part (d) – the location of the subject matter of the contract – also points to where the Plaintiffs resided because it was in Indiana and California (or, later, Arizona) that Mr. Paul and Ms. Clark would receive most of the medical care covered by their CHIPs.  (Id.)  The last factor under § 188(2) – the domicil, residence, nationality, place of incorporation and place of business of the parties – points to New Jersey, California and Indiana.

Overall, the factors of Restatement § 188 point to the application of the law of the

Plaintiffs' home states at the time of contracting.  The next step is to again consider the factors of

Restatement § 6:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative
> interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be
> applied.

Restatement (Second) of Conflict of Laws § 6(2) (1971).  For the most part, the analysis of the

states' interests under § 6 for the claims of breach of the implied covenant of good faith and fair

dealing is the same as the analysis discussed for the previous two causes of action.  As discussed

<u>supra</u>, the Plaintiffs' home states have a very strong interest in regulating the insurance policies

issued in their states and the relationships between the insurer and insured.  The factors that may

be different for the claim of the breach of the implied covenant are:  (d) the protection of justified

expectations, (e) the basic policies underlying the particular field of law, and (f) certainty,

predictability and uniformity of result.  Regarding part (d) – protection of justified expectations –

Prudential argues that the Plaintiffs expected that their own states' laws would apply to disputes

relating to their CHIPs, while the Plaintiffs argue that "CHIP policyholders probably would

assume that they could avail themselves of the state law affording the longest limitations period"

and that "Prudential would not be justified in assuming it could take refuge behind a shorter

period."  (Plts.' Opp'n Br. 57.)  While neither of these arguments is particularly strong, the court

finds that Prudential could reasonably expect to be subject to both the laws of its principal place

of business and the laws of the states where it conducts business, and that it would particularly

expect to be subject to the laws of a particular state when the dispute relates to an insurance policy issued in that state.  Further, it would be reasonable for an insured to expect disputes involving his insurance policy would be governed by the law of the state where he lives and purchased the policy, unless the policy states otherwise.

Parts (d) and (e) merge in this particular analysis under § 6 because the basic policy underlying the field of contracts is the "protection of the justified expectations of the parties." Restatement (Second) of Conflict of Laws § 188 cmt. b. (1971).

Part (f) of § 6(2) – certainty, predictability and uniformity of result – could weigh in favor of the application of the laws of the Plaintiffs' home states or the law of New Jersey.  A rule requiring the application of either the law of the home state of the insured or of the law of the principal place of business of the insurer would provide certainty and predictability. Uniformity of result could be achieved either for all persons who have insurance policies with a certain insurer or could be achieved for all persons purchasing insurances policies within a state. Given the heavy regulation of insurance by the individual states, discussed supra, the court finds that the preferable uniformity of result should be achieved among those who purchase insurance within a state.

Because the factors of Restatement § 6 do not serve to alter the analysis conducted under Restatement § 188 as to which state has the most significant relationship to the Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing, California law will be applied to Ms. Clark's claim and Indiana law will be applied to Mr. Paul's claim.

Under California law, it has long been recognized that "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.  This principle applies equally to

38

insurance policies, which are a category of contracts." <u>Kransco v. Am. Empire Surplus Lines Ins. Co.</u>, 23 Cal. 4th 390, 400 (Cal. 2000) (citing <u>Comunale v. Traders & General Ins. Co.</u>, 50 Cal. 2d 654, 658 (Cal. 1958) (internal quotations omitted)).

Prudential argues that Ms. Clark's claim for breach of the implied covenant of good faith and fair dealing fails under California law for two reasons.  First, Prudential argues that Ms. Clark's claim is time barred.  (Def.'s Mot. to Dismiss 29.)  As discussed <u>supra</u>, Ms. Clark may be able to apply the delayed discovery rule to her claim; whether she is able to do so will involve a factual determination.  Thus, at this point Ms. Clark has pled sufficient facts to survive a motion to dismiss her claim for breach of the implied covenant based on the claim being time barred. Second, Prudential argues that "under California law, a claim based on an implied covenant of good faith and fair dealing cannot be used to contradict or supplement the express terms of the policy," and the policy language of Ms. Clark's CHIP expressly stated that Prudential would increase premiums and imposed no duty on Prudential to disclose the closing of the block or limit premium increases.  (<u>Id.</u>)  While Prudential's statements regarding the doctrine of the implied covenant of good faith and fair dealing are correct, it overlooks the special "fiduciary-like" duties between an insurer and insured under California law.  Given these special duties, discussed <u>supra</u>, failing to disclose the fact that Prudential had closed the block and that a death spiral would inevitably result from the closure could be considered an act that would "injure the right of [Ms. Clark] to receive the benefits of the agreement," and thus be considered a breach of the implied covenant.  Prudential's motion to dismiss Ms. Clark's claim of the implied covenant of good faith and fair dealing will therefore be denied.

Because the Plaintiffs have admitted that Mr. Paul's claim for breach of the implied covenant of good faith and fair dealing would be time-barred if Indiana's statute of limitations

applied to it, Mr. Paul's claim for breach of the implied covenant of good faith and fair dealing will be dismissed with prejudice.  (Plts.' Opp'n Br. 52.)

### III.  CONCLUSION

For the reasons set forth above, Prudential's motion to dismiss will be granted in part and denied in part.  Prudential's motion will be granted in so far as all of Mr. Paul's claims against Prudential will be dismissed with prejudice, and Ms. Clark's claims of consumer fraud and breach of fiduciary duty against Prudential will be dismissed without prejudice.  Prudential's motion will be denied in so far as it relates to Ms. Clark's claim of breach of the implied covenant of good faith and fair dealing.  The Court will enter an order implementing this opinion.

　　　　　　　　　　　　　　　　　　s/ Dickinson R. Debevoise
　　　　　　　　　　　　　　　　DICKINSON R. DEBEVOISE, U.S.S.D.J


Dated:  September 14, 2009