<u>**FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BEVERLY CLARK, JESSE J. PAUL and MARC H. LITWACK, <br><br>              Plaintiffs, <br><br>      v. <br><br> THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, <br><br>           Defendant. | Civ. No. 08-6197 (DRD) <br><br> **O P I N I O N** |

*Appearances by:*

NAGEL RICE LLP
Bruce Nagel, Esq.
Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, N.J. 07068

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Charles N. Freiberg, Esq.
Brian P. Brosnahan, Esq.
David A. Thomas, Esq.
Jacob N. Foster, Esq.
101 California Street, Suite 2050
San Francisco, CA 94111

LEVINE, STEINBERG, MILLER & HUVER
Harvey R. Levine, Esq.
Craig Miller, Esq.
550 West C Street, Suite 1810
San Diego, CA 92101

    *Attorneys for the Plaintiffs, Beverly Clark, Jesse J. Paul, and Marc H. Litwack*

LOWENSTEIN SANDLER PC
Douglas S. Eakeley, Esq.
Maureen A. Ruane, Esq.
John R. Middleton, Jr., Esq.
65 Livingston Ave.
Roseland, N.J. 07068

GOODWIN PROCTOR LLP
John D. Aldock, Esq.
Richard M. Wyner, Esq.
Mark S. Raffman, Esq.
901 New York Ave., N.W.
Washington, D.C. 20001

*Attorneys for the Defendant, The Prudential Insurance Company of America*

**DEBEVOISE, Senior District Judge**

On February 3, 2010, Beverly Clark, Jesse J. Paul, and Marc H. Litwack ("Plaintiffs")

filed an amended putative class action complaint against Prudential Insurance Company of

America ("Prudential") alleging claims for fraudulent misrepresentation, fraudulent omissions,

breach of the duty of good faith and fair dealing, violation of California's Unfair Competition

Law, and violation of the New Jersey Consumer Fraud Act.  The motion is directed at the

Plaintiffs' individual claims for relief as they have yet to move for class certification.  Prudential

moves to dismiss all counts of the Third Amended Complaint (TAC) with the exception of

Clark's claim for breach of the implied covenant of good faith and fair dealing.  For the reasons

set forth below, Prudential's motion to dismiss will be granted in part and denied in part.

## I.  BACKGROUND

**A.      Procedural History**

In the original Complaint, filed December 17, 2008, the two original plaintiffs, Clark and

Paul, asserted three causes of action for:  (1) violation of the New Jersey Consumer Fraud Act,

N.J. Stat. Ann. 56:8-1 et. seq, ("NJCFA"); (2) breach of fiduciary duty; and (3) breach of the duty of good faith and fair dealing.  Prudential moved to dismiss the individual plaintiffs' claims.

In an Opinion and Order dated September 15, 2009, the Court granted the motion in part, and denied it in part.  The Court dismissed Paul's claims with prejudice, and dismissed Clark's claims for consumer fraud and breach of fiduciary duty without prejudice.  Clark's claim for breach of the implied covenant of good faith and fair dealing was not dismissed.  Clark v. Prudential Ins. Co. of Am., Civ. No. 08-6197, 2009 U.S. Dist. LEXIS 84093 (D.N.J. Sept. 14, 2009).

In its September 2009 Opinion, the Court applied New Jersey's choice of law analysis and determined that Clark and Paul's home states at the time they purchased their CHIP policies—California and Indiana, respectively—have the greatest interest in having their laws applied to the consumer fraud, breach of fiduciary duty, and breach of good faith and fair dealing claims.  Id. at *47.  The Court found that under Indiana law, each of Paul's claims was barred by the applicable statute of limitations.  The Court dismissed Clark's consumer fraud claim with leave to re-plead under the appropriate California law; dismissed Clark's breach of fiduciary duty claim for failure to allege that the relationship between Clark and Prudential involved a fiduciary duty under California law; and found that Clark's claim for breach of the duty of good faith and fair dealing stated a claim under California law.  Id.

Subsequently, on October 30, 2009, Clark filed an Amended Complaint, asserting claims for unfair competition and breach of the duty of good faith and fair dealing against Prudential under California law.  Thereafter, the parties stipulated that Clark and Paul would file a Second Amended Complaint asserting additional claims for common law fraudulent misrepresentation and fraudulent omission.  The Second Amended Complaint (SAC) was filed on November 12,

2009, and Prudential filed a motion to dismiss the SAC on December 3, 2009.  After that motion was partially briefed, the parties stipulated that the Plaintiffs could file the TAC, adding Litwack as a new plaintiff.  The parties agreed that the Court would address, during a single motion hearing, the issues raised in both the motion to dismiss the SAC and the motion to dismiss the TAC.  For ease of reference, the Court will refer to the present motion as a motion to dismiss the TAC, as the TAC contains all of the relevant allegations.[1]

**B.    Allegations of the Complaint**

The TAC alleges five claims for relief:  (1) fraudulent misrepresentation, on behalf of Clark, Litwack, and Paul; (2) fraudulent omissions, on behalf of Clark, Litwack, and Paul; (3) breach of the duty of good faith and fair dealing, on behalf of Clark and Litwack; (4) violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, et seq., on behalf of Clark; and (5) violation of the NJCFA on behalf of Litwack.

The following are the allegations of the TAC, which are, for the purpose of this motion only, accepted as true and construed in the light most favorable to the Plaintiffs.  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

*i.    Prudential*

Prudential is, and at all relevant times was, a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey. (TAC ¶ 15.)  Prior to 2001, Prudential was a mutual life insurance company.  (Id. ¶ 16.)

Prudential sold an individual health policy, known as the Comprehensive Health Insurance Policy ("CHIP"), to individuals throughout the United States from 1973 through 1981. (Id. ¶ 1.)  CHIP is a major medical insurance policy designed to provide policyholders with

---

[1] For the sake of clarity, when referring to the briefs of the parties, the Court will reference the motion for which the brief was originally submitted.

coverage for medical expenses, including high or unexpected medical expenses.  (Id. ¶ 2.)  The

risk of high medical expenses is managed by Prudential through the creation of a risk pool,

where a large group shares the risk that certain policyholders will generate higher than expected

claims.  (Id.)  Large premium increases are generally not necessary in a functioning risk pool

because the premiums of healthy low-cost members subsidize the higher costs of less-healthy

members.  (Id.)  Prudential developed, marketed, and sold CHIP in the District of Columbia and

all 50 states of the United States.  (Id. ¶ 18.)

> The CHIP stated the following regarding continuation or termination of the policy:
>
>> You may continue this Policy in force for successive premium
>> periods of one month each by payment of the premiums as
>> specified in the following paragraphs.  However, Prudential may
>> refuse to continue this Policy as of any Policy Date anniversary,
>> but only if Prudential is then refusing to continue all policies with
>> the same provisions and premium rate basis in the jurisdiction
>> where you reside.  If Prudential takes this action you will be
>> notified not less than 31 days before the Policy Date anniversary.

(Id. ¶ 20.)

### ii.     Prudential "Closes the Block"

In 1981, Prudential ceased selling CHIP to new policyholders (it "closed the block").  (Id.

¶ 1.)  Prudential did not disclose to its policyholders that it had closed the block.  (Id.)  The block

closure prevented new policyholders from entering into the CHIP risk pool.  (Id. ¶ 3.)  New

policyholders are generally healthier, and their premiums subsidize the premiums of less-healthy

policyholders, who have higher rates of claims.  (Id.)  Prudential knew that the result of closing

the CHIP block would be that the CHIP risk pool would face an "anti-selection crisis" where

healthy policyholders who could secure coverage elsewhere terminated their CHIP.  (Id.)  With

CHIP closed to new entrants, and an insufficient percentage of healthy policyholders remaining

to subsidize the costs of unhealthy policyholders, Prudential knew the result would be what is

called a "death spiral."  (Id.)  In a death spiral, repeated cycles of higher premiums and a continually shrinking number of healthy policyholders cause premiums to eventually become so high that they force policyholders to drop their policies.  (Id.)

Prudential knew at the time it closed the block that the design features of the CHIP policy made a death spiral inevitable after the block was closed.  (Id. ¶ 4.)  For example, the CHIP policy lacked inside limits on specific policy benefits, which allowed very ill policyholders to incur massive claims.  (Id. ¶ 25.)  A lack of inside limits accentuates the dynamics of a death spiral.  (Id.)  Prudential had access to the relevant actuarial data related to the CHIP and the risk pool, and policyholders relied on Prudential's actuarial expertise in managing the pool.  (Id. ¶ 27.)  Although Prudential knew that massive increases in premiums in the future were inevitable because it had closed the block, it concealed these facts from policyholders.  (Id. ¶ 4.)  Policyholders were informed when premiums increased, but they had no reason to know that the premium increases were a result of closing the block.  (Id. ¶ 5.)  Prudential made uniform written representations to policyholders about individual rate increases, but in such documents it never disclosed that the reason for the rate increase was that the CHIP block had closed or that such closure made extreme rate increases inevitable.  (Id.)  Prudential also did not disclose that, by the time the inevitable massive increases in the premiums forced them to drop their policies, the policyholders might be unable to secure comparable coverage for medical conditions that they developed later.  (Id. ¶ 6.)  Because Prudential failed to disclose that closing the CHIP block would inevitably result in unaffordable premiums, policyholders were unable to make an informed choice whether to renew CHIP or search for alternative health insurance.  (Id. ¶ 7.)  Expert information and actuarial knowledge concerning the existence and ramifications of the block closure was in the sole possession of Prudential and, because it was not disclosed,

policyholders continued to renew their CHIP policies rather than look for alternative health insurance coverage.  (Id. ¶ 28.)

Plaintiffs allege that policyholders expected that they would not be forced to search for alternative health insurance because Prudential limited its right to discontinue the CHIP policy. (Id. ¶ 8.)  The CHIP policy states that policyholders "may continue this Policy in force . . . by payment of premiums," and that Prudential retained the right to discontinue the policy "only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where [the policyholder] reside[s]."  (Id.)

At the time Paul purchased his CHIP policy in 1980, Prudential made written representations that,

> The premiums for your plan depend on the current costs of medical care and treatment.  We continually review these costs and make adjustments in the premiums you pay so that they are kept current for the ages of those insured under your plan and the area in which you live.  Medical care costs have been rising in recent years also. There is also a tendency for individual costs to increase with age. As a result, you may expect that there will be an increase in your premium each year on the anniversary date of your policy.  We assure you that any increase will be held to the minimum possible that is consistent with our being able to continue providing this coverage.

(Id. ¶ 21.)

Clark, Litwack, and CHIP policy holders generally received substantially the same representations when they purchased the policy.  (Id.)

In communications with Clark, Prudential affirmatively misrepresented the reasons for the escalating premiums.  (Id. ¶ 33.)  When Prudential increased Clark's rates in 1996, 1997, 1998, 1999, and 2000, it sent Clark a form letter stating that the reasons CHIP premiums were

increasing was simply due to the general rising medical costs and her increasing age.  (Id.)  The

form letters stated, in relevant part,

> Several factors have caused CHIP premiums to increase.  Briefly,
> they are:
>
> Increase in Age
> You (and your dependent spouse if included under your policy) are
> a year older than last year.  Claim experience indicates that the
> frequency and size of claims generally increases as one gets older.
>
> Increasing Cost of Medical Care
> The cost of medical care continues to rise at a rate greater than the
> general rate of inflation.  New medical equipment and complex
> medical procedures have resulted in remarkable advances in
> medical care, but they are expensive.  Your CHIP benefits
> automatically adjust to the higher levels of health care costs.

(Id.)

The Plaintiffs allege, on information and belief, that all CHIP policy holders received the

same form letters.  (Id.)

### ii.     Ms. Clark

In 1978, Clark, who is currently a resident of Vancouver, British Columbia, purchased

CHIP from Prudential in San Diego, California, where she then resided.  (Id. ¶ 12.)  Clark also

lived in Arizona for a period of time during which she had her CHIP.  Her premium in 1982 was

$149.66 per month (or $1,795.92 per year).  (Id.)  Prudential did not inform Clark that (1) it had

closed the block for CHIP, (2) the closure would eventually force her policy into a death spiral,

(3) her premiums were increasing because the block was closed, or (4) she might be unable to

secure coverage for medical conditions she developed subsequent to the closure of the block if

she were forced to terminate her CHIP due to high premiums.  (Id.)  From 2002 to 2004, Clark's

premiums increased from $1,458.71 per month to $4,217.65 per month (or from $17,504.52 to

$50,611.80 per year).  (Id. ¶ 5.)  In September 2005, Prudential notified Clark that her premium

was scheduled to increase to $5,699 per month (or $63,388 per year).  (Id. ¶ 36.)  Clark then

stopped making her payments and Prudential terminated her policy on September 12, 2005.  (Id.)

