**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BEVERLY CLARK, JESSE J. PAUL, WARREN GOLD, and LINDA M. CUSANELLI,<br><br>                    Plaintiffs,<br><br>            v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>                    Defendant. | Civ. No. 08-6197 (DRD)<br><br>**O P I N I O N** |

*Appearances by:*

NAGEL RICE LLP
Bruce Nagel, Esq.
Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, N.J. 07068

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Charles N. Freiberg, Esq.
Brian P. Brosnahan, Esq.
David A. Thomas, Esq.
Jacob N. Foster, Esq.
101 California Street, Suite 2050
San Francisco, CA 94111

LEVINE, STEINBERG, MILLER & HUVER
Harvey R. Levine, Esq.
Craig A. Miller, Esq.
550 West C Street, Suite 1810
San Diego, CA 92101

> *Attorneys for the Plaintiffs, Beverly Clark, Jesse J. Paul, Warren Gold, and Linda M. Cusanelli*

LOWENSTEIN SANDLER PC
Douglas S. Eakeley, Esq.
Natalie J. Kraner, Esq.
John R. Middleton, Jr., Esq.
65 Livingston Ave.
Roseland, N.J. 07068

GOODWIN PROCTOR LLP
John D. Aldock, Esq.
Richard M. Wyner, Esq.
Mark S. Raffman, Esq.
901 New York Ave., N.W.
Washington, D.C. 20001

*Attorneys for the Defendant, The Prudential Insurance Company of America*

**DEBEVOISE, Senior District Judge**

This case concerns allegations of deception and bad faith conduct by a health insurance company. Plaintiffs Beverly Clark, Jesse J. Paul, Warren Gold, and Linda M. Cusanelli have filed a putative class action complaint against The Prudential Insurance Company of America ("Prudential") alleging that Prudential concealed a fatal actuarial defect in their health insurance plans. Prudential now moves to: (1) dismiss all non-disclosure claims arising under California law based on the recent Levine v. Blue Shield of California ("Levine") decision and (2) strike all class action allegations made on behalf of New York, Ohio, or Texas plaintiffs as barred by the filed-rate doctrine. For the reasons set forth below, Prudential's motion to strike will be GRANTED with respect to the New York claims only. Prudential's motion is otherwise DENIED.

## I.      BACKGROUND

### A.      Procedural History

In the original Complaint, filed December 17, 2008, the two original plaintiffs, Clark and Paul, asserted three causes of action for: (1) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 et. seq, ("NJCFA"); (2) breach of fiduciary duty; and (3) breach of the duty of good faith and fair dealing. The substance of Plaintiffs' claims is set forth more fully below, but in essence, Plaintiffs complain that Prudential took actions to render Plaintiffs' health insurance plans actuarially unsustainable. Plaintiffs allege that Prudential then deceived Plaintiffs about the inevitable collapse of their health plans over the course of several years. Because of this deception, Plaintiffs paid above-marked premiums and neglected to secure sustainable lower-cost insurance during a time period when it was available to them.

Prudential moved to dismiss the individual plaintiffs' claims. In an Opinion and Order dated September 14, 2009, the Court granted the motion in part, dismissing all claims except for Clark's claim for breach of the implied covenant of good faith and fair dealing.[1] Clark v. Prudential Ins. Co. of Am., Civ. No. 08-6197, 2009 U.S. Dist. LEXIS 84093 (D.N.J. Sept. 14, 2009) (Doc No. 40) ("2009 Op.").

Specifically, the September 2009 Opinion applied New Jersey's choice of law analysis to determine that Clark and Paul's home states at the time they purchased their CHIP policies—California and Indiana, respectively—had the greatest interest in having their laws applied to the consumer fraud, breach of fiduciary duty, and breach of good faith and fair dealing claims. Id. at *47. This Court found that under Indiana law, each of Paul's claims were barred by the applicable statute of limitations. The Court dismissed Clark's consumer fraud claim with leave to re-plead under the appropriate California law; dismissed Clark's breach of fiduciary duty claim for failure to allege that the relationship between Clark and Prudential involved a fiduciary duty under California law; and found that Clark's claim for breach of the duty of good faith and fair dealing stated a claim under California law. Id.

Subsequently, on October 30, 2009, Clark filed an Amended Complaint, asserting claims for unfair competition and breach of the duty of good faith and fair dealing against Prudential under California law. Thereafter, the parties stipulated that Clark and Paul would file a Second Amended Complaint asserting additional claims for common law fraudulent misrepresentation and fraudulent omission. The Second Amended Complaint ("SAC") was filed on November 12, 2009. It was shortly followed by a motion to dismiss from Prudential on December 3, 2009. After that motion was partially briefed, the parties stipulated that the Plaintiffs could file a Third

---

[1]      Clark's consumer fraud and breach of fiduciary duty claims were dismissed without prejudice to refile.

Amended Complaint ("TAC"), adding Litwack as a new plaintiff. The parties agreed that the Court would address, during a single motion hearing, the issues raised in both the motion to dismiss the SAC and the motion to dismiss the TAC.

In an opinion dated September 9, 2010, this Court dismissed Litwack's claims with prejudice as barred by the filed rate doctrine as applied under New Jersey law. The September 9, 2010 opinion also dismissed Clark's requests for injunctive relief and treble damages under the UCL, and dismissed Paul's claim that the renewal provision of the CHIP policy contained a misrepresentation. This Court denied Defendant's motion to dismiss all California causes of action for fraudulent omission, unfair competition, and good faith and fair dealing.

On November 5, 2010, the California Court of Appeals rendered a decision in the Levine v. Blue Shield of California case.[2] In that decision, the court held that Blue Shield did not owe a duty to disclose to a customer how he or she could restructure his or her health insurance plan as to lower his or her health care premium. The case also dismissed a cause of action under the California Unfair Competition Law ("UCL") for failure to allege a business act that was "either fraudulent, unlawful, or unfair." Id. at 1136.

