**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

BEVERLY CLARK, JESSE J. PAUL, WARREN GOLD, LINDA M. CUSANELLI, CAROLE L. WALCHER, and TERRI L. DROGELL,

    Plaintiffs,

v.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

    Defendant.

Civ. No. 08-6197 (DRD)

**O P I N I O N**

*Appearances by:*

NAGEL RICE LLP
Bruce Nagel, Esq.
Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, N.J. 07068

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Charles N. Freiberg, Esq.
Brian P. Brosnahan, Esq.
David A. Thomas, Esq.
Jacob N. Foster, Esq.
101 California Street, Suite 2050
San Francisco, CA 94111

LEVINE, STEINBERG, MILLER & HUVER
Harvey R. Levine, Esq.
Craig A. Miller, Esq.
550 West C Street, Suite 1810
San Diego, CA 92101

    *Attorneys for the Plaintiffs, Beverly Clark, Jesse J. Paul, Warren Gold, Linda M. Cusanelli, Carole L. Walcher, and Terri L. Drogell.*

LOWENSTEIN SANDLER PC
Douglas S. Eakeley, Esq.
Natalie J. Kraner, Esq.
John R. Middleton, Jr., Esq.
65 Livingston Ave.
Roseland, N.J. 07068

GOODWIN PROCTOR LLP
John D. Aldock, Esq.
Richard M. Wyner, Esq.
Mark S. Raffman, Esq.
901 New York Ave., N.W.
Washington, D.C. 20001

*Attorneys for the Defendant, The Prudential Insurance Company of America*

**DEBEVOISE, Senior District Judge**

Plaintiffs' case arises out of allegations of deception and bad faith conduct by a health insurance company. Plaintiffs Beverly Clark, Jesse J. Paul, Warren Gold, Linda M. Cusanelli, Carole L. Walcher, and Terri L. Drogell have filed a class action complaint against The Prudential Insurance Company of America ("Prudential") alleging that Prudential concealed a fatal actuarial defect in a health insurance plan sold across the nation. Presently before the Court is Plaintiffs' appeal of a discovery order dated March 1, 2011 (the "March 2011" order) denying Plaintiff's challenge to the confidentiality designations of fifteen documents. Plaintiffs argue that the documents are not protectable as confidential material under Rule 26(c) and that the current designation is unsupportable.

For the reasons set forth below, the March 2011 Order is REVERSED as to the designation of the fifteen documents at issue.

## I.  BACKGROUND

The facts of this case and procedural history are discussed at great length in several prior opinions dated September 14, 2009 (Doc. No. 39), September 9, 2010 (Doc. No. 98), and March 15, 2011 (Doc. No. 156). The essential details are as follows. Plaintiffs are former customers of Prudential who purchased health insurance plans marketed under the name Coordinated Health Insurance Program[1] ("CHIP"). Prudential sold CHIP throughout the United States from 1973 through 1981. The terms of CHIP permitted purchasers to continue to renew the policies

---

[1] There has been some inconsistency in how the parties define the acronym CHIP. In their Fifth Amended Complaint, Plaintiffs define it as "Coordinated Health Insurance Program." (Complaint ¶ 1). But in their moving papers, Plaintiffs instead call it the "Comprehensive Health Insurance Program." (Pl. Br. 1). Similarly, Defendant states that it should be "Coordinated Health Insurance Plan" in their opposition papers (Def. Br. 1). But all of Defendant's documents at issue in this motion refer to it as "Coordinated Health Insurance Program." See, e.g., PRU-BC-00001287, PRU-BC-000033769, PRU-BC-00033933, PRU-BC-00044333. As Prudential's documents are internally consistent and comport with the complaint, the most likely conclusion is that neither party managed to correctly define the acronym in their briefing on this motion.

indefinitely. However, Plaintiffs allege that when Prudential ceased selling CHIP in 1981, it destabilized the risk pool for existing policyholders, rendering it a virtual certainty that premiums would spiral out of control until all plan participants were forced to drop their coverage. Plaintiffs further allege that Prudential concealed this fact from CHIP policyholders, causing them to pay above-market premiums for many years and to forego the opportunity to purchase alternative health care coverage while they were healthy enough to qualify.

