IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BEVERLY CLARK ET AL., ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE PRUDENTIAL INSURANCE COMPANY ) <br> OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | Honorable Dickinson R. Debevoise <br><br> Civil Action No: 08-6197 |

## DECLARATION OF EMMETT SALINAS

I, Emmett Salinas, declare as follows:

1. I make this declaration based upon my personal knowledge and information that was reasonably accessible to me in the course of my employment with The Prudential Insurance Company of America ("Prudential").

2. At Prudential, I served in a variety of positions in multiple cities during the course of my employment from 1969 until I retired in 2005. In this declaration, I focus on Prudential's agency operation, whose agents serviced Prudential policies and interacted with policyholders, with particular reference to communications between Prudential agents and policyholders in the years after 1981.

3. Until the 1990s, Prudential operationally was highly regionalized. Although headquartered in Newark, Prudential had at one time as many as eight regional home offices ("RHOs") in cities across the country. These RHOs generally were responsible for Prudential's insurance operations in their respective geographic regions, including overseeing the servicing of in-force insurance policies sold and serviced by Prudential's agents.

4. From 1969 to 1976, I worked in two RHOs, in Chicago and Houston, and I briefly served as an insurance agent during the period. In 1976, I returned to the RHO in Chicago, whose territory spanned Illinois and Indiana. Between then and 1984, I served in multiple roles related to agency operations' planning and research, ultimately serving as director of planning and analysis. In 1984, I transferred to the Western RHO in Los Angeles, where I served as director and then vice president of planning and research. In 1991, I moved to Prudential's corporate office in Newark, where I performed various functions relating to the policies and operations of Prudential agents. In 1999, I transferred to the Western territorial office, which was located in Phoenix. There I served as western vice president of agency operations and control, handling agency compliance functions in the field and running operations for much of the country, until retiring in 2005.

5. I worked extensively with Prudential's agency force during the course of my career, and was familiar with its practices in servicing insurance policies.

6. During the 1980s, Prudential agents regularly and routinely communicated with Prudential policyholders regarding in-force policies, including to collect premiums, to discuss renewals, and to answer any questions the policyholder might have about the operation of a policy, including about premium increases.

7. CHIP was an individual health insurance policy that had been sold by Prudential to the public during the 1970s and until 1981. Although Prudential agents did not sell CHIP policies after 1981, Prudential agents continued to service in-force CHIP policies, including interacting with CHIP policyholders in connection with questions involving policy coverage, benefits, premiums, and renewals.

2

8. In addition to servicing existing CHIP policies after 1981, Prudential agents also continued to sell and service other insurance products, including life insurance, annuities, and property and casualty insurance. Thus, in the 1980s, CHIP policyholders communicated with Prudential agents, and also with personnel employed in Prudential local agency offices located across the country, regarding other Prudential individual insurance products, in addition to CHIP.

9. In the ongoing relationship between Prudential and its policyholders, the main point of contact was the agent and the respective agency office. In the 1980s, if a policyholder was unhappy with the operation or service regarding a Prudential insurance policy, for example, the policyholder would often tell his or her agent or agency office. Policyholders would talk to their agent about premiums. It was expected that policyholders would call their agent or meet in person with their agent. Oral communications between policyholders and their agents, in person or by phone, were a common and routine part of Prudential's business.

10. Staying in contact with existing policyholders was an important part of an agent's job. Agents wanted to maintain and build their books of business, and so it was important to agents that policyholders communicate with them and that they be responsive to policyholders. Agents were familiar with policyholders and their policies, were available to policyholders, and served as a central resource for policyholders. That was the way the business system was designed.

11. In my experience, agents had wide discretion in what they could discuss with policyholders. In general, agents were required to comply with applicable laws and regulations, be guided by Company materials, and accurately represent Prudential products and policies. Within these general requirements, agents were able to communicate about matters of interest to policyholders based on the agent's view of what information would be useful or helpful to the

3

policyholder. For instance, if an agent thought that there was a relationship between CHIP premium increases and the fact that CHIP was no longer being sold to the public, the agent was free to share that view with policyholders.

12. Prudential's agency force was composed of "district agents" and "ordinary agents." There were thousands of district agents nationwide, and a smaller but still substantial number of ordinary agents.

13. District agents sold insurance, collected premiums, and interacted with policyholders mainly in their defined physical territories, which were known as "debits." District agents worked in specific debits and were permitted to sell only Prudential products. District agents operated out of neighborhood agency offices, which provided convenient personal access for many policyholders. Because district agents were responsible for the entire range of Prudential products, their relationships with CHIP policyholders concerned not just health insurance, but also any other forms of insurance (e.g., life insurance) that those same policyholders had with Prudential.

14. Ordinary agents were permitted to sell insurance for companies other than Prudential, and they did not have as narrowly defined territories. These agents targeted a mid-to-upper-income market. Because ordinary agents sold not only Prudential policies but also policies issued by other insurers, they could – if a policyholder was dissatisfied with a Prudential policy – suggest that the policyholder consider another policy, even if it was not sold by Prudential, and explain why that policy may better serve the policyholder's needs. It was up to the policyholder, of course, to decide whether to switch policies.

15. To the extent that CHIP policyholders had questions or concerns about their CHIP premiums during the 1980s, those concerns would have given rise to individual communications

between Prudential policyholders and their agents and agency offices, either in person or by telephone. Such communications are a natural consequence of how Prudential's business operated at the time.

16. Because agents served as the main point of contact for policyholders, a person trying to determine what Prudential communicated to policyholders, or what policyholders knew about CHIP premiums and the reasons for premium increases, would need to find out about the specific communications policyholders had with agents.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ~~February~~ March 9, 2012.    *ecs.*

*Emmett C. Salinas* (signature)

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 9, 2012.

/s/ Douglas S. Eakeley