**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BEVERLY CLARK, JESSE J. PAUL,
WARREN GOLD, LINDA M.
CUSANELLI, CAROLE L. WALCHER,
and TERRI L. DROGELL, on behalf of
themselves and all others similarly situated,

                   Plaintiffs,

    v.

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA, a New Jersey
corporation,

                Defendant.

Civ. No. 08-6197 (DRD)

**OPINION**

*Appearances by:*

NAGEL RICE LLP
Bruce Nagel, Esq.
Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, NJ 07068-1031

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Charles N. Freiberg, Esq.
Brian P. Brosnahan, Esq.
David A. Thomas, Esq.
Jacob N. Foster, Esq.
101 California Street, Suite 2300
San Francisco, CA 94111

LEVINE, STEINBERG, MILLER & HUBER
Harvey R. Levine, Esq.
Craig A. Miller, Esq.
550 West C Street, Suite 1810

San Diego, CA 92101-8596

    *Attorneys for Plaintiffs*

LOWENSTEIN SANDLER PC
Douglas S. Eakeley, Esq.
Natalie J.  Kraner
65 Livingston Avenue
Roseland, NJ 07068

GOODWIN PROCTOR LLP
John D. Aldock, Esq.
Mark S. Raffman, Esq.
Richard M. Wyner, Esq.
Adam M. Chud
901 New York Ave., N.W.
Washington, D.C. 20001

    *Attorneys for Defendant*


**<u>DEBEVOISE, Senior District Judge</u>**

    This case concerns allegations of deception and bad faith against a health insurance

company, The Prudential Insurance Company of America ("Prudential").  Plaintiffs Beverly

Clark, Jesse J. Paul, Warren Gold, Linda M. Cusanelli, Carole L. Walcher, and Terri L. Drogell

(collectively, "Plaintiffs") have filed a putative class action complaint against Prudential.  Before

the Court are two motions:  Plaintiffs' motion for class certification, and Prudential's motion for

summary judgment on behalf of four of the six named plaintiffs based on the statute of

limitations.

    The heart of the complaint is that Prudential stopped selling a previous health insurance

policy to new customers ("closing the block"), knowing that this would result in a prohibitive

increase in premium rates.  Plaintiffs content that Prudential had falsely misrepresented to its

policy holders that the only reason for increased premiums would be increasing age of the

insured and rising medical costs and failed to disclose that a major reason for the premium

increases was the closing of the block.

 For the reasons set forth below, Plaintiffs' motion for class certification is DENIED.

Prudential's separate motion for summary judgment, addressed independently below for the sake

of judicial efficiency, is GRANTED with respect to Ms. Clark and Ms. Drogell, and DENIED

with respect to Ms. Cusanelli and Mr. Gold.

# I. TABLE OF CONTENTS

II. Background
 A. Procedural History
 B. Factual History
  1. The CHIP Policy
  2. Summary of CHIP's Timeline
  3. Prudential's Communications to CHIP policyholders
  4. CHIP policyholders and premium rates over time
  5. General Claims Asserted
  6. Class Representatives
   a. Beverly Clark
   b. Jesse J. Paul
   c. Warren Gold
   d. Linda M. Cusanelli
   e. Carole L. Walcher
   f. Terri L. Drogell
  7. Expert Reports and Damages
   a. Plaintiffs' Expert
   b. Prudential's Experts
   c. Proposed Adjustments
  8. Objections to Evidence
   a. Salinas Declaration, offered by Prudential to show representatives' oral communications with policyholders
   b. Certain Opinions of Prudential's Expert Wildsmith in his Expert Report, offered by Prudential to show the experienced loss-ratio
   c. Challenged Hearsay Evidence
   d. Contested Opinions in Prudential's Experts' Declarations
   e. Objections to Expert Opinion in Testimony based on Lack of Foundation
   f. Objections to Supposed Inadmissible Legal Argument Submitted by Prudential's Experts Strombom and Wildsmith
III. Motion for Class Certification

A.  The Class, Subclasses, and Associated Claims
 1.  The Original Class and Subclasses
 2.  The Revised Proposal
B.  Standard of Review
C.  Discussion
 1.  Common Law Fraud
 2.  California-Specific Claims
  a.  "Unlawful" business acts and the Implied Covenant of Good Faith & Fair Dealing Claim
  b.  "Unfair" business acts
  c.  "Fraudulent" practices
IV.  Motion for Summary Judgment
A.  Standard of Review
B.  Discussion
 1.  Inquiry notice
 2.  Relevant statutes of limitations
 3.  Application to the named plaintiffs
  a.  Ms. Clark
  b.  Ms. Cusanelli
  c.  Mr. Gold
  d.  Ms. Drogell
V.  Conclusion

## II.   BACKGROUND

The facts of this case and procedural history are discussed at great length in several prior opinions dated September 14, 2009 (ECF 39), September 9, 2010 (ECF 98), March 15, 2011 (Doc No. 156), and May 13, 2011 (ECF 170).  Plaintiffs are six former customers of Prudential who purchased health insurance plans marketed under the name Coordinated Health Insurance Program ("CHIP").

Plaintiffs filed a motion for class certification on February 22, 2012, on behalf of roughly 17,000 current and former CHIP policyholders spanning four states, California, Indiana, Ohio, and Texas, under various state laws.  The proposed class consists of individuals who paid one or more CHIP major medical premiums based on a rate increase effective on or after March 1, 1982.  Plaintiffs seek recovery for Prudential's failure to disclose that it stopped selling CHIP to

new policyholders, and the consequences thereof to existing policyholders, namely severe premium increases and the risk of being locked-out of other policies and locked-in to CHIP due to the development of a serious chronic condition.  Plaintiffs claim that this omission prevented class members from making the rational choice to switch to an alternate policy, and it gave the lie to Prudential's representations that premium increases would be based only on medical cost inflation, increases in policyholder age, and between 1985 to 1990 high claim cost.

Prudential filed the second motion herein considered for summary judgment on July 13, 2012.  Prudential essentially raises a statute of limitations defense, arguing that four of the named plaintiffs had knowledge of the underlying material facts and the time has run to bring their claims.

With regard to the handling of the two motions, the Court is informed by the reasoning set forth in <u>Achem  Prods. V. Windsor</u>, 521 U.S. 591 (1997).  Therein, the Supreme Court noted that because resolution of the class certification issues "is logically antecedent to the existence of Article III issues, it is appropriate to reach them first."  <u>Id.</u> at 612-613.  Thus, the Supreme Court was "follow[ing] the path taken by the [Third Circuit] Court of Appeals" in "declin[ing] to reach these [standing] issues because they would not exist but for the [class action] certification."  <u>Id.</u> Therefore, the discussion below first addresses the first motion submitted before the Court and corresponding files and responses including an objection to evidence proffered by Prudential in opposition to the motion, and a brief submitted with the consent of Court which outlines a revised proposal for subclasses.  Once issues related to class certification are resolved, the Court will address the second motion, with respect to summary judgment.

**A.  Procedural History**

In the original Complaint, the two original plaintiffs, Ms. Clark and Mr. Paul, asserted three causes of action for: (1) violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 *et. seq.*, ("NJCFA"); (2) breach of fiduciary duty; and (3) breach of the duty of good faith and fair dealing. Prudential moved to dismiss the individual plaintiffs' claims. In an Opinion and Order dated September 14, 2009, the Court granted the motion in part, dismissing all claims except for Ms. Clark's claim for breach of the implied covenant of good faith and fair dealing.[1] Clark v. Prudential Ins. Co. of Am., Civ. No. 08-6197, 2009 U.S. Dist. LEXIS 84093 (D.N.J. Sept. 14, 2009) (ECF 40) ("2009 Op.").[2]

Subsequently, on October 30, 2009, Ms. Clark filed an Amended Complaint, asserting claims for unfair competition and breach of the duty of good faith and fair dealing against Prudential under California law. Thereafter, the parties stipulated that Ms. Clark and Mr. Paul would file a Second Amended Complaint with additional claims for common law fraudulent misrepresentation and fraudulent omission. The Second Amended Complaint ("2AC") was filed on November 12, 2009. It was shortly followed by a motion to dismiss on December 3, 2009.

---

[1]    Ms. Clark's consumer fraud and breach of fiduciary duty claims were dismissed without prejudice to re-file.

[2]    The September 2009 Opinion applied New Jersey's choice of law analysis and determined that Ms. Clark and Mr. Paul's home states at the time they purchased their CHIP policies – California and Indiana, respectively – had the greatest interest in having their laws applied to the consumer fraud, breach of fiduciary duty, and breach of good faith and fair dealing claims. 2009 Op at 47. This Court found that under Indiana Law, each of Mr. Paul's claims was barred by the applicable statute of limitations. The Court dismissed Ms. Clark's consumer fraud claim with leave to re-plead under the appropriate California law; dismissed Ms. Clark's breach of fiduciary duty claim for failure to allege her relationship with Prudential involved a fiduciary duty under California law; and found that her claim for breach of the duty of good faith and fair dealing stated a claim under California law. Id.

The motion was partially briefed, and the parties stipulated that the Plaintiffs could file a Third Amended Complaint ("3AC"), adding Marc H. Litwack as a new plaintiff.  The parties agreed that the Court would address, during a single motion hearing, the issues raised in both the motions to dismiss the 2AC and the 3AC.  As a result of amendments and stipulation the following five claims for relief were pleaded: 1) fraudulent misrepresentations (by Clark, Litwack and Paul); 2) fraudulent omissions (by Clark, Litwack and Paul); 3) breach of duty of good faith and fair dealing (by Clark and Litwack); 4) violation of California Unfair Competition Law (by Clark); and 5) violation of New Jersey Consumer Fraud Act (by Litwack).

In an opinion dated September 9, 2010, this Court dismissed Mr. Litwack's claims with prejudice as barred by the filed rate doctrine as applied under New Jersey law.  The September 9, 2010 opinion also dismissed Ms. Clark's requests for injunctive relief and treble damages under California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, *et seq.*, and dismissed Mr. Paul's misrepresentation claim only to the extent that it is based on the renewal provision.  The Court held that for statute of limitation purposes, the discovery rule is applicable to UCL claims, and that Ms. Clark had sufficiently pled that she had exercised reasonable diligence and yet was unable to discover the death spiral and its consequences until 2005 at the earliest.[3]  The Court denied Prudential's motion to dismiss all California causes of action for fraudulent omission, unfair competition, and good faith and fair dealing.

On November 9, 2010, Plaintiffs filed a Fourth Amended Complaint ("4AC").  The 4AC asserted four claims: 1) fraudulent misrepresentation on behalf of a Multi-State Fraud Class; 2)

_____

[3]     Plaintiffs argue in their opposition to the present motion for summary judgment that the Court should rely on its prior holding on September 9, 2010 that Ms. Clark's claims are not barred based on the statute of limitations.  However, that ruling was explicitly based on the pleadings, and the record has since been considerably enlarged.

fraudulent omission on behalf of a Multi-State Fraud Class; 3) breach of good faith and fair dealing on behalf of a California Subclass; 4) violation of California Unfair Competition Law on behalf of a California Subclass.  The proposed class definition was "all persons living in California, Indiana, New York, Ohio or Texas who renewed a CHIP after Prudential closed the block."  Warren Gold and Linda Cusanelli were added as Plaintiffs.

Thereafter on December 16, 2010, Prudential filed a motion to dismiss or strike portions of the 4AC, arguing *inter alia* that a recent decision rendered by the California Court of Appeal mandated dismissal of the California causes of action and that the New York, Ohio, and Texas class claims were untenable under the filed rate doctrine.  Before this motion could be argued, Plaintiffs and Prudential entered into a stipulation under which Plaintiffs would file a Fifth Amended Complaint ("5AC").  The 5AC added claims by Plaintiffs Carole L. Walcher and Terri L. Drogell.  The Parties stipulated that this Court's ruling on the pending motion would apply with the same force as to the allegations of the 5AC, and that the pending motion would also be considered a motion to dismiss Ms. Drogell's claims as barred by the filed rate doctrine.

On March 15, 2011, the Court rendered an opinion which denied Prudential's motion to dismiss the California causes of action premised on duty to disclose, and granted Prudential's motion to strike the New York claims based on the filed rate doctrine, but denied the motion to strike the Ohio and Texas claims based on the filed rate doctrine. (ECF 156.)

The operative complaint is the Fifth Amended Complaint ("5AC"), submitted on February 16, 2011, which alleges four causes of action raised by six plaintiffs who purchased their health insurance plans in California, Indiana, Ohio, and Texas.  The 5AC alleges (1) fraudulent misrepresentation, on behalf of a Multi-State Fraud Class; (2) fraudulent omissions,

on behalf of a Multi-State Fraud Class; (3) breach of the duty of good faith and fair dealing, on

behalf of a California Subclass; and (4) violation of California's Unfair Competition Law (UCL),

Cal. Bus. & Prof. Code § 17200, *et seq.*, on behalf of a California Subclass. (ECF 140.)  The

prayer for relief includes a) an Order determining that the action may be maintained as a class

action and providing class certification; b) compensatory damages according to proof at trial; c)

punitive or exemplary damages; d) restoration of all money or property which may have been

acquired by Prudential by means of unfair competition; e) reasonable attorneys fees, and all costs

and disbursements including, without limitation, filing fees and reasonable costs of suit; and f)

such other further relief as this Court deems just and proper.  (Id.)

This case has also been heavily litigated in discovery.  Most recently, on May 13, 2011,

the Court reversed the Magistrate Judge's March 1, 2011 discovery order denying Plaintiff's

challenge to the confidentiality designation of fifteen documents.

### B.  Factual History[4]

### 1.  The CHIP Policy

The CHIP policy is a form of individual health insurance, distinct from group health

insurance.  "One of the goals of CHIP was to show there was no need for national health

insurance, that is, that health insurance could be provided by the private sector.  Despite good

intentions, the design included [ ] major flaws."  (Chud Decl., Ex. 2, CHIP Business Plan

Memorandum, PRU-BC-00001287).

CHIP has particularly rich benefits.  (See id.)  In addition to posing no lifetime limit on

benefits, policyholders under age 65 had no dollar cap on benefits, and CHIP included complete

---

[4]      The factual history is set forth with consideration to objections to evidence which are
addressed below in section 8.

choice of medical providers and unlimited coverage for private duty nursing.  The only limit is

$20,000 on mental health benefits.  Additionally, the contract included no prevention of

duplication of benefits, for example if a CHIP policyholder later purchased another additional

health coverage policy, s/he could receive benefits on both.

 The terms of CHIP permitted purchasers to continue to renew the policies indefinitely at

their election and as such, Prudential strictly limited its own right to discontinue the CHIP

policy.  Specifically, Prudential maintained the right to discontinue the policy only upon

canceling all CHIP policies in the state of the policyholder's residence.[5]  CHIP provides major

medical benefits.  A limited benefit plan was also offered, which served as a supplemental

insurance policy.  For example, when a CHIP policyholder became eligible for Medicare at 65,

CHIP coverage changed to limited medical coverage, for which benefits and premiums were

much less than those for major medical coverage.

 To some degree, CHIP is used as a bridge program to employer-sponsored coverage or

Medicare as individuals approach 65.  A 1975 study led Prudential to stop accepting applications

from persons who were unemployed, in a present job for less than six months, or from students

within twelve months of graduation.  (Id.)  Thus, a new short-term policy, called Temporary

Medical Protection, was introduced in 1979 as an alternative to cover applicants needing short-

---

[5] The CHIP policy states:

> You may continue this Policy in force for successive premium
> periods of one month each by payment of the premiums as
> specified in the following paragraphs.  However, Prudential may
> refuse to continue this Policy as of any Policy Date anniversary,
> but only if Prudential is then refusing to continue all policies with
> the same provisions and premium rate basis in the jurisdiction
> where you reside.  If Prudential takes this action you will be
> notified not less than 31 days before the Policy Date anniversary.

term coverage.  (Id.)  Additionally, once policyholders reached the age of 65, their CHIP policies were automatically converted to limited medical expense policies.  These limited medical expense policies are supplemental to Medicare, the primary source of health insurance coverage. Unlike the major medical policies, the limited medical policies had a lifetime limit of $10,000 for most covered expenses.

### 2.  Summary of CHIP's Timeline

Prudential sold CHIP throughout the United States from 1973 through 1981.  On December 17, 1981, Prudential "closed the block," or stopped selling CHIP to new customers. Thus, sales to new policyholders, which were down from previous years but still totaled 80,000 in 1981, virtually ceased.[6]  This action for class certification is on behalf of roughly 17,000 CHIP policyholders spanning four states, who paid one or more CHIP premiums based on a rate increase effective on or after March 1, 1982, the effective date of the first CHIP premium rate increase following block closure.

Premiums started to increase immediately following block closure, and within five years of the block closure, by 1986, fewer than 10% of the CHIP policies remained.

Starting in 1990, Prudential limited premiums through rate capping of 10% every year. Prudential instituted the cap to minimize constructive cancellation lawsuits that arose in 1986 for premiums raised to a point where the insured could not afford them and thus his or her policy was forced to lapse.  (Chud Decl., Ex. 2, PRU-BC-00001288.)  Prudential lifted the subsidy cap

---

[6]     New sales virtually ceased, but for a small number of individuals who converted from group insurance policies before 1983, and a small number of individuals who were already covered but needed a family status adjustment into the 1990s, such as in the case of a child reaching adulthood or a divorce from a policyholder.  (See Thomas Decl.. Ex. 36.)

in 2001, and the increased premiums were then directly ascribed to whatever CHIP policyholders remained.

### 3.   Prudential's Communications to CHIP policyholders

The nature and breadth of the communications being at issue, the following is an overview of the main written communications sent to CHIP policyholders.  First, Prudential sent a form letter known as a "welcome letter" to every CHIP policyholder at or about the time of policy issuance advising that premium increases would be based solely on increases in age and medical cost inflation.[7]

Subsequent to the block closure, Prudential sent annual notices of premium increases to CHIP policyholders whose policies were still in force.  These notices did not advise policyholders that premium increases were being affected by the closed block.

In 1985, Prudential began sending to all CHIP policyholders whose policies were still in force annual "notice of rerate" form letters that preceded each premium increase at the policy

---

[7]     Prudential stated:

> THE PREMIUMS FOR YOUR PLAN DEPEND ON THE
> CURRENT COSTS OF MEDICAL CARE AND TREATMENT.
> WE CONTINUALLY REVIEW THESE COSTS AND MAKE
> ADJUSTMENTS IN THE PREMIUMS YOU PAY SO THAT
> THEY ARE KEPT CURRENT FOR THE AGES OF THOSE
> INSURED UNDER YOUR PLAN AND THE AREA IN WHICH
> YOU LIVE.  MEDICAL CARE COSTS HAVE BEEN RISING
> IN RECENT YEARS ALSO.  THERE IS ALSO A TENDENCY
> FOR INDIVIDUAL COSTS TO INCREASE WITH AGE.  AS A
> RESULT, YOU MAY EXPECT THAT THERE WILL BE AN
> INCREASE IN YOUR PREMIUM EACH YEAR ON THE
> ANNIVERSARY DATE OF YOUR POLICY.  WE ASSURE
> YOU THAT ANY INCREASE WILL BE HELD TO THE
> MINIMUM POSSIBLE THAT IS CONSISTENT WITH OUR
> BEING ABLE TO CONTINUE PROVIDING THIS
> COVERAGE.

anniversary.  Plaintiffs argue that these uniform letters (the "three reason" letter) falsely advised that the only reasons for policyholders' premium increases were increase in age, high cost of medical care, which referred to medical cost inflation; and high claim cost.

In 1989, Prudential modified the annual "notice of rerate" form letter to drop the reference to high claim costs, such that the new letter advised that the only reasons for premium increases were increase in age and high cost of medical care (the "two reason" letter).  Prudential continued sending this form letter to all policyholders until early 2001.

None of these annual notices mentioned the Plaintiffs' contested reason for premium increases – the block closure, the death spiral and its inevitable creation of absurdly high premiums, or its lock-out/lock-in consequences whereby new customers are locked-out and sick customers are locked-in due to development of a pre-existing condition and inability to secure alternate health insurance accordingly.

In addition to the welcome letter, the three-reason letter, and the two-reason letter, on May 12, 1995, Prudential sent a letter to California policyholders referencing California Assembly Bill 1743.  (See Chud Decl., Ex. 21.)[8,9]

---

[8]      The 1995 letter directed by Prudential to California policyholders reads in pertinent part:

> California Assembly Bill 1743 requires insurers to combine their experience on closed blocks of business with experience on all appropriate open forms for the purposes of renewal rate determination.  Because Prudential no longer markets individual health insurance, it has been difficult to determine how the law will apply to our individual health inforce policies.  This includes the CHIP (Coordinated Health Insurance Program) plan that you have. [ . . . ]

(Chud Decl., Ex. 21.)