In response to correspondence with an attorney representing Clark and an inquiry from the

California Department of Insurance, Prudential continued to state that Clark's CHIP premiums

were rising because of her increasing age and the higher medical costs of the insured group.  (Id.

¶ 37.)  The TAC alleges that had Prudential disclosed the block closure and its implications, she

would have discontinued her policy and purchased less expensive alternative insurance.  (Id. ¶

38.)

### iv.    *Mr. Paul*

In 1980, Paul, who was then and is currently a resident of Indiana, purchased CHIP from

Prudential.  His initial premium was $25.50 per month (or $306 per year).  (Id. ¶ 13.)  Prudential

did not inform him that (1) its closure of the block would make his policy vulnerable to an

inevitable death spiral, (2) his premiums were increasing because the block was closed, or (3) he

might be unable to secure coverage for medical conditions he developed subsequent to the

closure of the block if he were forced to terminate his CHIP due to high premiums.  (Id.)  From

2002 to 2006, Paul's premiums increased from $715.99 per month to $3,057.45 per month (or

from $8,591.88 to $36,689.40 per year).  (Id. ¶ 40.)  In 2007, Prudential notified Paul that his

premium was scheduled to increase to $4,284.11 per month (or $51,409.32 per year).  (Id. ¶ 41.)

Shortly after this increase, Paul stopped making payments and his policy was terminated.  (Id.)

Even after Paul initiated an investigation in 2003, Prudential stated, in response to an inquiry

from the Indiana Department of Insurance, that his premium increases were due to his increasing

age and the higher medical costs of the insured group.  (Id. ¶ 42.)  If Paul had been informed

about the block closure and its implications, he would have discontinued his CHIP policy and purchased less expensive alternative insurance.  (Id. ¶ 43.)

>     *v.*     ***Mr. Litwack***

In 1979, Litwack, who was then and is currently a resident of New Jersey, purchased CHIP from Prudential.  (Id. ¶ 14.)  After Litwack increased his deductible to $300, his premium in 1984 was $77.48 a month (or $929.76 a year).  (Id.)  Prudential did not inform him that (1) its closure of the block would make his policy vulnerable to an inevitable death spiral, (2) his premiums were increasing because the block was closed, or (3) he might be unable to secure coverage for medical conditions he developed subsequent to the closure of the block if he were forced to terminate his CHIP due to high premiums.  (Id.)  From 2007 to 2009, Litwack's premium increased from $1,353.49 to $2,068.68 per month (or from $16,241.88 to 24,824.16 per year).  In 2009, Litwack increased his deductible from $300 to $5,000 in order to reduce his monthly premiums.  The higher deductible reduced his 2009 premium to $1,327.67 per month (or $15,932.04 per year).  In 2010, Prudential again raised his monthly premium to $1,682.67 (or $20,192.04 per year).  (Id. ¶ 45.)  If Prudential had disclosed the block closure and its implications, Litwack would have discontinued his CHIP policy and purchased less expensive alternative insurance.  (Id. ¶ 43.)

## B.    Relief Sought

The Plaintiffs seek to maintain this action as a class action, though they have not yet moved for certification of the class.  They also seek (1) compensatory damages; (2) punitive or exemplary damages; (3) a permanent injunction against Prudential enjoining it from engaging in the practices alleged in the TAC; (4) a refund of all moneys acquired from Litwack and the putative New Jersey subclass by means of the unlawful practices; (5) a restoration of all money

or property acquired by Prudential by means of unfair competition; (6) trebling of damages under

the NJCFA; (7) declaratory relief; (8) trebling of damages under the California Civil Code §

3345; and (9) reasonable attorneys' fees and costs.

## II.  DISCUSSION

The TAC states claims for (1) fraudulent misrepresentation, on behalf of Clark, Litwack,

and Paul; (2) fraudulent omissions, on behalf of Clark, Litwack, and Paul; (3) breach of the duty

of good faith and fair dealing, on behalf of Clark and Litwack; (4) violation of the UCL on

behalf of Clark; and (5) for violation of the NJCFA on behalf of Litwack.

Prudential argues that the common law fraud claims for each of the Plaintiffs are

deficient.  Specifically, Prudential asserts that (1) Clark's common law fraud claims should be

dismissed for failure to properly plead a misrepresentation, omission or causation, and because

they are barred by the relevant statute of limitations; (2) Paul's common law fraud claims fail to

properly plead injury, a duty to disclose, a material misrepresentation, or causation; and (3)

Litwack's common law fraud claims fail to properly plead a material omission or

misrepresentation.

Additionally, Prudential argues that Clark's claims under the UCL should fail (1) as

barred by the statute of limitations; (2) because she is ineligible for the equitable relief available

under the UCL; and (3) for failure to state a claim.  Moreover, if the Court does decide to allow

Clark's UCL claim to proceed, she should be barred from collecting treble damages.  Prudential

also asserts that Clark's claim under the UCL is not subject to the treble damages under

California Civil Code § 3345.

Prudential asserts that Litwack's claims are all barred by the filed rate doctrine.  In the

alternative, Litwack's claim for breach of the implied covenant of good faith and fair dealing

fails to state a claim, and his claim under the NJCFA fails to plead ascertainable loss or unlawful conduct.

## A.      Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  When considering a motion under Rule 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court's inquiry "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the standard for a motion to dismiss under Rule 12(b)(6) in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  In contrast, the Court in Bell Atlantic held that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  550 U.S. at 545.  The assertions in the complaint must be enough to "state a claim to relief that is plausible on its face." Id. at 570.  The plausibility standard requires that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (in order to survive a motion to dismiss, the factual allegations in a

complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Iqbal, 129 S. Ct. at 1949.  Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

**B.      Litwack's Claims and the Filed Rate Doctrine**

The Court will begin by addressing the filed rate doctrine since Prudential asserts that it should bar all of Litwack's claims, including his asserted causes of action under the NJCFA, and his common law claims for fraudulent misrepresentation, fraudulent omission, and breach of the duty of good faith and fair dealing.  Prudential asserts that the filed rate doctrine bars claims seeking monetary damages or refunds that either directly or effectively would result in the policyholder paying less than the approved rate.  Litwack argues that the filed rate doctrine does not bar his claims since this suit challenges communications to policyholders, rather than the calculation or approval of CHIP premium rates.

Generally, the filed rate doctrine provides that a rate filed with and approved by a governing regulatory agency is unassailable in judicial proceedings brought by ratepayers.

Alston v. Countrywide Fin. Corp., 585 F.3d 753, 763 (3d Cir. 2009). The doctrine has developed as federal common law, which allows the Court to "fill in the interstices of the doctrine by drawing on state law." In re Pa. Title Ins. Antitrust Litig., 648 F. Supp. 2d 663, 673 (E.D. Pa. 2009) (citing Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97-98 (1991)). The Court will focus principally on New Jersey law for guidance because this case involves the doctrine's application to a New Jersey regulatory agency's rate-making with regards to the CHIP policy. See id.

Prudential asserts that New Jersey jurisprudence and the relevant statutes governing the regulation of health insurance in the State of New Jersey require application of the filed rate doctrine to bar Litwack's claims. When a federal court applies state substantive law, it should apply the law as decided by the highest court of the state whose law governs the action. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1373 (3d Cir. 1996). When a state's highest court has not addressed the precise question before the court, a federal court must predict how the state's highest court would resolve the issue. Borman v. Raymark Indus., Inc., 960 F.2d 327, 331 (3d Cir. 1992). Although not dispositive, decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise. Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991), cert. denied, 507 U.S. 973 (1993).

The filed rate doctrine provides that a rate filed with and approved by a governing regulatory agency is unassailable in judicial proceedings brought by ratepayers. Alston v. Countrywide Fin. Corp., 585 F.3d 753, 763 (3d Cir. 2009) (citing Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994)). The doctrine is considered to have originated in Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156, 161-65 (1922), in which the Supreme

Court of the United States determined that the Interstate Commerce Commission's approval of freight rates submitted by the defendants precluded a private antitrust action seeking damages on the basis of those rates.

The filed rate doctrine's application is only necessary when one of its core purposes is implicated.  Smith v. SBC Communications, Inc., 178 N.J. 265, 275 (2004) (citing AT&T v. Central Office Tel., Inc., 524 U.S. 214, 223 (1998)).  The two core policy goals of the doctrine are (1) the non-discrimination strand, or the prevention of price discrimination by carriers as among ratepayers; and (2) the non-justiciability strand, or the preservation of the role of regulatory agencies in approving reasonable rates and the exclusion of the courts from the rate-making process.  Fax Telecomms., Inc. v. AT&T, 138 F.3d 479, 489 (2d Cir. 1998); H.J., Inc. v. Nw. Bell Tel. Co., 954 F.2d 485, 488 (8th Cir. 1992).  The non-discrimination strand is premised in part on the concept that awarding damages to plaintiffs while leaving less litigious customers paying the filed rates would be discriminatory.  See Goldwasser v. Ameritech Corp., 222 F.3d 390, 402 (7th Cir. 2000).  The non-justiciability strand reflects the courts' general reluctance to substitute their judgment for the judgment of the regulatory agency vested with primary authority to make such decisions and the courts' limited ability to determine the reasonableness of rates.  See AT&T v. JMC Telecom, LLC, 470 F.3d 525, 535 (3d Cir. 2006).  Thus, part of the "focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations."  H.J., Inc., 954 F.2d at 489; JMC Telecom, 470 F.3d at 535 (dismissing negligent misrepresentation claim because "to rule otherwise would force the courts to determine what the reasonable rate would be in order to assess damages.").

Where applicable, the doctrine prevents a customer from enforcing contract or tort rights that contradict the tariff.  JMC Telecom, 470 F.3d at 532 (citing Central Office, 524 U.S. at 226).

The effect of the doctrine is that "[r]egardless of the carrier's motive -- whether it seeks to benefit or harm a particular customer -- the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services."  Central Office, 524 U.S. at 223 (citing MCI Telecomms. Corp. v. AT&T, 512 U.S. 218, 229 (1994)).  "Thus, even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff."  Central Office, 524 U.S. at 222 (citing Kansas City S. R. Co. v. Carl, 227 U.S. 639, 653 (1913)); see also Weinberg v. Sprint Corp., 173 N.J. 233. 243 (2002) ("[T]he filed rate doctrine bars money damages…where the damage claims are premised on state contract principles, consumer fraud, or other basis on which plaintiffs seek to enforce a rate other than the filed rate."); Richardson v. Standard Guar. Ins. Co., 371 N.J. Super. 449, 470 (App. Div. 2004) ("[T]he doctrine precludes a claim for damages which would indirectly cause the application of rates different from the filed rates.")

Accordingly, there is no fraud exception to the filed rate doctrine.  JMC Telecom, 470 F.3d at 535.  Where fraud is present, the courts have left enforcement to the regulators, who are best situated to discover when regulated entities engage in fraud and to remedy fraud when it arises.  Wegoland, 27 F.3d at 21.  Additionally, fraud may be difficult to prove because under the doctrine, "[a]ll customers are conclusively presumed to have constructive knowledge of the filed tariff under which they receive service."  Fax Telecomms., 138 F.3d at 489.  In short, a filed tariff is said to "conclusively and exclusively enumerate the rights and liabilities of the contracting parties."  Marcus v. AT&T, 138 F.3d 46, 56 (2d Cir. 1998).  The doctrine bars a plaintiff "from seeking relief, whether equitable or legal, for having been misled by unconscionable sales practices which caused [a] plaintiff to enter into a contract consistent with

the filed rate." <u>Richardson</u>, 371 N.J. Super. at 470. "Although the filed rate doctrine produces

harsh results…such equitable concerns have been rejected by the Supreme Court." <u>JMC</u>

<u>Telecom</u>, 470 F.3d at 533 n.11 (citing <u>Central Office</u>, 524 U.S. at 223; <u>Maislin Indus. v. Primary</u>

<u>Steel, Inc.</u>, 497 U.S. 116, 128 (1990)).

 As a preliminary matter, the Court will explore the development of the filed rate doctrine

in New Jersey with respect to two issues; first, the application of the doctrine to state (as well as

federal) rate-making, and second, the doctrine's relevance in the context of insurance regulation.

 The Appellate Division of the Superior Court of New Jersey reasoned in a recent opinion

that the filed rate doctrine should apply to state as well as federal rate-making. <u>Richardson</u>, 371

N.J. Super. at 462.  The Appellate Division cited cases from various federal courts of appeals in

support of this finding.  <u>See id.</u> (citing <u>Wegoland, Ltd. v. NYNEX Corp.</u>, 27 F.3d 17, 20 (2d Cir.