On November 9, 2010, Plaintiffs filed a Fourth Amended Class Action Complaint ("4AC"). On December 16, 2010, Prudential filed the instant motion to dismiss/strike portions of the 4AC, arguing *inter alia* that the Levine decision mandated dismissal of the California causes of action and that the New York, Ohio, and Texas class claims were untenable under the filed rate doctrine. Before this motion could be argued, Plaintiffs and Prudential entered into a stipulation under which Plaintiffs would file a Fifth Amended Class Action Complaint ("5AC"). This 5AC added claims by Plaintiffs Carole L. Walcher and Tern L. Drogell. The Parties agreed in their stipulation that this Court's ruling on the instant motion would apply with the same force

---

[2]     189 Cal. App. 4th 1117 (2010).

to the allegations of the 5AC, and that the instant motion would also be considered a motion to dismiss Plaintiff Drogell's claims as barred by the filed rate doctrine.

**B.      Allegations of the Complaint**

The 4AC alleges four claims for relief: (1) fraudulent misrepresentation, on behalf of a Multi-State Fraud Class; (2) fraudulent omissions, on behalf of a Multi-State Fraud Class; (3) breach of the duty of good faith and fair dealing, on behalf of a California Subclass; and (4) violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*, on behalf of a California Subclass.

The following are the allegations of the 4AC, which are, for the purpose of this motion only, accepted as true and construed in the light most favorable to the Plaintiffs. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

> ### *i.      Prudential*

Prudential is, and at all relevant times was, a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey. (4AC ¶ 16.) Prior to 2001, Prudential was a mutual life insurance company. Id. ¶ 17.

Prudential sold an individual health policy, known as the Comprehensive Health Insurance Policy ("CHIP"), to individuals throughout the United States from 1973 through 1981. Id. ¶ 1. CHIP is a major medical insurance policy designed to provide policyholders with coverage for medical expenses, including high or unexpected medical expenses. Id. ¶ 2. The risk of high medical expenses is managed by Prudential through the creation of a risk pool, where a large group shares the risk that certain policyholders will generate higher than expected claims. Id. Large premium increases are generally not necessary in a functioning risk pool because the premiums of healthy low-cost members subsidize the higher costs of less-healthy members. Id.

Prudential developed, marketed, and sold CHIP in the District of Columbia and all 50 states of the United States. <u>Id</u>. ¶ 20.

> The CHIP stated the following regarding continuation or termination of the policy:
>
> > You may continue this Policy in force for successive premium periods of one month each by payment of the premiums as specified in the following paragraphs. However, Prudential may refuse to continue this Policy as of any Policy Date anniversary, but only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where you reside. If Prudential takes this action you will be notified not less than 31 days before the Policy Date anniversary.

<u>Id</u>. ¶ 21.

### ii.   *Prudential "Closes the Block"*

In 1981, Prudential ceased selling CHIP to new policyholders (it "closed the block"). <u>Id</u>. ¶ 1. The block closure prevented new policyholders from entering into the CHIP risk pool. <u>Id</u>. ¶ 3. New policyholders are generally healthier, and their premiums subsidize the premiums of less-healthy policyholders, who have higher rates of claims. <u>Id</u>. It is alleged that Prudential knew that closing the CHIP block would lead to an "anti-selection crisis" where healthy policyholders who could secure coverage elsewhere terminated their CHIP. <u>Id</u>. With CHIP closed to new entrants, and an insufficient percentage of healthy policyholders remaining to subsidize the costs of unhealthy policyholders, Prudential knew that the result would be what is colorfully termed a "death spiral." <u>Id</u>. In a death spiral, repeated cycles of higher premiums and a continually shrinking number of healthy policyholders cause premiums to eventually become so high that they force all policyholders to drop their policies. <u>Id</u>.

Prudential knew at the time it closed the block that the design features of the CHIP policy made a death spiral inevitable after the block was closed. <u>Id</u>. ¶ 4. For example, the CHIP policy lacked inside limits on specific policy benefits, which allowed very ill policyholders to incur

massive claims. Id. ¶ 26. A lack of inside limits accentuates the dynamics of a death spiral. Id. Although Prudential knew that massive increases in premiums in the future were inevitable because it had closed the block, it concealed these facts from policyholders. Id. ¶ 4. While policyholders were informed when premiums increased, they had no reason to know that the premium increases were a result of closing the block. Id. ¶ 5. Prudential also failed to disclose that, by the time the inevitable massive increases in the premiums forced them to drop their policies, the policyholders might be unable to secure comparable coverage for medical conditions that they developed later. Id. ¶ 6. Because this information was not disclosed, policyholders continued to renew their CHIP policies rather than look for alternative health insurance coverage. Id. ¶ 29.

Plaintiffs further allege that policyholders expected that they would not be forced to obtain alternative health insurance because Prudential limited its right to discontinue the CHIP policy. Id. ¶ 8. The CHIP policy states that policyholders "may continue this Policy in force . . . by payment of premiums," and that Prudential retained the right to discontinue the policy "only if Prudential is then refusing to continue all policies with the same provisions and premium rate basis in the jurisdiction where [the policyholder] reside[s]." Id.

At the time Paul purchased his CHIP policy in 1980, Prudential made written representations that,

> The premiums for your plan depend on the current costs of medical care and treatment. We continually review these costs and make adjustments in the premiums you pay so that they are kept current for the ages of those insured under your plan and the area in which you live. Medical care costs have been rising in recent years also. There is also a tendency for individual costs to increase with age. As a result, you may expect that there will be an increase in your premium each year on the anniversary date of your policy. We assure you that any increase will be held to the minimum possible

> that is consistent with our being able to continue providing this
> coverage.

<u>Id.</u> ¶ 22.