The case has seen extensive motion practice and several modification to Plaintiffs' putative claims and class representatives. On February 16, 2011, Plaintiffs filed their Fifth Amended Complaint ("5AC") alleging (1) fraudulent misrepresentation, on behalf of a Multi-State Fraud Class; (2) fraudulent omissions, on behalf of a Multi-State Fraud Class; (3) breach of the duty of good faith and fair dealing, on behalf of a California Subclass; and (4) violation of California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*, on behalf of a California Subclass. (Doc. No. 140).

Discovery has been ongoing since the fall of 2009, much of it directed at Prudential's business records. On March 22, 2010, the Court approved a Discovery Confidentiality Order ("DCO") that was previously negotiated and agreed-to by the parties. (Doc. No. 71). The DCO permits the parties to designate material as "Confidential Business Information" if it includes:

> (i)     Sensitive nonpublic financial information and statements;
>
> (ii)    Business or technical information that, if disclosed to the general public or competitors of any Party could reasonably be expected to cause competitive harm to that Party;
>
> (iii)   Trade secrets;
>
> (iv)    Proprietary business information, including business methods or practices, business plans and records of internal deliberations and decision-making, and policies and procedures not generally published;

>    (v)    Individual personal information that is protected from disclosure under state or federal law, including identifying personal information, about any Party, any employee of any party, or any third party;
>
>    (vi)   Any other information, the disclosure of which would, in the good faith judgment of the Party designating the information as Confidential Materials, reasonably be expected to cause competitive harm to that Party and be detrimental to the conduct of that Party's business or the business of any of that Party's customers or clients, or would cause one or more of the Parties substantial harm.

Pursuant to the DCO, the parties are required to prevent documents designated as "Confidential Business Information" from becoming a part of the public record. Cognizant of Court rules regarding sealed filings, the DCO does not explicitly instruct the parties to file designated documents under seal, but the confidentiality obligations that it imposes effectively requires them to do so. The DCO also reaffirms that in adjudicating disputes over the designation of documents, the designating party shall have the burden of demonstrating that the material is deserving of protection.

In August of 2010, Plaintiffs asked Prudential to remove the confidentiality designation on 15 documents[2] previously produced by Prudential. (Pl. Ex. 29). Prudential refused to do so, claiming that the documents reflected "proprietary business information." (Pl. Ex. 30). In October, the parties took the dispute to Judge Shipp, writing a joint letter dated October 19, 2010 that attached the relevant documents and included arguments from both sides. (Doc. No. 108).

On March 1, 2011, Judge Shipp issued an order denying Plaintiff's challenge. (Doc. No. 147). The March 2011 order did not articulate the reasoning behind the decision. Plaintiffs now appeal Judge Shipp's decision and ask this Court to find that the documents are not entitled to protection under Rule 26(c).

---

[2] Plaintiffs' August 6, 2010 email requested redesignation of 16 documents. Prudential agreed to redesignate one of the documents, bates numbered PRU-BC-00036063-4.

## II.     DISCUSSION

### A.     Standard of Review

A Magistrate Judge's decision is to be overturned only to the extent that the ruling is "clearly erroneous or contrary to law." L. Civ. R. 72.1(c)(1)(A). The burden of showing that a ruling is "clearly erroneous or contrary to law rests with the party filing the appeal." Marks v. Struble, 347 F. Supp. 2d 136, 149 (D.N.J. 2004). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co., 131 F.R.D. 63, 65 (D.N.J. 1990) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)). Moreover, "[a] ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc., 106 F.Supp.2d 761, 764 (D.N.J. 2000).

Where an appeal seeks review of a matter within the purview of the Magistrate Judge, such as a discovery dispute, an even more deferential standard, the "abuse of discretion standard" must be applied. Kounelis v. Sherrer, 529 F.Supp.2d 503, 518 (D.N.J. 2008) ("[w]here a magistrate judge is authorized to exercise his or her discretion, the decision will be reversed only for an abuse of discretion."); see also Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124, 138 (3d Cir. 2000) (discovery orders reviewed for abuse of discretion). An abuse of discretion occurs "when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Lindy

Bros. Builders v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 115 (3d Cir. 1976).