Individual policyholders also discussed CHIP premiums with Prudential representatives via telephone.  While the form letters described above were sent with uniformity to all policyholders, policyholders also had the option of calling Prudential representatives for further inquiry or assistance.  Indeed, policyholders were directly invited to do so via the three-reason and two-reason letters.  (Chud Decl., Exs 14, 15.)  Oral communications with named Plaintiffs are detailed further below.  For example, Ms. Clark's bookkeeper called Prudential in 1993 and learned that CHIP was closed. (Clark Dep. at 93:24 – 95:18, 121:5-121.)  Additionally, a Prudential representative advised Ms. Cusanelli in 2005 that CHIP was a "closed block of business" and that premiums were set based on "the claims that are being paid out." (Cusanelli 2005 Tscpt at 3:22, 4:22-5:2, 6:6-10, 7:11-10.)  Similarly, Mr. Gold learned from a call to Prudential in 2004 that CHIP was a "closed block of business." (Gold 2004 Tscpt at 7:3-18.)  Last, Ms. Walcher's financial advisor called Prudential on her behalf and learned that CHIP was a "closed book of business." (Walcher Dep. at 27:11-28:10.)  Of note, recordings exist for most calls made since 2002, however only incomplete records exist for calls made before that time. (See Hudson Decl., Apps. A, B, & C.)

The block closure was also publicized in widely-distributed newspaper reports beginning in December 1981.  For example, on December 18, 1981, the Wall Street Journal ran an article of Prudential's suspension of CHIP sales due to rising medical costs. (Chud Decl., Ex. 68.)  The same day, the Newark, NJ Star-Ledger stated the same and quoted a company statement that "[b]ecause of the comprehensiveness of its benefits, the CHIP policy has been particularly

---

[9]     To some degree, Prudential provided written response to individual inquiries about rate increases.  Specifically, Prudential points to two responses to individual letters in 1984 and 1986. (See Chud Decl., Ex. 23.)

susceptible to rapidly escalating medical care costs[.]" (Id., Ex. 69.)  The following day, on December 19, 1981, the Washington Post covered the item as well.  That article included a statement by executive vice president of Prudential John K Kittredge that the company "was a victim of what actuaries call 'adverse selection' – that those most likely to use a benefit are the only ones to buy it.  As the costs of premiums rose to keep pace with medical expenses . . . the customers who bought the policies tended to be those most likely to need medical care, and the cost of their care was not offset by premiums from healthier customers." (Id., 70.)  Similarly, the Dow Jones News Service ran an article that day in the Chicago Tribune entitled "Prudential Hits Cost, Drops Health Policies." (Id., 71.)  Further, articles by Jane Bryant Quinn addressed the issue in the LA Times Syndicate, Newsweek, and the Chicago Tribune in February 1982, February 1993, and February 1996 respectively.  The latter two articles were entitled "Insurance: The Death Spiral," and "Death-spiral Insurance Pricing Is Sickening." (Id., 72 – 74.)

> **4.  CHIP policyholders and premium rates over time**

CHIP policyholders dwindled over time.  As mentioned above, within five years of the block closure, fewer than 10% of the CHIP policies remained.  By 2001, when Prudential stopped capping premium increases at 10%, 99% of the proposed class had already dropped the CHIP policy.  The chart below illustrates the number of policyholders by state over years material to this action.

**Number of CHIP Policies by State over Time**

|      | Event | Nationwide | California | Indiana | Ohio | Texas |
|------|-------|-----------|-----------|---------|------|-------|
| 1975 | CHIP first sold on market | 229,648 | 15,588 | 11,225 | 9,415 | 3,315 |
| 1981 | Block Closed on 12/17/81 | 261,489 | 23,331 | 11,883 | 10,394 | 5,354 |
| 1982 | The first premium increase is effective on 3/1/82 | 152,875 | 11,878 | 6,369 | 5,512 | 2,919 |
| 1985 | Three-reason Letter first sent | 37,582 | 2,495 | 1,291 | 909 | 686 |
| 1989 | Two-reason Letter first sent | 15,012 | 961 | 578 | 392 | 294 |

| 1990 | Prudential's premium capping goes into effect | 13,431 | 846 | 529 | 353 | 260 |
|------|------|------|------|------|------|------|
| 2000 | | 3,918 | 223 | 151 | 97 | 82 |
| 2001 | Premium cap is lifted; Two-reason Letter no longer sent. | 3,376 | 195 | 119 | 70 | 54 |
| 2002 | | 3,042 | 203 | 130 | 81 | 69 |
| 2005 | | 1,515 | 115 | 56 | 33 | 17 |
| 2006 | | 1,076 | 77 | 37 | 24 | 12 |
| 2007 | | 850 | 62 | 21 | 18 | 10 |
| 2008 | | 681 | 46 | 18 | 15 | 8 |
| 2009 | | N/A | N/A | 15 | 12 | 5 |

(See Chud Decl., Ex. 75 )

The above chart is constructed based on the record.  (See id.)  The figures indicate that within

one year of the block closure, CHIP policyholders dropped 41.5% nationally; 49% in California;

46.4% in Indiana; 46.9% in Ohio; and 45.5% in Texas.  A small proportion of the policyholders

remained upon distribution of the three and two reason letters in 1985 and 1989 respectively:

14.4% and 5.7% nationally; 10.7% and 4.1% in California; 10.9% and 4.9% in Indiana; 8.7%

and 3.8% in Ohio; and 12.8% and 5.5% in Texas.  By 2001 when the premium cap was lifted, an

even smaller proportion of the population remained since the block closure:  nationally (1.3%);

California (0.8%); Indiana (1%); Ohio (0.7%); Texas (1%).

The majority of nationwide CHIP policyholders are enrolled in limited medical coverage

policies.  At the time the CHIP block was closed in 1981, of the 261,489 CHIP policies in force,

approximately 38% (or 97,971) were major medical policies and 63% (or 163,518) were limited

medical coverage policies. Limited medical policyholders currently constitute more than 70% of

all CHIP policyholders.

Plaintiffs' Complaint alleges that "Prudential knew that the block closure would

inevitably cause premiums to increase to affordable levels." (5AC ¶ 5.)  As an example of the

inevitable "extremely large premium increases," Plaintiffs recite the individual class

16

representatives' premium increases after 2000.  (<u>Id.</u>)  As a result of Prudential's conduct, Plaintiffs allege that they "suffered injury and damages, including higher premiums than would have been otherwise paid and medical costs for conditions that would have been covered by other insurance if the ramifications of the block closure had been disclosed." (<u>Id.</u> at ¶ 9.)  Further details of specific premium rises, caps, and effects after the cap was lifted, are briefed at length below with regard to the individual class representatives.

### 5.  General Claims Asserted

Plaintiffs allege that beginning in 1985, when the three-reason letter was first sent, Prudential began misrepresenting the reason for premium increases – the late-1981 block closure and its inevitable death spiral.  Plaintiffs claim that once Prudential ceased selling CHIP policies, it destabilized the risk pool for existing policyholders, rendering it a virtual certainty that premiums would spiral out of control until all plan participants were forced to drop their coverage.

As one federal court succinctly described this phenomenon:

> It is widely known throughout the insurance industry, but not to the general public, that closing a block of business, by ensuring that no new insureds will enter the pool covered by the policy, inevitably leads to a decrease in the size of the pool as healthy insureds switch to cheaper policies.  This in turn leads to increased premiums, as the risks and costs associated with the pool are shared by fewer and fewer people.  As the premiums increase, more healthy insureds flee the policy, leaving only those unhealthy insureds who cannot find insurance elsewhere, and leading to even higher premiums.
>
> This vicious circle of higher premiums and a shrinking pool to share the increased costs is known in the insurance industry as a "death spiral" and is most common in those sectors of the industry that sell policies covering small groups and individuals.  In a death spiral situation, eventually the premiums increase to the point

> where they become unaffordable to the vast majority of
> policyholders, at which point the insured fails to pay the premium
> and the policy lapses.

Dickerson v. Cent. United Life Ins. Co., 932 F. Supp. 1471, 1473 (M.D. Ga.
1996).

Similarly, the Fifth Circuit Court of Appeals examined the CHIP Policy in question and

its effects in 1987 and found as follows:

> These premiums increases were based on Prudential's nationwide
> loss experience with the CHIP policy, and were made for all
> policyholders within predetermined geographic areas.  Based
> partly on a greater than expected rise in the cost of offering CHIP
> policies, Prudential stopped marketing this insurance product to
> new customers.  This combination of loss-based pricing and a
> closed group of customers virtually guaranteed that the premiums
> for the remaining CHIP policyholders would continue to rise.
> Because only those with substantial continuing claims or high
> health risk were motivated to countenance the ever-increasing
> premiums, a continual worsening of loss-ratios was assured.
>
> [ . . . ]
>
> Prudential made a business decision to begin marketing the CHIP
> policy, and it made a business decision to terminate that marketing
> effort.  When it did the latter, the universe of policyholders
> necessarily began to constrict, with the certain result that the
> earnings/loss payable ratio steadily declined.
>
> The decision to terminate new sales of CHIP policies fixes with
> moral certitude the reality that financially the CHIP policy cannot
> stand on its own bottom.

Tusa v. Prudential Ins. Co., 825 F.2d 69, 71 (5th Cir. 1987).

Thus, Plaintiffs propose a class action on behalf of a putative class of roughly 17,000

members spanning four states, California, Indiana, Ohio, and Texas, under various state laws.

The proposed class consists of individuals who paid one or more CHIP major medical premiums

based on a rate increase effective on or after March 1, 1982.  Plaintiffs seek recovery for

18

Prudential's failure to disclose that it stopped selling CHIP to new policyholders, and related severe consequences to existing policyholders, namely severe premium increases and the risk of being locked out of other policies and locked into CHIP due to the development of a serious chronic condition.  Plaintiffs claim that this omission prevented class members from making the rational choice to switch to an alternate policy, and it gave the lie to Prudential's representations that premium increases would be based only on medical cost inflation; increases in policyholder age; and, between 1985 to 1990, high claim cost.

Prudential opposes the effort to certify the class, arguing that individual issues predominate over common ones.  Surprisingly, Prudential does not concede that the block closure leads to premium increases and a death spiral.  Nonetheless, the Court's role is not to assess the merits, but rather to review the factual evidence based on a preponderance of the evidence, and assess whether the Federal Rules of Civil Procedure are satisfied with respect to class certification.

### 6.  Class Representatives

All six named Plaintiffs held their policies until 2004 or later,[10] and dropped the plan when premiums reached extremely high levels.  Plaintiffs allege that none of them knew about or learned of the closed block and death spiral consequences in CHIP outside of the applicable limitations period, and that they all relied on Prudential's misrepresentations and omissions.  Plaintiffs uniformly contend that had they been alerted of the block closure and its consequences, they would have immediately begun searching for another health insurance plan and switched to that plan as soon as possible.  (See Declarations in support of class cert. mot.: Walcher Decl., ¶¶

---

[10]     As illustrated in the chart above, this places the named plaintiffs in the less than one-percent of the proposed class.

8, 12; Drogell Decl. ¶ 8; Cusanelli Decl. ¶¶ 8, 14; Paul Decl. ¶¶ 8, 13; Clark Decl. ¶¶ 8, 12; Gold Decl. ¶¶ 8; 11.)  Plaintiffs did not have a medical condition in 1981 which would have prevented them from securing alternate health insurance or dissuaded them from searching for alternate insurance at that time.  (Id.)  Below is outlined a full exploration of the relevant record, which consists of over 300 exhibits and appendices, again with consideration for objections to evidence which are addressed separately below, and with consideration of supplemental briefing filed in the motion for summary judgment.  Again, the motion for summary judgment is filed with respect to only four of the six proposed class representatives – Ms. Clark, Mr. Gold, Ms. Cusanelli, and Ms. Drogell.

      **a. Beverly Clark**

Ms. Clark is currently a resident of Vancouver, British Columbia.  Ms. Clark purchased CHIP from Prudential, with a policy date of September 13, 1978, in San Diego, California, where she then resided, at a monthly premium rate of $46.09.  By 1982, her premium was $149.66 per month.  (Clark Dep. 44:23-45:1.)  Ms. Clark terminated her policy in September of 2005 when her monthly premium reached $5,600 (or $68,388 per year), an increase from $4,217.65 per month (or $50,611.80 per year).   (Clark Decl. ¶ 11.)

Ms. Clark was attracted to the CHIP policy because it was "fully comprehensive." (Clark Dep. 24:22.)   When asked why she renewed her policy in 1984, she responded, "I never considered giving it up.  I loved my policy, I thought it was a great policy . . [b]ecause it was fully comprehensive."  (Clark Dep. 57:18-25.)

Ms. Clark concedes that she "didn't know what to think" when her premiums "started becoming quite enormous" in the 1980s.  (Clark Dep. 78:3-17.)  She further explains, "I couldn't understand why my rates were becoming so enormous, unless, perhaps, they were trying to get

rid of me." (Id. at 78:23-25.)  Although Ms. Clark could not remember the precise dates as to

when she believed Prudential was trying to rid her of her policy, she submitted that the company

was attempting to rid her "when they started increasing my premiums to such enormous

amounts." (Id. at 78:3-8.)

Ms. Clark concedes that in 1993 she believed that Prudential was "trying to get [her] to

drop the policy . . . [b]y increasing [her] rates." (Id. at 90:14-20.)  Ms. Clark further concedes

that she thought there had to be other reasons aside from age and costs for the rising costs:  "I

thought there had to be because it just didn't make sense to me." (Id. at 91:9-19.)[11,12]

---

[11]      Plaintiffs dispute the cited testimony as only reflecting Ms. Clark's belief that Prudential
was trying to get rid of her *at the time of her deposition*, not her state of mind in or around 1993.
(Pls.' Resp to Prudential's Statement of Undisputed Material Facts in Support of MSJ and Pls.'
Suppl. Statement of Disputed Material Facts at 4.)  However, a review of the deposition
transcript indicates that that is clearly not the case.  Ms. Clark was speaking to her past
impressions in 1993.  A closer look at the transcript is telling:

> Q.  *So did you think at the time in 1993* that when Prudential was
> telling you that the rates were going up because of age and costs,
> that that, in fact, wasn't the reason the costs were going up?
> A.  Well, I *knew* that that was one of the reasons, yes.
> Q.  *Did you think* there were other reasons?
> A.  I *thought* there had to be because it just didn't make sense to
> me.
> Q.  But you continued to renew the policy?
> A.  Yes.

(Clark Dep. 91:9-22, emphasis added.)

[12]      Prior to 1993, Ms. Clark was inadvertently dropped from CHIP due to miscommunication
between herself, her bookkeeper, and Prudential.  Seeking reinstatement into the policy, she
faxed her attorney Mr. Dean Goetz in 1993 asking if she should seek an attorney specialized in
insurance law to handle the matter of reinstatement.  She explained "I know such people [health
insurance specialists] exist because my girlfriend has a son in Sacramento who deals only with
health insurance and I'm sure there are people in San Diego that also specialize." (Raffman Decl.
Ex. 2, Clark Dep. Ex. 13 at 3.)

In 1993, although Ms. Clark attests that she believed Prudential's representations that the premium rates were based on her age and medical inflation, she her bookkeeper, Karen Ellis, to look into the issue because the price "made no sense to me whatsoever." (Clark Dep. at 93:24-95:18, 94:16-95:9, 121:5-21.)  Prudential indicated to Ms. Ellis that CHIP was no longer being sold to the public.  (Id. at 95:16-95:9.)  This was the first time that Ms. Clark had heard that the CHIP policy did not exist anymore.  (Id.; Id. at 108:20-24, 121:14-18.)  After hearing this from Ms. Ellis, Ms. Clark wanted the policy "even more . . . [b]ecause they didn't exist anymore.  If that fully comprehensive major medical didn't exist anywhere, I certainly was – it was important to me to keep this policy active."  (Id. at 95:6-18.)

In response to questioning concerning receipt of a letter from Prudential that several factors caused CHIP premiums to increase including increase in age and increasing cost of medical care, Ms. Clark responded that at the time she received the letter, she thought those were the actual reasons why her premiums increased.  However, when asked next whether she thought these were the only reasons, Ms. Clark responded, "Well, like I said, I was quite shocked sometimes.  I did wonder how could medical costs be this expensive." (Clark Dep. 112:1-9.)

In November of 1996, Prudential sent Ms. Clark a letter regarding her residency status, stating that it "reserve[d] the right to discontinue" her policy if she intended to stay in London more than six months.  (See Raffman Decl., Ex. 3 at 2, Clark Dep. Ex. 22.)  Before responding to Prudential, Ms. Clark again enlisted the assistance of her attorney Mr. Dean Goetz, writing him that she had "a very old policy" and that Prudential "tr[i]ed many times to cancel me."  (Id. at 1.) Ms. Clark further noted that Mr. Goetz "went to bat for me once before with them[,]" in reference to an effort to reinstate the policy a few years prior due to error.  Ms. Clark further

22

stated "I a[m] fully expecting a fight from them[,]" and explained her belief that, "[t]hey no longer have this type of policy and don't want it." (Id.)

Ms. Clark had approximately four telephone conversations with Prudential in the 2000s, regarding the reason why the rates were going up. (Clark. Dep. 204:24-205:6.) Ms. Clark testified that she made the calls "to vent my anger probably." (Id. at 81:14-15.) Specifically, when asked whether she was calling because she did not believe that the rates were going up because of age and medical cost inflation and "thought there might be some other reason as well," she answered "Yes" to the affirmative. (Id. at 81:16-21.) One of the telephone transcripts from this period indicates that on September 15, 2004, Ms. Clark disputed that her premium increase was: "outrageous. I've never heard of such a thing. There's not a human being in the world that can pay that kind of money." (Raffman Decl., Ex. 11, 9/15/04 Tr. at 1.)

At some point before her policy terminated in 2005, Ms. Clark telephoned a Prudential representative, who said that the premiums were increasing due to age and rising medical costs. (Clark Dep. 197:14-198:17.) The Prudential representative made no mention of the closed block. (Id.) Ms. Clark allegedly believed her due to the consistency of Prudential's representations. However, Ms. Clark noted in her deposition that "at the same time, I was beginning to get highly suspicious that there had to be something else. Because, you know, $5,600 a month just made absolutely no sense to me whatsoever." (Id. at 198:6-11.) It was that suspicion that led Ms. Clark to ask Mr. Goetz to look into the reason for the premium increases (Id. at 198:12-15.) "I also thought that surely California would have some sort of a law that would stop such a thing from happening." (Id. at 198:15-17.)

In the Fall of 2005, Ms. Clark asked Mr. Goetz to contact the Insurance Commission in California to see if there was a solution to her fear of being left without health insurance after

having paid Prudential for so many years, and to look into the reason for the premium increases.

(Clark Dep. 196:11-21, 198:12-17.)  On October 14, 2005, Mr. Goetz wrote a letter to the

California Department of Insurance stating:

> Prudential has been taking advantage of Ms. Clark for years by
> charging her exorbitant premiums.  They obviously realized she
> would not cancel the policy so they continued to take advantage of
> her by raising the premiums.  Prudential took advantage of a 64
> year old woman who feared losing her health insurance, as well as
> health insurance for her son.  Prudential's actions breached their
> covenant of good faith and fair dealing in violation of [the UCL
> and the California Insurance Code].

(Raffman Decl., Ex. 5, Goetz Dep. Ex. 16 at PRUDG000010.)  As of October 2005, Ms. Clark

still held hope that she would get the CHIP policy reinstated at a lesser price. (Clark Dep.

216:21-25.)

Subsequently, Ms. Clark filed a complaint with the California Department of Insurance

(DOI) about the CHIP premium increases.  (Clark Decl. ¶ 11.) Prudential responded on

November 10, 2005 by repeating that her premiums were based on "the overall experience of the

population" and her "age, gender and coverage" without mentioning the block closure of its

consequences. (Id.)  A February 1, 2006 letter from the DOI advised her that the DOI had no

authority to regulate Prudential's premium rates but did not explain that her premium increases

were due to block closures or that the policy was in the midst of a death spiral. (Id.)

**b.  Jesse J. Paul**

Mr. Paul is a resident of Indiana and purchased CHIP from Prudential, effective July 2,

1980, in Indianapolis, Indiana, where he then resided, at an initial monthly premium of $25.50.

(Paul Decl. ¶ 2.)   He considered CHIP his "Linus Ban Pelt blanket" and his "piece of the rock,"

because he "believed that [Prudential was going to keep premiums as low as possibly based

24

solely upon increasing medical costs and [] increasing age, and [he] wanted to keep this policy for life." (Id. ¶ 3.)  However, Mr. Paul terminated his policy in 2007 when Prudential raised his premiums to $4,284.11 per month ($51,409.32 per year).  (Id. ¶ 12.)

Mr. Paul is an attorney and had previously read about a state or federal regulation that limited or prohibited rating policies in "dead-end groups."  (Id. ¶ 10.)  Based on having read that article, the premium increase led him to question whether Prudential's representation was false that it was basing premiums on age and medical costs.  (Id.)  However, when he telephoned Prudential, he was told that he was not in a "dead-end group." (Paul Decl. ¶ 10.)

Mr. Paul then filed a complaint about the premium increase with the Indiana Department of Insurance in 2003, and received written responses from Prudential and the Indiana Department of Insurance.  Neither of these responses disclosed (1) that the CHIP block closure rendered a death spiral a certainty; (2) that the death spiral causes increasing premiums; (3) that those premiums would eventually rise to astronomical levels; (4) that a policy holder who develops a medical problem may be unable to secure other health insurance due to his or her pre-existing condition and may be locked in to CHIP until the premiums became unaffordable.  (Id.)

In 2004, Prudential again raised his monthly premium, this time from $1,036.66 to $1.501.28 (or $18,015.36 per year), a 45% increase.  (Id. ¶ 11.)  Shortly after receiving this notice, Mr. Paul telephoned Prudential.  During this call, he asked numerous questions about the premium increase and inquired again about the possibility of being a dead-end group.  A Prudential representative then informed him that Prudential stopped selling CHIP in 1981.  (Id.) After filing another complaint with the Indiana State Department of Insurance in 2004, he received a letter from the department informing him that CHIP was in a closed block premium rate spiral.  (Id.)