1994); <u>Taffet v. Southern Co.</u>, 967 F.2d 1483, 1494 (11th Cir. 1992), <u>cert.</u> <u>denied</u>, 506 U.S. 1021

(1992); <u>H.J. Inc. v. Northwestern Bell Tel. Co.</u>, 954 F.2d 485, 488 (8th Cir. 1992), <u>cert.</u> <u>denied</u>,

504 U.S. 957 (1992)).  Accordingly, the Court finds that the filed rate doctrine may be applied to

rate-making by a New Jersey regulatory agency.

 Second, although the filed rate doctrine traditionally applied to public utilities and

common carriers, the Appellate Division has held that it also applies to insurance regulation.

<u>Richardson</u>, 371 N.J. Super. at 463.  The plaintiff in <u>Richardson</u> alleged that the sales practices

of three insurance companies and a credit card company fraudulently induced her to purchase

various insurance policies, including credit interruption of income insurance, combined credit

life and credit disability insurance, and credit family leave insurance.  <u>Id.</u> at 458-59.  In

determining that the filed rate doctrine should apply to insurance rate-making, the Appellate

Division found that (1) many other jurisdictions had applied the doctrine to insurance industry

17

rate-making; (2) the insurance industry in New Jersey is heavily regulated; and (3) the statutory framework governing rate-making for credit insurance in New Jersey is meaningful and extensive.

Although the Court has not found any instance of a New Jersey court applying the filed rate doctrine to rate-making in the health insurance context, the Court has found a group of state and federal courts that have applied the filed rate doctrine to state regulation of health insurance. See Roussin v. AARP, 664 F. Supp. 2d 412 (S.D.N.Y. 2009), aff'd by 2010 U.S. App. LEXIS 10678 (2d Cir. May 26, 2010) (applying filed rate doctrine to bar claim for breach of fiduciary duty challenging a fee charged under a health insurance plan); Fersco v. Empire Blue Cross & Blue Shield, 1994 U.S. Dist. LEXIS 11479 (S.D.N.Y. Aug. 17, 1994) (dismissing as barred by the filed rate doctrine claims that the health insurance company had defrauded its insured by filing inaccurate financial reports to obtain excessive rate increase); In re Empire Blue Cross & Blue Shield Consumer Litig., 164 Misc. 2d 350, 622 N.Y.S.2d 843 (N.Y. Sup. Ct. 1994), aff'd sub nom., Minihane v. Weissman, 226 A.D.2d 152, 640 N.Y.S.2d 102 (N.Y. App. Div. 1996) (dismissing claims for breach of contract and fraud as barred by filed rate doctrine when health insurance company obtained excessive rate increases by filing inaccurate reports); Commonwealth ex rel. Chandler v. Anthem Ins. Cos., 8 S.W.3d 48 (Ky. Ct. App. Apr. 30, 1999) (dismissing claims that a health insurer engaged in a scheme to fraudulently inflate premium rates based on filed rate doctrine); but see In re Managed Care Litig., 150 F. Supp. 2d 1330 (S.D. Fla. 2001) (declining to apply the filed rate doctrine to a claim that managed care insurers misrepresented the quality and extent of plaintiffs' managed health care coverage).  It appears to be appropriate to apply the filed rate doctrine in this context.

Prudential argues that Litwack's claims should be barred by the filed rate doctrine because (1) his premium rates (including a disclosure of the block closure)[2] were submitted and approved by the New Jersey Department of Banking and Insurance (DOBI), the state agency authorized by New Jersey law to regulate insurance rates; and (2) his claims seek monetary relief which would impermissibly require the Court to determine what the reasonable rate would be in order to assess damages.  In support of its argument, Prudential refers the Court to the New Jersey statute governing DOBI's regulation of health insurance policies like the one at issue here. Pursuant to N.J. Stat. Ann. § 17B:26-1(a), (g), health insurance policies to be issued in the State of New Jersey must be filed with a DOBI commissioner.   The form filing must include details about premium rates and classification of risks.  The Commissioner may disapprove any filed policy if:

(1)     the benefits are unreasonable in relation to the premium charged, or

(2)     such form contains provisions which are unjust, unfair, inequitable, misleading, contrary to law or to the public policy of [the State of New Jersey], or

(3)     the policy is sold in such a manner as to mislead the insured, or

(4)     insurance under such policy is being solicited by means of advertising, communication, or dissemination of information which involves misleading or inadequate description of the provisions of the policy, specifying particulars.

N.J. Stat. Ann. § 17B:26-1(h).

---

[2] Prudential attached excerpts from the filings it submitted to DOBI.  In the cover letters submitted with filing forms for 1982, 1984, and 1985, for instance, Prudential disclosed that "[o]n December 17, 1981, because of persistent losses we stopped selling this policy although some new policies are issued as conversions from group contracts."  It is appropriate to consider this material on a motion to dismiss because it is part of a public filing.  See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir. 2000) (holding that on a motion for judgment on the pleadings, a court may take judicial notice of public disclosure documents filed with the Securities Exchange Commission).  Furthermore, Litwack did not object to Prudential's inclusion of the filings in its motion to dismiss.

Litwack counters that the filed rate doctrine does not apply because (1) his claims do not require the Court to second-guess any agency's determination about the reasonableness of the CHIP premium rates because rather than challenge the rates he was charged, Litwack is asserting that Prudential's misrepresentations and omissions regarding the death spiral impeded his ability to make an informed decision about whether to renew the policy or search for a different one; (2) the disclosure of the existence or non-existence of a death spiral to New Jersey consumers is not specifically regulated, so a decision in this case will not affect the regulatory agency's procedures and rate determinations; and (3) a judicial award of monetary damages in this case will not constitute rate regulation.

The Court must first determine whether the filed rate doctrine applies here by asking whether the core principles of the doctrine are implicated in the context of health insurance regulation in New Jersey.  DOBI was created to "regulate and oversee the operations of the insurance industry" and the agency is endowed with the statutory "obligation to protect the interests of New Jersey's insurance customers."  <u>Richardson</u>, 371 N.J. Super. at 463-64 (citing N.J. Stat. Ann. § 17:1C-19(a)(1)).  Health insurance premium rates for policies that will be issued in the state must be submitted to DOBI for approval.  The agency is empowered by statute to reject filings (1) for which the benefits are unreasonable in relation to the premium charged; (2) which contain unjust, unfair, inequitable, or misleading provisions; and (3) for policies that are sold in a misleading fashion or that inadequately describe the policy's provisions.  N.J. Stat. Ann. § 17B:26-1(h).  The Court finds that DOBI's regulation of health insurance does implicate the non-justiciability prong of the filed rate doctrine.  DOBI is the regulatory agency vested with the primary authority to determine the reasonableness of health insurance premium rates.  The rates that Litwack paid were approved by DOBI.  Additionally, the statute requires DOBI to

reject a policy for having misleading provisions or for being sold in a misleading fashion.  As such, the agency procedures appear to cover the relevant conduct in this case and the Court's intrusion in this area may tend to interfere with DOBI procedures and rate determinations.

The Court will now review Litwack's arguments.  First, Litwack argues that his claims do not require the Court to second-guess any agency's determination about the reasonableness of the CHIP premium rates because he is not challenging the rates he was charged.  Rather, Litwack asserts that Prudential's misrepresentations and omissions regarding the death spiral impeded his ability to make an informed decision about whether to renew the policy or search for a different one.  In support of this argument, Litwack cites principally to two cases.

Litwack first argues that there is no conflict here between DOBI's authority and the common law causes of action he is attempting to assert.  Litwick relies on Nader v. Allegheny Airlines, 426 U.S. 290 (1976).  In that case, relying on the doctrine of primary jurisdiction,[3] the court of appeals had issued an order staying an airline passenger's common law action pending referral to the Civil Aeronautics Board for a determination of whether an airline's overbooking practice was "deceptive" under the Federal Aviation Act.  The Supreme Court reversed the stay, finding that the Federal Aviation Act contemplated coexistence between common law tort actions and the federal statute in its saving clause.  In arriving at that conclusion, the Supreme Court distinguished the case before it from a 1907 Supreme Court decision, Texas & Pacific Ry.

---

[3] Although the filed rate doctrine is like the doctrine of primary jurisdiction in that both involve deference to administrative decision-making, the doctrines differ and have developed separately. "Primary jurisdiction is a doctrine that requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision."  Richman Bros. Records, Inc. v. U.S. Sprint Communications Co., 953 F.2d 1431, 1435 (3d Cir. 1991) (citing Baltimore Bank for Cooperative v. Farmers Cheese Cooperative, 583 F.2d 104, 108 (3d Cir. 1978)).  Primary jurisdiction is a procedural question which requires courts to consider whether to transfer a portion of a case that is within the expertise of an administrative agency.  The filed rate doctrine is more like a doctrine of abstention; courts must dismiss the claims to which it applies.

V. Abilene Cotton Oil Co., 204 U.S. 426 (1907), which is considered to have been a precursor to

the filed rate doctrine line of cases, which began with Keogh, 260 U.S. 156.  The Supreme Court

in Nader found that no irreconcilable conflict existed between the Federal Aviation Act's

statutory scheme and the passenger's common law causes of action, so the doctrine of primary

jurisdiction did not apply.  Specifically, the Supreme Court found that the specific issues raised

by the passenger were not regulated by the statute:

> The court…is not called upon to substitute its judgment for the
> agency's on the reasonableness of a rate - or, indeed, on the
> reasonableness of any carrier practice.  There is no Board
> requirement that air carriers engage in overbooking or that they fail
> to disclose that they do so.  And any impact on rates that may
> result from the imposition of tort liability or from practices adopted
> by a carrier to avoid such liability would be merely incidental.

Id. at 299-300.

The Nader reasoning arose in a different context—the doctrine of primary jurisdiction

rather than the filed rate doctrine—than the one currently before the Court.  The two doctrines

are similar in that both refer in some respect to regulatory agency determinations.  However,

Nader will not change the Court's analysis because the Court has already determined that here,

there is a potential for conflict between the subject matter DOBI regulates and the common law

causes of actions Litwack asserts.  Moreover, Nader is distinguishable because in that case, the

challenged practice—overbooking on commercial flights—had no bearing on any tariff provision

and the Civil Aeronautics Board had no specialized knowledge about the practice.

Litwack also relies on a district court case in which putative class action plaintiffs sued a

group of defendant managed care organizations (MCOs).  In re Managed Care Litig., 150 F.

Supp. 2d 1330 (S.D. Fla. 2001).  The plaintiffs asserted that the insurers had violated the

Racketeer Influenced and Corrupt Organizations Act (RICO) by defrauding them about the

nature of the care they would receive.  They alleged that the MCOs' representations in advertising and marketing materials that the plaintiffs' doctors would order medically necessary treatments were false because in fact the doctors' decisions about what was necessary were affected by a monetary incentive structure aimed at containing medical costs.  The district court determined that the filed rate doctrine did not bar the plaintiffs' claims because there was no conflict between the claims and the state regulatory structures.  The Court reasoned that:

> [The relevant] state regulatory regimes naturally can only review rates and policies for their objective reasonableness as applied to every payer of premiums within a given jurisdiction…. the Plaintiffs charge that the Defendants withheld information concerning internal policies which would have some bearing on the Plaintiffs' personal, subjective decision as to how much they were willing to pay and whether they would select one insurance plan over other alternatives.  It was this subjective decisionmaking process that the Plaintiffs submit was corrupted by the Defendants' omissions and misrepresentations.

Id. at 1344.

The Court also noted that:

> [The relevant regulations], however, do not speak to whether the alleged unsavory specifics of the Defendants' procedures were subjected to scrutiny.  For example, in view of the Plaintiffs' allegations, it may be that the definition of "medical necessity" acquires an Alice-in-Wonderland flavor, whereby the managed care insurance company manipulates those words so that they mean one thing within the context of regulatory review but something quite different in actual practice."

Id. at 1345.

In other words, based on the information before the district court at the time, the plaintiffs were not challenging information contained in the regulatory filings; rather, the problems of which they complained were not regulated and in fact could not be, because they arose in the

way the MCOs implemented the managed care and could not have been detected by regulatory agencies in filings.  Id.

Although the Court finds Litwack's reasoning persuasive, the Managed Care case is distinguishable from this case in a key aspect that makes the district court's analysis in that case potentially inapplicable here.  Both cases involve a disclosure that could have affected the customers' ability to make an informed decision about whether to select (or to continue to renew) one policy over the alternatives.  However, the regulatory agency might regulate the disclosure of which Litwack complains, whereas in Managed Care, the plaintiffs did not complain about anything that could be disclosed—they were upset about the way the plan was actually administered.