Clark, Gold, Cusanelli and CHIP Policy holders generally received substantially the same representations when they purchased the policy. <u>Id.</u>

In communications with Clark, Prudential affirmatively misrepresented the reasons for the escalating premiums. <u>Id.</u> ¶ 34. When Prudential increased Clark's rates in 1996, 1997, 1998, 1999, and 2000, it sent Clark a form letter stating that the reasons CHIP premiums were increasing was simply due to the general rising medical costs and her increasing age. <u>Id.</u> The form letters stated, in relevant part,

> Several factors have caused CHIP premiums to increase. Briefly,
> they are:
>
> Increase in Age
> You (and your dependent spouse if included under your policy) are
> a year older than last year. Claim experience indicates that the
> frequency and size of claims generally increases as one gets older.
>
> Increasing Cost of Medical Care
> The cost of medical care continues to rise at a rate greater than the
> general rate of inflation. New medical equipment and complex
> medical procedures have resulted in remarkable advances in
> medical care, but they are expensive. Your CHIP benefits
> automatically adjust to the higher levels of health care costs.

<u>Id</u>.

The Plaintiffs allege, on information and belief, that all CHIP policy holders received the same form letters. <u>Id.</u>

The Plaintiffs seek to maintain this action as a class action, though they have not yet moved for certification of the class. The proposed class definition includes all persons living in

California, Indiana, New York, Ohio, or Texas who renewed a CHIP after Prudential closed the block. Plaintiffs also propose a California-only subclass with additional claims.

## II.    DISCUSSION

### A.    Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted. When considering a motion under Rule 12(b)(6), the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). The court's inquiry "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the standard for a motion to dismiss under Rule 12(b)(6) in two cases: Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." In contrast, the Court in Twombly held that "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 545. The assertions in the complaint must be enough to "state a claim to relief that is plausible on its face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged." Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (in order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable

10

expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." <u>Iqbal</u>, 129 S. Ct. at 1949. Although for the purposes of a motion to dismiss the court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." <u>Id.</u> at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." <u>Id.</u>

With respect to a Motion to Strike, Federal Rule of Civil Procedure 12(f) provides that "[t]he Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts have broad discretion in resolving motions to strike. <u>Hanover Ins. Co. v. Ryan</u>, 619 F.Supp.2d 127, 132 (E.D. Pa. 2007) (citing <u>Cipollon v. Liggett Group, Inc.</u>, 789 F.2d 181, 185 (3d. Cir. 1986)). "The purpose of a motion to strike is to simplify the pleadings and save time and expense by excising from a plaintiff's complaint any redundant, immaterial, impertinent, or scandalous matter which will not have any possible bearing on the outcome of the litigation." <u>Receivables Purchasing Co., Inc. v. Engineering and Professional Services, Inc.</u>, 2010 WL 3488135, *2 (D.N.J. Aug. 30, 2010) (<u>quoting</u> <u>Garlanger v. Verbeke</u>, 223 F.Supp.2d 596, 609 (D.N.J. 2002)).

However, "motions to strike are usually 'viewed with disfavor' and will generally 'be denied unless the allegations have no possible relation to the controversy and may cause

prejudice to one of the parties, or if the allegations confuse the issues.'" Id. The striking of a pleading is considered a "drastic remedy to be resorted to only when required for the purposes of justice." Eisai Co. v. Teva Pharmaceuticals, USA, Inc., 629 F.Supp.2d 416, 425 (D.N.J. 2009) (quoting Tonka Corp. v. Rose Art Indus., Inc., 836 F.Supp. 200, 217 (D.N.J. 1993)). The moving party must show that the allegations have no possible relation to the controversy, may prejudice the parties, or confuse the issues. Id. quoting Tonka Corp., 836 F.Supp. at 217. "[O]nly allegations that are so unrelated to plaintiffs' claims as to be unworthy of any consideration should be stricken." Johnson v. Anhorn, 334 F.Supp.2d 802, 809 (E.D. Pa. 2004).

This Court will first examine whether the Levine decision compels reconsideration of its September 14, 2009 opinion and then determine whether the filed rate doctrine mandates striking Plaintiffs' Class Action complaints arising under New York, Ohio, and Texas law.

**B.     The Levine Decision and Plaintiffs' California Claims**

This Court's September 14, 2009 Opinion rejected Defendant's request to dismiss Clark's good faith and fair dealing claims under California law. This decision rested, in part, on the existence of a special "fiduciary like" relationship between an insurance company and an insured. This Court held that "[b]ecause it is 'a relationship often characterized by unequal bargaining power' where 'the insured must depend on the good faith and performance of the insurer,' California courts have imposed 'special and heightened' duties on the insurer." (2009 Op. 32) quoting Vu v. Prudential Property & Casualty Ins. Co., 26 Cal. 4th 1142, 1150-51 (2001). On the basis of these "heightened duties" this Court held that Plaintiffs had properly pled a claim for breach of the covenant of good faith and fair dealing by alleging that Prudential failed to disclose information concerning block closure and its effect on the future viability of the CHIP plans. (2009 Op. 40).

In the instant motion, Defendant claims that the <u>Levine</u> decision has altered California law concerning the duties owed by an insurer to an insured. In its brief, Defendant argues that the <u>Levine</u> decision holds that "fiduciary-like duties do <u>not</u> include a duty to disclose information related to premiums" and that "it is now clear that, under California law, Prudential had no duty to disclose the block closure or its alleged effects on premiums." (Def. Br. 1). Prudential then argues that without a duty to disclose, all of the California Plaintiffs' non-disclosure claims should be dismissed. (Def. Br. 11).[3]

In <u>Levine</u>, the California Court of Appeals reviewed a trial court dismissal of an action for negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and unfair competition. The plaintiffs in <u>Levine</u> were a married couple who had contracted for health insurance through Blue Shield. <u>Levine</u>, 189 Cal. App. 4th at 1122. Blue Shield sold the <u>Levine</u> plaintiffs three separate policies: one for the husband and wife and a separate policy for each of their two dependants. <u>Id</u>. The policies were structured so that the wife was listed as a dependant on her husband's health policy. <u>Id</u>.