Applying this deferential standard, this Court will examine each document to determine whether confidentiality protection was appropriately granted. As the March 2011 order does not articulate its reasoning, the Court is guided only by the Federal Rules and applicable case law in determining whether the decision was correct.

### B. Rule 26(c) Protection

Under the Federal Rules, confidentiality restrictions are not granted as a matter of course. Rather, "a party wishing to obtain an order of protection over discovery material must demonstrate that 'good cause' exists for the order of protection." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 786 (3d Cir. 1994) quoting Fed. R. Civ. P. Rule 26(c).[3] To demonstrate that "good cause" exists for a protective order, the party seeking protection must demonstrate "with specificity" that "that disclosure will work a clearly defined and serious injury to the party seeking closure." Id. quoting Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984). This requirement serves to balance legitimate privacy and secrecy interests against the "common law public right of access to judicial proceedings and records." In re Cendant Corp., 260 F.3d 183, 192 (3d Cir. 2001).

---

[3] A non-exclusive and non-mandatory list of factors that courts have considered in determining whether "good cause" exists includes "(1) the interest in privacy of the party seeking protection; (2) whether the information is being sought for a legitimate purpose or an improper purpose; (3) the prevention of embarrassment, and whether that embarrassment would be particularly serious; (4) whether the information sought is important to public health and safety; (5) whether sharing of the information among litigants would promote fairness and efficiency; (6) whether the party benefitting from the order of confidentiality is a public entity or official; and (7) whether the case involves issues important to the public." Arnold v. Pennsylvania, Dept. of Transp., 477 F.3d 105, 108 (3d Cir. 2007) citing Pansy, 23 F.3d at 787-88.

As a general rule, business information that is substantially out of date is unlikely to merit protection under Rule 26(c). Nestle Foods Corp. v. Aetna Cas. and Sur. Co., 129 F.R.D. 483, 485 (D.N.J. 1990) ("The purported need for protection is substantially diminished where the passage of time has made such documents stale."). A party seeking to protect outdated information must make a specific showing of present harm. Deford v. Schmid Products Co., a Div. of Schmid Laboratories, Inc., 120 F.R.D. 648, 654 (D.Md. 1987) ("While staleness of the information sought to be protected is not an absolute bar to issuance of an order, it is a factor which must be overcome by a specific showing of present harm."). Speculative allegations of injury will not suffice. Id. ("Speculative allegations of injury from the disclosure of years-old information are not sufficient to warrant issuance of a protective order.").

While parties frequently negotiate the terms of protective orders, the courts are not bound to grant orders of protection tailored to the stipulations of parties. Sprinturf, Inc. v. Southwest Recreational Industries, Inc., 216 F.R.D. 320, 323 (E.D.Pa. 2003) ("Protective orders stipulated between the parties are not guaranteed judicial approval.").[4] A court may not issue or enforce a protective order absent a determination that "good cause" exists.[5]

As a threshold matter, none of the document in this case contain private medical information, social security numbers, or other private data about natural persons. Prudential has

---

[4] See also Jepson, Inc. v. Makita Elec. Works, Ltd., 30 F.3d 854, 858 (7th Cir. 1994) ("In deciding whether to issue a stipulated protective order, the district court must independently determine if 'good cause' exists."); Pansy, 23 F.3d at 785 (describing the idea that "some courts routinely sign orders which contain confidentiality clauses without considering the propriety of such orders, or the countervailing public interests which are sacrificed by the orders" as "[d]isturbing[]").

[5] Prudential argues that Plaintiffs' endorsement of the DCO constitutes agreement that the challenged documents are deserving of protection and divests this Court of the ability to make an independent determination. (Def. Br. 7-11). But even if Plaintiffs had agreed to the confidentiality of the documents—which requires a tortured reading of the DCO—their agreement is not binding on this Court.

disclaimed any embarrassment concerning the contents of the documents (Def. Br. 21), and as a corporation has no personal privacy interest to protect.[6] No public policy interest is served in maintaining the secrecy of the documents—indeed, to the extent that the documents highlight bad faith efforts by Prudential to shirk its responsibilities as an insurer, the public interest is served through their disclosure. Consequently, the extreme age of the documents and scant allegations of injury[7] by Prudential demonstrate that none of the documents merit confidentiality protection under Rule 26(c).