After finding from the Indiana Department of Insurance in 2004 that CHIP was in a premium spiral, Mr. Paul attempted to obtain alternative insurance from other health insurance companies.  (Paul Decl. at ¶ 12.)  However, these applications were denied due to development of preexisting conditions, including high blood pressure and high cholesterol.  Mr. Paul then explored the possibility of obtaining coverage from the Indiana Comprehensive Health Insurance Association ("ICHIA"), but did not pursue such coverage at that time because the State of Indiana retained the ability to terminate ICHIA coverage without notice and he "did not want to move to a policy such as ICHIA that was terminated at the whim of . . . politicians or Indiana law."  (Id.)  Mr. Paul elected to stay with CHIP because it could be terminated only in very limited circumstances, and he was worried that his only other alternative, ICHIA, could be ended at any time by the Indiana state government.  (Id.)  In 2008, however, he chanced the ICHIA policy when Prudential raised his premium to $4,284.11 per month.  (Id. ¶ 12.)

Mr. Paul alleges that he did not discover the material facts constituting the basis of his claims before six years prior to the filing of the Complaint on December 17, 2008.  (Id. ¶ 10.)

### c.  Warren Gold

Mr. Gold is currently a resident of Nevada.  Mr. Gold purchased CHIP from Prudential on or about March 26, 1980 in California, where he then resided, at a monthly premium payment of approximately $30.18.   (Gold Decl. ¶ 2.)  He terminated his policy in May of 2006 when his monthly CHIP premium reached $2,029.01 (or, approximately $24,000 per year).  (Id. ¶ 11; Gold Dep. 31:9-21, 155:15-19.)

Mr. Gold purchased the CHIP plan due to the limitations on Prudential's termination of the plan, the absence of a maximum benefit cap, and the limited factors for premium increases.  (Id. at 24:23-15:2; 34:18-24.)

26

As of April 4, 1984, Mr. Gold increased his deductible from $1,000 to $5,000 to lower his premium.  (Id. at 66:22-25.)  In the very late eighties and very early nineties Mr. Gold developed Diabetes.  (Id. at 58: 21-25.)  Mr. Gold felt "trapped" in the policy due to the development of this preexisting condition.  (Id. at 97:18-21.)  The basis for that belief was information given to him by his physicians and his insurance broker.  However, he never submitted any applications for any other insurance after his diagnosis of diabetes.  (Gold Dep. 61:5-14.)

In March 2004, Mr. Gold called Prudential regarding a "huge raise" in his quarterly premium.  (Raffman Decl. Ex. 12, 3/16/04 Tr. at 2.)  On the same 2004 call, Mr. Gold advised the Prudential representative: "I don't know if you're aware or not, but this policy has not been written in many, many years."  (Id. at 7.)   The short exchange following that prompt is of some contention to the parties, so the text of the transcript is set forth here for full context:

> JULIE:  That's correct.
> WARREN GOLD:  How many people are left on this policy?
> JULIE:  I don't really have a way to research that because I don't have a research engine to do that.
> WARREN GOLD:  I'm guessing that there's not too many since they haven't written it since, I think, the early '80s.
> JULIE:  Yeah.  These policies are not—they're not writing these policies anymore.  It's a closed block of business.
> WARREN GOLD:  Okay.  So is there some point at which they're going to just say, um, "We're not going to continue these policies?"
> JULIE:  No, no.  These policies are policies open 'til you don't want it anymore.
> WARREN GOLD:  Well, what happens if it gets down where there's just ten guys that – or women or, you know, whatever or—
> JULIE:  Then we would cover ten people.  We – we don't only handle this policy.  We have a lot of policies in our office that are closed block of business, which means they stopped writing these policies because they came up with updated policies.  And they're selling different policies.

> WARREN GOLD:  Well, you're better off maybe to go to an updated policy that would be cheaper?
> JULIE:  Uhm, I really don't know.  We don't do that in this office because we are a closed block of business.  I can give you, um, the fine Prudential customer help desk.  They do have an option on it.  If you're calling concerning a new policy, you can push that option and see what would be available.
> WARREN GOLD:  Okay.

(Id. at 7-8.)  Mr. Gold submits that had been told of the closed block prior to the 2004 call, but does not remember when.  (Id. at 63:23 – 64:8.)

In a 2006 call with Prudential, Mr. Gold was concerned with his premium change from $1500 to $2000 per month, and said "this is the worse I've ever heard as far as what people are paying." (Raffman Decl. Ex. 13, 3/16/06 Tr. at 4.)  Mr. Gold called in an effort to lower his premiums.  (Id. at 6.)  Mr. Gold continued:  "I don't know anybody who's paying $30,000 a year before they get a benefit.  I really don't.  I mean it's just getting – I realize because they haven't written new policies that the rates are going to be higher but I mean I don't know what – I mean is this a normal sort of rate for insurance for somebody 56 years old?" (Id.)

When Mr. Gold received notice in 2006 of the increase in his monthly premium, he began to look for other insurance.  (Gold Dep. 49:12-19.)  He thereafter procured health insurance with The Anthem Blue Cross Blue Shield because he could no longer afford the CHIP policy which had reached $30,000 per year.  (Id. at 49:24, 120:22-24.)  Mr. Gold did not previously seek other insurance options because he "trusted Prudential" and "believed they were only raising rates for the two reasons in the policy explanation when I bought it and in many other correspondences that had been sent to me.  That only two reasons that my rates could be raised were getting a year older and the inflationary rise in the cost of medical care. [sic]."  (Id. at 151:9-18.)

### d.  Linda M. Cusanelli

Ms. Cusanelli is currently a resident of California, which is where she resided in or about October 24, 1978 when she purchased CHIP at an initial monthly premium payment of $52.62. (Cusanelli Decl. ¶ 2; Cusanelli Dep. 63:15-22, 150:21-151:10.)  She had bought the policy "for the long-term." (Id. at 75:10.)  However, she terminated her policy in 2007 when the premium "finally became intolerable" and reached $2,659.57 monthly (or $31,914.84 per year).  (Id. at 72:17-18.)

As of 1982 or 1983, Ms. Cusanelli considered her CHIP premiums to be "excessive." (Id. at 30:17-32:5, 79:15-22.)  By 1998, Ms. Cusanelli considered her premiums "already high" notwithstanding increases of approximately $10/month. (Id. at 107:18-108:5.)

Ms. Cusanelli was diagnosed with invasive malignant melanoma in or about January 1995, and was told by her doctor that she would have a hard time finding alternate health insurance and as a result should keep her current insurance with Prudential.  (Cusanelli Decl. ¶ 10; Cusanelli Dep. at 60:8-20.)

In September of 2002, Ms. Cusanelli filed a petition for bankruptcy. (Cusanelli Dep. at 41:10-13.)  That petition did not mention any outstanding claims associated with the instant case. (Id. at 44:14-17.)

Ms. Cusanelli believed that her increases between 1997 ($501 monthly) to 2000 ($531 monthly) were "fairly reasonable.  It gets worse later on." (Id. at 111:8-112:8.)[13]

---

[13]      Prudential submits that Ms. Cusanelli inferred that the CHIP premiums were "spiraling out of control" by comparing her initial premium of $52/month with the CHIP premium charged in 2000 of about $530/month. (ECF 219-5.)  Prudential exaggerates the record.  Ms. Cusanelli never said those words specifically.  Upon prompt, Ms. Cusanelli asked counsel for Prudential to define "spiraling out of control," then noted that while much larger premium increases occurred

29

In response to premium increases from 2001 to 2003, Ms. Cusanelli called Prudential to investigate whether she could change her deductible. (Cusanelli Dep. 122:18-123:19.)  In a September 2003 call to Prudential, Ms. Cusanelli stated that her CHIP premiums were "getting nasty." (Raffman Decl. Ex. 10, 9/9/03 Tr. at 1.)  In September 2005, Ms. Cusanelli's monthly premium CHIP increased to over $1900, an amount she found "intolerable." (Cusanelli Dep. 71:3-20.)

In the Fall of 2004, Ms. Cusanelli received a letter from Prudential that monthly rates were increasing to $1,459 because of age and increased healthcare costs.  She believed the stated causes for the premium increases because she had been with Prudential since 1978 and "didn't think they'd lie to me."  (Id. at 127:23-128:18.)

On October 7, 2005, Ms. Cusanelli called Prudential to complain about the "intolerable" annual increase in premiums. (Cusanelli Dep. 71:15-20; Raffman Decl. Ex. 14, 10/7/05 Tr. at 4.) During that call, the Prudential representative stated that "[w]e're a closed block of business in this office," and Ms. Cusanelli responded, "Right." (Id.)

Ms. Cusanelli called Prudential again on October 13, 2005.  (Raffman Decl. Ex. 15, 10/13/05 Tr. at 3.)  During that call, Ms. Cusanelli expressed that "[m]aybe they don't have those policies anymore and they'd like to, you know, would love to get rid of it." (Id.)  The Prudential representative said that CHIP was a "closed block of business" and that Prudential would only "service the policies that we already have in effect," to which Ms. Cusanelli responded:  "That's what I thought." (Id. at 3-4.)  Upon being advised by the representative that premiums could rise as much as thirty-five percent each year, Ms. Cusanelli expressed the view that "I'm sure they

outside of 1997 to 2000, the increases in those years were reasonable.  (Raffman Decl., Ex. 7 at 111:13-112:11.)

will do [it] every year because if they're not . . . writing this policy any more, they would just as soon get rid of all of us, you know, and have us go to something different." (Id. at 14-15.)

Thereafter, Ms. Cusanelli spoke with a neighbor knowledgeable about insurance, and submitted applications for alternate individual insurance policies in late 2006 and early 2007. (Cusanelli Dep. 149:5-17.)

Ms. Cusanelli alleges that she did not discover the material facts constituting the basis of her claims before three years prior to the filing of the Complaint on December 17, 2008.  Ms. Cusanelli did not learn what the term "closed the block" meant until she was contacted by an attorney associated with Plaintiff's counsel.  (Id. at 29:20-23.)

### e.   Carole L. Walcher

Ms. Walcher is currently a resident of Pennsylvania who purchased in or about 1974 in Indiana, where she then resided.  (Walcher Decl. ¶ 2.)   Her initial monthly premium payment was $23.17 per month.  (Id.; Walcher Dep. 47:24 – 48:2.)  She terminated her policy in 2008 when her monthly premiums reached $5,554.22 (or $66,650.64 per year).  (Walcher Decl. ¶12.)

Ms. Walcher purchased the policy due to the features of its coverage:

> It certainly had a number of nice features.  But to me the one that stood out when I researched what I was going to do after coming off my father's policy when I went to school, the most important thing was to be absolutely certain that I would have health insurance for the rest of my life.  And that feature, that safety net that they said that they would not cancel you individually because you had claims, that the only limited circumstances under which they would cancel the policy would be if they left the entire jurisdiction, that to me was the selling point.

(Walcher Dep. 44:10 – 45:3.)

31

Before purchasing the CHIP policy, Ms. Walcher examined Blue Cross Blue Shield and the university policies available through Indiana University.  (<u>Id.</u> at 45:20-46:2.)  "The feature that drew me to the CHIP policy was this safety net feature." (<u>Id.</u>; <u>Id.</u> at 100:10-18)  The same would not have been true of the Blue Cross policy.  (<u>Id.</u> at 46:3-6.)  Part of that safety net was that regardless of how many claims one accumulates over a lifetime, those claims would always get paid under the CHIP policy, i.e., that there was no maximum benefit cap.  (Walcher Dep. 46:17-47:4.)  In contrast, the Blue Cross she examined at the time did have a maximum lifetime benefit.  (<u>Id.</u>)

In 1983, Ms. Walcher's annual CHIP premium almost doubled from $82.61 to $163.01. Despite this increase, Ms. Walcher renewed her policy because she assumed that all other insurance companies were experiencing the same increasing costs.  "I kept reading about them in the paper, et cetera.  So [ ] it never occurred to me that this was something that was [ ] something unique to Prudential." (<u>Id.</u> at 104:21-105:2.)

Ms. Walcher alleges that she did not discover the material facts constituting the basis of her claims before six years prior to the filing of the Complaint on December 17, 2008.  In some of the later years, her CHIP premiums were paid out of a family trust created by her father for educational or health bills.  She now understands that Andrew Hayes, a trust officer for the family trust, contacted Prudential by telephone at some point and was told that Prudential was no longer selling CHIP policies, but he did not convey that information to her.  (Walcher Decl. ¶ 10.)  In any event, she claims that she would not have understood the consequences of CHIP being a closed block.  (<u>Id.</u>)  To the best of her recollection, the trust paid her CHIP premiums in 2007 and 2008.  (Walch Dep. 32:22 – 33:17.)  Ms. Walcher received health insurance through

Penn State in 2009 (<u>Id.</u> at 33:1-7), and was never without health insurance between 1974 to at least May 6, 2011 (<u>Id.</u> at 43:19-22.)

In 1998, Ms. Walcher was diagnosed with diabetes.  In phone calls to two main providers of individual policies in her area in 2004, to Blue Cross Blue Shield and Universal of Pittsburgh Medical (UPMC), Ms. Walcher was told that this preexisting condition caused her to be unable to obtain alternate insurance.  (<u>Id.</u> at 51:11 – 52:15.)  That phone call in 2004 was the first time she called anyone to inquire about health insurance other than CHIP.  (<u>Id.</u> at 52:8-11.)  Ms. Walcher cancelled her CHIP policy in February of 2009 when she obtained health insurance with no preexisting condition limitation which was offered by the group policy at Penn State University.  (Walcher Dep. 160:18 – 161:8.)  Ms. Walcher cancelled her CHIP policy as a result of financial ability when she received a notice that the CHIP monthly premium was to increase to $7,000.  (<u>Id.</u> at 180:22-182:9.)

### f.  Terri L. Drogell

Ms. Drogell purchased CHIP in Ohio, where she is still a resident, on or about May 22, 1979, at a monthly premium payment of $48.22.  (Drogell Decl. ¶ 2.)  She stopped making premium payments when her monthly premium quote in May 2004 reached $2,225.45 (or $26,705.40 per year). (<u>Id.</u> ¶ 13.)  Ms. Drogell dropped her policy in June 2004, when her premium was $657 per month, because it had become "unaffordable" for her. (Drogell Dep. 84:6-11, 28:16-23.)

In a May 2003 call to Prudential, Ms. Drogell complained that the increase in her CHIP premium that year was "unbelievable." (Raffman Decl. Ex. 16, 5/27/03 Tr. at 7.)  In that call, Ms. Drogell advised that "somebody from Prudential a long time ago told me that they had not sold this plan for a long time – this CHIP policy." (<u>Id.</u> at 2-3.)  She also stated that she had

33

consulted with "an insurance guy" who told her that "they base [premiums] on other people in the plan and probably the only people left in the plan are the ones that have an illness." (Id.)  In that same May 2003 call, in response to a comment from the Prudential representative that "[t]hey've closed this block of business, so the ones that have it still kept it but they're not writing new ones," Ms. Drogell said, "[a]nd they're probably the ones that have an illness that are kind of stuck probably – I would assume." (Id.)

After being told on the May 2003 call that the premiums were increasing due to increased medical costs and age, Ms. Drogell responded, "Okay.  Because I mean my parents are like 20 something years older than me and they pay way less and I just don't – and my mom has MS so I just don't understand why mine is so high." (Id. at 5.)  That conversation ended when Ms. Drogell requested mailing of a premium price quote for raising her deductible from the base of $100 to either $300, $500, $1,000, or $5,000. (Id. at 8, 11.)

Ms. Drogell alleges that after the call, she renewed the policy because "I trusted what they were telling me" and "I believed that . . . the increase was being based on age, as she [the Prudential representative] said, and increased medical costs." (Drogell Decl. ¶ 11; Drogell Dep. 179:6-180:11.)

### 7.  Expert Reports and Damages[14]

The Court is presented with lengthy and detailed reports by four experts which go to the Gordian Knot of whether damages can be measured by common formula.  Substantial discussion

---

[14]    The Court is aware of oral arguments recently heard by the Supreme Court in a case arising from the Third Circuit Court of Appeals regarding factual determinations of damages based on objected expert reports at the class certification stage.  See Behrend v. Comcast Corp., 655 F.3d 182 (Third Cir. 2011); pet. for cert. granted, 133 S. Ct. 24 (June 25, 2012).  Here, however, no such evidentiary objection is present pursuant to Fed. R. Ev. 702 or Daubert as to admissibility of the expert reports.

has been raised on this issue, as the expert reports presented new but related adjustments and contentions up to and through the submission of their Declarations.

### a. Plaintiffs' Expert

Plaintiffs' expert, Dr. H.E. Frech, III, first proposed two approaches to calculate damages for the class by common evidence and common formula.  First, Dr. Frech pointed to internal Prudential documents which note the presence of comparable plans offered by competitors such as Blue Cross/Blue Shield, Occidental, Mutual of Omaha, Metropolitan, Golden Rule, Washington National, Great Republic, United Fire, and Associated Life plans.  (Frech Initial Report, 36-37.)  Thus, Dr. Frech proposed that damages to the class can be defined as the difference between the excess amount of CHIP premiums paid by policyholders and the amount which policyholders would have paid had they switched into the alternative, similar plan. However, Dr. Frech did not expand on this theory by, for example, illustrating a reliable common method to overcome individual policyholder characteristics such as age, gender, geography, availability, and risk factor.   Indeed, little of his initial report is dedicated to this proposal, which is largely abandoned in his rebuttal report and Declaration.

The second approach proposed, which reflects the majority of Dr. Frech's efforts, is the use of a "yardstick" method to calculate excess premiums paid.  The yardstick method is generally employed to calculate damages as the difference between the price actually paid for a product subject to an alleged improper conduct, and the price for similar products in the absence of (or "but for") the improper conduct.

Rather than identify similar items on the market to establish the but-for premium, Dr. Frech attempts to construct the but-for premium using personal health care expenditure per capita, with a deductible leveraging adjustment, as a proxy.  His but-for premium is intended to

35

reflect what policyholders would have likely experienced if they had switched out of CHIP and into an alternative health insurance plan prior to block closure.[15]  Dr. Frech computes a "but for" index to demonstrate the price change over time, so that it can be compared with the change in actual premiums to assess damages.  Thus, he applies the percentage change in total personal health care expenditures per capita from 1977 to 1997[16] to the average CHIP premium in 1977, to calculate what an average annual premium would have been in 1997 if premiums had grown at the same rate as the increase in personal health care expenditures per capita.  Dr. Frech repeated this for years 2002 and 2010.

Dr. Frech argues that this but-for premium index is a reasonable calculation because the national growth rate of the personal health care expenditures per capita, with an adjustment for deductible leveraging, correlates with the national growth rate in average premiums for individual insurance reported in third-party market surveys. (Id. at 48 - 49.)  Dr. Frech demonstrates how reasonableness of the measurement can also be verified by applying the formula to the named Plaintiffs. Dr. Frech's explanation to justify this proxy is included here in

---

[15]    Dr. Frech excludes Prudential's limited medical expense policies in this analysis, by calculating a ratio of major medical to limited medical premium revenue for each year and using these ratios to estimate the major medical portion of total CHIP revenue reported in responses to the second set of interrogatories.  (See Frech Initial Report, 39, n. 93.)

[16]    Dr. Frech relies on data from the U.S. Department of Health & Human Services, Centers for Medicare & Medicaid Services, for personal health care expenditures per capita. (Frech Initial Report, 5-6, 46).  This data is provided separately for each state on an annual basis for the period 1980 to 2004 and nationally on an annual basis for the period 1960 to 2009.  Dr. Frech submits that although the data includes persons of all ages, including persons 65 years of age and older, when it is broken out by age group, very little difference in growth rates appear for all ages and for persons 19-64.  "Specifically, over the period 1987 to 2004, the compound annual growth rate in personal health care expenditures per capita for all ages was 6.5 percent while the growth rate for persons age 19-64 was 6.6 percent." (Frech Initial Report, 46, n. 105.)

full, because Prudential's experts raise substantial points of contention with the use of this proxy,

which are recited below.

Dr. Frech maintains:

> One can check the reasonableness of this but-for premium index by comparing it to actual market data in several ways. First, the national growth rate of the personal health care expenditures per capita tracks the national growth rate in average premiums for individual insurance reported in third-party market surveys. For example, America's Health Insurance Plans (AHIP), formerly known as Health Insurance Association of America, has conducted surveys of premiums in the individual health insurance market for a number of years. Over the period 2002 to 2009, the average annual premium paid by single (as opposed to family) individual insurance policyholders in the U.S. under age 65 increased from $2,070 to $2,985, for a compound annual growth rate (CAGR) of 5.4 percent. Over the same period, personal health care expenditures per capita in the U.S. increased from $4,761 to $6,796, for a CAGR of 5.2 percent. As this measure accounts for all spending on personal health care by individuals and insurance companies, it is not based on any given deductible level plan. Adjusting for deductible leveraging during this period using a weighted average of different deductible levels, the CAGR would be approximately 6.3 percent. Therefore, the growth in personal health care expenditures per capita with an adjustment for deductible leveraging – what I use as a but-for premium growth rate – is reasonably close to the growth in average premiums over this period, and even slightly higher (6.3 percent versus 5.4 percent).
>
> Similar consistency is found over a longer period. The average annual individual insurance premium (combined single and family policies) in 1977 was $476. Similar data (combined single and family policies) is available for 2010 from a Kaiser Family Foundation market survey and the average reported annual premium was $5,131. This translates into a CAGR of 7.5 percent over the period 1977 to 2010. Over the period 1977 to 2009 (the last year of available data), personal health care expenditures per capita increased from $655 to $6,796, for a CAGR of 7.6 percent. Over the period 1982 to 2009 the deductible leveraging adjustment from the Toole Memorandum is on average 1 percent so the total CAGR of health care expenditures with deductible leveraging is approximately 8.6 percent over the period 1977 to 2009. These comparisons show that the personal health care expenditure series

37

growth rate well approximates the growth rate in market individual health insurance premiums even without an adjustment for deductible leveraging.  Note that accounting for deductible leveraging increases the but-for premiums, and thus reduces the damages.