It is undisputed that DOBI is required to regulate the reasonableness of the rates for health insurance policies sold in New Jersey.  N.J. Stat. Ann. § 17B:26-1(h)(1).  In the present matter, the violation of which Litwack complains is that Prudential failed to inform him of the death spiral in its communications to him.  Litwack argues that having known about the death spiral would have caused him to choose another type of insurance.  Thus, like in the Managed Care case, Litwack's challenge is not to the rates themselves.  But here, although Litwack premises his claim on a failure to disclose a practice of the insurance company, the non-disclosure is related to rate-making in a more direct way than the non-disclosure of the practice in Managed Care.  The relevant decision-making on the part of the consumer that the non-disclosure impeded here was directly related to the insurance premium rate.  Furthermore, Litwack's claimed injury here is that he paid higher premiums than he would have for an alternative policy because CHIP was in a death spiral; thus the injury is directly related to the filed rate.

Moreover, Litwack is challenging another aspect of the parties' relationship that DOBI also regulates to some extent; the manner in which the policy is sold. The same section that allows DOBI to disapprove a policy if the premium rates are unreasonable also allows DOBI to disapprove a filed policy if

> (2)     such form contains provisions which are unjust, unfair, inequitable, misleading, contrary to law or to the public policy of [the State of New Jersey], or
>
> (3)     the policy is sold in such a manner as to mislead the insured, or
>
> (4)     insurance under such policy is being solicited by means of advertising, communication, or dissemination of information which involves misleading or inadequate description of the provisions of the policy, specifying particulars.

N.J. Stat. Ann. § 17B:26-1(h)(2)-(4). This case is distinguishable from both Nader and Managed Care.

Litwack next argues that a judicial award of monetary damages to policyholders based on fraudulent communications about the existence of a block closure would not interfere with DOBI's regulatory authority. In support of this argument, Litwack focuses on the fact that DOBI does not regulate communications to consumers because it only reviews the actual policies. Therefore, Litwack asserts, all of his claims that are based on form letters and other representations that Prudential made to him about the reason for the premium rate increases do not implicate the doctrine's policy goals. However, the Court is constrained by the federal common law and the New Jersey jurisprudence concerning the filed rate doctrine. The question under the filed rate doctrine is not whether DOBI specifically regulated certain communications; the question is whether a judicial award of damages would constitute rate regulation and require the Court to determine what a reasonable rate would have been.

The non-justiciability strand dictates that the Court apply the filed rate doctrine.  Under that strand, "any remedy requiring a refund of a portion of the filed rate is barred by application of the filed rate doctrine."  Smith, 178 N.J. at 281; see also Marcus, 138 F.3d at 60-61 ("[A]n award of compensatory damages would violate the non-justiciability strand of the doctrine….[because] appellants seek damages equal to the difference between AT&T's rate and the best alternative rate available under a competitor's tariff").  In his prayer for damages, Litwack seeks compensatory damages and a refund of all moneys acquired by means of unlawful practices.  However, Litwack cannot seek money damages that would require the Court to recalculate past rates that he paid which were consistent with the filed rate.  To do so would require the Court to determine what rate would have been reasonable and thereby interfere with DOBI's rate-making process.  Therefore, his claims for compensatory damages or refund based on insurance premiums he paid in previous years are barred by the filed rate doctrine.

The fact that Prudential allegedly induced Litwack to pay those higher premiums by misrepresenting the reason for the premium increases cannot change the Court's analysis.  There is no fraud exception to the filed rate doctrine.  JMC Telecom, 470 F.3d at 535.  The Richardson Court specifically held that the doctrine would "preclude [a] plaintiff from seeking relief, whether equitable or legal, for having been misled by unconscionable sales practices which caused plaintiff to enter into a contract consistent with the filed rate."  Richardson, 371 N.J. Super. at 470.  Unconscionable practices employed to induce a consumer to purchase a product are not unlike unconscionable practices employed to induce a consumer to continue to use that product.  Litwack's claim that Prudential's misrepresentations about the premium increases caused him to continue to renew the CHIP policy are barred by the filed rate doctrine because the premiums he paid were consistent with the rates that were approved by DOBI.

Each of Litwack's claims seeks damages that seek the return of some portion of his premium payments.  The Court will briefly review each of Litwack's claims for relief with more specificity.  The NJCFA makes it unlawful for "any person" to use an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact."  The NJCFA "provides a remedy for any consumer who has suffered an 'ascertainable loss of moneys or property, real or personal, as a result of [a violation of the NJCFA]."  Lee v. First Union Nat'l Bank, 199 N.J. 251, 257 (2009) (quoting N.J. Stat. Ann. § 56:8-19).  Ascertainable loss is a required element of a NJCFA claim, whether the plaintiff seeks injunctive relief or damages.  Weinberg, 173 N.J. at 249.  Under the filed rate doctrine's legal fiction, Litwack cannot recover money damages—and therefore cannot show that he suffered ascertainable loss—when he paid a rate that was consistent with Prudential's approved filed rate.  See id. at 244.  Furthermore, Litwack cannot proceed solely on his claim for injunctive relief when the Court has determined at this early stage that he has not suffered ascertainable loss.  Id. (holding that when the filed rate doctrine barred a plaintiff's claims because it prevented him from showing ascertainable loss, the plaintiff could not continue with only the claim for injunctive relief and attorneys' fees).  Where Litwack frames his requested relief as damages or a "refund," his NJCFA claim is barred by the doctrine. See Smith, 178 N.J. at 281 (explaining that the filed rate doctrine bars "any remedy requiring a refund of a portion of the filed rate.")

Litwack's common law claims for fraudulent misrepresentation, fraudulent omission, and breach of the duty of good faith and fair dealing are similarly barred by the application of the doctrine.  Litwack's fraud claims would "force the courts to determine what the reasonable rate would be to assess damages."  See JMC Telecom, 470 F.3d at 535 (dismissing claim for

negligent misrepresentation based on the filed rate doctrine).  Enforcement of the duty of good faith and fair dealing would "impermissibly enlarge the rights as defined by the tariff."  See id. (dismissing claim for violation of the duty of good faith and fair dealing).

The non-discrimination strand also works to bar Litwack's claims.  The filed rate doctrine "operates on the presumption that the plaintiff had knowledge of the filed rates and, thus, could not reasonably rely upon the regulated entity's misrepresentations or omissions of material facts."  Richardson, 371 N.J. Super. at 461.  This presumed knowledge applies to all the terms in the "tariff" or regulatory filings.  See Central Office, 524 U.S. at 229 ("[The doctrine] need pre-empt only those suits that seek to alter the terms and conditions provided for in the tariff."); Smith, 178 N.J. at 285 (reasoning that under the filed rate doctrine, it would be presumed that the plaintiff had knowledge of the "entire tariff" filed with the regulatory agency, including a provision about the relationship between the relevant entities).  Under the non-discrimination strand, Litwack is barred from proceeding on his fraudulent omission and misrepresentation theories because the disclosures to DOBI included information about the death spiral.  Therefore, he is presumed to have had knowledge of the death spiral and so he cannot claim to have been deceived by Prudential's failure to affirmatively disclose it to him

Because of the harsh consequences of the filed rate doctrine, this is an unsatisfying result, but the Court feels compelled to apply it to all of Litwack's claims for the reasons stated above.  Prudential's motion to dismiss Litwack's claims is granted.  Litwack's claims for fraudulent misrepresentations, fraudulent omissions, breach of the duty of good faith and fair dealing, and violation of the NJCFA are dismissed without prejudice.

**C.      Clark's Claims for Relief Based on California's Unfair Competition Law**

Count Four asserts a claim for relief on Clark's behalf under California's Unfair

Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq.  Prudential asserts that

Clark's UCL claim should be dismissed because (1) it is barred by the relevant four-year statute

of limitations; (2) Clark cannot avail herself of either of the two equitable remedies—injunction

or restitution—available under the UCL; and (3) Clark failed to plead facts that establish that

Prudential's conduct was unlawful, unfair, or fraudulent within the meaning of the UCL.

Additionally, Prudential asserts that Clark cannot seek treble damages for a UCL violation under

California Civil Code § 3345.

         *i.       Statute of Limitations*

With regard to the statute of limitations issue, Prudential argues that Clark's claim is stale

because (1) Clark last renewed her policy in September 2004, more than four years before the

Complaint was filed; and (2) she cannot invoke the delayed discovery rule because the Ninth

Circuit has held that it does not apply to UCL claims.  Clark counters that her claim is timely

because (1) each monthly payment of CHIP insurance premiums that Clark made from

December 2004 to September 2005 constituted a new injury and thus her UCL claim is within

the four-year statute of limitations; and (2) the discovery rule is applicable to UCL claims.

Section 17208 of the UCL provides, in pertinent part, that "[a]ny action to enforce any

cause of action pursuant to this chapter shall be commenced within four years after the cause of

action accrued."  Generally in California, where the delayed discovery rule applies, a cause of

action is deemed to accrue when a reasonable person would have discovered the factual basis for

a claim.  See April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805, 828-29 (Cal. Ct. App.

1983).

The Court will first address Prudential's contention that the discovery rule does not apply to UCL claims.  Prudential relies on a Ninth Circuit decision which held that under § 17208, UCL claims "are subject to a four-year statute of limitations which [begins] to run on the date the cause of action accrued, not on the date of discovery."  Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc., 285 F.3d 848, 857 (9th Cir. 2002) (emphasis added).  The Court finds, for the reasons described below, that based on a subsequent decision of a California Court of Appeal issued in 2009, Broberg v. Guardian Life Ins. Co. of Am., 171 Cal. App. 4th 912, 920 (Cal. Ct. App. 2009), the Ninth Circuit's truncated reasoning in Karl Storz is not the most persuasive prediction of how the Supreme Court of California would rule on this issue today.

The Ninth Circuit's interpretation of California state law is only persuasive, not binding, on this Court.  Furthermore, even the Ninth Circuit has held that its prediction of state law issues is only "binding in the absence of any subsequent indication from the California courts that our interpretation was incorrect."  Jones-Hamilton Co v. Beazer Materials & Servs., 973 F.2d 688, 696 n.4 (9th Cir. 1992).  When the Court sits in diversity jurisdiction, it must predict how a state's highest court would resolve a state issue of law, Borman, 960 F.2d at 331, and decisions of state intermediate appellate courts should be accorded significant weight in the absence of an indication that the highest state court would rule otherwise.  Rolick, 925 F.2d at 664.  Therefore, the Court turns to the relevant precedent under California law.

The Supreme Court of California has not yet decided, and the California Courts of Appeal are in disagreement as to whether the delayed discovery rule, which delays accrual of certain causes of action until the plaintiff has actual or constructive knowledge of facts giving rise to the claim, applies to claims for unfair competition.  Broberg v. Guardian Life Ins. Co. of Am., 171 Cal. App. 4th 912, 920 (Cal. Ct. App. 2009), review denied, 2009 Cal. LEXIS 5288;

Grisham v. Philip Morris USA, 40 Cal. 4th 623, 635 n.7 (Cal. 2007) (assuming for purposes of

deciding a question certified to it by the Court of Appeals for the Ninth Circuit that the delayed

discovery rule does apply to UCL causes of action, but explicitly declining to address the

disagreement); compare Snapp & Assocs. Ins. Servs., Inc. v. Robertson, 96 Cal. App. 4th 884,

891 (Cal. Ct. App. 2002) (discovery rule does not apply to UCL causes of action); with

Massachusetts Mut. Life Ins. Co. v. Superior Court, 97 Cal. App. 4th 1282, 1295 (Cal. Ct. App.

2002) (discovery rule "probably" applies).

   However, the Court is persuaded by the reasoning of Broberg, a 2009 California Court of

Appeal decision addressing the application of the delayed discovery rule to a UCL claim in a

case with issues analogous to the ones presently before the Court.  See Broberg, 171 Cal. App.

4th 912.  In  that case, the plaintiff asserted that marketing materials for a life insurance policy

were intentionally deceptive in representing that a consumer's premium payment obligations

would "vanish" after eleven years.   The model used in the marketing materials to explain the

vanishing premium option was premised on the faulty assumption that investment returns would

not change over time.  The California Court of Appeal determined that the plaintiff's § 17200

claim based on this deceptive practice could benefit from the delayed discovery rule.   It noted

the conflicting California authorities and decided that

> At least in the context of unfair competition claims based on a
> defendant's allegedly deceptive marketing material and sales
> practices….and where the harm from the unfair conduct will not
> reasonably be discovered until a future date, we believe the better
> view is that the time to file a section 17200 cause of action starts to
> run only when a reasonable person would have discovered the
> factual basis for a claim.

Id. at 920-21.