After a sudden increase in premiums, the <u>Levine</u> plaintiffs contacted Blue Shield to determine how they could lower their insurance costs. <u>Id</u>. at 1123. Plaintiffs then learned that they could have obtained the same medical coverage from Blue Shield for a substantially lower premium if the wife had been named as the primary insured or if they had consolidated their three health policies into a single family plan. <u>Id</u>. The <u>Levine</u> plaintiffs made the change to their health plans and requested that Blue Shield refund the "extra" premiums that it had collected. <u>Id</u>. When Blue Shield refused, plaintiffs filed suit. <u>Id</u>.

---

[3]     The claims based on duty of disclosure include portions of Count Two (fraudulent omission), Count Three (good faith and fair dealing), and Count Four (UCL).

In moving to dismiss the action, Blue Shield argued, both to the trial court and to the Court of Appeals, that it had no duty to aid plaintiffs in choosing which insurance products to buy. Id. at 1124. The Levine plaintiffs argued in opposition that Blue Cross owed a duty to reveal "the actual amount of premiums Blue Shield [was] willing to accept for health care coverage." Id. at 1125. The trial court ruled that "[i]nasmuch as the existence of a duty of disclosure is a fundamental element of each of the first … three causes of action [fraudulent concealment, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing], as well as the fifth [unfair competition], and inasmuch as plaintiffs cannot allege a statutory duty under … section 332… all of these actions are subject to demurrer." Id. at 1125 quoting lower court opinion.

On review, the Court of Appeals upheld the trial court decision. Relying principally on California Service Station etc. Assn. v. American Home Assurance Co., 62 Cal. App. 4th 1166 (1998), the court held that "an insurer does not owe a purchaser of insurance any 'special duty' in negotiating the price of an insurance contract" and that "a person's initial decision to obtain insurance and an insurer's decision to offer coverage generally should be governed by traditional standards of freedom to contract." Id. at 1129. Moreover the court held that there was no authority under California law that would "support the proposition that a court may order an insurer to disclose the lowest price that the insurer is willing to accept in exchange for providing coverage" or require disclosure of "how the [plaintiffs] could obtain the same health care coverage for a lower price." Id. In response to the Levine plaintiffs' argument that the insurer had a pre-existing insurance relationship that gave rise to "special obligations" to disclose, the court held that fiduciary-like duties apply only "where those obligations foster the unique

14

purposes of an insurance contract, namely, bringing an insured peace of mind and security from loss." Id. at 1131.[4]

Prudential argues that under the Levine decision, any claim of non-disclosure "relating to pricing" must "fail as a matter of law…." (Def. Br. 12). Prudential contends that Plaintiffs' good faith and fair dealing claims, which are based on failures by Prudential to disclose the actuarially unsound condition of the CHIP policies, the true reasons for the regular premium increases, and the virtual certainty that the CHIP premiums would rapidly spiral into unaffordability, are disclosures "relating to pricing" that are thereby categorically barred. (Def. Br. 12).

But this argument both overstates Levine and mischaracterizes Plaintiffs' claims. The Levine court did not impose a blanket prohibition on omission claims that touch even tangentially on pricing. Rather the court sought to preserve the ability of health insurance companies to offer multiple plans and negotiate with customers concerning price without being forced to assume the role of an "insurance broker." Plaintiffs do not allege that Prudential neglected to disclose the prices of its plans or alternative product offerings that would lower Plaintiffs' total insurance costs. Rather, Plaintiffs claim that Prudential failed to disclose "the ramifications of the block closure to CHIP policyholders" in spite of the fact that it knew that "the block closure would inevitably cause premiums to rise to unaffordable levels" and that "the flawed design features of the CHIP policy would accentuate the dynamics of the death spiral." (4AC ¶¶ 4-5).

In addition, the Levine court reaffirmed the holding of Pastoria v. Nationwide Ins., 112 Cal. App. 4th 1490 (2003). In Pastoria, the Court of Appeals sustained an unfair competition

---

[4]  Notably, the Levine court did not address whether an insurer would be liable for claims based on "fraud, deceit or misrepresentation causes of action" as the plaintiffs "actively disavowed" such claims. Levine, 189 Cal. App. 4th at 1130.

claim on the grounds that the insurer "had a duty to disclose to plaintiffs that there were ***impending amendments to the policies changing premiums and benefits***, even before the plaintiffs purchased their policies." Id. at 1496 (emphasis added). The Levine court distinguished Pastoria on the grounds that Blue Shield's failure to disclose a "lowest hypothetical price" at which it would accept coverage was very different than a failure to disclose "actual amounts to be paid by a purchaser of insurance" Levine, 189 Cal. App. 4th at 1135. However the instant case is more factually akin to Pastoria than to Levine. Here, Plaintiffs have effectively alleged "impending" changes to their insurance policies that materially altered both premiums and Plaintiffs' continuing ability to retain coverage. As alleged, these material changes were known with certainty by Prudential and not disclosed. The alterations in the policies purportedly threatened the "peace of mind and security from loss" that "foster the unique purposes of an insurance contract", and thereby give rise to special obligations under California law. Id. at 1131.

The Levine decision does not fundamentally alter California law on this point, and does not require this Court to revisit its previous decision. Prudential's motion to dismiss Plaintiffs' California causes of action premised on a duty to disclose is DENIED.

**C.      The Filed Rate Doctrine**

In its September 9, 2010 Opinion, this Court dismissed all claims by former plaintiff Litwack as barred by the filed rate doctrine as applied under New Jersey law. (Doc No. 98) ("2010 Op." 28). Emboldened by this ruling, Prudential now seeks to strike all class action allegations alleging claims under New York, Ohio, or Texas law on the grounds that the filed rate doctrine as applied each state bars such claims. (Def. Br. 19-20).