### i. November 22, 1994 Memorandum PRU-BC-00001284-1322

The cover to this document is a memorandum to Gene O'Hara, Chief Financial Officer, from Don Southwell, President of Prudential Insurance and Financial Services. It encloses a business plan and exhibits prepared by Phillip J. Grigg in mid November of 1994. The plan discusses five potential strategies for mitigating losses on CHIP, including altering the

---

[6] See FCC v. AT& T Inc., 131 S.Ct. 1177, 1183 (2011). Of course Prudential has the ordinary privacy interests of a corporation over sensitive business information. Carpenter v. U.S., 484 U.S. 19, 26 (1987) ("Confidential information acquired or compiled by a corporation in the course and conduct of its business is a species of property to which the corporation has the exclusive right and benefit, and which a court of equity will protect through the injunctive process or other appropriate remedy"). However in this case that interest has been substantially diminished by the passage of time.

[7] Prudential claims that it "need not demonstrate a monetizable injury" to obtain a protective order, and cites Pearson v. Miller, 211 F.3d 57 (3d Cir. 2000) in support. (Def. Br. 11). However the Pearson case involved the private medical records of individuals and an evaluation of the "embarrassment" that those individuals might suffer if the records were made public. Pearson, 211 F.3d at 72. As a corporation, Prudential's rights against embarrassment extend only to disclosures that will cause it financial harm. Glenmede Trust Co. v. Thompson, 56 F.3d 476, 484 (3d Cir. 1995) ("General allegations of injury to reputation and client relationships or embarrassment that may result from dissemination of privileged documents is insufficient to justify judicial endorsement of an umbrella confidentiality agreement. We have typically viewed the 'embarrassment' factor in terms of non-pecuniary harm to individuals; however, the primary measure of the well-being of a business is pecuniary.").

contractual language used in the CHIP policies, replacing CHIP with an HMO plan, supplementing CHIP with a less comprehensive plan such as Pru-Med, buying off current policyholders, and selling the CHIP block to another insurer. The plan includes detailed information concerning CHIP's financial performance from 1973-1994 including total earned premiums, claims, and prudent loss ratios. The memo makes observations about the "regulatory environment" in various states and includes anonymous information concerning seven example CHIP policyholders.

While the detailed information in this document might once have merited protection under Rule 26(c), particularly given the possibility of selling the CHIP block, many years have passed and the information is clearly stale. The financial results and business plans set out in the memorandum have long since made their way into public disclosures. The market data and intelligence, even if particularly astute, is so out of date as to render it useless to competitors.

Prudential claims that its ancient documents contain "proprietary information" about "business strategies" that could give third parties "unfair leverage" over future business deals. This argument strains credulity. It is no great secret that Prudential regularly monitors the financial performance of its products and engages in a deliberative decision making process to determine whether a product should be discontinued or rescinded. Nor will it shock competitors that Prudential considers the actions of regulators when evaluating broad termination of benefits. Prudential's fear that its entire thought process will be extrapolated by competitors borders on paranoia. The notion that closely-guarded particulars of Prudential's business can be deduced from decades old discussions about the problems of CHIP is exactly the kind of "speculative allegation" of harm that has been consistently rejected by the courts. See e.g., Deford, 120

F.R.D. at 654. Nothing before the Court suggests that this dusty memorandum provides a "keen insight" into Prudential's current business.

Prudential does not, and cannot, demonstrate a credible threat of present injury resulting from the disclosure of information about a product that has been off the market for thirty years. As such, this document is not protectable under Rule 26(c).

    ii.        **Number of CHIP Policies PRU-BC-00025943**

This is a chart detailing the number of active CHIP policies—both nationwide and in California— for each year between 1975 and 2009. No other information is depicted on the chart.