The reasonableness of the but-for premium index also can be verified by generating implied premiums for the named Plaintiffs.  These implied premiums can be compared to those reported in third-party market surveys of individual insurance premiums.  For example, Beverly Clark's annual premium in 1982 was $1,796 for herself and her son.  Grown at the rate of annual increases in personal health care expenditures per capita in California, the implied premium in 2009 would be $7,523.  Including a deductible leveraging adjustment, the implied premium in 2009 would be $9,772.  By comparison, the average premium for a single policy for a person age 60 to 64 in 2009 was $5,755 and for a family policy the average premium was $9,952.  Thus, the implied premium for Beverly Clark is within the range of the reported average premiums in the market from a third-party survey.  Of course, this is much lower than Beverly Clark's actual annual premium of $68,393 in 2006.

(Id. at 48-49, footnotes omitted.)

Then, Dr. Frech identifies the actual CHIP premium paid which was influenced by the alleged improper conduct.  The index with which Dr. Frech proposes to assess actual CHIP premiums over time is based on percent changes reported in Prudential actuarial memoranda from 1973 to 1989, and rate tables which he constructs from year 1989 to account for capping. The rate tables are based on information of rates submitted to each state and an assessment of Prudential's capping methodology.  The actual premiums are assessed separately for each state relevant in this litigation, since percentage premium rate changes and capping rules did at times vary by state but were predominantly common within a given state.  (Id. at 44.)  Dr. Frech uses weighted average premiums each year, with weights for relative numbers of policyholders in

each gender and deductible level as of 1990.  Changes in the weighted average premium each year relative to 1989 is used to extend the premium index from 1989 through 2010.  (Id. at 32.)

Thus, Dr. Frech submits Figure 7 as the index of actual CHIP premiums for California during the class period based on Prudential's reported average premium increases and incorporating the effects of capping.  The graph shows steady increases through the eighties, a plateau through the nineties on account of the capping, and drastic increases after 2001 when the cap was lifted:



(Frech's Initial Report, 45.)

Next, Dr. Frech offers Figure 9 to illustrate how the difference between the actual premium index and the but-for premium index in California can calculate the percent excess premium assigned:



(Id. at 51.)

According to the figure above, in 1990, 70 percent of the actual CHIP premiums were in excess

of alternative but-for premiums.  (Id. at 50.)  Dr. Frech explains that the formula used to measure

the damages is not complicated by individual issues such as risk or area factors, generosity and

type of payments, gender, age, etc., because those details are already included in the actual

premium index and the but-for premium index for any given policyholder.  (Id. at 51.)   As a

check of the reasonableness of this calculation, Dr. Frech compared the excess premium

percentages with effective rates of alternate plans offered for a 45 year old male in Los Angeles

Zip Code 900 in or around 2010.  The implied but-for premium Dr. Frech calculated based on his

model is comparable to the average premium of the other plans.

Thus, Dr. Frech proposes that the total dollar amount of excess premiums paid by the class can be calculated by multiplying the excess premium percentage by the total actual CHIP premiums paid by the class in each state (i) for each year (t):

$$\text{Dollar Excess Premium}_{it} = \text{Percent Excess Premium}_{it} \text{ X Total Dollar Premium}_{it}$$

The present value of the excess dollar premiums paid by the class can then be calculated using an appropriate prejudgment interest rate.

Using this methodology, Dr. Frech preliminarily calculates the total damages to the class, with adjustment for deductible leveraging and a 7 percent simple interest rate for prejudgment interest for each state as $198,694,328. (Id. at 54-55.)

### b. Prudential's Experts

Dr. Strombom, Mr. Wildsmith, and Professor Buchmueller are Prudential's experts.  Dr. Strombom argues that in order to calculate the extent of economic damages sustained by each number of the class, a determination must first be made whether the individual class member would have altered his or her choice of health coverage plan upon proper disclosure of the block closure and its consequences.  Dr. Strombom submits that Plaintiffs wrongly assume that class members would have uniformly and immediately switched from CHIP to alternate health insurance coverage if proper disclosure was made.  For example, Dr. Strombom notes that CHIP policyholders interested in short-term coverage, and those who developed a pre-existing condition prior to the block-closure, would not likely be affected by news of future premium changes.  Thus, Dr. Strombom maintains that an individual inquiry would be necessary for a determination of switching behavior, but speculates that "it is reasonable to assume that the thousands of policyholders who abandoned CHIP shortly after block closure are unlikely to have

behaved differently regardless of whether they had received different or additional information from Prudential[ ]." (Strombom Initial Report, 20.)

After determining the potential impact of new information on class member conduct, Dr. Strombom observes that an individual analysis of the alternate options available to each policy holder is necessary. "As a general matter, the options available to an individual CHIP policyholder are likely to have depended on his or her employment status, health status, associations, geography, willingness and ability to research options and other factors." (Id. at 20.) Thus, a policyholder may switch to an alternate health insurance product "comprised of a variety of characteristics including premiums, co-pay levels, covered services, policy limits, provider panels and many others." (Id. at 21, relying on Expert Report of Professor Buchmueller.)

Last, Dr. Strombom submits that the final stage of the inquiry is a comparison of total costs between the CHIP policy and the alternate option if chosen, such as deductibles and out-of-pocket expenses. He explains that the magnitude of these differences depends on the actual health experience of individual policyholders, and essentially that some policyholders were better off under CHIP because of its robust coverage, which would have otherwise resulted in significant financial loss under other plans. This identification of individual policyholders who were better off under CHIP based on the total cost and expenses covered, is therefore argued to be again a matter requiring individual inquiry.

Mr. Wildsmith's findings largely corroborate Dr. Strombom's arguments as to the individual inquiry necessary to gauge causation and damages. Mr. Wildsmith adds that there is a lack of commonality as to the premiums which CHIP policyholders paid to Prudential, as premiums varied based on age, gender, geographic location, the premium rate increases

approved in their resident state, and the operation of the premium caps implemented.

Additionally, the premiums paid by any given policyholder also varied over time based on

changes in residency, deductibles, and the addition or removal of dependants. (Wildsmith Initial

Report, 24.)

Mr. Wildsmith submits that even if the CHIP block remained open, reduction of

enrollment and sales would have been likely, due to the "significant shift" in the 1980s and

1990s "towards managed care products based on networks of providers with negotiated payment

rates, and away from traditional 'indemnity' products such as CHIP." (Id. at 17.)  Thus, Mr.

Wildsmith concludes that "[h]ad the block remained open, it is highly likely that it would have

effectively closed itself as the CHIP product became less competitive and sales continued to

decline." (Id. at 22.)  For example, "[b]y 2004, only 2 percent of single policies and 1 percent of

family policies in the individual health insurance market were indemnity plans." (Wildsmith

Rebuttal Report, 30.)

Of particular note to the question of whether a common formula to encompass class

damages may be achieved, Mr. Wildsmith challenges Dr. Frech's underlying assumption as

unfounded:  that benefit payments under individual health insurance policies track changes in

total per capita personal health expenditures.

As to the first assumption, Mr. Wildsmith raises the invalidity of the rise of total personal

health expenditures per capita as a proxy for expenses covered by insurance, because the former

is based on a materially different set of goods and services.  First, it includes costs for dental,

vision, nursing home services, and over-the-counter pharmaceuticals.  Second, it is based on the

entire U.S. population rather than just those covered by individual health insurance.  Therefore, it

is affected by unrelated factors such as the uninsured rate, the average age of the national

population, and fees paid to health care providers by Medicare, Medicaid, and the Veteran's

Administration.  For example, of the total national personal health care expenditures for 2009,

only approximately one-third were funded through private health insurance, while the remaining

two-thirds was attributable to other sources of funding which, in many cases, provide services to

very different populations such as Medicaid beneficiaries, Veterans Administration patients and

the uninsured.  (Id. at 2-3.)

 Mr. Wildsmith further challenges the use of the proxy by applying Dr. Frech's own data

to illustrate the percentage to which it diverges from CHIP premiums even before the block was

closed:



Thus, using Dr. Frech's own data, by 1976, the index for California CHIP premiums was 10

percent higher than the index for personal health expenditures, and by 1981, the divergence

exceeded over 50 percent higher.  (Id. at 8.)

To further disprove applicability of the proxy, Mr. Wildsmith points to the nonmonolitic nature of average premiums in the individual health insurance market.  For example, one of Dr. Frech's sources estimates that the average single premium for 2002 ranges from $1,871 to $2,568.  (Wildsmith Rebuttal Report, 4.)

Mr. Wildsmith questions of Dr. Frech's second assumption that the cost of alternative coverage and the pre-closure or open-block cost of CHIP coverage are substantially identical.

> Health insurance is fundamentally different from commodities and most consumer goods in that the cost of 'manufacturing' depends directly on the personal characteristics of the purchasers . . . Health insurance . . . can vary dramatically from one person to the next. The rates filed by any given health insurer will depend on prior experience, which in turn depends on the demographic mix of the insurer's policyholders.  Because of this, knowing the premiums offered by one insurer does not allow you to infer the premiums for another insurer.
>
> (Id. at 9.)

Additionally, Mr. Wildsmith undermines Dr. Frech's demonstration of reasonableness of the but-for index when applied to the named Plaintiffs.  See block quote *supra* at 31.  By way of review, see id., Dr. Frech illustrates the reasonableness of the but-for index and formula by identifying Ms. Clark's annual premium in 1982 ($7,523) and applying the rate of annual increases in personal health care expenditures per capita in California, and a deductible leveraging adjustment, to calculate an implied premium in 2009 of $9,772.  Dr. Frech then compares this final figure with the average premium for a family policy in 2009 ($9,952). However, Mr. Wildsmith argues that simply applying the rate of personal health care expenditure per capita to the actual premium in 1982 in order to project an implied premium in 2009 is flawed, because the formula does not include the impact of individual factors such as aging on benefit costs over time.  Mr. Wildsmith's Table 1 (Id. at 15) shows annual and cumulative

premium increases due to age.  In Ms. Clark's case, her premium increases would have increased by 76%, thereby adjusting her projected implied premium from $9,772 to $17,199.  Mr. Wildsmith maintains that this "completely undermin[es] the apparent congruence between Dr. Frech's index and the survey data on individual health insurance premiums." (Id. at 13.)

Relatedly, Mr. Wildsmith contends that this type of assessment must be conducted on an individual level for various adjustments over time in addition to age, such as changing health status and differences in deductible leveraging over time between different deductible levels. For example, the increase for Mr. Gold due to aging over the same time period would have been approximately 196 percent.  (Id. at 15.)  Similarly, the cumulative effect of the deductible leveraging adjustments for California range from 10 percent for a $100 deductible to 88 percent for a $5,000 deductible.  (See Wildsmith Rebuttal Report, Table 4, 25.)

Based on documents produced by Prudential, Mr. Wildsmith also submits the following chart to illustrate the decreasing enrollment, sales, and ongoing lapse rate of the CHIP policy since its introduction on the market:

| Table 6 | | | | |
|---|---|---|---|---|
| CHIP Enrollment, Sales & Lapses | | | | |
| Year | In-Force at Year End | Sales | Lapses | Lapse Rate |
| 1975 | 229,648 | 161,542 | 84,680 | 55.4% |
| 1976 | 310,391 | 203,134 | 122,391 | 53.3% |
| 1977 | 323,369 | 143,208 | 130,230 | 42.0% |
| 1978 | 332,139 | 129,462 | 120,692 | 37.3% |
| 1979 | 333,757 | 122,602 | 120,984 | 36.4% |
| 1980 | 322,258 | 112,279 | 123,778 | 37.1% |
| 1981 | 261,489 | 78,133 | 138,902 | 43.1% |
| 1982 | 152,875 | 4,402 | 113,016 | 43.2% |
| 1983 | 92,242 | 8 | 60,641 | 39.7% |
| 1984 | 57,161 | 8 | 35,089 | 38.0% |
| 1985 | 37,582 | 9 | 19,588 | 34.3% |
| 1986 | 27,652 | 2 | 9,932 | 26.4% |
| 1987 | 21,226 | 3 | 6,429 | 23.2% |
| 1988 | 17,393 | 0 | 3,833 | 18.1% |

Sources: PRU-BC-00000001, PRU-BC-00001298, PRU-BC-00034998 - PRU-BC-00035011

Note: Lapses and lapse rates are calculated based on enrollment and sales data.

(Wildsmith Rebuttal Report, 29.)  Due to these calculations, Mr. Wildsmith submits that "[c]losure of the CHIP block did not accelerate the departure of healthy policyholders from the block.  The lapse rate for 1982 was almost identical to that for 1981 (43.2 percent versus 43.1 percent) and the lapse rate declined steadily in subsequent years." (Id. at 28.)

### c.  Proposed Adjustments

In a concession to criticism of his approach by Prudential's experts, at the last hour Dr. Frech submitted in his Declaration three proposed adjustments to his formula.

First, Dr. Frech attempts to adjust for the industry shift from indemnity to managed health care plans by looking to the dwindling percentage of employees covered under indemnity health plans in medium and large firms, and estimating the reduction in health care spending associated with the shift.   Relying on an estimate produced in a 1996 report by the Office of the Chief Economist for the U.S. Department of Labor, Dr. Frech assumes that managed care is 20% less expensive than the indemnity plan over time.   Thus, an adjusted formula for implied indemnity-based expenditure for each state (s) and each year (t) is proposed:

Implied Indemnity Expenditure$_{st}$ = (Original Expenditure$_{st}$) / (Percent Indemnity$_t$) + 0.8(1 – Percent Indemnity)

In response to Mr. Wildsmith's criticism that the but-for index does not account for the increase in the percent of the uninsured population, Dr. Frech argues that the impact on growth in health expenditures per capita from a change in the percent uninsured is negligible.   Like the first adjustment, Dr. Frech proposes a formula which incorporates the rising percentage of the nation's uninsured population and the relative percentage cost of 38% which uninsured individuals spend on health insurance as compared to insured individuals:

Implied Indemnity Expenditure$_{st}$ = (Original Expenditure$_{st}$) / (Percent Insured$_t$) + 0.38(1 – Percent Insured)

Dr. Frech shows that incorporating these conservative adjustments for the shift to managed care and the increase in the percent uninsured result in only minor changes to his preliminary estimates of aggregated damages to the class.   (See Frech Decl., Table 4, 15.) "[T]he dollar excess premium including prejudgment interest at 7 percent simple interest is reduced from $198,479,399 to $191,730,490."   (Frech Decl., 16.)

Third, Dr. Frech responds to Mr. Wildsmith's criticism of the use of the personal health care expenditures per capita proxy in creating a but-for premium index because the expenditure accounts for materially different set of goods and services.   By way of reminder, Mr. Wildsmith

contested that the proxy is inappropriate because it "includes types of services typically excluded by individual health insurance, such as dental, vision and nursing home services and the cost of over-the-counter pharmaceuticals," and thus that the expenditures cover services provided to "very different populations such as Medicaid beneficiaries, Veterans Administration patients and the uninsured." (Wildsmith Rebuttal Report, 2-3; see also *infra*, 35-36.)  However, Dr. Frech argues that a review of growth rates of private health insurance expenditures for hospital, physician and clinical services – services arguably more closely related to the services covered by individual health insurance among a population more closely related to the individual insurance population – results in a compound annual growth rate ("CAGR") of 7.6 percent. "Therefore, controlling for the basket of services and population argued for by Mr. Wildsmith results in a very similar growth rate as the broader category of expenditures I used in creating the but-for premium index in my initial report – a difference of only one tenth of one percent in the CAGR."  (Frech Decl., 18.)

Last, Dr. Frech notes that the approach and methodology which he proposes has also been used in a peer-reviewed academic study co-authored by one of the leading health care economists, Professor Joseph Newhouse.  To measure premium growths for indemnity plans, the authors used personal health care expenditures per capita as a but-for index.

Dr. Strombom and Mr. Wildsmith critique the proposed adjustments as unsound.  Dr. Strombom underscores two fundamental flaws in Dr. Frech's proposal:  1) his failure to identify a specific similar policy to establish an "*actual*, not made up" yardstick; and 2) the false assumption that "the individual circumstances and knowledge of each policyholder can be ignored in determining the existence and extent of damages." (Strombom Decl., 3.)

Turning to Dr. Frech's proposed modification to account for the shift in the industry, Dr. Strombom points out that Dr. Frech provides "no evidence that the share of employees at medium and large employers enrolled in indemnity plans is representative of the share of expenditures under indemnity plans in his index." (Id. at 6.)  Next, Dr. Strombom notes that Dr. Frech's reliance on a single source which purports to represent the difference in "medical plan costs per employee" is not the same as personal health care expenditures.  Moreover, Dr. Strombom questions the applicability of the source's 20 percent estimate for the entire period in question, 1981 to 2010, because the statistic only relates to a single year, 1995.  Indeed, Dr. Strombom points to another study which estimates benefit costs for a sample of state and local employees in Massachusetts in 1995 were approximately 50 percent lower for managed health care plans than for indemnity plans.  Last, Dr. Strombom notes that the study relied upon by Dr. Frech itself cautions that "'[t]he cost difference for employers differs by region, by firm size, and according to the demographic composition of the workforce,' yet Dr. Frech makes no attempt to account for these differences in his calculations." (Id. at 7.)

Similarly, Mr. Wildsmith believes that that Dr. Frech has still failed to identify the alternative coverage to which his proposed index would apply:  "The alternatives available to the proposed class members would vary from person to person.  Those purchasing individual coverage would be re-underwritten and many, due to changes in health status since they purchased their CHIP policies, would face higher premiums or be denied coverage.  Thus, even if his proposed index were technically sound, he has not indentified [sic] an appropriate base to which it may be applied to estimate the cost of alternative coverage." (Wildsmith Decl., 1.)

Additionally, Mr. Wildsmith maintains that the per capita national health expenditure proxy is not a valid basis for constructing the index.  Specifically, Mr. Wildsmith contends that it

is "implausible" for Dr. Frech to suggest that there is no material difference in spending patterns between different health insurance programs and populations and thereby rely on national average data.  Mr. Wildsmith provides the Economic Healthcare Indices recently introduced by Standard and Poor's as an example of a more sophisticated analysis with distinguishing factors. In contrast, "Dr. Frech is led to conclude that the pattern of cost increases for individual plans, employer-sponsored plans, and government-sponsored programs such as Medicare and Medicaid are materially the same – despite the significant differences in the programs and covered populations."  (Id. at 4.)

        Last, Mr. Wildsmith asserts that Dr. Frech's proposed remedies are oversimplified and inadequate.  In addition to the issue Dr. Strombom raises above, regarding the lack of reliability of the twenty percent figure to demonstrate the difference in costs between plans, Mr. Wildsmith takes issue with Dr. Frech's calculation to reflect the impact of changes in the uninsured rate on national healthcare spending:  "Both the uninsured rates and the estimates of the impact of coverage on health spending are for the non-elderly population, but Dr. Frech applies them to spending data that includes both the elderly and non-elderly.  The uninsured rates are national rates, but Dr. Frech applies them to state-specific spending data – even though uninsured rates vary significantly between states.  Once again, Dr. Frech has offered an ad hoc fix rather than a serious analysis of the impact of coverage levels on the cost of health care in the states covered by this litigation."  (Id. at 6.)

        Mr. Wildsmith maintains that "[t]he use of inappropriate data cannot be corrected through simple, ad hoc fixes."  (Id.)  Were a rescue of his proposed index possible, "it would require removing all of the many extraneous and confounding factors that lie between the claims paid by health insurers for policyholders enrolled in unmanaged indemnity plans (which

51

ultimately drives the price of such policies), and aggregate national spending on personal health care. Whatever such an analysis might ultimately look like (assuming it is even possible, which has not been shown), it would of necessity be developed using fundamentally different data and methods than Dr. Frech has proposed." (Wildsmith Decl., 6-7.)

### 8. Objections to Evidence

Plaintiffs filed an additional brief objecting to evidence proffered by Prudential in opposition to the motion for class certification. In turn, Prudential filed a response brief with a supplemental declaration and additional exhibits attached thereto. Although, as Plaintiffs concede, the majority of Plaintiffs' objections to evidence are inapposite to the class certification determinations presently before the Court because they relate to the merits, the Court will address each objection below. The objections are grouped by category or type.