In support of its reasoning, the Court of Appeals quoted <u>April Enterprises</u>, 147 Cal. App. 3d at 828, for the propositions that "the nature of the right sued upon, not the form of the action…determines the applicability of the statute of limitations."[4]

This case is analogous to <u>Broberg</u>.  Both this matter and <u>Broberg</u> involve deceptive marketing and sales practices for insurance policies.  Furthermore, the injuries complained of in both cases are similar in a way that relates to the delayed discovery rule; the injuries in both instances result from unforeseen mounting future premium payments that are higher than the customer had anticipated due to a condition that is allegedly not disclosed.  The Court is therefore persuaded that <u>Broberg</u>, as a recent decision of a California Court of Appeal addressing the rule in a context that is analogous to this case, dictates that the delayed discovery rule may apply to Clark's cause of action.

On July 16, 2010, after oral arguments on the present motion, Prudential filed a notice of supplemental authority to direct the Court's attention to a recent decision by a California Court of Appeal, <u>Aryeh v. Canon Business Solutions, Inc.</u>, 185 Cal. App. 4th 1159 (2010), that it asserts relates to the UCL and the delayed discovery rule.  <u>Aryeh</u> does not affect this Court's analysis of <u>Broberg</u> or change its conclusion that the delayed discovery rule may be applied to Clark's UCL cause of action.  Accordingly, the Court holds that Clark is not barred, as a matter of law, from invoking the delayed discovery rule for her UCL claim in this case.

Prudential contends that even if the Court decides that the delayed discovery rule may apply to UCL claims, it should dismiss Clark's UCL claim for failure to plead the facts necessary

---

[4] The Supreme Court of California declined to review <u>Broberg</u>, 2009 Cal. LEXIS 5288.  Notably, in a 2007 case, the Supreme Court of California declined to resolve the split over the application of the discovery rule in the UCL context, but assumed, for just the purpose of its review in the case before it, that the discovery rule does apply in the UCL context. <u>Grisham</u>, 40 Cal. 4th at 635 n.7.

to invoke the rule.  Prudential argues that to survive a motion to dismiss based on the statute of limitations by asserting the discovery rule, Clark must have alleged (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. Prudential asserts that the TAC fails to allege those facts.

The Court disagrees that Clark was required to plead facts relating to the time and manner in which she discovered the facts constituting her claim.  A statute of limitations defense is affirmative.  Fed. R. Civ. P. 8(c).  Therefore, it may only be resolved on a motion to dismiss if it is clear from the face of the complaint that the statute of limitations bars the claim.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994).  There is no requirement that a plaintiff affirmatively plead facts in the complaint showing that the statute of limitations has not run.

Moreover, Clark has pled facts that could support an inference that she diligently researched, but was unable to discover that the reason for the increasing premiums was the death spiral.  The TAC asserts in paragraph thirty-seven that:

> Prudential repeatedly advised Ms. Clark (in at least 1996, 1997, 1998, 1999, and 2000) that her increasing premiums were attributable to her increasing age and to medical cost inflation. Even after Ms. Clark initiated an investigation in 2005, Prudential told her, in response to correspondence from an attorney for Ms. Clark and an inquiry from the California Department of Insurance, that her premium increases were due to her increasing age and to the higher medical costs of the insured group, without ever disclosing that the higher medical costs of the insured group were due to the block closure and the death spiral that it caused by driving relatively healthy policyholders out of the group.

Those allegations are sufficient at the pleading stage to establish that Clark exercised reasonable diligence and yet was unable to discover the existence of the death spiral or its resulting consequences until 2005 at the earliest.  Since the Complaint was filed on December 17, 2008,

the TAC alleges sufficient factual information to show that Ms. Clark may be able to apply the delayed discovery rule to her claim; whether the delayed discovery rule will shelter her claim will involve a subsequent factual determination.

ii.     *Remedies Available Under the UCL*

Under the UCL, which is equitable in nature, "prevailing plaintiffs are generally limited to injunctive relief and restitution." In re Tobacco II Cases, 46 Cal. 4th 298 (Cal. 2009) (quoting Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (Cal. 2003) (internal quotations and citation omitted). Under UCL § 17203, a court may enjoin behavior that violates the UCL or order restoration "to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." An order for restitution was defined by the California courts as one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property or those claiming through that person." Korea Supply, 29 Cal. 4th at 1144-45.

Prudential argues that Clark's UCL claim should be dismissed because she cannot avail herself of either of the two equitable remedies—injunction or restitution—available under the UCL.

Prudential is correct that Clark lacks Article III standing to seek injunctive relief in this matter. Since she cancelled her CHIP policy in September 2005, she no longer faces a threat of continued harm with regard to Prudential's disclosures about the CHIP policy. See Los Angeles v. Lyons, 461 U.S. 95, 105 (1983). Clark also cannot establish standing to sue for injunctive relief on behalf of any CHIP policyholders in California who may have continued their CHIP

policy.  Although § 17204[5] authorizes a plaintiff to pursue injunctive relief in California state

courts as a private attorney general even though he or she currently suffers no individualized

injury as a result of a defendant's conduct, Clark cannot pursue her action in federal court unless

she can demonstrate a real or immediate threat of irreparable injury.  See Hangarter v. Provident

Life & Accident Ins. Co., 373 F.3d 998, 1021-22 (9th Cir. 2004).  "A plaintiff whose cause of

action [under § 17204] is perfectly viable in state court under state law may nonetheless be

foreclosed from litigating the same cause of action in federal court, if he cannot demonstrate the

requisite [continuing threat of] injury" to establish Article III standing.  Id. (citing Lee v. Am.

Nat'l Ins. Co., 260 F.3d 997, 1001-02 (9th Cir. 2001).  Therefore, the Court must dismiss,

without prejudice, any portion of Clark's UCL claim that purports to seek injunctive relief.

      As for restitution, Prudential argues that Clark's complaint appears to seek compensatory

damages rather than restitution; and that even if her claim for relief had been styled as one

restitution, she is not eligible to receive restitution because she received and retained the benefit

of her bargain.  The Court will address each argument in turn.

      Prudential is correct that restitution is the only monetary remedy authorized by statute for

a violation of the UCL.  See Cal. Bus. & Prof. Code § 17203.  However, Prudential's reliance on

Korea Supply is unfounded because the Supreme Court of California's analysis of available

---

[5] Additionally, "[a]ny person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with § 382 of the California Code of Civil Procedure."  Cal. Bus. & Prof. Code § 17203.  Section 17204 states that UCL actions may be prosecuted by "any person who has suffered injury in fact and has lost money or property as a result of such unfair competition."

Section 382 of the California Code of Civil Procedure, which addresses "defense by parties on behalf of others having common interests" enumerates the requirements for such representative suits, including "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

remedies in that case arose in a distinguishable context.  There, the plaintiff was a company that allegedly had lost a business opportunity due to the unfair practices of a competitor.  The Supreme Court reasoned that the plaintiff could not recover under a theory of restitution because the money it sought from the competitor "was not taken from the plaintiff and the plaintiff did not have an ownership interest in the money."  <u>Korea Supply</u>, 29 Cal. 4th at 1144.  "[A]n individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."  <u>Korea Supply</u>, 29 Cal. 4th at 1148.  "The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest."  <u>Id.</u> at 1149.  Whereas "[a]ctual direct victims of unfair competition may obtain restitution," <u>id.</u> at 1152, the plaintiff in <u>Korea Supply</u> could not avail itself of the equitable UCL remedies because the defendant in that case had taken a business opportunity from the plaintiff; it did not take money from the plaintiff that could be restored under a restitution theory.

Thus, because Clark alleges here that she was a direct victim of Prudential's unfair competition, and that Prudential may have unfairly obtained monies from her that should be restored, the Court will reject Prudential's argument without prejudice at the pleading stage.  The remedies section of the TAC seeks "a restoration of all money or property which may have been acquired by Prudential by means of unfair competition."  The UCL grants a "broad equitable power" to the courts.  <u>Cortez v. Purolator Air Filtration Products Co.</u>, 23 Cal. 4th 163, 180 (Cal. 2000).  "The purpose of the [] remedy is to allow recovery of the excess paid and to prohibit the seller from receiving and keeping such excess."  <u>People ex rel. Kennedy v. Beaumont Investment, Ltd.</u>, 111 Cal. App. 4th 102, 135 (Cal. Ct. App. 2003) (citing <u>Elmers v. Shapiro</u>, 91 Cal. App. 2d 741, 752 (Cal. Ct. App. 1949)).  Moreover, statutory restitution is "not solely

intended to benefit [the victims] by the return of money, but instead is designed to penalize a defendant for past unlawful conduct and thereby deter future violations." Id. at 135 (quotation marks omitted) (quoting People v. Toomey, 157 Cal. App. 3d 1, 22 (Cal. Ct. App. 1984)).  It would be premature to reject Clark's request for restitution at this stage in the litigation.  Clark will be afforded an opportunity to craft a remedy and provide evidence in support of her claim for restitution.  Whether or not restitution is available to Clark will involve both a factual and legal determination at a subsequent phase of the litigation.

Next, the Court will address Prudential's argument that the restitution claim cannot stand because Clark received and retained the benefit of her bargain.  Prudential argues that Clark bargained for health insurance coverage and that Prudential provided the coverage it contractually promised to provide.  Clark counters that Prudential's unfair practice led her to pay exorbitant insurance premiums; she would have been able to buy less expensive insurance elsewhere had Prudential informed her that the policy was in a death spiral; and she did not bargain for an insurance plan that was in a death spiral.

Clark and Prudential both argue that Peterson v. Cellco Partnership, 164 Cal. App. 4th 1583 (2008), supports their respective positions.  In that case, the plaintiffs bought insurance policies for their mobile phones and the phone service provider retained a percentage of the premium payments.  The plaintiffs asserted that the defendant's conduct violated the UCL because the service provider was not licensed to sell insurance.  The service provider challenged the allegations, arguing that the plaintiffs had not been injured by its practice, so they did not have standing, even under the broad standing provisions of § 17204, to challenge the practice. The Court of Appeals agreed, holding that:

> [P]laintiffs here do not allege they paid more for the insurance due
> to defendant's collecting a commission.  They do not allege they

> could have bought the same insurance for a lower price either directly from the insurer or from a licensed insurance agent. Absent such an allegation, plaintiffs have not shown they suffered actual economic injury.  Rather, they received the benefit of their bargain, having obtained the bargained for insurance at the bargained for price.

Peterson, 164 Cal. App. 4th at 1591.

The Court agrees with Clark that the present situation is distinguishable from Peterson. In the first place, the above-quoted excerpt from Peterson upon which Prudential relies arose in a discussion of § 17204's standing provision.  Prudential is not challenging Clark's standing to sue.  More importantly, in Peterson the plaintiffs had been unable to show that they had suffered any injury as a result of the service provider taking a commission on the insurance policies it offered its customers.  Here, on the other hand, Clark asserts that she was injured by Prudential's failure to disclose the death spiral because she was paying more for coverage than she would have if she had sought alternative individual coverage that was not subject to a death spiral.

Prudential argues that Clark has not sufficiently alleged injury because she has not alleged "that she could have bought the same coverage as her CHIP policy at a lower price." (Def.'s Br. in Opp'n to Mot. to Dismiss SAC 5.)  The Court is not swayed by this argument, which addresses a factual question that is beyond the scope of this motion to dismiss.  At the current juncture, the Court is satisfied that Clark has pled that she suffered some injury that deprived her of the benefit of her bargain.  She alleged that large premium increases are generally not necessary in a functioning risk pool since the premiums paid by low cost members subsidize the higher cost of less healthy members.  (TAC ¶ 2.)  Thus, it is fair to infer that she could have purchased a less expensive policy that was not in a death spiral.  Prudential's failure to disclose that it had closed the block and that a death spiral would inevitably result from the

closure could be considered an act that would injure Clark's ability to receive the benefit of the agreement.

In another case Clark cites, a group of plaintiffs alleged that the owner of a mobile home park unlawfully forced mobile home tenants to accept long-term leases in order to avoid rent control provisions. Kennedy, 111 Cal. App. 4th at 132. The trial court ordered the park owners to pay restitution to tenants affected by the practice (1) in the amount of all above-ordinance rents charged to tenants in unlawful long-term leases, and (2) for diminution in value of their leasehold interests resulting from the unlawful practices. Id. at 132. The California Court of Appeal reasoned that "[w]here restitution is ordered as a means of redressing a statutory violation, the courts are not concerned with restoring the violator to the status quo ante….[t]he focus instead is on the victim." Id. at 134. The Court of Appeal determined that the trial court was correct to craft a remedy that would "avoid unjustly enriching defendants and [] compensate tenants who paid above-ordinance rents." Id. at 135. The natural consequence of the trial court's remedy was that the plaintiffs reaped the benefit of their bargain—they lived on the land pursuant to the leases—and yet were also paid restitution, measured by the difference between the rent controlled amount they should have been charged and the amount they were charged in the unlawfully-obtained lease agreements.