While motions to strike are generally disfavored, in a complex action such as this one, they serve an important role in focusing the litigation on potentially meritorious claims at an

early stage. See Receivables, at *2. As such, to the extent that putative class action claims on behalf of potential class members are barred by the application of the filed rate doctrine, they will be stricken. Since each state presents dramatically different issues, the Court will examine each state individually.

>    ### i.    New York

In their papers[5] and at oral argument, Plaintiffs admit that the law and reasoning applied in this Court's September 9, 2010 opinion mandates the application of the filed rate doctrine to claims brought on behalf of New York purchasers. As such, Defendant's motion to strike the New York claims is GRANTED.

>    ### ii.    Ohio

Before turning to the substance of Ohio law, a word is necessary on the appropriate mode of analysis. Prudential asserts in its brief that the filed rate doctrine "varies little from one jurisdiction to another" and that it bars any claim "that implicates either one of its 'core purposes.'" (Def. Br. 17). While these statements are not strictly erroneous, this high level of abstraction tends to gloss over the finer points of a policy that applies to different categories of claims for very different reasons.

The modern filed rate doctrine originated in the Keogh v. Chicago & Northwestern Railway Co., 260 U.S. 156 (1922) case. In Keogh, the Supreme Court of the United States determined that the Interstate Commerce Commission's approval of freight rates submitted by the defendants precluded a private antitrust action seeking damages on the basis of those rates. Id. at 161-165. Keogh stood for the proposition that the federal antitrust laws cannot be used as a collateral attack on a federal regulator's determination that rates are reasonable. Critically, the Supreme Court had the authority to make this decision as the ultimate arbiter of the meaning of

---

[5]    Pl. Br. 16- 17.

the federal antitrust statutes. See Id. at 161 ("Whether there is a cause of action under section 7 of the Anti-Trust Act is the sole question for decision.").

Since Keogh, the filed rate doctrine has been extended to bar other federal causes of action that undermine rates approved by other state and federal regulators. See, e.g., Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994) (barring RICO claims that undermine rates set by state and federal regulators). Again, the basis for this authority lies in the power of the federal courts to interpret the limitations of causes of action arising under federal law.[6]

In addition, the filed rate doctrine has been further extended to bar state causes of action that challenge the rates set by federal regulators. While these cases resemble other filed rate decisions in the federal courts, the basis for the court's authority to dismiss these claims is fundamentally different. The federal courts have no authority to define the parameters of constitutionally solvent state causes of action. Cohn v. G.D. Searle & Co., 784 F.2d 460, 463 (3d Cir. 1986) ("we are required to defer to the state's highest court as the ultimate arbiter of the meaning of state law…where the Constitution or treaties of the United States or Acts of Congress do not otherwise require or provide.") (internal citation omitted).[7] Rather, state claims which undermine federal rate setting authority are barred on the basis of preemption under the supremacy clause. American Tel. and Tel. Co. v. Central Office Telephone, Inc., 524 U.S. 214,

---

[6]     And where applicable, the scope of statutes providing for federal regulatory authority.

[7]     See also 28 U.S.C. § 1652 (the Rules of Decision Act) ("The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.").

226 (1998) (holding state law claims which implicated FCC tariffs to be "pre-empted under the filed rate doctrine").[8]

Last, the filed rate doctrine has been occasionally applied to bar state causes of action which challenge rates set by state regulators. This final extension is beyond the power of the federal courts, and may only be effected where the laws of a state, as expressed in its statutes and by its highest court, dictate. The state courts are the ultimate arbiters of state law and the reach of state causes of action that do not offend the constitution. Douglas v. City of Jeannette (Pennsylvania), 319 U.S. 157, 163 (1943) (with respect to "state law, state courts are the final arbiters of its meaning and application, subject only to review by this Court on federal grounds appropriately asserted."); see also Danforth v. Minnesota, 552 U.S. 264, 291(2008) (Roberts, J., dissenting) ("State courts are the final arbiters of their own state law").

In some cases, state courts have adopted some version of the filed rate doctrine. See, e.g., Richardson v. Standard Guar. Ins. Co., 371 N.J. Super 449, 463 (App. Div. 2004) ("We, thus, align our decision with the considerable weight of authority from other jurisdictions that have applied the filed rate doctrine to ratemaking in the insurance industry."). Others have rejected it, at least in certain contexts. See e.g., Cellular Plus, Inc. v. Superior Court, 14 Cal. App. 4th 1224, 1241-1242 (1993) ("We also are not compelled to follow the *Keogh* and *Square D* rulings"). It is neither prudent nor appropriate for a federal court to impose the filed rate doctrine on a state

---

[8]     See also, Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 580 (1981) ("the mere fact that respondents brought this suit under state law would not rescue it, for when congress has established an exclusive form of regulation, 'there can be no divided authority over interstate commerce.' Congress here has granted exclusive authority over rate regulation to the Commission. In so doing, Congress withheld the authority to grant retroactive rate increases or to permit collection of a rate other than the one on file. It would surely be inconsistent with this congressional purpose to permit a state court to do through a breach-of-contract action what the Commission itself may not do.") (internal citations omitted); Entergy Louisiana, Inc. v. Louisiana Public Service Com'n, 539 U.S. 39, 47 (2003) ("When the filed rate doctrine applies to state regulators, it does so as a matter of federal pre-emption through the Supremacy Clause.").

which has not adopted it. Nor should a court stretch or bend a state doctrine to more comfortably

fit the contours of the federal rule.