Prudential argues that this information should be protected because it "is included in regulatory filings, which are themselves confidential in this state." (Def. Br. 18). This argument is unpersuasive. Regulatory filings contain large quantities of information. Some of that information, such as the name and address of the insurer, is always publically available. Other information may become publically available at a later date, such as audited financial statements and balance sheets. Still other portions of the filings are highly confidential and proprietary, such as loss reserve data on product or transaction specific level. The entire regulatory filing is kept confidential, but that does not itself demonstrate the secrecy of any individual portion of it. Prudential has advanced no argument for why disclosure of the inforce statistics will cause it a particularized harm. As Prudential no longer sells CHIP and the downward trend reflected in the data is a natural and obvious consequence of the block closure, this document is fundamentally harmless and does not merit protection.

   iii.  **CHIP Policy Inforce Data PRU-BC-00025944**

Like the previous document, this chart details the number of nationwide CHIP policies for each year between 1975 and 2009. This document also includes the number of policies issued to New Jersey residents. For the same reasons stated above, this document is not protectable.

   iv.  **July 12, 1985 Memorandum PRU-BC-00025947-25982**

This memorandum, authored by Arthur W. Ericson and addressed to multiple recipients within Prudential, attaches a report predicting escalating CHIP losses. The report concludes that Prudential must take action to terminate the policies. The report includes several varieties of data about CHIP, including opinion surveys, aggregate demographic and health data of CHIP insureds, and various stratifications of the risk pool. Also included are projections of the financial performance of CHIP through 1987.

This document is over twenty-five years old. The financial performance data and demographic information that it contains is decades out of date. The health care market about which the memo was written has changed dramatically, and the policyholders that it seeks to force out of CHIP have overwhelmingly already left the plan. Prudential offers no convincing reason to keep this document confidential.

   v.  **February 21, 1990 Memorandum PRU-BC-00032120-32125**

A claim consultant named Bonnie J. Snider prepared this memorandum describing changes in Prudential's handling of CHIP claims. The document details the practice of referring reimbursement requests to two "case management services" for review because of the length and complexity of CHIP claim files. The memo also describes changes to, among other things, reimbursement procedures for laboratory work, dental expenses, home medical equipment, surgery, and mental health expenses.

Even if this document were current, it is unclear that Prudential could demonstrate any real harm from disclosure. The policies that it describes would apply to—at most—the few hundred remaining CHIP insureds. And there is no reason to believe that the document reflects current practice as it is more than two decades out of date. Even if it did, the competitive harm would be minimal—as the documents make clear, no current competitors would seek to replicate the disastrous CHIP product. As Prudential offers no convincing reason to keep this document from disclosure, it is not protectable under Rule 26(c).

vi. **September 5, 1983 Memorandum PRU-BC-00033661-33662**

This memorandum summarizes a meeting that took place on August 26, 1985 between Prudential's Small Group Systems Department and Health Insurance Administration Department. It reports that those in attendance at the meeting received a report arguing that the CHIP product was losing significant amounts of money and should be cancelled immediately. The memorandum takes issue with the idea of cancellation, suggesting that it would damage Prudential's reputation and not serve to minimize its losses. Handwritten notes from a person named "Ken" state that he agrees with the memorandum's conclusions and believes that attempting to remove 50,000 customers from the CHIP program poses a serious "moral issue."

While potentially embarrassing to Prudential, this memorandum is utterly devoid of confidential business information. It contains no real data on any of Prudential's products, internal processes, or financial performance. It is unlikely that such a document would merit a protective order if written twenty-seven days ago. The document was prepared twenty-seven years ago and will not be protected.

      **vii.**      **January 28, 1983 Memorandum PRU-BC-00033736-33737**

Richard Drake wrote this memorandum to Edwin Harris, the Director of Group Underwriting for Prudential's Group Insurance Department. The memorandum states that Prudential "recognized the possibility that [it] would eventually have to terminate all inforce CHIP contracts" after declaring a moratorium on new CHIP sales in 1981, and discusses several outstanding "legal" and "policyholder relations" questions that stand in the way of termination.

Like the previous memo, this is an old document containing no business secrets and few surprises. It is not protectable under Rule 26(c).

      **viii.**      **October 5, 1983 Memorandum PRU-BC-00033743-33744**

This memorandum answers questions about the status of CHIP that were posed by David J. Sherwood. It provides figures concerning the total number of CHIP policies outstanding as of 1983 and the projected underwriting losses to Prudential. Some discussion is made about various remediation plans, including cancelling coverage and negotiating with existing policyholders.

This information is out of date and the risk that it poses to Prudential is minimal. It will not be protected.