### a. Salinas Declaration, offered by Prudential to show representatives' oral communications with policyholders

Plaintiffs challenge Mr. Salinas's Declaration in its entirety pursuant to Fed. R. Ev. 602, for lack of personal knowledge of the attested matters. Plaintiffs contest Mr. Salinas's knowledge of the nature and frequency of oral communications between CHIP policyholders and Prudential agents, as evidenced in admissions arising in his deposition. (Supp. Thomas Decl. Ex. 2). Plaintiffs contend that Mr. Salinas only sold life insurance (not health insurance) as a Prudential agent for only seven months before CHIP was introduced on the market, and that the focus of his conversations with agents thereafter was only on life insurance and potential other lines of business. Mr. Salinas worked at Prudential in a variety of positions from 1969 to retirement in 2005, ranging from planning and research analysis of policies, operations management, and agency compliance. He engaged in conversations with agents, mostly related

52

to life insurance due to the nature of the industry at the time.  However, Mr. Salinas also had

personal knowledge that agents would be contacted with respect to older policies, and be

responsible for communicating policies relating to them.  Mr. Salinas directly answered that he

does not "have any reason to assume that an agent would treat health insurance any differently

from life insurance or property and casualty in his discussion with clients[.]" (Salinas Dep.

105:6-14.)  The Court finds that Mr. Salinas is qualified to speak to the general frequency and

nature of oral communications between agents and CHIP policyholders, which are the pertinent

statements which Plaintiffs object to in Prudential's opposition brief.  As Prudential notes,

Plaintiffs "do not seriously dispute that agents communicated with policyholders about CHIP

after 1981, including about CHIP rate increases.  Indeed, documents that plaintiffs affirmatively

submitted and documents to which they do not object confirm that fact."  (Prudential's Resp. to

Obj. of Evid. Br. at 5, footnote with referencing documents omitted).

> **b.  Certain Opinions of Prudential's Expert Wildsmith in his Expert Report (Chud Decl. Exs. 81, 83.), offered by Prudential to show the experienced loss-ratio**

Plaintiffs seek to exclude opinion evidence of Mr. Wildsmith regarding whether

Prudential's loss ratio reflects the massive subsidies of the CHIP policy during the block closure.

Plaintiffs argue that the evidence is irrelevant to the determination of class certification.

Relatedly, Plaintiffs' contest the admissibility of Mr. Wildsmith's criticism of Dr. Frech's

finding of the relatively small pool of class members who may have developed a preexisting

condition during block closure, who therefore had difficulty procuring alternate health insurance,

and its effect upon Prudential's losses from paying the medical claims of those who developed

preexisting conditions.  Plaintiffs essentially challenge the admissibility of any evidence of

Prudential's loss ratio and related subsidy as irrelevant to the determination of class certification.

The Court finds that the matter regarding the loss ratio and subsidies is indeed irrelevant to any basis to the opposition to the certification of the class; such evidence will therefore not be considered in the class action discussion below.

### c.   Challenged Hearsay Evidence

Plaintiffs concede that the seven pertinent statements in Prudential's Opposition brief to which they object are based on impermissible hearsay evidence, but do not undermine the certifiability of the class and subclasses.  Indeed, the contested statements go to the merits.  Nonetheless, Plaintiffs argue that they should be excluded from the record and the Court's consideration.  In general, the seven statements go to whether:

-   rising CHIP premiums were actually a result of the block closure;
-   the total loss experienced by Prudential exceeded the company's projections;
-   the premium spiral was inevitable;
-   individuals of compromised health were attracted to CHIP;
-   purchasing decisions for health insurance are a personal, individualized assessment;
-   Prudential elected to cap policies to prevent passing increases to policyholders, even at rates lower than those approved by regulating bodies.

Plaintiffs object to Prudential's introduction of several excerpts of deposition testimony and one declaration from civil actions twenty years prior, and two internal Prudential memoranda.  With respect to the Deposition of Julius Vogel and Alan Ferguson in another civil action arising in the District Court for the Central District of California, the Court finds that the deposition evidence is admissible because plaintiff therein was a successor in interest and the testimony involves the same subject matter pursuant to Fed. R. Civ. P. 32(a)(8).  Indeed, that case related to whether Prudential breached its duty when it misrepresented to the plaintiff its decision to stop selling CHIP despite skyrocketing insurance premiums.  (Chud Suppl. Decl., Ex. 2.)  Similarly, the deposition testimony in the civil action is admissible pursuant to Fed. R. Ev. 804(b)(1), because the "predecessor in interest [ ] had an opportunity and similar motive to

develop it by direct, cross-, or redirect examination."  See also Lloyd v. Am. Export Lines, Inc., 580 F.2d 1179, 1187 (3d Cir. 1978) (A party to a prior action is a predecessor in interest of a party in a pending action "if it appears that in the former suit a party having a like motive to cross-examine about the same matters as the present party would have, was accorded an adequate opportunity for such examination.")  The challenged Deposition and Declaration of Anthony Houghton in another California civil action is admissible for the same reason, where that case also related to the Prudential's alleged failure to disclose, fraudulently conceal, and breach of contract regarding the CHIP block closure.  (Chud Suppl. Decl., Ex. 3.)

Last, the two internal memoranda which Plaintiffs take issue with are admissible hearsay. The Bonnie Snider memorandum fits under the business record exception, Fed. R. Evid. 803(6), and under the rule of completeness to the extent that they relate to CHIP's business plan which Plaintiffs cite to in the record (See MCC Br. at 6, n. 17) or similar testimony entered by Plaintiffs (See Thomas Ex. 36, PRU-BC 00001288).  Further, the second memorandum contested by Plaintiffs, which related to rate capping, was itself introduced and read into the record by Plaintiffs' counsel in the deposition of Surangi Patel, and by Ms. Patel at the direction of counsel.  (Chud Decl., Ex. 97.)  Plaintiffs' counsel repeatedly asked Ms. Patel whether the description of capping and the capping process was correct, after having read the document into the record.  Ms. Patel affirmed and adopted the contents into her testimony.  Thus, the testimony does not qualify as hearsay, since it is not an out of court statement and was subject to examination.

After a full review of the seven objected statements, the Court finds all seven objections based on hearsay are denied.

### d.  Contested Opinions in Prudential's Experts' Declarations

This litigious proceeding is replete with thousands of pages of briefs, sur-replies, and testimony. Plaintiffs now surprisingly contest that certain sections of Declarations made by Prudential's experts Mr. Wildsmith and Dr. Strombom exceed rebuttal of Dr. Frech's opinion. In turn, Prudential persuasively notes Dr. Frech's inclusion in his Declaration of new attempts to make "adjustments in the potential damages methodology proposed to account for concerns" raised by Prudential's experts. (Frech Decl., 2.) Further, Prudential argues that if Dr. Frech had wanted to rebut critiques of his opinions that Prudential's experts made in their reports and deposition testimony, then he could have done so properly within thirty days pursuant to Fed. R. Ev. 26(a)(2)(D)(ii). Indeed, the portions in the Strombom and Wildsmith Declarations which Plaintiffs contest go to why Dr. Frech's Declaration, with its new adjustments, did not fix the problems that he set out to fix. Thus, the Court finds that the opinions are proper rebuttal evidence, and the objections are denied.

### e. Objections to Supposed Inadmissible Legal Argument Submitted by Prudential's Experts Strombom and Wildsmith

Plaintiffs argue that Prudential's experts rendered "impermissible legal argument" about "the requirements for proof of damages" by criticizing Dr. Frech's failure to identify or refer to any actual comparator products in support of his yardstick approach to damages. However Dr. Frech himself purports that his damages theory is based upon the existence of "alternative, similar plans" into which policyholders might have switched. (Frech Initial Report, 38.) Dr. Strombom's and Mr. Wildsmith's criticism goes to the methodology employed to calculate damages in their expert capacities. Thus, the opinions are admissible for such purposes.

### f. Objections to Expert Opinion in Testimony based on Lack of Foundation

First, Plaintiffs seek to exclude expert testimony by Wayne Clarke and Allen Haight, and related assertions in Prudential's opposition papers that CHIP's benefits were "unique" and with "no competition." Plaintiffs argue that neither expert witness has any basis for testifying to the matter, and therefore lack personal knowledge pursuant to Fed. R. Evid. 602.[17]  However, Mr. Clarke testified as Prudential's Rule 30(b)(6) corporate representative (Chud Supp. Decl. Ex. 4, Clarke Dep. 23),[18] and therefore is not required to have personal knowledge of the facts on which he gives testimony.  Mr. Clarke is only required to be sufficiently educated on the designated deposition topics.  Plaintiffs do not dispute that Mr. Clarke was sufficiently educated about the subject matter in support of his affirmative duty to prepare to testify to information

---

[17]     Fed. R. Evid. 602 (need for personal knowledge) provides:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under Rule 703.

[18]     Fed. R. Civ. P. 30(b)(6) (notice or subpoena directed to an organization) provides:

> In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

"known or reasonably available to the organization."  Fed. R. Civ. P. 30(b)(6); see e.g., Sanofi-Aventis v. Sandoz, Inc., 272 F.R.D. 391, 393 (D.N.J. 2011).

Moreover, Mr. Haight clearly testified that he believed that CHIP was "unique" due to the general sentiment at the company. (Thomas Supp. Decl., Ex. 4, Haight Dep. at 80:4-24)  ("I believed that, I guess, because everybody in my company said we're the only ones doing this.")  In response to whether he ever studied what policies competitors offered in the individual health market, Mr. Haight admits, "I'm sure I did, but I don't recall it.  But I'm – probably.")  (Chud Decl., Ex. 95, Haight Dep. at 80:4-7.)  Accordingly, the objection as to Mr. Haight and Mr. Clarke's testimonies goes to weight rather than admissibility.

Second, Plaintiffs seek to exclude Prudential's assertion and supporting testimony by Dr. Strombom and Mr. Wildsmith, that at the time of the block closure in December 1981, "the CHIP block included many policyholders whose health status would have made it difficult or impossible for them to secure alternate health insurance coverage, as other insurers would not have subsidized their medical claims like Prudential did." (MCC Opp. Br. at 7 & n. 19.) Plaintiffs seek to exclude the testimony and argument to the extent that the matters are inadmissible pursuant to Rule 602, and fail to comply with the foundational requirements of Rule 701as to lay opinion and Rule 702 as to expert opinion.[19]  The testimony is admissible because

---

[19]     Fed. R. Evid. R. 701 (opinion testimony by lay witnesses) provides:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

healthcare economics experts may testify about the behavior of insurers and the basic point that

insurers do not intentionally accept new policyholders at rates that would be expected to generate

losses to the insurer.  Moreover, a matter not raised by either pary, is the Plaintiffs' expert's

concession of the point:

> There was a small percentage of CHIP policyholders that would
> not have been able to switch out of CHIP and into an alternative
> insurance policy when Prudential allegedly should have made the
> appropriate disclosures.  These are the policyholders who
> developed a major chronic condition by the time of the block
> closure in 1981 such that they would have been denied coverage. .
> . This [preliminary] analysis . . . generates a conservative estimate
> of class members who may have had difficulty obtaining health
> insurance from another source around the time of the CHIP block
> closure.

(Dr. Frech Initial Report, 38.)

Third, Plaintiffs contest Mr. Clarke's testimony that in 1981, agents were Prudential's

"primary contact with [its] policyholders," should be excluded because Mr. Clarke did not begin

his employment with Prudential until 1989 and therefore lacks personal knowledge of

communications between CHIP policyholders and agents during the relevant time period and

---

Fed. R. Evid. R. 702 (testimony by expert witnesses) provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

matters supporting the notion that agents were the "primary contact" with policyholders.  Again, as Prudential's Rule 30(b)(6) corporate witness, Mr. Clarke is not required to have personal knowledge.  Moreover, as Prudential notes, there is ample documentary evidence to confirm that agents played a role in communicating with policyholders.  Indeed, the two and three-reason letters explicitly invite policyholders to call agents with questions.

Fourth, Plaintiffs contest any assertion that "the block closure had *not* caused CHIP premiums to rise" (MCC OB at 8 & n.24, emphasis in original) to the extent that it is supported by Mr. Clarke's deposition testimony. (Chud Decl. Ex. 96, Clarke Dep. at 73:12-75:19) ("Prudential does not believe today, nor did it believe at the time, that there was a direct impact of the block closure on premiums.").  Plaintiffs argue that because Mr. Clarke was not at the company at the time of the block closure, he lacks personal knowledge of the impacts.  Once again, as Prudential's Rule 30(b)(6) corporate witness, Mr. Clarke is not required to have personal knowledge.  Nor do Plaintiffs dispute that he was sufficiently educated on the issue as is required by Rule 30(b)(6), particularly given that it was based on his review of "information known or reasonably available to the organization," including deposition testimony by Prudential executives in the 1980s in which they stated the same.

Fifth, Plaintiffs contest the assertion that some policyholders would have understood the three-reason letter, and particularly the reason related to high claim cost – that premiums are rising more rapidly than the general medical care charges, to "convey that CHIP premiums were increasing due to adverse forces specific to CHIP, as opposed to reasons that would also affect other insurers' premiums." (MCC OB at 12-13 & n.35.)  Specifically, Plaintiffs seek to exclude supporting testimony by Dr. Strombom. (Chud Decl. Ex. 87, Strombom Dep. at 223:3-14) ("That to my mind says – you know, captures the essence of the – what we think of as adverse selection

or a spiral in claims cost"). Plaintiffs note that Dr. Strombom immediately responded in context

that the three-reason letter did not disclose the risk of lock-in (id. at 222:15-22) and did not

discuss future premiums (id. at 223:3-18.)

Thus, Plaintiffs seek to exclude the testimony to the extent that Dr. Strombom is

attempting to offer an opinion as to whether the three-reason letter would be perceived by some

consumers as disclosing the "essence" of adverse selection or some form of a spiral, because he

lacks foundation to provide that opinion. Of note, Dr. Frech's deposition largely supports Dr.

Strombom's statement. (Chud Decl. Ex. 88, Frech. Dep. at 174:14 – 175:14) (depending on

"level of sophistication," a policyholder could infer from the high claim cost clause in the three-

reason letter that "CHIP premiums were going up for reasons that are not shared by those other

policies"). Pursuant to Rule 702, Dr. Strombom is testifying in the form of his opinion as to his

expert knowledge, including his extensive experience studying consumer behavior concerning

health insurance. (See Strombom Initial Report, App. A, curriculum vitae explaining experience

studying behavior of health insurance consumers.) The testimony is therefore admissible.

Last, Plaintiffs seek to exclude deposition testimony by Frank Rubino (Chud Decl. Ex.

98, Rubino Dep. at 203:25-204:9) to support the assertion that "a lot of agents had close

relationships with these policyholders." (MCC OB at 15 & n. 45.) Plaintiffs argue that there is

no evidence that Mr. Rubino, a former Prudential actuary, had any personal knowledge of any

"close relationships" between agents and policyholders, or the quantity of agents with such

relationships. Mr. Rubino's testimony was in response to questioning as to the principles or

guidance which he used in making recommendations for premium rates between 1979 and 1993.

While Mr. Rubino was asked follow-up questions on this issue, he was not specifically probed

on his knowledge of close relationships between agents and policyholders. Moreover, Mr.

Rubino is not required to have personal knowledge on this subject, because he is testifying as a corporate representative witness.  Therefore, the testimony is admissible.

Having fully briefed the relevant factual background, the Court now turns to the merits of the motions.  Part II addresses the motion for class certification.  Part III addresses the motion for summary judgment based on the statute of limitations.

### III.  Motion for Class Certification

#### A.  The Class, Subclasses, and Associated Claims

Perhaps Plaintiffs anticipated the hopeless intermingling of the original categorization of the classes proposed by presenting a new proposal for class structure.  Nevertheless, the Court will set forth the original proposed class structure for completeness.

#### 1.  The Original Class and Subclasses

Plaintiffs initially proposed one Multi-State Fraud Class ("MSF Class") and five overlapping subclasses of the MSF Class, on behalf of roughly 17,000 current and former CHIP policyholders from four states, California, Indiana, Ohio, and Texas, who paid one or more CHIP major medical premiums based on a rate increase effective on or after March 1, 1982.

Plaintiffs proposed that the MSF Class be defined as:

> All current or former CHIP policyholders who resided in California, Indiana, Ohio, or Texas at the time of policy issuance and who paid one or more CHIP major medical premiums based on a rate increase effective on or after March 1, 1982.

> Specifically excluded from the Multi-State Fraud Class are past or present officers, directors or employees of the Defendant; any agents or others who sold CHIP policies for the Defendant; any entity in which the Defendant has a controlling interest; the affiliates, legal representatives, attorneys or assigns of the Defendant; any judge, justice or judicial officer presiding over this matter and the staff and immediate family of any such judge, justice or judicial officer.

(MCC Br. at 11 – 12.)

All members of the MSF Class asserted claims for fraudulent concealment, which were not limited to situations of active concealment of a material fact, but encompassed any failure to disclose material facts when there is a duty to speak.  (Id. at 19.)

Apart from fraudulent concealment, Plaintiffs asserted additional claims on behalf of five overlapping subclasses of the MSF Class: (1) the "California Subclass"; (2) the "Post-1984 Subclass"; (3) the "Post-1989 Subclass"; (4) the "Constructive Fraud-Omissions Subclass"; and (5) the "Constructive Fraud – Misrepresentations Subclass." (Id. at 12.)  Based on Plaintiffs' calculations, of the 17,000 approximately proposed class members, 8,000 derive from the California Subclass, 2,200 derive from the Post-1984 Subclass, 700 derive from the Post-1989 Subclass, 15,000 derive from the Constructive Fraud—Omissions Subclass, and 1,500 derive from the Constructive Fraud-Misrepresentations Subclass.  (Thomas Decl. ¶ 64.)

Plaintiffs submitted that these five subclasses fell into three groups, outlined below, based on the additional claims asserted (See MCC Br. at 12-14):

1. California-Specific Claims.  The "California Subclass" [20] was defined as:  "Those members of the Multi-State Fraud Class who resided in California at the time of policy issuance."

On behalf of the California Subclass, Plaintiffs additionally asserted a claim under California law for breach of the implied covenant of good faith and fair dealing and claims for violation of all three prongs of the UCL – fraudulent, unfair, and unlawful.

2. Fraudulent Misrepresentation Claims.  These were two subclasses that additionally assert claims for "fraudulent misrepresentation" [21]  based on two different "notice of

---

[20]     The California Subclass' claims for breach of duty of good faith and fair dealing, and violation of the UCL, comprise the third and fourth claims for relief in the 5AC.

rerate" form letters that Prudential sent at different times to all CHIP policyholders whose policies were then in force:

    a.   The "Post-1984 Subclass" was defined as:  "Those members of the Multi-State Fraud Class who paid one or more major medical premiums at any time from August 28, 1985 through July 31, 1990, on or after any policy anniversary during that period."

The members of the Post-1984 Subclass received the fraudulent "three reason" notice of

rerate form letters from Prudential and asserted claims based on them.

    b.   The "Post-1989 Subclass" was defined as:  "Those members of the Multi-State Fraud Class who paid one or more major medical premiums at any time on or after August 1, 1990, on or after any policy anniversary during that period."

The members of the Post-1989 Subclass received the fraudulent "two reason" notice of

rerate form letters from Prudential and asserted claims based thereon.

These two subclasses were, together, sometimes referred to by Plaintiffs as the

"Fraudulent Misrepresentation Subclasses." Moreover, all members of the Post-1989 Subclass

were also members of the Post-1984 Subclass except the small number of class members whose

policies were issued on or after August 1, 1990.

    3.   <u>Constructive Fraud Claims</u>.  There were two subclasses that additionally asserted claims for constructive fraud, as follows:

    a.   The "Constructive Fraud – Omissions Subclass" [22]  which was defined as: "Those members of the Multi-State Fraud Class who resided in California, Indiana, or Ohio at the time of policy issuance."

This subclass additionally asserts claims for constructive fraud based on omissions.

---

[21]    The Fraudulent Misrepresentation Subclasses, consisting of the Post-1984 Subclass and the Post-1989 Subclass, are found in the first claim for relief in the 5AC.

[22]  The Constructive Fraud-Omissions Subclass is found in the second claim for relief in the 5AC.

      b.  The "Constructive Fraud – Misrepresentations Subclass"[23]  which was defined as: "Those members of the Post-1984 Subclass and/or the Post-1989 Subclass who resided in California or Indiana at the time of policy issuance."

This subclass additionally asserted claims for constructive fraud based on misrepresentations.  These two subclasses were, together, referred to by Plaintiffs as the "Constructive Fraud Subclasses." Moreover, all members of the "Constructive Fraud – Misrepresentations Subclass" were also members of the "Constructive Fraud – Omissions Subclass."

Plaintiffs submitted a chart designed to overcome this confusion, but which in fact serves to illustrate how confusing the original categorization was:

---

[23]  The Constructive Fraud – Misrepresentations Subclass is found in the first claim for relief in the 5AC.