Prudential's argument that restitution is not an appropriate remedy for Clark's claim does not compel dismissal at this stage. Although Clark did receive insurance coverage in exchange for the premiums she paid, it is fair to infer that she also paid a higher premium because of the death spiral than she would not have paid if Prudential had disclosed the death spiral's consequences and she had searched for different individual coverage. This finding is consistent with the statute's broad authorization for courts to order restoration of "any money or

property…which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.  It may be possible to craft a remedy that restores some amount of money that Clark would not have paid for an alternative policy she could have purchased if Prudential had disclosed the death spiral, without granting her a windfall.  The appropriate remedy here will depend on the factual landscape the parties present; it would be premature to dismiss Clark's request for restitution at this point.

### iii.      *Unlawful, Unfair or Fraudulent Conduct*

Prudential argues that Clark has failed to plead facts establishing that Prudential's conduct was "unlawful, unfair, or fraudulent" within the meaning of the UCL.  Although Clark need only allege that Prudential's action states a claim for one of these three categories, she maintains that her allegations meet all three of the possible grounds necessary to prove a violation of the UCL.

The Supreme Court of California has stated that, "[i]n contrast to its limited remedies, the unfair competition law's scope is broad." Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 180 (Cal. 1999).  "Unfair competition" is defined by the UCL to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.  The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." Rubin v. Green, 4 Cal. 4th 1187, 1200 (Cal. 1993) (internal quotations omitted).  "It governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition." Cel-Tech, 20 Cal. 4th at 180 (citations omitted).  The Court will examine Prudential's arguments with respect to each of the three types, or prongs of conduct that can give rise to a § 17200 liability.

a.   *"Unlawful" Business Acts*

With regard to the first category of potential violations, the "unlawful" business act

prong, Prudential argues that Clark must plead a violation of a statute, regulation, or court order,

and that an unlawful act cannot be premised on a violation of common law.  The TAC asserts

that the unlawful act was Prudential's alleged violation of the implied covenant of good faith and

fair dealing.  Clark counters that common law causes of action can form the basis for the

"unlawful" acts prong; in the alternative, Clark argues that some common law causes of action

that have been codified in the state of California may provide additional bases for the "unlawful"

acts prong.[6]

The "unlawful" practices prohibited by the UCL "are any practices forbidden by law, be

it civil or criminal, federal, state, or municipal, statutory, regulatory or court-made."  Saunders v.

Superior Court, 27 Cal. App. 4th 832, 838-39 (Cal. Ct. App. 1994).  By proscribing "any

unlawful" business practice, § 17200 "borrows violations of other laws and treats them as

independently actionable."  Cel-Tech, 20 Cal. 4th at 180 (citations and internal quotation marks

omitted).  Although both Clark and Prudential have found case law supporting their respective

positions, the Court is persuaded by the cases Clark cites because they provide more detailed

reasoning and are more firmly rooted in interpretations of the UCL by California Courts of

Appeal.

Prudential cites a set of cases in support of its contention that common law claims cannot

form the basis for an "unlawful" act under the UCL.  The first one in the set is Watson Labs, Inc.

v. Rhone-Poulenc Rorer, Inc., 178 F Supp. 2d 1099, 1118 n.3 (C.D. Cal. 2001), which held

without a great deal of analysis that  "a breach of contract may in fact form the predicate for

---

[6] Clark cites Cal. Civ. Code §§ 1709-1710 (fraudulent deceit) and §§ 1572-1573 (actual and
constructive fraud).

Section 17200 claims, provided it also constitutes conduct that is 'unlawful, or unfair, or fraudulent.'"  The remaining cases Prudential cites rely on the line of cases that begin with National Rural Telecomms. Coop. v. DIRECTTV, Inc., 319 F. Supp. 2d 1059, 1074 (C.D. Cal. 2003).  In that case, with limited analysis, the district court declined to allow the "unlawful" prong to be based on a breach of contract claim because it decided that Watson Labs dictated that a statutory violation is necessary to satisfy the "unlawful" prong.  After National Rural, various unpublished district court decisions followed suit.  See, e.g. Hartless v. Clorox Co., 2007 U.S. Dist. LEXIS 81686 *18 (S.D. Cal. Nov. 2, 2007) (rejecting common law negligence claim as a predicate for "unlawful" acts based on National Rural); Stearns v. Select Comfort Retail Corp., 2009 U.S. Dist. LEXIS 112971 *39 (N.D. Cal. Dec. 4, 2009) (holding, based on Hartless, that common law claims for negligence and product liability may not constitute predicate acts for a UCL claim); Waqavesi v. Indymac Fed. Bank, FSB, 2009 U.S. Dist. LEXIS 105555 *26 (E.D. Cal. Nov. 11, 2009) (citing Hartless for the proposition that "[c]ommon law claims, such as negligence, cannot form the basis for a UCL claim."); but see Azzini v. Countrywide Home Loans, 2009 U.S. Dist. LEXIS 120599 *10-11 (dismissing UCL claim because the plaintiff failed to state a claim for any of the alleged underlying statutory violations, but not directly addressing the issue whether common law causes of action can form the predicate "unlawful" act for a UCL claim).  None of the cases Prudential cites that specifically hold that common law claims cannot be a predicate for the "unlawful" prong are from a California state court.

Clark cites a different set of cases.  In Paulus v. Bob Lynch Ford, Inc., 139 Cal App. 4th 659, 681 (Cal. Ct. App. 2006), a California Court of Appeal held that "[v]irtually any law or regulation—federal or state, statutory or common law—can serve as a predicate for a §17200 'unlawful' violation."  The Court of Appeals for the Ninth Circuit, in CRST Van Expedited, Inc.

v. Werner Enters., 479 F.3d 1099, 1107 (9th Cir. 2006), allowed a common law claim for intentional interference with a competitor's employment contracts because it is a "tortious violation of duties imposed by law."  A federal district court allowed a breach of the implied covenant of good faith and fair dealing to serve as a predicate for a UCL claim in Gabana Gulf Distrib., Ltd. v. Gap Int'l Sales, Inc., 2008 U.S. Dist. LEXIS 1658 (N.D. Cal. Jan. 9, 2008).  The district court noted in that case that "[a]lthough the state of § 17200 jurisprudence is in rapid flux, California courts have not yet foreclosed common law theories—such as breach of the covenant of good faith—as a basis for actions pursuant to § 17200."  Id.; see also Mercado v. Allstate Ins. Co., 340 F.3d 824, 828 n.3 (9th Cir. 2003) ("[Plaintiff] raises the common law claim for breach of the covenant of good faith and fair dealing….California courts have not yet foreclosed common law theories as a basis for actions pursuant to § 17200."); Diaz v. Allstate Ins. Grp., 185 F.R.D. 581, 595 (C.D. Cal. 1998) ("[A]llegations of fraudulent and unfair business activity are sufficient to state a cause of action for relief under [§ 17200].")

One unpublished district court case, Cortez v. Global Support, LLC, 2009 U.S. Dist. LEXIS 110268 *6-11 (N.D. Cal. Nov. 25, 2009), contains a lengthy discussion of whether common law causes of action may serve as the necessary "unlawful" act for a UCL violation. The district court cited a number of authorities.  First, it quoted Saunders, 27 Cal. App. 4th at 838-39, for the proposition that "unlawful practices are any practices forbidden by law, be it civil or criminal…or court-made."  Additionally, it quoted a case from a California Court of Appeal that stated, "an 'unlawful' business practice actionable under the UCL is one that violates an existing law, including case law."  Cmty. Assisting Recovery, Inc. v. Aegis Sec. Ins. Co., 92 Cal. App. 4th 886, 891 (Cal. Ct. App. 2001) (dismissing UCL claim because plaintiff failed to state a claim under the holding of the previous case upon which the plaintiffs relied).  Finally, the

district court in <u>Cortez</u> decided that because the UCL is meant to have an exceptional breadth of coverage, the plaintiff should be allowed to predicate its UCL claim on a common law negligent product design cause of action.  <u>See also</u> <u>Roots Ready Made Garments v. Gap, Inc.</u>, 2008 U.S. Dist. LEXIS 67669 *27 (N.D. Cal. Aug. 29, 2008) (allowing a claim for common law fraud to be the actionable "unlawful" conduct for a UCL claim) (citing <u>Diaz</u>, 185 F.R.D. at 591).

The Court is convinced that there is ample authority to allow Clark to pursue her UCL claim for "unlawful" acts based on the implied covenant of good faith.  The Court already determined in its previous opinion that Clark stated a claim for violation of the implied covenant of good faith and fair dealing under California law.  Therefore, Prudential's motion to dismiss will be denied on this issue.

### b.  "Unfair" Business Act

The parties agree that there is some uncertainty in the California courts as to which of three tests a court should apply to determine whether a business act that effects consumers (as opposed to competitors) is "unfair" within the meaning of the UCL.  In <u>Cel-Tech</u>, 20 Cal. 4th 163, the Supreme Court of California rejected—in the context of competitor (as opposed to consumer[7] suits—a previous test which balanced the harm to the consumer against the utility of the defendant's practice.  The Supreme Court of California decided to "require that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition."  <u>Id.</u> at 186-87. Accordingly, <u>Cel-Tech</u> dictated that in the competitor-suit context, "unfair" conduct is that which "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

---

[7] The Supreme Court of California specifically stated that "nothing we say [in this case] relates to actions by consumers."  <u>Cel-Tech</u>, 20 Cal. 4th at 187 n.12.

laws because its effects are comparable to or the same as a violation of the law, or otherwise

significantly threatens or harms competition." Id. at 187.

Post-Cel-Tech, the California Courts of Appeal are split as to which test should govern

the "unfairness" analysis in a consumer suit.  The Fourth District Court of Appeal extended the

Cel-Tech test to consumer cases.  Scripps Clinic v. Superior Court, 108 Cal. App. 4th 917 (Cal.

Ct. App. 2003).  The Second District Court of Appeal applied the old balancing test, which

defines an unfair business practice as one that "violates established public policy or [] is

immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs

its benefits."  McKell v. Washington Mut., Inc., 142 Cal. App. 4th 1457, 1473 (Cal Ct. App.

2006).  A court applying the balancing test will "weigh the utility of the defendant's conduct

against the gravity of the harm to the alleged victim."  Id.  Finally, some California courts have

held that dicta in Cel-Tech points to a third potential test, originating in the the jurisprudence

related to § 5 of the Federal Trade Commission Act, 15 U.S.C. 45(n).  Camacho v. Auto. Club of

S. California, 142 Cal. App. 4th 1394, 1403 (Cal. Ct. App. 2006).  The factors that define

unfairness under the § 5 tests are (1) the consumer injury must be substantial; (2) the injury must

not be outweighed by any countervailing benefits to consumers or competition; and (3) it must

be an injury that consumers themselves could not reasonably have avoided.  Id.

Clark suggests that her allegations suffice to meet the requirements of each of the three

tests.  Prudential disagrees.  Prudential argues that Clark's allegations fail as to the Cal-Tech test

because the only statute to which Clark cites, California Insurance Code § 10176.10(d), is one

that was not enacted until after the Prudential closed the block.  Prudential challenges the § 5 test

on the grounds that Clark could have avoided the injury by buying a different policy when she

was informed that the premiums would increase.  Prudential does not address the balancing test in its briefs at all.

Without deciding which of the three tests should apply, the Court will reject Prudential's two arguments.  First, the Court will examine Prudential's argument under the Cel-Tech test that Prudential's practice did not offend a legislatively declared policy.  The California Insurance Code § 10176.10, enacted in 1994, requires that within thirty days, an insurer must inform the insurance commissioner that it has closed a block of business.  Cal. Ins. Code § 10176.10(h).  Additionally, an insurer must "not provide misleading information about the active or closed status of its business for the purpose of evading this section."  Id. at § 10176.10(f). Clark alleges that in 2005, in response to an inquiry from the California Department of Insurance, Prudential informed her that her premium increases were due to her increasing age and the higher costs of the insured group, without disclosing that the higher medical costs of the group were due to the block closure.  (TAC ¶ 37.)

Prudential argues that Clark's reference to § 10176.10 must fail because Prudential did not actually violate the statute.  The parties agree that Prudential did not violate the statute when it closed the CHIP block because (1) the CHIP block was closed before the effective date of the statute and (2) Prudential had no open blocks of individual health insurance as of the effective date of the statute.  However, the Court agrees with Clark that the statute can be construed, in the context of the UCL, as stating a legislative policy favoring disclosure of the closed status of an insurance blocks in order to prevent customers from continuing to buy insurance in a closed block.  The statute also evinces—by its requirement that insurers pool the closed block with any open blocks of business—a policy in favor of avoiding exorbitant rate increases for policy holders who find themselves in a closed block of business.