In this case, all claims arise under state law and do not implicate rates set by federal

regulators. As such, the applicability of the filed rate doctrine is entirely governed by the laws of

each individual state. Turning first to the laws of Ohio, when a federal court applies state

substantive law, it should apply the law as decided by the highest court of the state whose law

governs the action. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Orson, Inc. v.

Miramax Film Corp., 79 F.3d 1358, 1373 (3d Cir. 1996). When a state's highest court has not

addressed the precise question before the court, a federal court must predict how the state's

highest court would resolve the issue. Borman v. Raymark Indus., Inc., 960 F.2d 327, 331 (3d

Cir. 1992). Although not dispositive, decisions of state intermediate appellate courts should be

accorded significant weight in the absence of an indication that the highest state court would rule

otherwise. Rolick v. Collins Pine Co., 925 F.2d 661, 664 (3d Cir. 1991), cert. denied, 507 U.S.

973 (1993).

Unlike their counterparts in New York and New Jersey, the Ohio courts have not broadly

embraced the filed rate doctrine as it is understood under federal law. The Ohio filed rate

doctrine is a far more limited rule applying to public utilities and its parameters are set largely by

statute. In particular, the Ohio doctrine does not appear to bar claims based on misrepresentations

or omissions by a defendant. The Ohio Court of Appeals set forth the Ohio filed rate doctrine in

Gary Phillips & Assoc. v. Ameritech Corp., 144 Ohio App.3d 149, 153 (Ohio Ct. App. 2001),

writing:

> The Ohio General Assembly has created a comprehensive statutory system for
> regulating the business activities of public utilities. Contained within Title 49 of
> the Ohio Revised Code is the framework for the regulation of utility service, and
> the fixation of rates charged by utilities to their customers. In order to administer

20

this system, the General Assembly created the Public Utilities Commission ("PUCO") and bestowed upon it the authority to administer and enforce the provisions of R.C. Title 49.

As part of this regulatory scheme, every public utility in the state is required to apply for PUCO approval of tariff schedules that detail the rates, charges, and classifications of their services. R.C. 4905.30. This requirement has given birth to what is known as the "filed rate doctrine." The filed rate doctrine, embodied in R.C. 4905.33, mandates that a public utility must charge the tariff rates approved by the PUCO. Further, deviation from those rates is not permitted except under the supervision of the PUCO.

While public utilities are subject to pervasive regulation, and while the PUCO is vested with sweeping oversight, such authority is not all-encompassing, nor does it in any manner diminish the "jurisdiction of the court of common pleas in other areas of possible claims against public utilities."

Moreover, <u>Gary Phillips</u> also speaks to the limitations of the rule even in the public utility context. In <u>Gary Phillips</u>, the Ohio Court of Appeals reviewed a trial court order dismissing a case under the filed rate doctrine. The plaintiffs in <u>Gary Phillips</u> claimed that they had been deceived into buying telephone voicemail services due to misleading advertising by Ameritech Corporation and Ohio Bell Telephone Company. Defendants countered that the rates for their services had been approved by the Ohio regulator and could not be challenge through suit. While this form of reasoning has led to the dismissal of federal claims on the basis of the filed rate doctrine, The Ohio Court of Appeals rejected it, writing that:

> [T]he trial court erred when it dismissed plaintiff's complaint on the basis that "the rates complained of herein are tariffs regulated and monitored by the PUCO." While it is true that the defendants' local call charges are covered by a valid tariff, the heart of the plaintiff's complaint is that the defendants have engaged in fraudulent and misleading *advertising* practices. The core allegation and focus of this complaint does not stand or fall on the reasonableness of what the defendants charge for local calls, the defendants' authority to charge for local calls, or the availability or quality of local call service. Instead, it turns upon the legality of the defendants' advertising practices and, specifically, upon whether the defendants intentionally misled customers into believing that they would not be charged for local calls, or any other service in connection with the use of voice mail. As such, the trial court improperly concluded that the plaintiff's claim is barred by the filed rate doctrine.

Id. at 153-154.

Similarly, in Lazarus v. Ohio Cas. Group, 144 Ohio App.3d 716, 721 (Ohio Ct. App. 2001), the Ohio Court of Appeals rejected the argument that the Ohio insurance regulator had primary jurisdiction[9] over a case where "[t]he issues raised in these claims focus not on the actual rate charged but rather on the information provided by the insurance company regarding what the rates cover. In other words, the issues are fraud and deceptive practices, unjust enrichment, conversion, breach of contract and fiduciary duty and negligence, not whether the rate charged was acceptable or not."

While no Ohio court has embraced the filed rate doctrine as understood under federal law, some federal courts in Ohio have produced mixed decisions. In Zangara v. Travelers Indem. Co. of America,[10] the court examined an action brought on behalf of homeowners who claimed that they had been deceived into purchasing higher priced insurance when lower cost insurance was available.[11] Applying Lazarus, The Zangara court rejected the application of the filed rate doctrine, holding that "the filed rate doctrine does not apply to the present case because Plaintiffs are not challenging the *reasonableness* of Travelers' insurance rates; they challenge an alleged

[9]       Primary jurisdiction is a doctrine of regulatory deference that is related to the filed rate doctrine, though the two are not identical. "Primary jurisdiction is a doctrine that requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision." Richman Bros. Records, Inc. v. U.S. Sprint Communications Co., 953 F.2d 1431, 1435 (3d Cir. 1991) (citing Baltimore Bank for Cooperative v. Farmers Cheese Cooperative, 583 F.2d 104, 108 (3d Cir. 1978)).

[10]       423 F.Supp.2d 762, 776 (N.D. Ohio 2006) vacated on other grounds, 2006 WL 825231 (N.D. Ohio March 30, 2006).