      **ix.**      **November 18, 1988 Memorandum PRU-BC-00033769-33776**

Marked "DRAFT" and "CONFIDENTIAL" this memorandum provides various metrics of the financial performance of a variety of Small Group and Individual Health products sold by Prudential, including CHIP. The memorandum predicts losses in 1988 and describes several possible "action items" to reduce internal expenses and modify or eliminate product offerings in the hopes of shoring up future returns.

14

While the financial information and future business plans might have merited protection in 1988, they are too old to be of serious concern now. Prudential has failed to demonstrate why this stale data merits confidentiality.

### x. October 5, 1992 Memorandum PRU-BC-00033786-33795

This memorandum, titled "Individual Health Losses" provides information about the financial performance of several individual health products sold by Prudential, including Pru-Med, CHIP, and TEMP. An earnings statement is attached for each product, and individual strategies are discussed for reducing costs and improving expense ratios. The CHIP narrative also discusses the existence of constructive cancelation suits by CHIP insureds based on the repeated increases in premium pricing.

As above, nothing in this document suggests that its publication would cause likely injury to Prudential. The financial information and future business plans are too old to be of serious concern now and will not be protected.

### xi. Individual Health Service Plan Types PRU-BC-00033933-33935

This document contains narrative descriptions of the key features of several individual health insurance plans sold by Prudential, including CHIP, CMN, CNJ, Pru-Med, and Individual Health Plans ("H's"). Each narrative also contains the number of policies still outstanding for each product and a discussion of the benefits and weaknesses of the product features and contractual language. An annotation on the last page of the document reads "Total Inforce = 129,000". This number appears to be the sum of the subtotals by product. The document is not dated, but the number of inforce CHIP plan participants suggests that it was drafted in the early to mid 1990s.

The information contained in the narratives is not sensitive and the document is not protectable.

### xii.     December 12, 1980 Letter PRU-BC-00035888-35891

A district agent in San Diego wrote this letter to Melvin P. Haycraft concerning rate increases in the CHIP product line. The agent recommends against further increases, believing that they will price Prudential out of the market and cede ground to its competitors. The agent compares the cost of CHIP insurance for a 33 year-old male to that offered under plans sold by Blue Cross, Blue Shield, and others.

None of the information in this letter is confidential and the letter itself is over thirty years old. The document does not merit protection.

### xiii.    December 18, 1980 Letter PRU-BC-00035893-35894

This letter responds to questions presented in a memorandum written in November of 1980.  While the questions are not restated, they appear to have concerned possible ways of reducing Prudential's costs attributable to the CHIP product.

As above, none of the information in this letter is confidential and the letter itself is very old. The document will not be protected.

### xiv.     April 20, 1989 Memorandum PRU-BC-00044333-44336

This memorandum provides ten years of projected financial results for CHIP and makes suggestions for how Prudential can improve the performance of the program. The memorandum contains statistics concerning the number of CHIP insureds, the premiums that had been collected to date, and the history of rate increases.

None of this information is current or sensitive. The document is not protectable.

xv. **February 13, 1987 Memorandum PRU-BC-00044339-44340**

This memorandum to file describes a pilot program designed to convince CHIP policyholders in Florida to switch over to a different individual heathcare offering called PruCare Plus. One stated reason for the plan is that Prudential had been unable to obtain the premium increases from Florida regulators that it desired.

Nothing in this document merits protection.

### III. CONCLUSION

For the reasons set forth above, Magistrate Judge Shipp's March 1, 2011 order is REVERSED to the extent that it upholds the confidentiality designations on documents bates numbered as follows:

| | | |
|---|---|---|
| PRU-BC-00001284-1322 | PRU-BC-00033661-33662 | PRU-BC-00033933-33935 |
| PRU-BC-00025943 | PRU-BC-00033736-33737 | PRU-BC-00035888-35891 |
| PRU-BC-00025944 | PRU-BC-00033743-33744 | PRU-BC-00035893-35894 |
| PRU-BC-00025947-25982 | PRU-BC-00033769-33776 | PRU-BC-00044333-44336 |
| PRU-BC-00032120-32125 | PRU-BC-00033786-33795 | PRU-BC-00044339-44340 |

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: May 13, 2011

17