<u>**Subclasses**</u>

1.   California Subclass

2a.   Post-1984 Subclass

2b.   Post-1989 Subclass

3a.   Constructive Fraud—Omissions Subclass

3b.   Constructive Fraud—Misrepresentations Subclass


<u>**CHIP Policies in Force as of Date of Block Closure**</u>[*]

<u>**State of Policy Issuance**</u>

| | | California | Indiana | Ohio | Texas |
|---|---|---|---|---|---|
| **Termination Date** | Before 8/28/85 | 1, 3a | 3a | 3a | -[†] |
| | 8/28/85 to 7/31/90 | 1, 2a, 3a, 3b | 2a, 3a, 3b | 2a, 3a | 2a |
| | After 7/31/90 (or none) | 1, 2a, 2b, 3a, 3b | 2a, 2b, 3a, 3b | 2a, 2b, 3a | 2a, 2b |

---

[*] N.B.:  (1) The pertinent time periods in these tables (denoted by "Termination Date" and "Period in Force") refer to periods of payment of *major medical* premiums only.  Thus, for example, a CHIP policy that changed from major medical status to Limited Medical Expense (LME) status on 1/1/88 would be considered to have terminated on 1/1/88 for purposes of these tables, even if the policy, after converting to LME status, did not terminate until later.  (2) For inclusion in the Post-1984 Subclass and/or the Post-1989 Subclass, as applicable, a policyholder must have paid major medical premiums during each pertinent time period on or after any policy anniversary during that pertinent time period.

[†] Texas class members whose policies terminated before August 28, 1985 (before Prudential began sending out its "three reason" notice of rerate form letter to subclass members) do not belong to any subclass because:  Plaintiffs do not assert any constructive fraud claim under Texas law; the California claims necessarily are unavailable to Texas class members; and Plaintiffs are not asserting any fraudulent misrepresentation claim for those class members.


(MCC Br., App. A:  Subclass Membership.)

### 2.   The Revised Proposal

Pursuant to leave of Court, Plaintiffs submit a revised proposal to create just two subclasses:  (1) the "California Subclass"; and (2) a new "Misrepresentations Subclass." (Revised Proposal for Subclasses Br. at 3) (ECF 209.)  Plaintiffs propose that this new "Misrepresentations Subclass" would consolidate the previously submitted "Post-1984 Subclass," "Post-1989 Subclass," and the "Constructive Fraud-Misrepresentations Subclass." Further, Plaintiffs propose to eliminate the "Constructive Fraud – Omissions Subclass" as a separate subclass, because all class members have a fraudulent concealment claim based on omissions, and all class members except Texas class members also have a constructive fraud claim based on omissions.

Thus, Plaintiffs revised proposal to define the class, subclasses, and underlying claims is as follows:

(1) The Multi-State Fraud Class definition remains the same, and is defined as:

> All current or former CHIP policyholders who resided in California, Indiana, Ohio, or Texas at the time of policy issuance and who paid one or more CHIP major medical premiums based on a rate increase effective on or after March 1, 1982.

> Specifically excluded from the Multi-State Fraud Class are past or present officers, directors or employees of the Defendant; any agents or others who sold CHIP policies for the Defendant; any entity in which the Defendant has a controlling interest; the affiliates, legal representatives, attorneys or assigns of the Defendant; any judge, justice or judicial officer presiding over this matter and the staff and immediate family of any such judge, justice or judicial officer.

All MSF class members maintain a fraudulent concealment claim (based on omissions), and all MSF class members, except for Texas class members, also have a constructive fraud claim based on omissions.

(2) The California Subclass definition remains the same, and by way of review is defined as:

> Those members of the Multi-State Fraud Class who resided in California at the time of policy issuance.

The California Subclass now includes fraudulent concealment and constructive fraud claims, in addition to a UCL claims and an implied covenant claim.

(3) The Misrepresentations Subclass is now proposed and defined as:

> Those members of the Multi-State Fraud Class who paid one or more major medical premiums on or after any policy anniversary falling on August 28, 1985 or thereafter.

The Misrepresentations Subclass now includes claims applicable to all members for common law fraudulent misrepresentation based on either or both of the two or three-reason form letters.  Additionally, the California or Indiana members of this subclass also have a constructive fraud claim based on misrepresentations.  Plaintiffs submit that the elements of these two claims are overlapping, and the fact that Ohio and Texas do not recognize constructive fraud claims on misrepresentations may be reflected in the jury instructions.

Prudential opposes the new proposal, arguing that there is no conceivable range of subclasses, or jury charge / verdict form equivalents, that would both accommodate the many material differences in proof evident among the 17,000 putative class members, and honor Prudential's and absent class members' due process right to a fair trial on all disputed issues. Prudential argues that the new proposal does nothing to cure the differences in substantive law,

individualized factual determinations, and significant differences among the class members and representatives which render this action inappropriate for class treatment.

**B.  Standard of Review**

"District courts have discretion under Rule 23 to certify a class."  Beck v. Maximus Inc., 457 F.3d 291, 297 (3d Cir. 2006).  To do so, a Court must find that the proposed class meets the prerequisites of a class action; i.e., that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met.  See infra, FED. R. CIV. P. 23(a), (b); see also In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 309 (3d Cir. 2008).

A class action is

> an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.  Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class.  For in such cases, the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23.

Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982) (quotation marks and citations omitted) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979)).

The district court must conduct a "rigorous analysis" of the evidence and arguments in making a class certification decision.  In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 309, 315 (citing Falcon, 457 U.S. at 161).  This analysis requires "a thorough examination of the factual and legal allegations" which "may include a preliminary inquiry into the merits." Id. at 317 (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166, 168 (3d Cir. 2001)).  Further, "the court may consider the substantive elements of the plaintiffs' case in

69

order to envision the form that a trial on those issues would take."  Id.  (quoting Newton, 259 F.3d at 166) (internal citations and quotations omitted).

Thus, "Rule 23 makes clear that a district court has limited authority to examine the merits when conducting the certification inquiry." Sullivan v. DB Invs., 667 F.3d 273, 305 (3d Cir. 2011).  However, "[t]he ability of a named plaintiff to succeed on his or her individual claims has never been a prerequisite to certification of a class." Id. (quoting Hassine v. Jeffes, 846 F.2d 169, 178 (3d Cir. 1988)).  "A court may inquire whether the elements of asserted claims are capable of proof through common evidence, but lacks authority to adjudge the legal validity or soundness of the substantive elements of asserted claims.  Put another way, a district court may inquire into the merits of the claims presented in order to determine whether the requirements of Rule 23 are met, but not in order to determine whether the individual elements of each claim are satisfied." Id.

"Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence.  In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." Id. at 320 (quoting In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 320).  "In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action," however while "the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits." Id. at 317, relying in part on Newton, 259 F.3d at 168 (internal quotations omitted).

Rule 23(a) states four threshold requirements applicable to all class actions:  (1) numerosity (the "class is so numerous that joinder of all members is impracticable"); (2)

commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").  These four requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances."  <u>Baby Neal v. Casey</u>, 43 F.3d 48, 55 (3d Cir. 1994).  "While the proponent of class certification must meet each of the four separate requirements of Rule 23, the Supreme Court has recognized that the commonality, typicality, and adequacy of representation requirements tend to merge."  McLaughlin on Class Actions: Law and Practice, Vol. 1 (2011) 4:1 at 521.

The Supreme Court recently instructed that "[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities with the proposed class are what have the potential to impede the generation of common answers."  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2550-51 (2011) (internal citation omitted).

In addition, parties seeking class certification must show that the action is of a type prescribed by Rule 23(b).  Here, Plaintiffs submit that Rule 23(b) (3) applies.  Rule 23(b)(3) adds two requirements beyond the Rule 23(a) prerequisites:  "questions of law or fact common to class members [must] predominate over any questions affecting only individual members" and class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."  FED. R. CIV. P. 23(b) (3).

71

The Rule 23(b) (3) further provides a non-exhaustive list of factors pertinent to a court's review of the predominance and superiority criteria:

    (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

    (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

    (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

    (D)    the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b) (3).

In adding "predominance" and "superiority" to the qualification for certification list, the Advisory Committee sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Anchem, 521 U.S. at 615 (quoting Adv. Comm. Notes, 28 U.S.C. App., p 697).

Where, as here, "an action is to proceed under Rule 23(b) (3), the commonality requirement [of Rule 23(a)] is subsumed by [Rule 23(b) (3)'s] predominance requirement." Danvers Motors Co., Inc. v. Ford Motor Co., 543 F. 3d 141, 148 (3d Cir. 2008) (internal quotations and citations omitted). This predominance requirement "tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandates that it is far more demanding than the Rule 23(a) (2) commonality requirement." Id. (quoting In re Life USA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001)). Thus, the Rule 23(a) discussion herein accounts for the numerosity, typicality, and adequacy requisites, and leaves consideration of commonality to the Rule 23(b)(3) predominance discussion. See id.; see also Hayes v. Wal-Mart, 2012 U.S. Dist. LEXIS 33329 (D.N.J. Mar. 12, 2012).

Finally, both size of class and complexity of litigation should be limited to encourage manageability of class suits. Rule 23(c)(4) permits division of any action into subclasses so as to increase manageability. Rule 23(c)(4) provides that, if "a class [is] divided into subclasses[,] . . . each subclass [is] treated as a class." Therefore, subclasses must meet the requirements of Fed. R. Civ. P. 23. Rule 23(c)(4) provides the court with power to limit a class to particular issues. "Judicial economy considerations are central to the predominance test of Rule 23(b)(3) and the court's power to limit a class to selected issues under Rule 23(c)(4)." Newburg on Class Actions (West Group 4ed.) Vol. 2, at 168.

## C. Discussion

The proposed class and subclasses consist of thousands of policyholders and clearly meet the numerosity requirement of Rule 23(a)(1). However, the typicality and adequacy of representation requirements are not as clearly met pursuant to Rule 23(a)(3) and (a)(4). The allegations of this case turn on misrepresentations or omissions that the block was closed and related consequences, stemming from the welcome letter and the two and three-reason letters. The proposed class is on behalf of policyholders who maintained CHIP after the block was closed in 1981, and therefore were subject to the first premium increase that went into effect on March 1, 1982. However, the claims or defenses of the representative parties are not typical of those of the class, and it is therefore questionable that they would be able to fairly and adequately protect the interests thereof. None of the six proposed class representatives are in the approximately 85% and 94% of the proposed class who dropped the policy prior to distribution of the three and two-reason letters in 1985 and 1989 respectively. Indeed, all six experienced the the limited rate caps throughout the nineties, and are in the 1% of the proposed class members

73

who maintained the policy until 2001 when the premium cap was lifted and premiums

skyrocketed.

With respect to the commonality/predominance inquiry, Plaintiffs repeatedly rely on one

of the unquestionable common nuclei of facts – that none of the form letters included an

announcement or explanation related to the block closure and its consequences.  However, the

existence of that commonality does not *ipso facto* call for class certification.

### 1.  Common Law Fraud

Prudential argues that the Court should rely on the differences in state law to deny the

motion for lack of commonality and predominance because class trial would be unmanageable.

(MCC OB at 27-29.)  Though the precise contours of common-law omissions and

representations fraud claims vary from state to state, the cause of action generally requires:  (1)

omissions or misrepresentations of fact; (2) in the case of omissions, a duty to disclose; (3) intent

to mislead; (4) materiality; (5) justifiable reliance; and (6) damages proximately caused by that

reliance.  See e.g., Boschma v. Home Loan Ctr., Inc., 198 Cal. App. 4th 230, 248 (2011);

Thomas v. Best, 478 N.E.2d 79, 83 (Ind. Ct. App. 1985); Russ v. TRW, Inc., 570 N.E.2d 1076,

1083-84 (1991); Hoggett v. Brown, 971 S.W.2d 472, 487 (Tex. App. 1997).

However, Prudential points to the scienter requirement in Texas, which does not exist in

other states here, where Prudential would have had to have known that Texan policyholders did

not possess and could not reasonably discover the omitted information.  See e.g., Holland v.

Thompson, 338 S.W.3d 586 (Tex. App. 2010) (no fraud where state agency had the information

and its "records were available"); Springs Window Fashions Div., Inc. v. Blind Maker, Inc., 184

S.W.3d 840, 863-64 (Tex. App. 2006) (tortfeasor must know that victim is ignorant of omitted

fact and lacks equal opportunity to discover truth.)  Prudential also points out that "constructive

74

fraud" in California requires that the defendant have gained an "advantage," while Indiana

requires an "unconscionable advantage."  See Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th

951, 981 n.13 (1997) ("Constructive fraud consists of 'any breach of duty which . . . gains an

advantage to the person in fault. . . . '" (quoting Cal. Civ. Code § 1573); Trytko v. Hubbell, Inc.,

28 F.3d 715, 728-29 (7th Cir. 1994) (rejecting constructive fraud claim under Indiana law

because any advantage gained was not "unconscionable").

> Plaintiffs are unmoved by these differences, and argue that courts routinely certify classes

involving application of the laws of just a handful of states.  Indeed, the Third Circuit Court of

Appeals provides ample instruction on this matter in Sullivan v. DB Invs., Inc., 667 F.3d 273,

301 (3d. Cir. 2011) (en banc), cert. den. 132 S. Ct. 1876 (2012).  The Third Circuit Court of

Appeals clarifies that there is "no support in our Court's jurisprudence for the proposition that

commonality and predominance are defeated merely because available rights and remedies differ

under the several laws that form the basis for the class claims.  We have never required the

presentation of identical or uniform issues or claims as a prerequisite to certification of a class."

Id.

> The heart of this case turns on the commonality among factual and legal issues pertinent

to the alleged fraud.  Namely, issues related to the uniformity of the omissions or representations

of fact, materiality, justifiable reliance, and damages proximately caused by that reliance.

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the

same injury' . . . . [The] claims must depend upon a common contention . . . That common

contention, moreover, must be of such a nature that it is capable of classwide resolution – which

means that determination of its truth or falsity will resolve an issue that is central to the validity

of each one of the claims in one stroke." <u>Walmart v. Dukes</u>, 121 S. Ct. 2541, 2551 (quoting

<u>General Telephone Co. of Southwest v. Falcon</u>, 457 U.S. 147, 157 (1982)).

 Plaintiffs argue that an "objective" or "reasonable man" standard should apply here in

one broad stroke as to the issue of materiality of the misrepresentation or omission, and that "[i]n

light of this objective standard, courts routinely certify class actions asserting common law fraud

or fraud-related claims on the premise that the trier of fact can conclude on a classwide basis that

the pertinent facts omitted or misrepresented were material." (MCC Br. at 31-32.)  Plaintiffs rely

on various case holdings in support of this proposition.  However, alleged misrepresentations

such as that "YoPlus" promotes a better digestive health benefit than ordinary yogurt (<u>Johnson v.</u>

<u>General Mills, Inc.</u>, 276 F.R.D. 519 (C.D. Cal. 2011)), that laptops will meet system

requirements when purchased (<u>Wolph v. Acer Am. Corp.</u>, 272 F.R.D. 477, 488 (N.D. Cal.

2011)), and that a vehicle is equipped with an instant emergency response system (<u>In re</u>

<u>Mercedes-Benz Tele Aid Contract Litig.</u>, 257 F.R.D. 46 (D.N.J. 2009)), involve a materially

different ambit of considerations than those present here regarding a consumer's investment in a

health insurance policy with particularly rich benefits.

 The Advisory Committee Notes further informs the Court:

> It is only where this predominance exists that economies can be
> achieved by means of the class-action device.  In this view, a fraud
> perpetrated on numerous persons by the use of similar
> misrepresentations may be an appealing situation for a class action,
> and may remain so despite the need, if liability is found, for
> separate determination of the damages suffered by individuals
> within the class.  *On the other hand, although having some
> common core, a fraud case may be unsuited for treatment as a
> class action if there was material variation in the representations
> made or in the kinds or degrees of reliance by the persons to whom
> they were addressed.*

Fed. R. Civ. P. 23 advisory committee's note (emphasis added) (citing Oppenheimer v F. J.

Young & Co., Inc., 144 F.2d 387 (2d Cir. 1944); Miller v National City Bank of N. Y., 166 F.2d

723 (2d Cir. 1948); Hughes v Encyclopedia Britannica, 199 F2d 295 (7th Cir. 1952); Sturgeon v

Great Lakes Steel Corp., 143 F.2d 819 (6th Cir. 1944)).[24]

The evidentiary record here makes clear that a substantial portion of the proposed class of

17,000 CHIP policyholders over a thirty year period would not find the pertinent information

material, and that resolution of the materiality inquiry requires individualized consideration.

First, the proposed class does not differentiate the substantial number of policyholders who

dropped CHIP for reasons independent of the block closure and before the staggering premium

increases took root. For example, even in the first two years of CHIP's introduction on the

market in 1975 and 1976, 55.4% and 53.3% of policyholders dropped the policy. Similarly, an

almost identical proportion of CHIP policyholders dropped out the year of the block closure and

---

[24]    The Advisory Committee Note further informs:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. See *Pennsylvania R.R. v. United States*, 111 F. Supp. 80 (D.N.J.1953); cf. Weinstein, supra, 9 Buffalo L.Rev. at 469. Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. See *Union Carbide & Carbon Corp. v. Nisley*, 300 F.2d 561 (10th Cir. 1961), pet. cert. dism., 371 U.S. 801 (1963); cf. *Weeks v. Bareco Oil Co.*, 125 F.2d 84 (7th Cir. 1941); *Kainz v. Anheuser-Busch, Inc.*, 194 F.2d 737 (7th Cir. 1952); *Hess v. Anderson, Clayton & Co.*, 20 F.R.D. 466 (S.D. Calif. 1957).

Fed. R. Civ. P. 23 advisory committee's note.

the first year that premium increases went into effect:  43.1% in 1981, and 43.2% in 1982.  See Table, *supra* at 47.  Moreover, three years after the first premium increase following block closure, the proportion of the proposed class dropped-out by a whopping 85 percent.  See Table, *supra* at 15-16.  In sum, CHIP policyholders consistently maintained a significant lapse rate which predated and was consistent well after block closure.

Possible explanations for the drop-out are varied.  For example, some policyholders were only interested in short-term coverage until they either gained employment and eligibility for employer-provided insurance.  Another explanation for switching behavior is policyholder's aging into CHIP's separate and attractive limited medical program, which currently includes 70% of CHIP policyholders and held nearly two-thirds of policyholders when the block was closed.  Similarly, perhaps some aged into Medicare and did not wish to convert into CHIP's supplemental limited medical policy.  Although these limited medical care policyholders are not formulated as a part of the class here, the switching behavior of major medical policyholders into limited or other outside care is relevant because it goes to the intention to stay with CHIP for a long period of time and thus the materiality of the disclosure or omission.  Another explanation for CHIP drop-outs is that policyholders joined the major national shift in the 1980s and 1990s away from indemnity plans like CHIP and towards managed health care plans.  These possible explanations corroborate the high lapse rate prior to the block closure and the ongoing lapse rate well into the eighties.  What is clear, however, is that uniform treatment of these policyholders as reliant on the omission or misrepresentation is not proper due to such varied and non-delineated factors.

Additionally, the proposed class includes policyholders who developed a pre-existing condition prior to block closure in 1981, and therefore were effectively locked-in to CHIP for

reasons independent of the block closure.  Dr. Frech concedes this point, submitting that 3.5 to 6.4% of class members "would not have been able to switch out of CHIP."  (Frech Dep. at 202:13 – 203:15; Frech Initial Report, 109-113.)  This translates to approximately 600 to 1,100 putative class members who cannot be identified without individualized fact finding.

Moreover, although a commonality exists as to the uniform form letters routinely sent out, substantial evidence has been submitted as to the nature and frequency of oral communications with Prudential agents.  Indeed, the form letters directly invited policyholders to call agents with any questions.  An examination of the oral communications with the proposed class representatives further elucidates the fact-specific individual inquiry that will be necessary to determine presence of the fraud.  For example, in 1993, Ms. Clark asked her bookkeeper to call Prudential because the premium price "made no sense to [her] whatsoever." (Clark Dep. at 93:24-95:18, 121:5-21.)  Following the phone call, Ms. Clark learned for the first time that the block was closed. (Id.)  In spring of 2004, Mr. Gold spoke with a Prudential call representative regarding the nature of the closed block and speculated that perhaps his premiums would be cheaper if he updated his policy.  (Raffman Decl. Ex. 12, 3/16/04 Tr. at 7-8.)  Similarly, in a May 2003 call to Prudential, Ms. Drogell complained that her premium that year was "unbelievable," and that she had consulted with "an insurance guy" who essentially suggested the death spiral occurrence.  (Raffman Decl. Ex. 16, 5/2/03 Tr. at 2-3.)  The Prudential representative therein told her of the block closure, to which Ms. Drogell replied "[a]nd they're [remaining CHIP policyholders are] probably the ones that have an illness that are kind of stuck probably – I would assume." (Id.)

In sum, issues related to typicality and adequacy of representation aside, although having some common core as to omission or misrepresentation of the block closure and its

79

consequences, the fraud is not suitable for class treatment based on the varying degrees of its materiality and reliance by the proposed class of 17,000 policyholders over a thirty year period, and the lack of commonality with regard to communications with policyholders.  See Hydrogen Peroxide, 552 F.3d at 311 ("If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.").

Although the analysis can end here, the Court will address the question whether the proposed approach to assessing damages meets the commonality and predominance requirement. That issue is heavily contested, as is evident by the thousands of pages of expert reports and exhibits.  Despite repeated back and forth between the parties' experts, Dr. Frech has still failed to overcome the Plaintiff's burden to establish a common formula or methodology based on a preponderance of the evidence.  Although Dr. Frech first cursorily proposes that alternative policies can offer an actual comparative but-for yardstick, he does not explain how these policies can be examined in light of policyholders' individual characteristics such as gender, age, risk level, geography, and deductible rate.