On a motion to dismiss, the party moving for dismissal has the burden of proving that no claim has been stated. Kehr Packages v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). Here, Prudential cites no authority in support of its contention that under the Cel-Tech test, the "unfair" prong is only implicated when the plaintiff shows that the defendant has actually violated a statute. That interpretation of Cel-Tech strikes the Court as overly restrictive because in effect, requiring a violation of a statute would read the "unfair" prong out of the statute by making it essentially the same as the "unlawful" prong. Moreover, Prudential's proposed reading of Cel-Tech departs from the plain meaning of the Cel-Tech's holding, that "any finding of unfairness…be tethered to some legislatively declared policy." Cel-Tech, 20 Cal. 4th at 186. To interpret Cel-Tech to require a violation of a statute, rather than a contravention of "the policy or spirit" of a statute would conflict with the plain meaning of its holding. See id. at 187. If the Cel-Tech court meant to require a statutory violation, it would not have used the language referring to a legislatively declared policy.

Furthermore, as the Supreme Court of California specifically stated in Cel-Tech, "a practice may be deemed unfair even if not specifically proscribed by some other law." Requiring a statutory violation as a predicate for a finding of "unfairness" would flatly contradict a core policy of the UCL. The California courts have often stated that § 17200 "was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable 'new schemes which the fertility of man's invention would contrive.'" Id. at 181. Without specific citations to any authority, the Court cannot accept Prudential's restrictive reading of the "unfair" prong. The Court finds that § 10176.10 may serve as evidence of a legislatively declared policy in favor of protecting consumers from the deleterious consequences that are expected when an insurance block closes.

47

Prudential's second argument, in reference to the FTCA § 5 test, is that Clark could have reasonably avoided injury by buying a different policy when she was informed that the premiums would increase. The factors that define unfairness under the § 5 tests are (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided. Camacho, 142 Cal. App. 4th at 1403. Prudential is challenging the third element.

Prudential relies on Davis v. Ford Motor Credit Co., 179 Cal. App. 4th 581, 598 (Cal. Ct. App. 2009), in which a California Court of Appeal determined that the complained-of injury could have been reasonably avoided. The plaintiff in that case alleged that he was injured under a retail sales installment contract when the creditor applied certain of his on-time installment payments against past due installments, triggering additional late charges. Id. at 584. The Court of Appeal found that the practice was explicitly permitted by the contract, which allowed the creditor to "apply each payment to the earned and unpaid part of the finance charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose." Id. at 587. The Court of Appeal upheld the trial court's dismissal of the plaintiff's UCL claim because he "could have avoided the imposition of successive late fees for successive months by making his monthly payments timely, or within the 10-day grace period, in accordance with his obligations under the contract." Id. at 584-85.

The Court is not persuaded that Davis is analogous to the current case. Clark is not challenging the fact that the premiums increased. Rather, she is challenging Prudential's non-disclosure of the reason for the steep increases, since without knowing the reason for the increases—that the block had closed and was in a death spiral—she could not make an informed

decision about whether to continue her CHIP policy or search for another one.  Thus, whereas in Davis, the installment contract specifically authorized and informed the consumer of the relevant practice, in this matter, Prudential did not disclose the block closure even after Clark made inquiries via the California Department of Insurance and an attorney.  The Court is not convinced by Prudential's analogy that Clark could have reasonably avoided the injury by cancelling her contract when she learned that the premiums would increase, since she did not know about the real reason for the increases or that the death spiral would make additional steep increases necessary each year.  Davis does not require dismissal of Clark's claim premised on the "unfair" practices prong.

> ### c.    *"Fraudulent" Practices*

Prudential argues that Clark cannot assert a claim under the "fraudulent" prong because she has not adequately pled that she relied on Prudential's misrepresentations or omissions.

The heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to causes of action under this prong of the UCL.  Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009).  The fraud prong of the UCL is distinct from common law fraud, which requires allegations of actual falsity and reasonable reliance.  In re Tobacco, 46 Cal. 4th at 312.  A fraudulent business practice is one that is likely to deceive members of the public.  In re Tobacco, 46 Cal. 4th at 312.  Only a named plaintiff must show actual reliance to recover under the fraud prong of the UCL.  Morgan v. AT&T Wireless Servs., Inc., 177 Cal. App. 4th 1235, 1257 (Cal. Ct. App. 2009).  To plead and prove reliance, while a plaintiff "must allege that the defendant's misrepresentations were an immediate cause of the injury-causing conduct, the plaintiff is not required to allege that those misrepresentations were the sole or even the decisive

cause of the injury-producing conduct." <u>In re Tobacco</u>, 46 Cal. 4th at 328. The Supreme Court of California explained that to plead reliance under the fraud prong of the UCL:

> It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision. Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be material if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

<u>Id.</u> at 326-27 (internal citations and quotations omitted).

Prudential asserts that Clark has not pled "<u>any</u> facts at all that would establish the she relied to her detriment on the alleged misrepresentations or omissions." (Def.'s Br. in Opp'n to Mot. to Dismiss SAC 16.) (emphasis in original). Prudential asserts that Clark's only theory of recovery is based on the inability of a CHIP policy holder to find alternative insurance due to a pre-existing condition developed after the block closure. After defining Clark's claims thus, Prudential correctly notes that Clark has not pled that she suffered from a pre-existing condition.

The Court does not read the TAC to present the pre-existing condition theory as Clark's sole legal theory of causation or injury. The TAC does not assert that Clark had a pre-existing condition at all. Rather, the Court reads the TAC to assert that Clark was unaware of the death spiral and was repeatedly informed by Prudential that the increasing premiums were only due to her age and overall rising medical costs. She asserts that she was induced by these representations to continue to pay for more expensive CHIP coverage rather than seeking out a different policy. As a result, she paid premiums that were subject to massive yearly increases.

The CHIP premiums were increasing because of the death spiral and would continue to rise until they were unaffordable.

The Court is satisfied that Clark has sufficiently pled individual reliance.  Under the fraud prong, reliance is presumed where a plaintiff has pled facts establishing that a misrepresentation or omission was "material."  In re Tobacco, 46 Cal. 4th at 327.  Because materiality is normally a factual question, the Court will not attempt to resolve it here.  See id.  But, for the purpose of this motion to dismiss it is enough to note that non-disclosure of the death spiral is not "obviously unimportant" to a policy-holder's decision whether or not to renew her CHIP policy.  See id. ("[M]ateriality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.") (internal quotations and citations omitted).  The Court will deny Prudential's motion to dismiss the fraud prong of Clark's UCL claim.

iv.     Treble Damages

The TAC sought treble damages, pursuant to California Civil Code Section 3345, for any violations of the UCL.  The parties briefed and argued the issue.  On August 9, 2010, Clark submitted a supplemental filing alerting the Court that the Supreme Court of California had determined in a recent case, Clark v. Superior Court, 2010 Cal. LEXIS 7624 (Cal. August 9, 2010),[8] that an award of restitution under the UCL "is not subject to section 3345's trebling provision."  Therefore, Clark withdrew her request for trebled damages.  Accordingly, Prudential's motion to dismiss is granted with regard to that request for relief.

---

[8] The plaintiff in Clark v. Superior Court is not in any way related to Beverly Clark, the plaintiff in the case instantly before this Court.

**D.     Clark's Common Law Fraud Claims**

Prudential moves to dismiss Clark's Counts One and Two, for fraudulent misrepresentation and fraudulent omissions, arguing that she failed to state a claim under California's common law doctrines for those claims.  Prudential argues that Clark's common law claims must fail under California law because (1) she has failed to plead an injury; and (2) her claims are barred by California's three-year statute of limitations because the delayed discovery rule cannot save her claim.

*i.     Injury*

Prudential again argues that Clark has not pled sufficient facts to establish reliance and damages.[9]  Having already rejected that same argument in this Opinion, the Court need not revisit it.  Clark's allegations sufficiently establish reliance and damages at the pleading stage.

*ii.     Statute of Limitations*

As the Court previously stated, a statute of limitations defense is affirmative.  Fed. R. Civ. P. 8(c).  Therefore, it may only be resolved on a motion to dismiss if it is clear from the face of the complaint that the statute of limitations bars the claim.  Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994).  "[T]he uniform California rule is that a limitations period dependent on discovery of the cause of action begins to run no later than the time the plaintiff learns, or should have learned, the facts essential to his claim."  Cleveland v. Internet Specialties W., Inc., 171 Cal. App. 4th 24, 31 (Cal. Ct. App. 2009) (citing Gutierrez v. Mofid, 39 Cal.3d 892, 897 (Cal. 1985)).

The TAC does not allege when Clark was able to discover the facts constituting her claim.  In the context of Clark's UCL claim, the Court was able to extrapolate from the pleadings that as of 2005, and after exercising due diligence, Clark did not yet know that the block closure

---

[9] See the discussion section of this Opinion, Part (C)(iii)(c).

and resulting death spiral was the reason for the increasing premiums.  Since the UCL has a four-year statute of limitations, the Court was able to make a preliminary determination based on the face of the TAC that the statute had not run before Clark filed her Complaint in 2008.

However, the Court is unable to make the same determination in this context because the statute of limitations for fraud claims in California is three years.  It is less clear from the TAC whether Clark's fraud claims may be sheltered by the discovery rule.  Whether the rule applies to Clark's fraud claim will involve a factual determination that the Court is not equipped to make at this stage in the litigation.  Prudential's motion to dismiss Clark's fraud claims is denied.

> **E.  Paul's Common Law Fraud Claims**

Prudential argues that Paul's claims for fraudulent misrepresentation and omissions under Indiana law should be dismissed because (1) he has failed to plead an injury; (2) he cannot establish that Prudential owed him a fiduciary duty to disclose that it had closed the CHIP block; (3) he cannot establish misrepresentation because contract terms cannot constitute fraud absent a then-existing intention not to honor the contract.  The parties agree that Indiana law applies to Paul's fraudulent misrepresentation and omissions claims.  The misrepresentation claim in Indiana law would be one for "actual fraud."  Under Indiana law, fraudulent omissions can give rise to a claim for "constructive fraud" or "fraudulent concealment."

The elements required to assert a cause of action for actual fraud are:  (1) a material misrepresentation of past or existing fact; (2) the representation was false; (3) the representation was made with knowledge or reckless ignorance of its falsity; (4) the complaining party relied on the representation; and (5) the representation proximately caused the complaining party's injury.  Wells v. Stone City Bank, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998).

"Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." Id. at 1250.  Under Indiana law, a constructive fraud claim is comprised of five elements:  (1) a duty existing by virtue of the relationship between the parties; (2) representations or omissions were made in violation of that duty; (3) reliance thereon by the complainant; (4) injury to the complainant as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complainant. Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co., 478 F. Supp. 2d 1076, 1091 (S.D. Ind. 2007) (citing Siegel v. Williams, 818 N.E.2d 510, 516 (Ind. Ct. App. 2004)).

There is significant overlap between fraudulent concealment claims and constructive fraud, but the elements differ slightly. Reginald Martin, 478 F. Supp. 2d at 1091.  The elements of a fraudulent concealment claim are (1) the wrongdoer had a duty to disclose certain facts to another; (2) it knowingly failed to do so; and (3) the other justifiably relied upon such non-disclosure to his detriment. De Voe Chevrolet-Cadillac, Inc. v. Cartwright, 526 N.E.2d 1237, 1240 (Ind. Ct. App. 1988).

    *i.*    *Injury*

Prudential argues that Paul has not asserted an injury.  In support of its argument, Prudential asserts that "the basic premise of plaintiffs' death spiral theory is that non-disclosure of the block closure can injure a party if, when premiums rise, the policyholder cannot simply buy a different policy due to intervening pre-existing medical conditions."  (Def.'s Br. in Opp'n to Mot. to Dismiss SAC 20.) (internal quotations omitted).  Having narrowed Paul's claims to only the pre-existing conditions issue, Prudential correctly asserts that Paul did not claim that he

personally suffered from a pre-existing condition that prevented him from obtaining alternative insurance when the CHIP policy became unaffordable.

In asserting this argument, Prudential fails to recognize that the TAC asserts that Paul was injured by the failure to disclose the death spiral in that it caused him to pay higher premiums than he otherwise would have if he had sought insurance from a policy that was not in a death spiral.  Under Indiana law, "[p]roximate cause exists when there is some direct relation between the injury asserted and the injurious conduct alleged."  Ruse v. Bleeke, 914 N.E.2d 1, 10 (Ind. Ct. App. 2009).  Paul's allegations are sufficient to satisfy this standard for proximate cause at the pleading phase.