[11]       Prudential suggests that the Court ignore Zangara, as the decision was subsequently vacated for lack of subject matter jurisdiction. (Def. Reply 12). However, none of the federal district court opinions from Ohio, whether standing or vacated, are binding on this Court. There is no reason to disregard the reasoning from Zangara to the extent that it is a well reasoned and persuasive analysis of Ohio law.

deceptive sales practice." <u>Zangara</u>, 423 F.Supp.2d at 776. Similarly, the court in <u>Chesner v.</u>

<u>Stewart Title Guaranty Co.</u>, No. 06-cv-476, 2006 WL 2252542 (N.D. Ohio Aug. 4, 2006) and

<u>Barnes v. First Am. Title Ins. Co.</u>, No. 06-cv-574, 2006 WL 2265553 (N.D. Ohio Aug. 4, 2006),

in identical decisions, rejected the application of the filed rate doctrine to claims for fraud and

misrepresentation brought against title insurance companies, writing that "[t]he case law cited by

Defendant does not involve the sale of title insurance nor insurance transactions in general" and

that there was no reason to believe that "the 'filed rate doctrine' applies outside the public

utilities or common carrier arenas." <u>Chesner</u>, at *7.

Prudential urges this Court to rely upon the only federal district court decision from Ohio

holding otherwise. <u>In re Title Ins. Antitrust Cases</u>, 702 F.Supp.2d 840 (N.D. Ohio 2010) ("<u>Title</u>

<u>Insurance</u>") concerned a class action brought by purchasers of title insurance. The suit alleged

that insurers, acting through a trade association, had conspired to increase prices for title

insurance in Ohio. On a motion to dismiss, the <u>Title Insurance</u> court found that plaintiffs'

Sherman Act claims were barred under the federal filed rate doctrine. <u>Id</u>. at 861. Turning then to

state antitrust claims, the court first acknowledged that "the question of whether the filed rate

doctrine acts to preclude their state law … claims for damages as to rates filed with a state

regulatory agency is a matter of Ohio law." <u>Id</u>. at 861. In examining the available caselaw, the

court determined that "the filed rate doctrine has never been applied to the Ohio title insurance

industry" and that "Ohio has not applied the filed rate doctrine to preclude a suit for damages by

a private plaintiff" <u>Id</u>. at 848, 862.

In an effort to predict whether the Ohio Supreme Court would apply the filed rate

doctrine to private antitrust claims in the title insurance industry, the <u>Title Insurance</u> court relied

upon three authorities. The first was <u>In re Investigation of Nat'l Union Fire Ins. Co.</u>, 66 Ohio

St.3d 81 (1993) ("National Union"). The National Union case did not concern private plaintiffs or the filed rate doctrine, but instead involved a challenge by an insurer to fines it had received for failing to file its rates for a "multi-peril policy" issued to the city of Brook Park. The court in National Union rejected arguments by an insurance company that it could permissibly deviate from filed rates on the basis of "underwriting judgment." Id. at 88 ("National Union was not in any way excused from compliance with Ohio's rate-filing statutes and was, therefore, required to file the modified rates it planned to charge Brook Park prior to their implementation."). While acknowledging that the filed rate doctrine was not discussed in National Union, the Title Insurance court claimed that the issue of whether insurance rates could vary after being filed was a "corollary principal" that suggested that the federal filed rate doctrine would be applied. Title Insurance, 702 F.Supp.2d at 862.

The second authority relied upon by Title Insurance was Office of Consumers' Counsel v. Public Utils. Com, 61 Ohio St.3d 396 (1991) ("OCC"). The Title Insurance court quoted language from OCC suggesting that the filed rate doctrine is "well-established." However the language quoted by Title Insurance from the OCC case was in the dissenting opinion. Id. at 406-407. Moreover, the OCC case was not a suit between private parties that touched on a filed insurance rate, but instead involved a dispute over the power of the Ohio Public Utilities Commission to remove discriminatory language from an electricity rate filed with its agency after the rate had been filed.

The third authority relied upon by the Title Insurance court was Gary Phillips, which the court quoted for the proposition that the filed rate doctrine was recognized in Ohio. But as described above, the filed rate doctrine adopted by Gary Phillips is—in spite of the name—a

distant cousin to the federal filed rate doctrine and arguably limited by the public utility regulation statutes that give rise to it.

On the basis of these dubious authorities, the <u>Title Insurance</u> court predicted that the Ohio Supreme Court would apply the filed rate doctrine to dismiss state antitrust claims. Strangely, the court did not cite to the <u>Lazarus</u> decision at all, and made no efforts to examine the contours of the <u>Gary Phillips</u> decision, which deviate significantly from federal filed rate precedents.[12]

In essence, the <u>Title Insurance</u> court, familiar with the filed rate doctrine from federal practice, assumed that the filed rate doctrine would be adopted *in toto* by any state with an effective regulatory framework. This mode of analysis is fundamentally flawed. It has been well established that the filed rate doctrine is a "harsh remedy" that often leads to inequitable results. <u>Maislin Industries, U.S., Inc. v. Primary Steel, Inc.</u>, 497 U.S. 116, 132 (1990) (the doctrine "has never been justified on the ground[s] [of] … equit[y] … despite its harsh consequences in some cases"). In the absence of Ohio law dictating its application, it is inappropriate for a federal court to assume that the Ohio courts would adopt this aggressive rule. Indeed, even the Supreme Court has acknowledged that filed rate doctrine endures in Federal Court primarily because of *stare decisis* and "the strong presumption of continued validity that adheres in the judicial interpretation of a statute." <u>Square D Co. v. Niagara Frontier Tariff Bureau, Inc.</u>, 476 U.S. 409, 424 (1986). To dismiss the claims of Ohio plaintiffs on the assumption that Ohio courts would fall lockstep behind their federal counterparts does great violence to the sovereignty of the state

---

[12]     <u>Title Insurance</u> did acknowledge the existence of <u>Barnes</u> and <u>Chestler</u>, but disregarded them on the grounds that "[s]uccess by the <u>Barnes</u> and <u>Chesner</u> plaintiffs would not have resulted in the alteration of the rate paid by plaintiffs-the rate would have remained fully intact. Damages would have been calculated by determining the difference between the two *approved* filed rates." <u>Title Insurance</u>, 864 (N.D. Ohio 2010). To the extent that this reasoning were adopted, it would also argue against applying the filed rate doctrine in this case, where damages could potentially be calculated by looking to other market rates, or even to other insurance products offered by Prudential.

and the right of its people to structure their regulatory environment as they see fit. This Court is neither bound to, nor persuaded by, the <u>Title Insurance</u> decision, which is also in tension with pre-existing Ohio precedents and the judgments of other federal courts in the Northern District of Ohio.