Perhaps in anticipation of his failure to overcome these individualized issues, Dr. Frech attempts to establish a "but-for" yardstick by calculation.  However, despite multiple adjustments in response to criticism of his approach, he still has not satisfied the burden.  Premiums vary based on a range of individualized factors including age, gender, geographic location, health status, approvals of premium rate increases by resident state, deductible levels, and addition or removal of dependants.  Dr. Frech seems to justify his proposal by arguing that these individualized considerations go to the wayside because these they are already weighted and included in his actual premium index and the but-for premium index. (Frech Initial Report, 50.)

However, Mr. Wildsmith clearly demonstrates that once calculations are taken into consideration for just one of Ms. Clark's changing individual characteristics, the purported reasonableness of Dr. Frech's proxy due to a seeming congruence with the compound annual growth rate of personal health expenditure premiums fails. Specifically, once Mr. Wildsmith considers Ms. Clark's changing age, her damages assessment jumps from Dr. Frech's projected implied premium of $9,772 to $17,199. See *supra*, 38, 46. This suggests that the formula offered by Dr. Frech is static and does not account for a range of possible changing conditions over time. Mr. Wildsmith further explains the material differences between individuals with regard to gender and aging. For example, while the increase in cost due to age for Ms. Clark over the period from 1982 to 2009 would have been approximately 76%, the increase for Mr. Gold over the same period of time would have been 196%. See id. While Plaintiffs adamantly advocate for Dr. Frech's approach, the Court has not been presented with precedent which has managed to apply such a formula in the health insurance context. The formula offered by Plaintiffs to assess a common and uniform approach to damages appears simply too good to be true.

### 2.  California-Specific Claims

 "Unfair competition" is defined by the UCL to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200. The UCL's coverage is "sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law." Rubin v. Green, 4 Cal. 4th 1187, 1200 (Cal. 1993) (internal quotations omitted). "It governs anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition." Cal-Tech Commc'ns, Inc. v. Los Angeles Cellular

Tel. Co., 20 Cal. 4th 163, 180 (Cal. 1999) (citations omitted).  The Supreme Court of California

explains that, "[i]n contrast to its limited remedies, the unfair competition law's scope is broad."

(Id.)  The remedies available in a UCL action are limited to injunctive relief and restitution.  See

In re Vioxx Class Cases, 180 Cal. App. 4th 116, 130 (2009); Cal. Bus & Prof. Code § 17203.

> The difference between what the plaintiff paid and the value of
> what the plaintiff received is a proper measure of restitution.  In
> order to recover under this measure, there must be evidence of the
> actual value of what the plaintiff received.  When the plaintiff
> seeks to value the product received by means of the market price of
> another, comparable product, that measure cannot be awarded
> without evidence that the proposed comparator is actually a
> product of comparable value to what was received.

Id. at 131 (internal citation omitted).

The Court will examine Prudential's arguments with respect to each of the three types, or

prongs of conduct raised here.

### a.  "Unlawful" business acts and the Implied Covenant of Good Faith & Fair Dealing Claim

Pursuant to a review of cases arising from California which address the matter, the Court

previously held that there is ample authority to allow pursuit of the UCL claim for "unlawful"

business acts based on the implied covenant of good faith.  (MTD Opinion, 9/9/2010, Doc-98.)

Under California law, it has long been recognized that "[t]here is an implied covenant of good

faith and fair dealing in every contract that neither party will do anything which will injure the

right of the other to receive the benefits of the agreement.  This principle applies equally to

insurance policies, which are a category of contracts." Kransco v. Am. Empire Surplus Lines Ins.

Co., 23 Cal. 4th 390, 400 (Cal. 2000) (citing Comunale v. Traders & General Ins. Co., 50 Cal. 2d

654, 658 (Cal. 1958) (internal quotations omitted).

Plaintiffs allege that Prudential breached the implied covenant of good faith and fair dealing by "failing to disclose the block closure and its significant negative consequences to policyholders." (MCC Br. at 66.)  California courts deny certification of implied covenant claims where individualized evidence is needed to prove unfair interference, harm, and restitution.  See e.g., Campion v. Old Republic Home Prot. Co., 272 F.R.D. 517, 531 (S.D. Cal. 2011). As explained above, the determination of the nature and materiality of the communication, and the related harm, is subject to individualized consideration here where, among other reasons, a consistent lapse rate was evident even prior to the block closure, policyholders left CHIP for a variety of reasons, and the harm cannot be assessed on a common basis.

Additionally, Plaintiffs rely on Pastoria v. Nationwide Insurance which holds that the failure to disclose imminent changes to an insurance policy may constitute a breach of California Insurance Code section 330 *et seq.* and thus gives rise to an "unlawful" UCL claim.  112 Cal. App. 4th 1490 (Cal. Ct. App. 2003).  However, although the lawsuit in Pastoria was filed as a class action, it was not certified as such, and the plaintiffs did not contest the issue of class certification on appeal.  Here, again, as discussed in detail above, there is a basic lack of commonality and predominance with respect to different degrees of materiality, different types of communications rendered, and an inability to establish a class-wide approach to equitable relief.

### b.  "Unfair" business acts

The California Courts of Appeal are split as to which test should govern the 'unfairness' analysis in a consumer suit, as the Court has previously discussed.  Scripps Clinic v. Superior Court, 108 Cal. App. 4th 917 (Cal. Ct. App. 2003); (see also Sept. 2010 Op. at 46, ECF 98.) Briefly, the balancing test weighs the harm from the conduct against the justification for the

conduct; <u>see</u> <u>McKell v. Washington Mut. Inc.</u>, 1432 Cal. App. 4th 1457, 1473 (Cal. Ct. App. 2006); the <u>Cel-Tech</u> test requires "that any finding of unfairness to competitors under section 17200 be tethered to some legislatively declared policy or proof of some actual or threatened impact on competition[,]" <u>see</u> <u>Cel-Tech</u>, 20 Cal. 4th 163; [25] and the Section 5 test arising from the Federal Trade Commission Act, 15 U.S.C. 45(n), which lists the factors that define unfairness as (1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided, <u>see</u> <u>Camacho v. Auto. Club of S. California</u>, 142 Cal. App. 4th 1394, 1403 (Cal. Ct. App. 2006).

Here, as in the common law fraud analysis, individualized considerations predominate the inquiry as to conduct, harm or injury, and equitable relief.

### c. "Fraudulent" practices

The fraud prong of the UCL is distinct from common law fraud, which requires allegations of actual falsity and reasonable reliance. <u>In re Tobacco II Cases</u>, 46 Cal. 4th 298, 312 (Cal. 2009). Thus, to state a claim under California's UCL, "it is necessary only to show that members of the public are likely to be deceived" by the defendant's conduct." <u>Stearns v. Ticketmaster Corp.</u>, 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting <u>Tobacco II</u>, 46 Cal. 4th at 312). The focus of the UCL – a consumer protection law – is on the defendant's conduct, and not on the plaintiff's damages. <u>Id.</u> Indeed, the UCL provides only for equitable relief, such as

---

[25]     The Court previously found that California Insurance Code 10176.10 "may serve as evidence of a legislatively declared policy in favor of protecting consumers from the deleterious consequences that are expected when an insurance block closes." (Sept. 2010 Op. at 47.), The statute was enacted in 1994 and requires that within thirty days, an insurer must inform the insurance commissioner that it has closed the block of business, and must "not provide misleading information about the active or closed status of its business for the purpose of evading this section." Cal Ins. Code § 10176.10, - (h).

injunctive relief and restitution, in light of the statute's overarching "purpose of protecting the general public against unscrupulous business practices."  See Tobacco II, 46 Cal. 4th at 312; see also Stearns, 655 at 1020.  Thus, "relief under the UCL is available without individualized proof of deception, reliance and injury." Id. (quoting Tobacco II, 46 Cal. 4th at 320.)

An interesting potential contradistinction appears in California law to establish commonality under the fraudulent business prong of the UCL.  Namely, the California Supreme Court instructs that reliance need not be determined by common proof and only the class representative need show it, while the issue of materiality of a representation is subject to common proof.  Compare Tobacco II, 46 Cal. 4th at 327-28 with Fairbanks et al., v. Farmers New World Life Ins. Co. et al., 197 Cal. App. 4th 544 (Cal. Ct. App. 2011), *modified in separate part*, 2011 Cal. App. LEXIS 995 (Aug. 1, 2011), *denying rev.,* 2011 Cal. LEXIS 10787 (Ca. Supreme Court, Oct. 19, 2011).  See also Stearns, 655 F.3d at 1020 (citing Wal-Mart and cautioning predominance may be lacking in UCL claim where there is "no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant").

"[A]s Stearns makes clear, while class members need not prove individualized deception, reliance and injury, the Court must consider whether disclosures to class members were made and, if so, whether such disclosures: (a) tend to defeat the claim that the common conduct attributed to the defendant is likely to deceive the entire class, and (b) are so numerous and individualized that they defeat commonality."  In re: Countrywide Fin. Corp. Mort. Mktg. & Sales Practices Litig. v. Countrywide Home Loans, Inc., 2011 U.S. Dist. LEXIS 147689, *41-42 (S.D. Cal. Dec. 16, 2011).

This analysis corresponds with that reached by the Seventh Circuit Court of Appeals – while the UCL does not require a showing of reliance and a plaintiff must show that the fraudulent conduct was likely to deceive a reasonable consumer, "[t]his standard is subject to common proof if the actionable conduct was both uniform and material.  Thus, materiality is a relevant factor in the Court's class certification analysis."  In re Yasmin & Yaz Mktg, 2012 U.S. Dist. LEXIS 33183, *65 (S.D.Ill. Mar. 13, 2012); see also id. at *73-76.  Thus, while Plaintiffs are correct in arguing that materiality is not an explicit element of the UCL, it is still a relevant factor in the analysis.

Further, despite Plaintiffs' contentions that the reasoning reached by the Court of Appeal in Fairbanks is not appropriate here because it was in dictum and not authoritative, the case is directly on point.  There, the court found it impossible to determine as a matter of common proof whether the allegedly misrepresented permanence of certain life insurance policies was material to the entire class because many buyers did not intend for the insurance to be permanent and only purchased it for a fixed term.  197 Cal. App. 4th at 565.  The court further explained that "[w]hile it may have been material to a sizeable subclass of policyholders, plaintiffs made no attempt to seek certification of a class for whom materiality was subject to common proof."  Id.

Similarly, in Vioxx, the Court of Appeal found that the evidence supported "the trial court's conclusion that whether Merck's misrepresentations were material, and therefore induced reliance, is a matter on which individual issues prevailed over common issues, justifying denial of class certification with respect to the CLRA [UCL] claim." In re Vioxx Class Cases, 180 Cal. App. 4th 116, 134 (2009).  The individualized considerations included that some would have taken the drug regardless "because, for some patients, the benefits outweigh the risks[,]" and that "physicians consider many patient-specific factors in determining which drugs to prescribe,

including the patient's history and drug allergies, the condition being treated, and the potential

for adverse reactions with the patient's other medications – in addition to the risks and benefits

associated with the drug." Id.  Further, with regard to damages, Vioxx upheld the refusal to

certify a UCL claim where the plaintiffs' attempted identification of a comparable product did

not establish the amount of restitution due because "the issue of a proper comparator was a

patient-specific issue, incorporating the patient's medical history, treatment needs, and drug

interactions."  Id. at 136.

Class certification based on fraudulent practices under the UCL is denied based on the

varying communications with policyholders and the individualized determinations necessary to

gauge materiality and equitable relief.

In conclusion, Plaintiffs' motion for class certification premised in common law fraud,

the California Unfair Competition Law and the implied covenant of good faith and fair dealing,

among a large class of 17,000 policyholders across four states spanning a thirty year period, must

be denied because individualized inquiry is a superior and more efficient method for handling the

mixed communications, particularities as to materiality and reliance on the omission or

misrepresentation, and calculation of equitable relief.

### IV.  Motion for Summary Judgment

The present motion for summary judgment is filed by Prudential against four of the six

proposed class members based on the statute of limitations.  The claims of Ms. Clark, Ms.

Cusanelli, and Mr. Gold arise and are scrutinized under California state law, and those of Ms.

Drogell under Ohio law.  Although this motion relates to only four of the six originally proposed

class representatives, collectively they are referred to as "Plaintiffs" below.

### A.  Standard of Review

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."

The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  An issue is "genuine" if it supported by evidence "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.  A fact is "material" if a dispute about the fact might affect the outcome of the suit.  Id.  The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Specifically, the adverse party "may not rest upon the mere allegations or denials of adverse party's pleadings, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

 "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 2247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).  But the non-moving party must come forth with more than "the mere existence of a scintilla of evidence." Anderson, 477 U.S. at 252.  Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether this is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 251 (quoting

88

Improvement Co. v. Munson, 81 U.S. 442 (1872)).  Thus, "where the record taken as a whole

could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue

for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)

(citation omitted).

**B.  Discussion**

The main issue is whether the individual plaintiffs were put on inquiry notice such that

they incurred a duty to investigate further.  Prudential argues that the facts support a finding that

the individuals were suspicious of wrongdoing, and as such, were put on inquiry notice which

thereby triggered a duty to investigate further.  In turn, Plaintiffs argue that the facts do not

support a finding that inquiry notice was triggered in the first place. Plaintiffs further contend

that even if their suspicions were triggered, they would not have uncovered the material facts to

substantiate their fraud claim upon further investigation.  The relevant legal analysis is similar

under both California and Ohio law.

**1.  Inquiry notice**

The Ninth Circuit Court of Appeals recently provided a cogent overview of the California

state law, which the Court has additionally reviewed in full.  As the circuit court explained:

> In *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 87 Cal. Rptr. 2d 453,
> 981 P.2d 79 (1999), the California Supreme Court articulated:
>
> "[T]he plaintiff discovers the cause of action when he at least
> suspects a factual basis, as opposed to a legal theory, for its
> elements, even if he lacks knowledge thereof -- when, simply put,
> he at least suspects that someone has done something wrong to
> him, wrong being used, not in any technical sense, but rather in
> accordance with its lay understanding. He has reason to discover
> the cause of action when he has reason at least to suspect a factual
> basis for its elements. He has reason to suspect when he has notice
> or information of circumstances to put a reasonable person on
> *inquiry*; he need not know the specific facts necessary to establish

the cause of action; rather, he may seek to learn such facts through the process contemplated by pretrial discovery; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place -- he cannot wait for them to find him and sit on his rights;   he must go find them himself if he can and file suit if he does."

*Id.* at 397-98 (citations, alteration, and internal quotation marks omitted) (emphasis in the original).  The California Court of Appeal has observed that "[t]he courts interpret discovery in this context to mean not when the plaintiff became aware of the specific wrong alleged, but when the plaintiff suspected or should have suspected that an injury was caused by wrongdoing." *Kline v. Turner*, 87 Cal. App. 4th 1369, 1374, 105 Cal. Rptr. 2d 699 (2001). "A plaintiff need not be aware of the specific facts necessary to establish a claim since they can be developed in pretrial discovery. Wrong and wrongdoing in this context are understood in their lay and not legal senses." *Id.* (citation omitted). As the court reasoned in *Brandon G.*:

"Code of Civil Procedure section 338, subdivision (d), effectively codifies the delayed discovery rule in connection with actions for fraud, providing that a cause of action for fraud is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake. In a case such as this, that date is the date the complaining party learns, or at least is put on notice, that a representation was false."

111 Cal. App. 4th at 35 (internal quotation marks omitted). [The California Supreme Court in] *Norgart* explained that by discussing the discovery rule in terms of a plaintiff's suspicion of elements of a cause of action, it was referring to the generic elements of wrongdoing, causation, and harm. In so using the term elements, we do not take a hypertechnical approach to the application of the discovery rule. Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them.

*Fox*, 35 Cal. 4th at 807 (citation and internal quotation marks omitted).

Platt Elec. Supply, Inc. v. EOFF Elec., Inc., 522 F.3d 1049, 1057-1058 (9th Cir. 2008).

The Supreme Court of California explained that "[t]he discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action.  The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have 'information of circumstances to put [them] *on inquiry*' or if they have '*the opportunity to obtain knowledge* from sources open to [their] investigation.' In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation." Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797, 807-808 (Cal. 2005) (emphasis in original) (internal reference omitted).

For example, in Norgart v. Upjohn Co., *supra*, the Supreme Court of California found that where the daughter of the plaintiffs committed suicide by intentionally taking an overdose of prescription drugs, including Halcion, the plaintiffs had reason to discover the cause of action against the defendant drug company soon after the daughter's death when they learned at that time of her depression and suicide by taking an overdose of the drugs.  "The plaintiffs also learned of the possible connection between Halcion and the suicide, because such a connection was disclosed during the plaintiffs' investigation of the drug's package insert, which warned of a possible suicide risk." 21 Cal. 4th at 390.  Thus, the court held that the statute of limitations had run and the delayed discovery rule was inapplicable because the parent plaintiffs had ample reason to suspect the basis of their claim.

Similarly, the Supreme Court of Ohio explained:

> A cause of action for fraud or conversion accrues either when the
> fraud is discovered, or [when] in the exercise of reasonable
> diligence, the fraud should have been discovered.  When
> determining whether the exercise of reasonable diligence should
> have discovered a case of fraud, the relevant inquiry is whether the

91

> facts known 'would lead a fair and prudent man, using ordinary care and thoughtfulness, to make further inquiry.'  As the First District has recognized, '*this standard does not require the victim of the alleged fraud to possess concrete and detailed knowledge, down to the exact penny of damages, of the alleged fraud*; rather, the standard requires only facts sufficient to alert a reasonable person of the *possibility* of fraud.' '[C]onstructive knowledge of facts, rather than *actual* knowledge of their legal significance, is enough to start the statute of limitations running on the discovery rule.'

Cundall v. U.S. Bank et al., 909 N.E.2d 1244, 1250 (Ohio 2009) (internal references omitted) (emphasis added).  For example, in Cundall, the Supreme Court of Ohio found that where the plaintiff knew of the price difference between what he and another stockholder received in a stock sale, he thus "knew then, or in the exercise of reasonable diligence should have known, of the possibility that the true value of the stock was being, or had been, misrepresented[.]" Id. Thus, the court held that the statute of limitations had run and the delayed discovery rule was inapplicable.

Both Ohio and California law recognizes a distinction between discovery of an injury and discovery of wrongful conduct.  For example, in Norgard v. Brush Wellman, Inc., the Supreme Court of Ohio clarified that whether an employee knew he was sick as a result of exposure to beryllium at the workplace, and whether he knew that his illness was caused by the employer's conduct, are separate inquiries.  766 N.E.2d 977 (2001).  The court posited that "discovery of an injury alone is insufficient to start the statute of limitations running *if* at that time there is no indication of wrongful conduct of the defendant." Id. at 979 (emphasis added).

Norgard originally believed his injury was a result of a relatively rare sensitivity to a chemical which he was exposed to at his workplace.  However years later, he became aware of the potential wrongdoing by his employer.  Specifically, Norgard read an article in a local

newspaper about beryllium lawsuits involving his employer and employees in another state.  He then learned from an attorney that his employer had known that its air-sampling collections were faulty and inaccurate, that a large number of employees were developing a disease, and that there might have been problems related to respiratory equipment and ventilation that led to unnecessarily elevated beryllium exposures.  The Supreme Court of Ohio thus drew the distinction between knowledge of injury and knowledge of wrongdoing, and held that the statute of limitations began to toll upon discovery of the wrongful conduct rather than the injury itself.  Id. at 978-79.

The Norgard court reasoned:

> This holding is consistent with the rationale underlying a state of limitations and the discovery rule.  Its underlying purpose is fairness to both sides.  Once a plaintiff knows of an injury and the cause of the injury, the law gives the plaintiff a reasonable time to file suit.  Yet if a plaintiff is unaware that his or her rights have been infringed, how can it be said that he or she slept on those rights?  To deny an employee the right to file an action before he or she discovers that the injury was caused by the employer's wrongful conduct is to deny the employee the right to bring any claim at all.  By applying the discovery rule as we do, we take away the advantage of employers who conceal harmful information until it is too late for the employees to use it.

Id. at 981.

The distinction between Cundall, *supra*, and Norgard is that in the latter, no facts suggest that the employee should have suspected that his workplace injury was a result of employer wrongdoing  rather than the employee's relatively rare sensitivity to the chemical, whereas in the former, the plaintiff's knowledge of a price difference between what he and another stockholder received for stock was sufficient to trigger the statute of limitations prior to learning years later the details of the fraud perpetrated on him by the trustee of the estate.

93

California law also recognizes this distinction.  For example, in <u>Snow v. A.H. Robins Co.</u>, the Court of Appeal found that where the plaintiff reasonably believed that she was one of the few individuals on whom an intrauterine device malfunctioned.  211 Cal. Rptr. 271 (Cal. Ct. App. 1985).  The malfunction resulted in an unwanted pregnancy, a therapeutic abortion, and medical problems causing permanent physical and emotional damages.   However, after the statute of limitations ran from the date of the injury, Snow discovered the possibility of fraud by the manufacturer when watching a "60 Minutes" television broadcast which featured the manufacturer's concealment of the side effects of the IUD and that its actual pregnancy rate was considerably higher than she had originally thought it to be.