### ii.     Duty to Disclose

In support of his claims for fraudulent concealment, constructive fraud, and actual fraud, Paul posits two principal theories giving rise to an alleged duty, on Prudential's part, to disclose the block closure and resulting death spiral:  (1) a misleading partial disclosure gave rise to a duty to disclose; or (2) a special relationship between Paul and Prudential gave rise to a duty.

Prudential does not challenge Paul's partial disclosure theory, except to argue that "it duplicates Paul's misrepresentation claim, rather than supporting a separate omission claim." (Def.'s Reply Br. in Opp'n to Mot. to Dismiss SAC 14.)  The misleading partial disclosure theory is rooted in the principle that once a defendant undertakes "to disclose facts within his knowledge, he [had to] disclose the whole truth without concealing material facts."  Thompson v. Best, 478 N.E.2d 79, 84 (Ind. Ct. App. 1985).  The courts have allowed this theory to support claims for all three causes of action—actual fraud, constructive fraud, and fraudulent concealment.  See, e.g., Kiesling v. Kiesling, 546 F. Supp. 2d 627, 639 (N.D. Ind. 2008) (applying the partial disclosure theory to claims for constructive fraud and actual fraud).  Paul

supports the misleading partial disclosure theory by alleging that the letters from Prudential

representing after the block closure that the only reasons for the premium increases were the

policyholder's age and the general rise in medical costs constituted a misleading partial

disclosure.  The Court sees no reason why Paul cannot proceed on parallel causes of action at

this stage in the litigation, so the Court will allow each of the fraud claims, insofar as they are

based the theory of misleading partial disclosure—to survive this motion to dismiss.  Prudential's

motion to dismiss is denied to the extent that it challenges the misleading partial disclosures in

the letters and other communications as the basis for Paul's fraud claims.

 The Court will turn now to the theories based on Prudential's relationship with Paul.

Prudential asserts that in Indiana, (1) no special relationship automatically exists between an

insurer and its insured; and (2) the factors that could give rise to such a relationship are not

satisfied here.  In support of its argument that no special relationship existed between Paul and

Prudential, Prudential cites three cases—Am. Family Mut. Ins. Co v. Dye, 634 N.E.2d 844, 848

(Ind. Ct. App. 1994), Filip v. Block, 879 N.E.2d 1076 (Ind. 2008), and Grow v. Indiana Retired

Teachers Cmty., 271 N.E.2d 140, 142-43 (Ind. Ct. App. 1971).  The Court is not convinced by

Prudential's arguments premised on these three cases that dismissal of the special relationship

theory of recovery is warranted because all of these cases arose in contexts that are inapposite to

the situation currently before the Court.

 Although Prudential represented in its brief that there is no fiduciary-like duty that arises

merely by virtue of the relationship between an insurer and its insured, the cases it cites to

support that proposition actually hold that there may be a special relationship between an

insurance agent and the insured and do not address the more general relationship between an

insurance company and the insured.  The Court has not found a general definition of the relationship between the insured and its insurance company in any of the cases Prudential cited.

The standards in <u>Dye</u> and <u>Filip</u> are specifically tailored to the relationship between an insured and his insurance agent, who, for the purpose of certain interactions is deemed under Indiana law to become an agent of the insured, which gives rise to specific fiduciary duties.  In the present matter, Paul asserts that the omissions were made to him in form letters and in the insurance contract.  He has not alleged that he had some special relationship with an insurance agent.  Therefore, Prudential's citation to cases in which the relevant relationship was between an insured and his insurance agent are inapposite here.

The third case that Prudential cites also deals with the "special relationship" issue in a context-specific analysis that does not implicate an insured-insurer relationship in any sense.  In <u>Grow</u>, a nonprofit Indiana corporation operating a retirement home represented to a retired woman that it could provide lifetime care at the home for which the monthly fee at the time was $150.  A year after the retiree entered into the contract, the monthly charge was raised to $256, in part because the retirement home was not fully occupied.  The retiree asserted a fraud claim, based on a duty to disclose that the monthly fee at the time she moved into the home was based on an assumption of full occupancy.  She asserted three legal theories in support of the alleged duty: (1) the relationship of trust and confidence, (2) the fact that the Corporation had superior knowledge, and (3) the fact that the Corporation had made representations about the monthly service charge which distracted her attention from the fact that the monthly service charge was based upon an assumed rate of full occupancy rather than upon the actual occupancy.  The Indiana Court of Appeal found that no special relationship existed under case law asserting a special relationship based on age or illness because the plaintiff was not too aged or infirm to

understand the contract.  The Court of Appeal also found that the retirement home did not have superior knowledge, since it had genuinely believed that the monthly fee was correctly computed and would not substantially change.  Finally, even if a duty to disclose did arise, the plaintiff had not proven, after a trial on the merits, that she had in fact relied on the retirement home's representations about the method of calculating the fee.

Although <u>Grow</u> did involve an increased fee that the plaintiff purported not to have anticpated, the analogies between this case and that one end there.  Whereas in <u>Grow</u>, the alleged relationship of trust was premised on the plaintiff's elderly state, no such assertion is made here.  The defendant in <u>Grow</u> was found not to have misrepresented or omitted any material fact because it actually believed when it made the representation that its calculations of the fee were a correct projection.  Here, Paul asserts that Prudential knew that its representations about the fee's calculations did not disclose all the material information available.  Finally, in <u>Grow</u>, the Court rested its reasoning in large part on the fact that after a trial on the merits, the plaintiff had not proved that she relied on the defendant's statements; the Court here has not yet fully considered the facts regarding the issue of reliance.

The Court should only dismiss a claim if the defendant has asserted arguments requiring dismissal.  The Court is not convinced by Prudential's citation to <u>Dye</u>, <u>Filip</u>, and <u>Grow</u> that dismissal of Paul's special relationship theory is appropriate at this stage.

### iii.   *Misrepresentation Based on Terms of the Policy*

The TAC asserts that Prudential's representations regarding premium increases appeared in two sources:  (1) the renewal provision of the CHIP policy; and (2) form letters and other communications to policy-holders informing them that the premium rates were increasing solely based on age and general rising medical costs.  Prudential is not challenging the latter basis for

Paul's fraud claims in this motion to dismiss.  Specifically, Prudential is only challenging Paul's

fraud claim to the extent that it asserts that the CHIP policy misrepresented that CHIP could only

be discontinued under certain limited circumstances.

The TAC asserts that:

> Prudential made uniform written representations that CHIP could
> only be discontinued under certain limited circumstances, with the
> intent that policyholders would rely on these representations.  As
> Prudential knew that closing the block would force policyholders
> to discontinue CHIP, such promises were false and misleading at
> each renewal after the block was closed, particularly in light of the
> representations described in paragraph 21 [of the TAC].

(TAC ¶ 65(a).)

The CHIP policy stated:

> Prudential may refuse to continue this Policy as of any Policy Date
> anniversary, but only if Prudential is then refusing to continue all
> policies with the same provisions and premium rate basis in the
> jurisdiction in which you reside.  If Prudential takes this action you
> will be notified not less than 31 days before the Policy Date
> anniversary.

(Id. at ¶ 19.)

Prudential correctly asserts that in Indiana representations about a future fact cannot

support a fraud action.  See Wells, 691 N.E.2d at 1250.  Paul counters that the above passage

from the CHIP policy does not contain any representation about a future fact, but rather

constitutes a statement of the parties' rights under the policy.  The Court agrees with Paul that

the renewal provision is a statement about the parties' rights under the policy rather than a

representation about a future fact.  Specifically, it provides that Prudential may not refuse to

continue the CHIP policy unless it is refusing to continue all similar policies in a given

geographical area.

Prudential argues, in the alternative, that the renewal provision did not constitute a misrepresentation of any fact.  Prudential cites an unpublished decision of the Court of Appeals in support of its argument.  Alvarez v. Insurance Co. of N. Am., 313 Fed. Appx. 465 (3d Cir. 2008).  Pursuant to Rule 5.7 of the Internal Operating Procedures, the citation of unpublished Court of Appeals decisions is discouraged and "[s]uch opinions are not regarded as precedents that bind the court because they do not circulate to the full court before filing."  See, e.g., Jamison v. Klem, 544 F.3d 266, 278 n.11 (3d Cir. 2008) ("We do not accept [unpublished opinions] as binding precedent because, unlike precedential opinions, they do not circulate to the entire court before they are filed."); In re Grand Jury Investigation, 445 F.3d 266, 276 (3d Cir. 2006) (finding that "[t]he District Court erred in relying on a NPO," and stating that such rulings "are not precedents for the district courts of this circuit.")  However, Alvarez can serve as persuasive authority.

In that case, the plaintiff purchased long-term care insurance which was "guaranteed renewable."  Alvarez, 313 Fed. Appx. at 466.  The policy stated that

> Your coverage will stay in effect as long as you continue to pay premiums.  [The insurance company] cannot terminate your coverage for any other reason.

Id.

The insurance company closed the block, provoking a death spiral which made premiums increase exponentially.  The plaintiff argued that the insurance company's representation that the policy was "guaranteed renewable" constituted a half-truth that misled the plaintiff.  The Court of Appeals reasoned that:

> [C]ontrary to [the plaintiff's] interpretation, the policy was guaranteed renewable, not guaranteed affordable.  The guaranteed renewable clause meant that INA could not cancel a member's policy unilaterally for any reason, unless the member failed to pay

> the premium.  This guaranteed the right to renew the policy, not
> the financial ability to renew the policy, and did not imply that
> premiums would never increase, or that they would only increase
> by a limited, affordable amount.

Id. at 468-69.

The plaintiffs' theory of misrepresentation based on the renewal provision in Alvarez and

Paul's parallel argument in this case both amount to a theories of constructive termination.  In

other words, Paul is asserting that he was forced to cancel his policy because it became

unaffordable due to the block closure.  He asserts that Prudential—by closing the block—forced

him to drop his CHIP policy.  The constructive termination theory rests on the presumption that

the company has forced the policyholder to cancel his insurance by making the premiums

unaffordable.  To find that the renewal provision was a misrepresentation in the context of this

theory, the Court would have to assume that in the renewal provision, Prudential somehow

impliedly promised that Paul would be able to afford the CHIP premiums.

This Court is persuaded by the reasoning of the Court of Appeals in Alvarez.  The

provision in the CHIP policy stating that Prudential could only refuse to renew the policy under

certain circumstances was not implicated by the block closure.  That provision stated that

Prudential could not unilaterally cancel the policy; it did not promise that the policy would be

affordable.  Prudential did not refuse to continue Paul's CHIP policy; Paul decided on his own

that the policy was too expensive and cancelled it.  The Court will grant Prudential's motion to

dismiss Paul's misrepresentation claim only to the extent that it is based on the renewal

provision.  This determination has no logical connection and no bearing on the Plaintiffs' other

fraud claims based on the form letters and other communications made outside of the policy

itself.  The Court is only dismissing Paul's fraud claim to the extent that it asserts that the

renewal provision was a misrepresentation.

### III.  CONCLUSION

For the foregoing reasons, the Court will grant the motion in part and deny it in part.  The Court will grant the motion to dismiss on the following claims or issues (1) Litwack's claims for violation of the NJCFA, fraudulent misrepresentation, fraudulent omission, and breach of the duty of good faith and fair dealing are dismissed without prejudice as barred by the filed rate doctrine; (2) Clark's request for injunctive relief under the UCL is dismissed without prejudice; (3) Clark's request for treble damages under the UCL is dismissed with prejudice; (4) Paul's claim that the renewal provision of the CHIP policy contained a misrepresentation is dismissed without prejudice.  Clark may move for leave to file an amended complaint within 30 days of the date of this order.  The remaining portions of the motion to dismiss are denied.[10]

The Court will enter an order implementing this opinion.

**_____s/ Dickinson R. Debevoise_____**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: September 9, 2010

---

[10] The TAC asserted five claims for relief:  (1) fraudulent misrepresentation, on behalf of Clark, Litwack, and Paul; (2) fraudulent omissions, on behalf of Clark, Litwack, and Paul; (3) breach of the duty of good faith and fair dealing, on behalf of Clark and Litwack; (4) violation of California's UCL on behalf of Clark; and (5) violation of the NJCFA on behalf of Litwack.

The claims that remain in the case following this motion to dismiss are:  (1) fraudulent misrepresentation, on behalf of Clark and Paul (with the exception of the portion of Paul's misrepresentation claim that is based on the renewal provision in the CHIP policy, which the Court is dismissing in the present opinion); (2) fraudulent omissions, on behalf of Clark and Paul; (3) breach of the duty of good faith and fair dealing on behalf of Clark; and (4) violation of California's UCL (although Clark will not be entitled to injunctive relief or treble damages on her UCL claim if she prevails, as the Court is dismissing those forms of relief in the present opinion).