Based on the alternative formulations of the filed rate doctrine embraced by the Ohio Court of Appeals, this Court holds that the Ohio filed rate doctrine would not bar Plaintiffs' claims. Defendants' motion to strike the Ohio claims is DENIED.

### *iii.    Texas*

Texas courts also recognize and apply a particular version of filed rate doctrine. As stated in <u>Sw. Elec. Power Co. v. Grant</u>, 73 S.W.3d 211, 216-217 (Tex. 2002):

> The "filed-rate doctrine" applies when state law creates a state agency and a statutory scheme under which the agency determines reasonable rates for the service provided. The doctrine holds that a tariff filed with and approved by an administrative agency under a statutory scheme is presumed reasonable unless a litigant proves otherwise. Thus, under the doctrine, filed tariffs govern a utility's relationship with its customers and have the force and effect of law until suspended or set aside.
>
> Additionally, under the filed-rate doctrine, regulated utilities cannot vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those properly filed with the appropriate regulatory authority. And a utility's obligations to its customers cannot exceed its duties under a filed tariff. It follows, then, that aggrieved customers cannot enforce alleged rights that contradict the tariff's provisions. Consequently, the filed-rate doctrine prohibits a customer from suing a utility in contract or tort over issues that a publicly-filed tariff's terms govern.
>
> (internal citations omitted).

Whether a state agency has the authority to approve reasonable rates is critical. In Texas, "[t]he application of the filed rate doctrine … is necessarily circumscribed by the legislative grant of authority" to the administrative agency. <u>Mid-Century Ins. Co. of Texas v. Ademaj</u>, 243 S.W.3d 618, 625 (Tex. 2007). Indeed, "[t]he considerations underlying the doctrine are the preservation

of the regulatory agency's primary jurisdiction over reasonableness of rates…." CenterPoint
Energy Entex v. Railroad Com'n of Texas, 208 S.W.3d 608, 621 -622 (Tex. Ct. App. 2006).

       Plaintiffs acknowledge that Prudential was required to file its rates with the Texas
Department of Insurance. (Pl. Br. 37). However, Plaintiffs argue that the Texas Department of
Insurance has no statutory authority to approve or reject rates filed. (Pl. Br. 35). Indeed, Tex. Ins.
Code § 1701.057(e) makes explicit that the authority granted to the commissioner to require rate
filings "does not grant the commissioner the authority to determine, fix, prescribe, or promulgate
rates to be charged for an individual accident and health insurance policy." Moreover, the filings
submitted by Prudential appear to have been filed under 28 Tex. Admin. Code § 3.5(b)(1)—that
is "[a] filing that is submitted for informational purposes only and is not subject to approval."

       Prudential acknowledges that individual health insurance rates do not have to be
approved by the Texas Insurance Department. (Def. Br. 23). It argues instead that the mere filing
of the rate and "not any affirmative approval or scrutiny" is sufficient to invoke the filed rate
doctrine. Id. at 24. But none of the cases cited by Prudential in support of this argument apply
Texas law. Moreover, the decisions cited by Prudential stand only for the proposition that—in
cases involving the federal filed rate doctrine— a showing that the federal regulator did not
conduct a comprehensive inquiry into the reasonableness of the individual rate will not defeat the
application of the rule.[13] Prudential cites no authority for the proposition that the filed rate
doctrine is applicable—under Texas law or any other—when a rate is filed with an agency with
no authority to approve or reject it. Nor is such a holding sensible. An insurer cannot escape
liability by filing its rates with the Department of Education or the EPA.

---

[13]    See, e.g., Town of Norwood, Mass. v. New England Power Co., 202 F.3d 408, 419 (1st
Cir. 2000) (applying filed rate doctrine where Federal Energy Regulatory Commission had
authority to review rate, even if it did not do so.).

In a curious addendum, Prudential claims that despite lacking "formal" authority to review rates, the Texas Insurance Department "will not treat rates submitted by an insurer as having been 'filed' until the department is satisfied with the proposed rates." (Def. Br. 25). Prudential cites no authority for this position. Instead, Prudential has produced correspondence between it and Dewayne Matthews, an "Insurance Specialist" working for the Texas Department of Insurance. (Wyner Cert. Ex. B). In one letter concerning a recent filing, Matthews states that "you have requested a rate increase of 50%. We are proposing an increase of up to 30% for these policies." Id. at B-7.

While this letter does raise questions about whether the employees of the Texas Department of Insurance may be acting outside the scope of their authority, the actual conduct by Department of Insurance employees is irrelevant. Nothing submitted by Prudential suggests a "legislative grant of authority" that would permit the Texas Department of Insurance to set insurance rates. In the face of clear statutory language to the contrary, the only reasonable conclusion is that in Texas, health insurance rates must be filed, not approved. The filed rate doctrine does not apply, and Defendant's motion to strike claims under Texas law is DENIED.

## III.   CONCLUSION

For the reasons set forth above, Defendant's motion is to strike is GRANTED with respect to Plaintiffs' class action claims under New York law. Defendant's motion to strike is otherwise DENIED. Defendant's motion to dismiss is DENIED.

s/ Dickinson R. Debevoise

DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:  March 15, 2011