The Court of Appeal found that the statute of limitations was tolled on her fraud-based claim, and explained:

> The circumstances of this case demonstrate plaintiff had no basis for suspecting fraudulent concealment of actual pregnancy rates until reports of the alleged fraud became public.  The record demonstrates facts sufficient to raise an inference of fraudulent concealment of other material facts which, if known to plaintiff, would have disclosed other the nature and existence of her right of action.  There was simply no basis to plaintiff for considering herself other than one of the unlucky few who would wind up pregnant.  This minimal risk she had willingly assumed.  Her cause of action for fraud could not accrue until she became aware of the facts from which she could conclude that defendant may have fraudulently misrepresented or concealed the *actual* risk of pregnancy with the Dalkon Shield.

<u>Id.</u> at 279 (emphasis in original).

In sum, the analysis under both California and Ohio law turns on a suspicion that something is wrong, based on a layperson's understanding, and a connection of the wrongdoing with the injury, such that further reasonable investigation is necessary, which would in turn uncover the facts constituting the fraud.

Here, Plaintiffs convolutedly argue that they did not have knowledge of their injury because they did not know that the above-market premiums were linked to Prudential's potential wrongdoing.  Plaintiffs concede that "[t]he sole pertinent items of *factual information* possessed by these plaintiffs that Prudential identifies are (1) the amounts of their premium increases and (2) the fact that the CHIP block was closed."  (MSJ Opp. Br. at 22, emphasis in original.)  However, Plaintiffs argue that "[n]either of these facts, alone or in combination, would cause a reasonable person to investigate whether he was being defrauded." (Id.)  Thus, Plaintiffs argue, that "the named plaintiffs had no duty to investigate because . . . large premium increases and the fact that Prudential was not selling CHIP did not provide a reasonable indication that Prudential might be defrauding them (or, for that matter, engaging in the other wrongdoing)." (MSJ Opp. Br. at 27.)  Specifically, Plaintiffs maintain that "Prudential is liable because it failed to disclose the death spiral and its negative consequences to CHIP policyholders." (MSJ Opp Br. at 22.)

However, this is contrary to legal principles surrounding inquiry notice.  Specifically, once the Plaintiffs' suspicions are aroused that something is amiss, and suspicion is linked to the injury, it is at that point when the statute of limitations begin to toll.  Magic words such as death spiral or lock-in/lock-out need not be uttered here in order to trigger the statute of limitations.  If that were the case, the litigants would forever have the right to bring a suit for fraud suit despite their suspicion of wrongdoing related to an injury.  Plaintiffs' logic is circular.  The suspicion that something is amiss itself suggests a fraud here because they are not being told the whole truth about the escalating premiums.  They did not need to know the precise facts to allege the fraud in order to trigger the statute of limitations.  "So long as a *suspicion* exists, it is clear that the plaintiffs must go find the facts; she cannot wait for the facts to find her."  Jolly v. Eli Lilly & Co., 751 P.2d 923, 928 (Cal. 1988).

95

Second, Plaintiffs argue that the limitations period did not run because a reasonably diligent investigation would not have uncovered the facts supporting the cause of actions, because the facts supporting the fraud were inaccessible and in the sole possession of the defendants.  (MSJ Opp. Br. at 13-14.)  "Without that information, Plaintiffs could not allege a colorable claim against Prudential.  Such an inquiry would not have uncovered the death spiral and its consequences." (Id. at 35.)  "Plaintiffs [expressly] submit that the most that could be expected of a reasonably diligent investigation by a CHIP policyholder is for the policyholder to contact Prudential and inquire as to the reasons for his premium increases." (MSJ Opp. Br. at 35.)  However, understandably, discovery will not be delayed where the plaintiff inquires the very persons he suspects of wrongdoing.  See Craggett, 92 Ohio App. 3d at 454-55 ("Once sufficient indicia of misrepresentation are shown a party cannot rely on its unawareness or the efforts of the opposition to lull it into a false sense of security to toll the period of limitations."); see also Susan L. Thomas, 34A Cal. Jurisprudence (Third) Fraud § 59 (2012) ("[I]f a party who has undertaken to investigate the subject matter of a contract in which he or she is interested becomes aware of facts that tend to arouse suspicion, or if the party has reason to believe that any representations made to him or her in such connection are false or only partially true, it is the party's legal duty to complete the investigation, and he or she has no right to rely on statements of the other contracting party.").

Moreover, the experiences of the particular plaintiffs indicate that they had alternate avenues to explore, some of which indeed confirmed the existence of the closed block and its connection with illness and escalating premiums.  For example, Ms. Clark contracted her attorney a number of times, who himself understood and stated to Prudential that her rights were being violated under California law.  Additionally, Ms. Drogell spoke to an "insurance guy" who

told her of the connection between the incurring premium rates and the sick closed block.  These alternate avenues are, of course, notwithstanding the individuals' own understanding and conclusions or confirmations as to the connection of their injury and the wrongdoing, which is discussed further below in detail.

### 2.   Relevant statutes of limitations

It is undisputed that the period for CA plaintiffs' UCL claims is four years (see Cal. Bus & Prof. Code 17208; Aryeh v. Canon Business Solutions, Inc., No. S184929 (Cal., Jan. 24, 2013)); that the period for their fraud claims (and constructive fraud claims) is three years (see Cal. Civ. Proc. Code 338(d)); and that the period for Ohio plaintiff Terri Drogell's fraud claim (and constructive fraud claim) is four years (see Ohio Rev. Code. Ann. 2305.09(c)).

The only dispute is over the limitations period for California plaintiffs' implied covenant claim.  The dispute arises out of an argument of whether the implied covenant for good faith and bad dealing claim arises under a claim for tort, whereby it would be subject to a two year statute of limitations pursuant to Cal. Civ. Proc. 339(1), or whether it is a claim which sounds in contract, whereby it would be subject to a four year statute of limitations pursuant to Cal. Code. Civ. P. 343.

The Court already found, in reliance on Cal. Code Civ. P. 343, the applicable statute of limitations to be four years.  (ECF 39 at 34.)  Prudential now puts forth, seemingly for the first time, a very cursory argument for the claim to arise under tort.  Prudential simply lists one case, Archdale v. Am. Int'l Specialty Lines Ins. Co., 154 Cal. App. 4th 449, 467 (Cal. Ct. App. 2007), in support for the proposition.

Plaintiffs contend that a tortuous implied covenant claim under California law is limited to instances "when the breach occurs in the context of an insurance company's failure to

properly settle a claim against an insured, or to resolve a claim asserted by the insured." (MSJ

Opp. Br. at 7, quoting Elmer v. Infinity Ins. Co., 2010 U.S. Dist. LEXIS 66462, *8-11 (E.D. Cal.

July 1, 2010)).

An examination of the original pleading enlightens this discussion to show that this claim

sounds in contract.  The 5AC puts forth that "[t]he implied covenant of good faith and fair

dealing required Prudential to refrain from any action that had the effect of destroying or injuring

the right of its policyholders to receive the full benefit of the CHIP policy." (5AC ¶ 93.)

Plaintiffs contend that "[t]he duty of good faith and fair dealing proscribes Prudential from

discontinuing the CHIP policy except in the limited circumstances listed in the policy, and

requires it to fully disclose material facts concerning the block closure and its implications for

policyholders." (Id. at ¶ 94.)  Moreover, Plaintiffs put forth that "Prudential did not inform,

disclose to, or advise policyholders that despite its limited contractual right to discontinue CHIP,

and despite policyholders' right to keep CHIP in force at their election, Prudential knew that

CHIP would effectively be discontinued as a result of the block closure and subsequent death

spiral." (Id. at ¶ 95b.)  Thus, in their request for relief on this claim, Plaintiffs submit that "[a]s a

direct and proximate result of Prudential's bad faith conduct, class members will have, and/or

continue to suffer economic losses, requiring compensatory, and/or equitable relief to be

determined by the Court." (Id. at ¶ 96.)

First, Plaintiffs frame the claim as one based on the terms of the policy and it is their right

to elect that theory. Second, Plaintiffs' punitive or exemplary damages requests, although found

elsewhere in the complaint in support of other claims, are not embodied in the implied covenant

claim.  Third, more persuasive is that the alleged fraud here arises directly out of a policy

between an insurer and insureds.  Indeed, the case posited by Prudential explains the significance

98

of these factors and supports the Court's previous finding that the four year statute of limitation

applies here.

First, <u>Archdale</u> explains that the relief sought will affect whether the remedy will be in

contract or tort:

> Unlike any other contract, the breach of an *insurance* contract (by
> the insurer) of the implied covenant of good faith and fair dealing
> will give rise to an action in tort by the insured, as well as one in
> contract, at the election of the insured (or assignee).  An action for
> recovery on either theory is what is commonly referred to as one
> for 'bad faith.'  There is a significant difference, however, in the
> available remedies.  If the insured elects to proceed in tort,
> recovery is possible for not only all unpaid policy benefits and
> other contract damages, but also extra-contractual damages such as
> those for emotional distress, punitive damages and attorney fees.
> An insured electing to proceed in tort, however, is burdened with a
> significantly shorter statute of limitations . . . . If the insured (or
> assignee) elects to proceed only in contract . . . then recovery is
> limited to those damages recoverable in contract (See Civ. Code,
> 3300).

Cal. App. 4th at 466 & n. 19.  Second, "[t]he covenant of good faith is read into contracts in

order to protect the express covenants or promises of the contract, not to protect some general

public policy interest not directly tied to the contract's purposes.  In short, it is an implied-in-law

term of the contract and its breach will necessarily result in a breach of the contract."  <u>Id.</u> at 469

(internal citations and references omitted).

### 3.   Application to the named plaintiffs

The Court is presented with a factual question whether Ms. Clark, Ms. Cusanelli, Mr.

Gold, and Ms. Drogell were put on inquiry notice of wrongdoing in connection with their injury

outside the statute of limitations prior to the filing of this action on December 17, 2008, which

would have triggered a duty to investigate that would have confirmed the alleged fraud, such that

summary judgment should be found against them as a matter of law.  In order to overcome the limitations hurdle, Plaintiffs allege that they did not have sufficient information at their disposal to trigger an inquiry outside the applicable limitations period.  Plaintiffs further argue that because this inquiry notice was not triggered, no duty to investigate flowed.  The facts are set forth in full above, *supra* at 19-34.

### a.  Ms. Clark

The record shows that Ms. Clark repeatedly and unequivocally suspected that Prudential was trying to get rid of her.  In the 1980s when her premiums "started becoming quite enormous," Ms. Clark notes that she "didn't know what to think."  Plaintiffs argue that Ms. Clark's testimony only reflects a lack of understanding at that time as to why her premium increases were so large.  However, closer inspection indicates otherwise.  Ms. Clark attests, "I couldn't understand why my rates were becoming so enormous, unless, perhaps, they were trying to get rid of me."  Thus, Ms. Clark clearly inferred a connection in the 1980s between her premium increases and some wrongdoing by Prudential.  Ms. Clark again confirms the connection between her injury and suspected wrongdoing when she believed in or around 1993 that Prudential was "trying to get me to drop the policy . . . [b]y increasing my rates."  Indeed, because the premiums "made no sense" to her "whatsoever[,]" Ms. Clark asked her bookkeeper to look into the issue in 1993.  Those inquiries lead Ms. Clark to learn that the CHIP policy did not exist anymore.  Additionally, in 1996, she wrote to her attorney that she "expect[ed] a fight" from Prudential regarding an issue related to her living abroad, and reaffirmed that Prudential "no longer [has] this policy and don't want it."

Under California law, the statute of limitations runs from the "date that the complaining party learns, or at least is put on notice, that a representation is false."  Platt v. Elect. Supply, Inc.

v. EEOF Elec., Inc., 522 F.3d 1049, 1058 (9th Cir. 2008).   There is no genuine issue of fact that

by at least 1993 when she asked her bookkeeper to investigate the premium increases, that Ms.

Clark made a connection between the premium increases and the misrepresentation or omissions

presented by Prudential in form letters, and that she knew that the policy was no longer sold.

Specifically, in subsequent deposition, when asked whether she believed the factors listed in the

letter were the only reasons why her premiums increased, Ms. Clark directly responded:  "Well,

like I said, I was quite shocked sometimes.  I did wonder how could medical costs be this

expensive."  Platt informs the query,  "[s]o long as there is a reasonable ground for suspicion, the

plaintiff must go out and find the facts; she cannot wait for the facts to find her."  Id. at 1054.

(quoting Slovensky v. Friedman, 142 Cal. App. 4th 1518, 1528-29 (Cal. Ct. Appl. 2006) and

omitting citations).

Moreover, Ms. Clark clearly suspected that her injury, the shocking premium rates, was

caused by wrongdoing by at least 1993, and specifically "that someone has done something

wrong to her," thereby triggering notice inquiry and the running of the limitations period.  See

Jolly v. Eli Lilly & Co., 751 P.2d 923, 927 (Cal. 1988).  Her attorney indeed confirmed this

wrongful injury under California law and wrote to Prudential on October 14, 2005 about it,

outside of the statute of limitations before the suit was filed.  Ms. Clark is clearly out of time to

contest her allegations of fraud.

### b.  Ms. Cusanelli

Ms. Cusanelli uses a number of adjectives to describe the CHIP premiums over time.

Indeed, even in 1982 or 1983, she considered them to be "excessive," and in a 2003 call she

described them as "nasty."  By September 2005, she describes the CHIP premium "intolerable"

when it increased to over $1,900.  However, these concerns about high premium increases only relates to discovery of her injury, not a suspicion of wrongdoing.

On October 7, 2005, Ms. Cusanelli spoke with a Prudential representative by phone, at which point she was informed that CHIP was a closed block of business, and Ms. Cusanelli responded "Right."  Six days later, on October 13, 2005, Ms. Cusanelli called Prudential again, and expressed "[m]aybe they don't have those policies anymore and they'd like to, you know, would love to get rid of it."  The Prudential representative again stated that CHIP was a closed block of business.  Upon being advised of a potential thirty-five percent premium increase, Ms. Cusanelli responded "I'm sure they will do [it] every year because if they're not . . . writing this policy any more, they would just as soon get rid of all of us, you know, and have us go to something different."

Plaintiffs plead that Ms. Cusanelli's October 2005 calls indicate that she believed the representative's explanations for why changing the deductible on her CHIP policy would result in a higher premium because the 35% cap that Prudential had been applying would then be removed, resulting in a resetting of premiums at an even higher rate.  Plaintiffs plead that her last remark reflects "only a surmise that, because it was no longer selling CHIP, Prudential no longer *had an incentive to keep premiums low*; it does not remotely suggest that she believed that the block closure was *causing* premiums to increase." (MSJ Opp. Br. at 32.)

In turn, Prudential argues that Ms. Cusanelli confirmed her *prior* awareness of the fact of the closure when she responded "Right" to being informed by the representative on the October 7, 2005 call that the block was closed.  Prudential argues that this defeats the four-year limitations period for her UCL claim because the alleged prior knowledge dooms her attempt to establish reliance for that claim.  Prudential's justifications are unpersuasive and beyond

speculative, especially when the Court is to draw all justifiable inferences in favor of Ms. Cusanelli.

Prudential also argues that the October 2005 calls show that the company "freely shared the block-closure information, and thus that the information was readily available to her all along. Because Ms. Cusanelli's own words show that she considered her premiums to be 'excessive' (or 'nasty') for many years in advance of those calls, she has no basis to assert the delayed discovery rule as an excuse for failing to bring suit more than four years prior to December 17, 2008." (MSJ Br. at 26-27.)

The Court is not prepared to extend suspicion of wrongdoing here simply based on Ms. Cusanelli's assertion that the premium was "excessive" in 1982 or 1983. That statement must be taken in context, where her initial premium in 1971 was $52 per month, reached approximately $530 per month in 2000, and over $2,500 in 2007. In 1995, Ms. Cusanelli was diagnosed with invasive malignant melanoma. Additionally, in September of 2002, in her petition for bankruptcy, Ms. Cusanelli did not mention outstanding claims against Prudential related to the facts in this case. In her call to Prudential in 2003 in which she requested information for a possible deductible-adjustment to lower her premiums, she called the premiums "nasty." Prudential seems to argue that the "nasty" premium increases alone should have caused her suspicion to arise and seek the information readily available to her along the way. However, the facts do not indicate a suspicion of wrongdoing. Moreover, Ms. Cusanelli testified that she believed the stated reasons in her 2004 letter that monthly rates were increasing because of age and increased healthcare costs. Indeed, a reasonable trier of fact could justifiably infer that Ms. Cusanelli believed the premiums were increasing at the rate they did on account of the pre-existing condition she developed in 1995.

The inquiry shifts when, in the second call in October 2005, Ms. Cusanelli again expressed concern with the rising premium rates and expressed that Prudential "[doesn't have] those policies anymore and they'd like to, you know, would love to get rid of it."  Here, she was again informed of the closed block of business.  Drawing all reasonable inferences in favor of her, it was upon this second call to Prudential where Ms. Cusanelli established the connection between her premium increases, the block closure, and the potential wrongdoing.  There is simply no indication that Ms. Cusanelli suspected any wrongdoing prior to the October 13, 2005 call.  The statute of limitations will therefore be tolled from this date.  Because the Complaint was filed on December 17, 2008, Ms. Cusanelli is within the four year statute of limitations with respect to her UCL and implied covenant claims, and outside of the three year statute of limitations with respect to her common law fraud claim.

### c.  Mr. Gold

In March of 2004, Mr. Gold called Prudential regarding a "huge raise" in his premium, and expressed knowledge of the block closure.  The exchange which followed is the subject of debate between the parties.  The transcript of the telephone conversation is included *supra* at 27-28.  Prudential argues that his statements indicate that he believed that his premiums were extraordinarily high, that the block was closed, and that premiums might be lower for a policy that was still being sold.  (MSJ Br. at 24.)  Prudential argues that "[g]iven Mr. Gold's expressed suspicion that the premiums he was complaining about were inflated (at least in part) due to the block's closure, he clearly believed that 'something was amiss.'" (Id., quoting Mendenhall, 2011 U.S. Dist. LEXIS 44588, at *11-12.)

On the other hand, Plaintiffs argue that the pertinent passage indicates that Mr. Gold was "inquiring whether Prudential would get to a point where it would *cancel* the remaining CHIP

policies altogether." (MSJ Opp. Br. at 30.)  Plaintiffs contend that it was when the representative

indicated to Gold that the company had come up with "updated policies" and were "selling

different policies," that Mr. Gold repeated the term "updated policy" and asked whether he

would be better off pursuing one that would be cheaper.  (Id. at 31.)

      Drawing all reasonable inferences in favor of Mr. Gold, a rational trier of fact may find in

his favor.  Thus, there exists a genuine issue of material fact as to the March 2004 call.  Although

some connection between the premium cost and the block closure can be drawn out from the

exchange, it is limited and not related to a suspicion of wrongdoing.  Indeed, Mr. Gold's inquiry

into switching into an updated policy is a follow-up from his concern of Prudential would cancel

the few remaining policies.

      Perhaps anticipating this genuine issue of material fact, Prudential points to a subsequent

2006 call during which Mr. Gold clearly indicates his suspicion that something is amiss when he

expressed that he doesn't know anybody paying such high premiums and expresses concern of

whether these rates are "normal."  Prudential argues that Mr. Gold's suspicion in 2006 simply

"confirms his previously expressed understanding [in the 2004 call] that block closure was

causing premiums to spike." (MSJ Br. at 13.)  While the 2006 call is a clear indication of

suspicion and inquiry notice, it is not dispositive here because it is inside the statute of

limitations.  The Court is not prepared to protract the suspicion expressed here to his 2004 phone

call.  Prudential could have tried to prove this in deposition by asking if Mr. Gold learned

anything new in the two-year interim, but evidently chose not do so.  The facts do not support the

transference of the suspicion to two years prior.  Mr. Gold's understanding in 2004 is a genuine

issue for trial, and thus summary judgment is denied as to him based on the statute of limitations.

   **d.  Ms. Drogell**

Ms. Drogell clearly establishes her suspicion in a call on May 27, 2003 of her premium increases.  In addition to expressing that the premiums were "unbelievable;" she expressed prior knowledge of the block closure, and that she spoke with an "insurance guy" who drew the connection between the premium increases, the block closure, and a potential remaining ill population of policyholders.  She reaffirmed her understanding of that connection during that call.  After the Prudential representative explained that the premium increases were due to increasing age and medical costs, Ms. Drogell again expressed disbelief, calling into comparison the premium rates of her parents, including that of her mother with multiple sclerosis.  Ms. Drogell's testimony of her comparison with her parents' premium rates is somewhat reminiscent of the facts considered by the Supreme Court of Ohio in Cundall, *supra* at 91, which triggered inquiry notice, namely the difference in price value despite knowledge of the actual details of the fraud.  Moreover, during this conversation, Ms. Drogell clearly indicates discovery of her injury, suspicion of some wrongdoing, and a connection between the two.  There is no issue of material fact that Ms. Drogell was put on inquiry notice here.  The statute of limitations of four years began to run from the date of the call, and therefore she is out of time to assert her claim as of the filing of the complaint on December 17, 2008.

## V.  CONCLUSION

In conclusion, Plaintiffs' motion for class certification is denied due to lack of commonality and predominance based on the individualized review necessary to establish materiality, reliance, and redress.  Further, Prudential's motion for summary judgment is denied in part and granted in part.  The statute of limitations has run with respect to Ms. Clark and Ms. Drogell.  However, Ms. Cusanelli and Mr. Gold survive summary judgment because the running of their claims concern genuine issues of material fact.

106

An order will be entered in accordance with this opinion.


s/Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.


**Dated:** February 5, 2013