**<u>FOR PUBLICATION</u>**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

| | |
|---|---|
| BEVERLY CLARK, JESSE J. PAUL, WARREN GOLD, LINDA M. CUSANELLI, CAROLE L. WALCHER, and TERRI L. DROGGEL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation,<br><br>        Defendant. | Civ. No. 08-6197 (DRD)<br><br>**<u>OPINION</u>** |

---

*Appearances by:*

NAGEL RICE LLP
Bruce Nagel, Esq.
Robert H. Solomon, Esq.
103 Eisenhower Parkway
Roseland, NJ 07068-1031

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Charles N. Freiberg, Esq.
Brian P. Brosnahan, Esq.
David A. Thomas, Esq.
Jacob N. Foster, Esq.
101 California Street, Suite 2300
San Francisco, CA 94111

LAW OFFICES OF CRAIG A. MILLER
Craig A. Miller, Esq.
225 Broadway, Suite 1310
San Diego, CA 92101

*Attorneys for Plaintiffs*

LOWENSTEIN SANDLER PC
Douglas S. Eakeley, Esq.
Natalie J. Kraner, Esq.
65 Livingston Avenue
Roseland, NJ 07068

GOODWIN PROCTOR LLP
John D. Aldock, Esq.
Mark S. Raffman, Esq.
Adam M. Chud, Esq.
901 New York Ave., N.W.
Washington, D.C. 20001

*Attorneys for Defendant*

**<u>DEBEVOISE, Senior District Judge</u>**

## I.     BACKGROUND

This case concerns allegations of deception and bad faith against a health insurance company, The Prudential Insurance Company of America ("Prudential").  The heart of the complaint is that Prudential stopped selling a certain health insurance policy to new customers ("closing the block"), knowing that this would result in prohibitive increases in premium rates as sick policyholders remain in the block and healthy policyholders leave, resulting in the sick getting locked-in to the increasingly expensive policy and locked-out of alternative options due to development of a pre-existing condition.  Plaintiffs, former policyholders, contend that Prudential had falsely misrepresented to its policyholders that the only reason for increased premiums would be increasing age of the insured and rising medical costs, and failed to disclose that a major reason for the premium increases was the closing of the block and the consequences thereof.  On February 5, 2013, the Court rendered a decision denying class certification on multiple grounds and granting Prudential's summary judgment in part based on the statute of limitations.

Currently before the Court are three motions filed by Plaintiffs:  a motion for reconsideration of the order denying Plaintiffs' motion for class certification; a motion to alter or amend the class certification order with respect to redefining the class and bifurcating liability and damages issues so that the class may be certified solely for purposes of liability; and a motion for reconsideration of the order granting Prudential's motion for summary judgment in part.

## II.      DISCUSSION

### A.  STANDARD OF REVIEW

In the District of New Jersey, motions for reconsideration are governed by Local Civil Rule 7.1(i) and are considered "extremely limited procedural vehicle(s)." <u>Resorts Int'l, Inc. v. Greate Bay Hotel & Casino</u>, 830 F. Supp. 826, 831 (D.N.J. 1992).  As a result, "reconsideration is an extraordinary remedy, that is granted 'very sparingly[.]'" <u>Brackett v. Ashcroft,</u> Civ. No. 03-3988 (WJM), 2003 U.S. Dist. LEXIS 21312, 2003 WL 22303078, at *2 (D.N.J. Oct. 7, 2003) (quoting <u>Interfaith Community Org. v. Honeywell Int'l, Inc.</u>, 215 F. Supp. 2d 482, 507 (D.N.J. 2002)).

Local Civil Rule 7.1(i)  permits a party to seek reconsideration by the Court of matters which the party "believes the Judge or Magistrate Judge has overlooked" when it ruled on the motion. <u>See</u> L. Civ. R. 7.1(i).  The movant has the burden of demonstrating either: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." <u>Max's Seafood Cafe v. Quinteros</u>, 176 F.3d 669, 677 (3d Cir. 1999) (<u>citing</u> <u>N. River Ins. Co. v. CIGNA Reinsurance Co.</u>, 52 F.3d 1194, 1218 (3d Cir. 1995)). The Court will grant a motion for reconsideration only where its prior decision has overlooked a

factual or legal issue that may alter the disposition of the matter. See Compaction Sys. Corp., 88 F. Supp.2d at 345; see also L. Civ. R. 7.1(i).  "The word 'overlooked' is the operative term in the Rule." Bowers v. NCAA, 130 F. Supp. 2d 610, 612 (D.N.J. 2001) (citation omitted).

Moreover, L. Civ. R. 7.1(i) does not allow parties to restate arguments which the court has already considered.  See G-69 v. Degnan, 748 F. Supp. 274, 275 (D.N.J. 1990). Thus, a difference of opinion with the court's decision should be dealt with through the normal appellate process.  See e.g., Bowers, 130 F. Supp. 2d at 612 (citations omitted); Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F. Supp. 159, 162 (D.N.J. 1988); NL Indus., Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996) ("Reconsideration motions . . . may not be used to re- litigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.").  In other words, "[a] motion for reconsideration should not provide the parties with an opportunity for a second bite at the apple." Tischio v. Bontex, Inc., 16 F. Supp. 2d 511, 533 (D.N.J. 1998) (citation omitted).

**B.  ANALYSIS**

After extensive briefing and oral argument, the Court issued a 107-page opinion concluding that the claims of the proposed 17,000-member class spanning a thirty-year period across four states were not fit for class treatment.  (See Opinion, ECF 227, hereinafter "Op.") The ruling considered hundreds of pages of briefing and analysis, thousands of pages of exhibits, oral argument, and supplemental briefing.  First, the Court set forth a factual record going to the individual plaintiffs' experiences with the Comprehensive Health Insurance Policy ("CHIP"), the overall experience of CHIP policyholders over a thirty year period, and the methodology proposed and critiqued by experts in lengthy reports, rebuttals, and certifications as to the ability to establish a reliable common approach to assess damages for the class.  The Court then

4

assessed objections to evidence, and examined the original proposal to categorize the class and subclass, and the revised proposal for class categorization.   Part Two of the Opinion analyzed the facts in light of the Rule 23 requirements for class certification.  Part Three addressed the individual facts of four of the six proposed class representatives with respect to summary judgment based on the statute of limitations.  The facts and findings of the Court are set forth in full in the Opinion, and are discussed below  with respect to objections raised by Plaintiffs in their motions to reconsider and amend.

The briefs with regard to the motion for reconsideration of the order denying the motion for class certification (hereinafter "MRCC") and the motion to alter or amend the class certification order to redefine the class and bifurcate liability from damages (hereinafter "MAC"), are inter-related and cross-referential, and are addressed jointly first.  The motion for reconsideration of the order granting in part Prudential's motion for summary judgment (hereinafter "MRSJ") is then addressed in part two of the discussion below.

1. **Motion for Reconsideration of the Order denying Class Certification and the Motion to Alter or Amend the Order denying class certification**

In the event that the Court does not reverse its Order denying class certification, Plaintiffs propose two types of narrowing of the class certification:  1) limiting class membership to policyholders who maintained CHIP in force until at least 2001; and/or 2) bifurcating the issue of liability and damages so that the class may be certified as to liability, with a separate trial to handle individuals' damages.  These two proposals are introduced for the first time, despite the substantial procedural history in this case detailed in the Court's  prior opinion, which includes the addition and removal of class representatives, claims, and a revised class categorization proposal.

**A.  Damages and Bifurcation**

Plaintiffs argue that the Court made a clear error of fact in concluding that the damages methodology proposed by Dr. Frech did not satisfy Plaintiffs' burden to propose a common approach to measuring damages.  First, Plaintiffs argue that the Court made a clear error of fact in concluding that the damages methodology proposed by Dr. Frech fails to account for individualized factors such as age, gender, geographic location, health status, approvals of premium rate increases by resident state, deductible levels, and addition or removal of dependants because these factors are incorporated in the actual dollar premiums, and the percent excess premiums mathematically cancel out the individual factors.  (MRCC Br. at 1-5.)  However the Court noted that "Dr. Frech seems to justify his proposal by arguing that these individualized considerations go to the wayside because they are already weighted and included in his actual premium index and the but-for premium index." (Op. at 80.)

The Court went on to determine that Dr. Frech's proposal failed because criticism submitted by Mr. Wildsmith "suggests that the formula offered by Dr. Frech is static and does not account for a range of possible changing conditions over time." (Op. at 81.)   Indeed, Plaintiffs submit as follows:

> [O]ne could argue that [Dr. Frech's calculation] was not an exact apples-to-apples' comparison because the but-for index does not account for aging while the average market premium was for [Ms. Clark's] 2009 age.  Mr. Wildsmith correctly noted and adjusted her but-for premium for aging.  The result was that the implied but-for premium for her was roughly twice the average market premium.

(MRCC Br. at 6-7.)  Plaintiffs attempt to reframe Mr. Wildsmith's critique as a validation of the model because it shows that Dr. Frech's calculation is conservative.  Additionally, Plaintiffs summarily argue that Dr. Frech's damages calculation is substantiated because it "factors in the

relative richness of CHIP's benefits compared to other policies[, as] one would expect the implied but-for premium for a rich policy to be substantially higher than an average market premium[.]" (Id.)  However, the reasonableness check clearly establishes that Dr. Frech's proposed substitutive methodology for an actual yardstick fails because his projected implied but-for premium was two-times larger than the proposed comparative check, and therefore of questionable accuracy and reliability.  The Court has not overlooked any factual or legal matter dispositive to the resolution of the case, and the motion for reconsideration on this point is denied.

Additionally, Plaintiffs argue that the Court's approach to damages is "fundamentally wrong on the law because it ignores the well accepted principles that 1) precision in calculation of damages is not required for recovery, and 2) some individualized calculation of damages is frequently required in class cases, yet that rarely defeats class certification where common issues predominate as to liability."  (MRCC at 8.)  Plaintiffs primarily look to the instruction provided by the Third Circuit Court of Appeals in the seventies, Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977):

> [I]f for any reason the district court were to conclude that there would be problems involved in proving damages which would outweigh the advantages of class certification, it should give appropriate consideration to certification of a class limited to the determination of liability.  *See* Rule 23(c)(4)(A).

Thus, Plaintiffs now assert for the first time, that the "common issues as to liability are divisible from any individual issues of damages, and there are no impediments to bifurcation of liability issues for class treatment." (MCC at 8.)  Plaintiffs simply drop a supporting footnote for this

assertion with no additional explanation, citing to an environmental tort class challenge, <u>Gates v. Rohm & Haas Co.</u>, 655 F.3d 255, 273 (3d Cir. 2011).[1]

     In <u>Gates</u>, the Third Circuit Court of Appeals acknowledges this complicated area of class action procedure, and advises the trial court to consider a list of factors[2] when deciding whether

---

[1]     Plaintiffs also list another case from the seventies in this general section, <u>Geraghty v. U.S. Parole Com.</u>, 579 F.2d 238, 253 (3d Cir. 1978).  However, the relevant portion in <u>Geraghty</u> is simply the quote from <u>Bogosian</u>, <i>supra</i>, embedded in footnote 64.  Aside from its reference to <u>Bogosian</u>, <u>Geraghty</u> is not persuasive here because it turned on the district court's failure to consider the categorization of prisoner subclasses to which the claims applied rather than any class issue as to damages for the declaratory and injunctive relief sought there.  The Third Circuit Court of Appeals held that by not limiting the overbroad classes by use of subclasses under Rule 23(c)(4), the district court abused its discretion.

[2]     Specifically, the Third Circuit Court of Appeals informed:

> In light of the adoption of the Final Draft of the Principles of Aggregate Litigation, when deciding whether or not to certify an issue class, the trial court should consider: the type of claim(s) and issue(s) in question; the overall complexity of the case; the efficiencies to be gained by granting partial certification in light of realistic procedural alternatives; the substantive law underlying the claim(s), including any choice-of-law questions it may present and whether the substantive law separates the issue(s) from other issues concerning liability or remedy; the impact partial certification will have on the constitutional and statutory rights of both the class members and the defendant(s); the potential preclusive effect or lack thereof that resolution of the proposed issue class will have; the repercussions certification of an issue(s) class will have on the effectiveness and fairness of resolution of remaining issues; the impact individual proceedings may have upon one another, including whether remedies are indivisible such that granting or not granting relief to any claimant as a practical matter determines the claims of others; and the kind of evidence presented on the issue(s) certified and potentially presented on the remaining issues, including the risk subsequent triers of fact will need to reexamine evidence and findings from resolution of the common issue(s). <i>See</i> Principles of the Law of Aggregate Litigation §§ 2.02-05 (2010); <i>Hohider, 574 F.3d at 201</i>. This non-exclusive list of factors should guide courts as they apply <i>Fed. R. Civ. P. 23(c)(4)</i> "to 'treat common things in common and to distinguish the

8

or not to certify a liability-only class.  Id.  The Third Circuit Court of Appeals concluded that the

trial court did not abuse its discretion by declining to certify a liability-only issue when it "found

liability inseverable from other issues that would be left for follow-up proceedings.  Nor did the

court err in finding no marked division between damages and liability." Id.

Nor is a division between damages and liability present here.  In addition to explaining

the wide array of reasons why policyholders would have dropped CHIP, (Op. at 77-78), the

varied nature and frequency of oral communications with policyholders further "elucidate[d] the

fact-specific individual inquiry that will be necessary to determine presence of the fraud." (Id. at

78-79.)  Specifically, the Court examined individualized instances which defy commonality

when proposed class representatives called Prudential and expressed general concern and

disbelief about the nature of the premium increases, and in some cases made an express

connection between the premium increases and the block closure.  (Id.)  The Court later

examined these communications in light of the motion for summary judgment as to four of the

six proposed class representatives, and found that based on review of the individuals' records,

---

distinguishable."" *Chiang, 385 F.3d at 256* (quoting *Jenkins, 400 F.2d at 35*).

When certifying an issue class the court should clearly enumerate the issue(s) to be tried as a class as required by *Fed. R. Civ. P. 23(c)(1)(B). See Wachtel v. Guardian Life Ins. Co. of Am., 453 F.3d 179, 184-85 (3d Cir. 2006)*. It should also explain how class resolution of the issue(s) will fairly and efficiently advance the resolution of class members' claims, including resolution of remaining issues. *See* Principles of the Law of Aggregate Litigation §§ 2.02(e) (2010).

Gates, 655 F.3d at 273.

the limitations period had already expired as to two of the four individually considered.   (Id. at 99-106.)

Moreover, it is still good law in the Third Circuit that "plaintiffs must establish that the alleged damages are capable of measurement on a class-wide basis using common proof." Behrend v. Comcast Corp., 655 F.3d 182, 200 (3d Cir. 2011) (citing Hydrogen Peroxide, 552 F.3d at 211, 325-326; c.f. Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 187 (3d Cir. 2001) (stating that the "Herculean task" of calculating individual damages from hundreds of millions of different transactions "counsels against finding predominance")); *cert. granted*, 133 S. Ct. 24 (2012); *rev'd on other grounds*, 133 S. Ct. 572 (Nov. 2, 2012). Newton is instructive here, where an actual yardstick of a comparative policy's price is not being offered, an individualized proof produces a damages assessment which is approximately double that calculated by the substitute formula, and individualized considerations surmount.  (See Op. at 78-81.)

In Newton, the Third Circuit Court of Appeals considered a securities fraud class challenge brought by thousands of investors against broker-dealers for offering stock trades at the price offered on the central National Best Bid and Offer system (NBBO) rather than investigating alternatives that potentially offered better prices.  Critical to the determination of whether class certification was proper, the appeals court noted the individualized proof necessary:

> Ascertaining what prices are reasonably available to any particular situation may require a factual inquiry into all of the surrounding circumstances . . . .
>
> [ . . . ]

> These factors would appear to vary from class member to
> class member and, for each class member, from trade to trade.
> Whether a class member suffered economic loss from a given
> securities transaction would require proof of the circumstances
> surrounding each trade, the available alternative prices, and the
> state of mind of each investor at the time the trade was requested.
> This Herculean task, involving hundreds of millions of
> transactions, counsels against finding predominance.

Newton, 259 F.3d at 187 (quoting in part Newton, 135 F.3d 266, 270 & n.2 (3d Cir. 1998) (en

bank)).  Newton reasoned that a factual inquiry into all of the surrounding inquiries is necessary

based on factors which vary from class member to class member and trade to trade such as an

available alternative price and the state of mind of each investor at the time the trade was

requested.

Similarly, here the Court has already noted the various possible explanations for the

switching behavior of health insurance policyholders:

> The evidentiary record here makes clear that a substantial
> portion of the proposed class of 17,000 CHIP policyholders over a
> thirty year period would not find the pertinent information
> material, and that resolution of the materiality inquiry requires
> individualized consideration.  First, the proposed class does not
> differentiate the substantial number of policyholders who dropped
> CHIP for reasons independent of the block closure and before the
> staggering premium increases took root.  For example, even in the
> first two years of CHIP's introduction on the market in 1975 and
> 1976, 55.4% and 53.3% of policyholders dropped the policy.
> Similarly, an almost identical proportion of CHIP policyholders
> dropped out the year of the block closure and the first year that
> premium increases went into effect:  43.1% in 1981, and 43.2% in
> 1982.  See Table, *supra* at 47.  Moreover, three years after the first
> premium increases following block closure, the proportion of the
> proposed class dropped-out by a whopping 85 percent.  See Table,
> *supra* at 15-16.  In sum, CHIP policyholders consistently
> maintained a significant lapse rate which predated and was
> consistent well after block closure.
> Possible explanations for the drop-out are varied.  For
> example, some policyholders were only interested in short-term
> coverage until they either gained employment and eligibility for

11

> employer-provided insurance.  Another explanation for switching
> behavior is [a] policyholder's aging into CHIP's separate and
> attractive limited medical program, which currently includes 70%
> of CHIP policyholders and held nearly two-thirds of policyholders
> when the block was closed.  Similarly, perhaps some aged into
> Medicare and did not wish to convert into CHIP's supplemental
> limited medical policy.  Although these limited medical care
> policyholders are not formulated as a part of the class here, the
> switching behavior of major medical policyholders into limited or
> other outside care is relevant because it goes to the intention to stay
> with CHIP for a long period of time and thus the materiality of the
> disclosure or omission.  Another explanation for CHIP drop-outs is
> that policyholders joined the major national shift in the 1980s and
> 1990s away from indemnity plans like CHIP and towards managed
> health care plans.  These possible explanations corroborate the
> high lapse rate prior to the block closure and the ongoing lapse rate
> well into the eighties.  What is clear, however, is that uniform
> treatment of these policyholders as reliant on the omission or
> misrepresentation is not proper due to such varied and non-
> delineated factors.
>> [ . . . ]

(Op. at 77-78.)  In sum, the individualized issues which arise in the calculation of damages and

damages in fact are so inextricably linked that bifurcation would be judicially inefficient.

   B.  **The Common Law Fraud Claim and Materiality**

        Plaintiffs go on to argue that the Court made three broad errors of fact and law in

concluding that materiality could not be determined on a class-wide basis for purposes of

Plaintiffs' common law fraud claims.  First, Plaintiffs contend that the Court ignored their

argument that class-wide materiality could be shown by the fact that the nondisclosure meant

that all class members paid above-market premiums.  (MRCC 9.)  Second, Plaintiffs take issue

that the Court made a clear error of fact when it relied on post-block-closure lapse rates and

speculation about varying reasons for lapse to support its conclusion that materiality could not be

established on a class-wide basis.  Plaintiffs put forth that "[t]he inquiry is not why class

members who, ignorant of the fraud, eventually dropped out of CHIP; it is instead whether, had a

reasonable class member known of the fraud, he would have considered the undisclosed

information important to *his decision to keep the policy in force for any amount of time*."

(MRCC at 9-10)(emphasis in original.)

However, the Court clearly considered these issues but rejected them.  (See Op. at 77-80,

"In sum[ ] . . . although having some common core as to the omission or misrepresentation of the

block closure and its consequences, the fraud is not suitable for class treatment based on the

varying degrees of its materiality and reliance by the proposed class of 17,000 policyholders over

a thirty year period, and the lack of commonality with regard to communications with

policyholders.")  Indeed, the Court expressly noted Plaintiffs' thesis, explaining that "Plaintiffs

claim that this omission prevented class members from making the rational choice to switch to

an alternate policy . . . ." (Op. at 5.)  After a full review of the record, Court considered various

factors and concluded that materiality was not proper on a class-wide basis, see e.g., *supra* at 9-

10.  The question is ripe for appeal, but not for a "second bite of the apple" via motion for

reconsideration.   Tischio v. Bontex, Inc., 16 F. Supp. 2d at 533.

Third, Plaintiffs argue that the Court made a clear error of fact and law in finding that Dr.

Frech "'concede[d]' that 3.5% to 6.4% of class members would not have been able to switch out

of CHIP and that the implications of this number precluded class certification." (MRCC at 10.)

It is uncontested that Dr. Frech submitted this approximation; what is contested however is the

weight that it should be given.  Plaintiffs contend that the record supports that Dr. Frech

emphasized that this was a conservative estimate.  Plaintiffs also take issue that the Court did not

mention Dr. Buchmueller's notation that "very few" individuals experienced these health shocks

at the time of block closure.  (MRCC Br. at 10.)  However, this figure, which translated to

approximately 600 to 1,100 putative class members (Op. at 79),  was only one of the factors

taken into consideration in the Court's review of predominance.  Indeed, the Court described "varied and non-delineated factors why policyholders would not have relied on the disclosure" (*supra* at 11-12), in addition to varying oral communications, to find lack of commonality, which also pointed to dismissal on summary judgment due to the statute of limitations.  The conservative nature of Dr. Frech's calculation of the number of CHIP policyholders who had a pre-existing condition at the time of block closure and to whom notice of the block closure would therefore be immaterial is noted.  However, as per the standard of review before the Court, no factual or legal issue has been overlooked that may alter the disposition here.

### C.  The UCL

In oral argument, Plaintiffs argued that "the flaws of the opinion are most pronounced in [the UCL] area because the opinion ignores the unique elements of a UCL violation." (Tr. at 26:24 – 27:1.)  Plaintiffs overlook the need for individualized litigation concerning materiality, conduct, and limitations defenses, and a reliable approach to establish damages by common proof.

#### a.  Fraudulent Prong

First, Plaintiffs argue that the Court made clear errors of law regarding the claims under the fraud prong of the UCL.  Specifically, Plaintiffs contend that the line of authority relied on by the Court "is contrary to the law expressed in *Vioxx* [180 Ca. App. 4th 116 (2009)] and many other decisions because the UCL's fraudulent prong merely requires a showing under an objective, 'reasonable person' standard that the challenged act or practice was 'likely to deceive' members of the public; it does not involve an individualized assessment of materiality." (MRCC at 14.)

The Court relied on several California cases in support of its analysis:

14

The fraud prong of the UCL is distinct from common law fraud, which requires allegations of actual falsity and reasonable reliance.  In re Tobacco II Cases, 46 Cal. 4th 298, 312 (Cal. 2009). Thus, to state a claim under California's UCL, "it is necessary only to show that members of the public are likely to be deceived" by the defendant's conduct." Stearns v. Ticketmaster Copr., 655 F.3d 1013, 1020 (9th Cir. 2011) (quoting Tobacco II, 46 Cal. 4th at 312).  The focus of the UCL – a consumer protection law – is on the defendant's conduct, and not on the plaintiff's damages.  Id. Indeed, the UCL provides only for equitable relief, such as injunctive relief and restitution, in light of the statute's overarching "purpose of protecting the general public against unscrupulous business practices."  See Tobacco II, 46 Cal. 4th at 312; see also Stearns, 655 at 1020.  Thus, "relief under the UCL is available without individualized proof of deception, reliance and injury." Id. (quoting Tobacco II, 46 Cal. 4th at 320.)

An interesting potential contradistinction appears in California law to establish commonality under the fraudulent business prong of the UCL.  Namely, the California Supreme Court instructs that reliance need not be determined by common proof and only the class representative need show it, while the issue of materiality of a representation is subject to common proof.  Compare Tobacco II, 46 Cal. 4th at 327-28 with Fairbanks et al., v. Farmers New World Life Ins. Co. et al., 197 Cal. App. 4th 544 (Cal. Ct. App. 2011), modified in separate part, 2011 Cal. App. LEXIS 995 (Aug. 1, 2011), denying rev., 2011 Cal. LEXIS 10787 (Ca. Supreme Court, Oct. 19, 2011).  See also Stearns, [655 F.3d 1013, 1020 (9th Cir. 2011)] (citing Wal-Mart and cautioning predominance may be lacking in UCL claim where there is "no cohesion among the members because they were exposed to quite disparate information from various representatives of the defendant").

"[A]s Stearns makes clear, while class members need not prove individualized deception, reliance and injury, the Court must consider whether disclosures to class members were made and, if so, whether such disclosures: (a) tend to defeat the claim that the common conduct attributed to the defendant is likely to deceive the entire class, and (b) are so numerous and individualized that they defeat commonality." In re: Countrywide Fin. Corp. Mort. Mktg. & Sales Practices Litig. V. Countrywide Home Loans, Inc., 2011 U.S. Dist. LEXIS 147689, *41-42 (S.D. Cal. Dec. 16, 2011).

This analysis corresponds with that reached by the [Southern District of Illinois[3]] – while the UCL does not require a showing of

---

[3]        The Court's review of the Opinion revealed a typographical error in its explanation of Yasmin, which was decided by the Southern District of Illinois and not the Seventh Circuit Court

reliance and a plaintiff must show that the fraudulent conduct was likely to deceive a reasonable consumer, "[t]his standard is subject to common proof if the actionable conduct was both uniform and material. Thus, materiality is a relevant factor in the Court's class certification analysis." In re Yasmin & Yaz Mktg, 2012 U.S. Dist. LEXIS 33183, *65 (S.D. Ill. Mar. 13, 2012); see also id. at *73-76. Thus, while Plaintiffs are correct in arguing that materiality is not an explicit element of the UCL, it is still a relevant factor in the analysis.

Further, despite Plaintiffs' contentions that the reasoning reached by the Court of Appeal in Fairbanks is not appropriate here because it was in dictum and not authoritative, the case is directly on point. There, the court found it impossible to determine as a matter of common proof whether the allegedly misrepresented permanence of certain life insurance policies was material to the entire class because many buyers did not intend for the insurance to be permanent and only purchased it for a fixed term. 197 Cal. App. 4th at 565. The court further explained that "[w]hile it may have been material to a sizeable subclass of policyholders, plaintiffs made no attempt to seek certification of a class for whom materiality was subject to common proof." Id.

(Op. at 84-86.)

Additionally, the Court held that the UCL claim for fraudulent practices failed because individualized determinations were necessary to gauge the equitable relief available. In reaching that conclusion, the Court relied in part on the reasoning employed by the California Court of Appeal in In re Vioxx Class Cases, 180 Cal. App. 4th 116, 136 (2009). There, the appellate court refused to certify a UCL claim where the plaintiffs' attempted identification of a comparable product did not establish the amount of restitution due because "the issue of a proper

---

of Appeals. The accompanying order will amend the Opinion to properly reflect the applicable court.

comparator was a patient-specific issue, incorporating the patient's medical history, treatment needs, and drug interactions." (See also Op. at 87.) [4]

---

[4]      Plaintiffs point out that the Court erroneously conflated the UCL with the Consumer Legal Remedies Act (CLRA) in its restatement of the holding in Vioxx that individualized review is necessary to establish reliance of the class under the UCL. (Op. at 86.) Plaintiffs exaggerate that the Court "relied heavily" on Vioxx and insist that the Court was therefore in clear error of law. While the typographical error is noted, it is inapposite as to the Court's holding. Indeed, the Court's analysis clearly conveys the necessary class-wide consideration of the materiality of the fraud and its uniformity to state a claim of fraudulent business practices under the UCL. See discussion, *supra* 14-16.

For ease of clarity, the accompanying Order will amend the relevant portion of the Opinion to reflect as follows, with a strike-through and underline to illustrate deletion and addition of text respectively:

> Similarly, in Vioxx, the Court of Appeal found that the evidence supported "the trial court's conclusion that whether Merck's misrepresentations were material, and therefore induced reliance, is a matter on which individual issues prevailed over common issues, justifying denial of class certification with respect to the CLRA [UCL] claim." In re Vioxx Class Cases, 180 Cal. App. 4th 116, 134 (2009). The individualized considerations under the CLRA analysis included that some would have taken the drug regardless "because, for some patients, the benefits outweigh the risk[,]" and that "physicians consider many patient-specific factors in determining which drugs to prescribe, including the patient's history and drug allergies, the condition being treated, and the potential for adverse reactions with the patient's other medications – in addition to the risks and benefits associated with the drug." Id. While it is widely recognized that reliance is a relevant factor in a class certification analysis under the CLRA and not the UCL as discussed above, class-wide consideration of the materiality of the fraud and uniformity of communications to establish a claim under the fraudulent business prong of the UCL is still appropriate. Further, with regard to damages, Vioxx upheld the refusal to certify a UCL claim where the plaintiffs' attempted identification of a comparable product did not establish the amount of restitution due because "the issue of proper comparator was a patient-specific

17

Plaintiffs' contention that the Court made a clear error of law is not persuasive.  The Court expressly recognized the tension in the UCL that reliance need not be shown by common proof, but that materiality and uniformity of communications need be.   Plaintiffs grasp firmly to the conclusion reached by the California Supreme Court in Occidental Land, 18 Cal. 3d 355 (1976), in which 155 homeowners sought class certification in an action against a developer for fraudulent misrepresentation of the cost and extent of monthly maintenance fees of their housing project.  The proposed class claimed that after inducing the homeowners to purchase their property, the developer tried to collect a fee nearly four times greater than that initially proposed. The California Supreme Court concluded that the cost of monthly maintenance fees is manifestly a material factor in planned development and condominium purchases.  In footnote 6, the court articulated that it was unmoved by defendants' argument that the materiality of the alleged representation depends on a highly particularized proof of each individual's financial status.  The court concluded that there was "no authority for this novel proposition.  Requiring proof of this nature would necessarily preclude the certification of virtually all class actions based on allegations of fraud.  Our decision in Vasquez repudiates such a concept."  Id. at 363, n. 6; see also Vasquez v. Supreme Court, 4 Cal. 3d 800, 814 (1971) ("[I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class.").

The holding of Occidental Land is unpersuasive here.  The issue there was misrepresentation of construction and maintenance costs to home purchasers.  The Supreme Court found that class certification based on materiality of the misrepresentation should not be

issue, incorporating the patient's medical history, treatment needs, and drug interactions."  Id. at 136.

18

denied due to the purchasers' varying financial status.  Here, CHIP was a particularly unique and

rich policy which individuals purchased and dropped or maintained for a variety of reasons,

amidst varied conduct and reasons including but not limited to a large national shift in the health

insurance industry away from indemnity plans like CHIP and towards managed health care

plans.  The Court's decision of course does not foreclose future class actions challenging health

insurance fraud.  However, Plaintiffs have cited no controlling decision to support the notion that

materiality is not relevant to the Court's class certification analysis, and courts considering the

issue support its relevancy.  The Court has not overlooked any factual or legal issue on this point

to support reconsideration of its holding.

### a.  Unfairness Prong

Plaintiffs also take issue with the Court's handling of the unfairness prong under the

UCL.  During oral arguments, Plaintiffs argued that the applicable tests to assess unfairness

under the UCL do not provide for individualized consideration.  (Tr. at 27:9-30:2.)[5]  The Court

---

[5]       Plaintiffs dedicate only one paragraph in the underlying briefs, found in the motion brief
for class certification, in relation to the applicable tests:

> For purposes of Plaintiffs' UCL claim based on unfairness, as this
> Court previously discussed, California courts have applied three
> different tests to determine whether a business act or practice is
> unfair:  the balancing test; the *Cel-Tech* test; and the Section 5 (or
> FTCA § 5) test.  Common proof for the balancing test will involve
> evidence of the harm produced by Prudential's conduct (class
> members' payment of above-market premiums) balanced against
> whatever justification Prudential may offer for its conduct.  Under
> the *Cel-Tech* test, the Court already has ruled that Plaintiffs have
> stated a UCL unfairness claim because California Insurance Code
> section "10176.10 may serve as evidence of a legislatively
> declared policy in favor of protecting consumers from the
> deleterious consequences that are expected when an insurance

previously described the three tests, and concluded that "as in the common law fraud analysis, individualized considerations predominate the inquiry as to conduct, harm or injury, and equitable relief."  (Op. at 84.)  Plaintiffs are correct to assert that as per Tobacco II, injury is only required to be shown by the class representatives; however Plaintiffs disregard that this principle relates to the effect of passage of California Proposition 64 on the issue of standing.[6] Nevertheless, the Court has not overlooked any factual or legal issue which would alter the disposition of the matter.  Plaintiffs reargue the commonality of the inquiry; however the Court addressed the lack of uniformity in the conduct at issue, the material relevancy to individual policyholders, and the difficulty in establishing damages by common proof.

Plaintiffs also argue that the Opinion did not explain how inequitable relief could affect whether the unfairness claim can be certified.  However, the Court clearly found that the damages formula could not be applied by common proof.  This is evident by clear implication following lengthy consideration of the damages issue, and by way of direct reference within the UCL unfairness discussion to the preceding common law fraud's consideration of damages. The same holds under the Cel-Tech test.  For, even if the California Insurance Code may provide evidence of a legislatively declared policy in favor of disclosing a block closure in order to prevent consumers from continuing to buy insurance in a closed block, as the Court previously

---

block closes" and Prudential's conduct could be found to have offended a legislatively declared policy in section 10176.10 "favoring disclosure of the closed status of an insurance block[ ] in order to prevent customers from continuing to buy insurance in a closed block."

(MRCC Br. at 60-61) (quoting Sept. 9, 2010 Op. at 46-47.)

[6]     The Court's subsequent review on the motion for summary judgment, as explained further below, found that two of the four challenged class representatives lack injury.

contemplated (*see supra* 15, n. 5), it does not necessarily follow that unfairness can be assessed by class-wide basis.  Common proof is still lacking due to the individualized review necessary to assess conduct, materiality, and damages.  Applicability of the Section 5 test is unavailing for the same reasons.

### D.  Motion to Amend or Alter the Class

Last, Plaintiffs assert that the Court "made a clear legal error and worked a manifest injustice" by not considering whether to certify a narrower class which plaintiffs have never before proposed.  (MRCC 14-15.)  Despite already having submitted five amended complaints and multiple proposals for class categorization, at the last hour Plaintiffs propose that the Court should certify a class defined as:

> All current or former CHIP policyholders who resided in
> California, Indiana, Ohio, or Texas at the time of policy issuance
> and who paid one or more CHIP major medical premiums based
> on a rate increase effective on or after May 14, 2001 (for CHIP
> policyholders who resided in California at the time of policy
> issuance), June 11, 2001 (for CHIP policyholders who resided in
> Ohio or Texas at the time of policy issuance, or July 29, 2002 (for
> CHIP policyholders who resided in Indiana at the time of policy
> issuance).

> Specifically excluded from the Class are past or present officers,
> directors or employees of the Defendant; any agents or others who
> sold CHIP policies for the Defendant; any entity in which the
> Defendant has a controlling interest; the affiliates, legal
> representatives, attorneys or assigns of the Defendant; any judge,
> justice or judicial officer presiding over this matter and the staff
> and immediate family of any such judge, justice or judicial officer.

> (MAC 6.)

The new class asserts claims for fraudulent misrepresentations and fraudulent omissions.

Plaintiffs maintain that the Court may also certify a "California Subclass" ("Those members of the Class who resided in California at the time of policy issuance") that asserts claims for breach

of the duty of good faith and fair dealing under California law and violation of California's

Unfair Competition Law. (MAC Br. at 6.)  The proposed Class would consist of approximately

146 members and the California subclass of approximately 58 members. (MAC Br. at 8-9.)

However, the proposed class and subclass still do not overcome the problems of class-

wide treatment discussed at length above:  materiality, varied conduct, or calculation of damages

by common proof.  The post-2001 policyholders were subject to the sharp premium increases

once Prudential lifted the cap.  As a result of these sharp increases, the post-2001 policyholders

were understandably likely to call Prudential as to the cause of their increased bills and to seek

assistance in lowering the premium.  Indeed, the Court's individualized review of these varied

communications with agents later lead to dismissal of two of the four challenged class

representatives, who all held on to their policy after 2001, due to the triggering of notice and

running of the statute of limitations.

Prudential suggests that the Court did not consider the statute of limitations issue in

consideration of commonality and predominance in the motion for class certification.  However,

the Court's review on the motion for class certification found that "[a]n examination of the oral

communications with the proposed class representatives further elucidates the fact-specific

individual inquiry that will be necessary to determine presence of the fraud." (Op. at 79.)  The

Court then provided some examples of the proposed class members which illustrated varying

knowledge and suspicion of the block closure and its effects on premiums.  Those examples were

later repeated and expanded upon in consideration of the motion for summary judgment.

Therefore, implicitly, the Court considered the lack of commonality with respect to the statute of

limitations issue in consideration of the motion for class certification.  The motion to amend or

alter the class will therefore be denied because the new class still does not overcome the foregoing obstacles.

2. **Motion for Reconsideration of Order granting Prudential's Motion for Summary Judgment in part**

In its consideration of the motion for summary judgment as to four of the six proposed class representatives, the Court concluded that the claims raised by Ms. Clark and Ms. Drogell were time-barred due to the running of the statute of limitations, and that the claims by Mr. Gold and Ms. Cusanelli could continue because a triable issue of material fact existed as to whether the delayed discovery rule may apply in their favor.  The Court introduced the discussion on the underlying motion by framing the "main issue [as] whether the individual plaintiffs were put on inquiry notice such that they incurred a duty to investigate further." (Op. at 89.)  The Court then dedicated over five pages reviewing California and Ohio law on the issue, and concluded that "the analysis under both California and Ohio law turns on a suspicion that something is wrong, based on a layperson's understanding, and a connection of the wrongdoing with the inquiry, such that further reasonable investigation is necessary, which would in turn uncover the facts constituting the fraud."  (Op. at 94.)  Plaintiffs argue that the Court misconstrued the relevant California and Ohio law and misapplied the facts as to Mss. Clark and Drogell.

First, Plaintiffs argue that  the Court "overlooked dispositive California law establishing that merely having a suspicion of wrongdoing is insufficient to commence the running of the limitations period if the facts known to the plaintiff do not provide him or her with reason to suspect the basis of the claims in question, and the facts known to Ms. Clark did not give her reason to suspect the basis of her death spiral-based claims (or, at least, a triable issue of material fact exists on that point)[.]" (MRSJ at 1.)  Plaintiffs zealously advocate that the limitations period

23

did not commence as to Ms. Clark because "the facts known to Ms. Clark gave her no reasonable

basis to suspect that she was being defrauded as to the true reason for her CHIP premium

increases or otherwise that CHIP was in a death spiral; at a minimum, there is a triable issue of

material fact on this point." (MRSJ  Br. at 5.)  Plaintiffs continue that "[k]nowledge of the block

closure furnished no clue to a reasonable person, but only to those few in the insurance industry

school in anti-selection dynamics." (MRSJ Br. at 6.)

      The Court already considered Plaintiffs' position, but explained that "[m]agic words

disclosing the death spiral or lock-in/lock-out phenomena need not be uttered in order to trigger

the statute of limitations. . . . The suspicion that something is amiss itself suggests a fraud here

because they were not being told the whole truth about the escalating premiums."  (Op. at 95.)

Specifically, the Court explained:

> [ . . . ] [ ] Plaintiffs argue, that "the named plaintiffs had no
> duty to investigate because . . . large premium increases and the
> fact that Prudential was not selling CHIP did not provide a
> reasonable indication that Prudential might be defrauding them (or,
> for that matter, engaging in the other wrongdoing)." (MSJ Opp. Br.
> at 27.)  Specifically, Plaintiffs maintain that "Prudential is liable
> because it failed to disclose the death spiral and its negative
> consequences to CHIP policyholders." (MSJ Opp. Br. at 22.)
>
>     However, this is contrary to legal principles surrounding
> inquiry notice.  Specifically, once the Plaintiffs' suspicions were
> aroused that something is amiss, and suspicion is linked to the
> injury, it is at that point when the statute of limitations begin [sic]
> to toll.  Magic words such as death spiral or lock-in-lock-out need
> not be uttered here in order to trigger the statute of limitations.  If
> that were the case, the litigants would forever have the right to
> bring a suit for fraud [ ] despite their suspicion of wrongdoing
> related to an injury.  Plaintiffs' logic is circular.  The suspicion that
> something is amiss itself suggests a fraud here because they were
> not being told the whole truth about the escalating premiums.
> They did not need to know the precise facts to allege the fraud in
> order to trigger the statute of limitations.  'So long as a *suspicion*
> exists, it is clear that the plaintiffs must go find the facts; she

cannot wait for the facts to find her.' <u>Jolly v. Eli Lilly & Co.</u>, 751 P.2d 923, 928 (Cal. 1988).

(<u>Id.</u>)

As to Ms. Clark, the Court examined the record and concluded that she is "clearly out of time to contest her allegations of fraud." (Op. at 101.) The Court reasoned:

> The record shows that Ms. Clark repeatedly and unequivocally suspected that Prudential was trying to get rid of her. In the 1980s when her premiums "started becoming quite enormous," Ms. Clark notes that she "didn't know what to think." Plaintiffs argue that Ms. Clark's testimony only reflects a lack of understanding at that time as to why her premium increases were so large. However, closer inspection indicates otherwise. Ms. Clark attests, "I couldn't understand why my rates were becoming so enormous, unless, perhaps, they were trying to get rid of me." Thus, Ms. Clark clearly inferred a connection in the 1980s between her premium increases and some wrongdoing by Prudential. Ms. Clark again confirms the connection between her injury and suspected wrongdoing when she believed in or around 1993 that Prudential was "trying to get me to drop the policy . . . [b]y increasing my rates." Indeed, because the premiums "made no sense" to her "whatsoever[,]" Ms. Clark asked her bookkeeper to look into the issue in 1993. Those inquiries lead Ms. Clark to learn that the CHIP policy did not exist anymore. Additionally, in 1996, she wrote to her attorney that she "expect[ed] a fight" from Prudential regarding an issue related to her living abroad, and reaffirmed that Prudential "no longer [has] this policy and don't want it."
>
> Under California law, the statute of limitations runs from the "date that the complaining party learns, or at least is put on notice, that a representation is false." <u>Platt v. Elect. Supply, Inc. v. EEOF Elec., Inc.</u>, 522 F.3d 1049, 1058 (9th Cir. 2008). *There is no genuine issue of fact that by at least 1993 when she asked her bookkeeper to investigate the premium increases, that Ms. Clark made a connection between the premium increases and the misrepresentation or omissions presented by Prudential in form letters, and that she knew that the policy was no longer sold. Specifically, in subsequent deposition, when asked whether she believed the factors listed in the letter were the only reasons why her premiums increased, Ms. Clark directly responded: "Well, like I said, I was quite shocked sometimes. I did wonder how could medical costs be this expensive."* <u>Platt</u> informs the query, "[s]o

25

> long as there is a reasonable ground for suspicion, the plaintiff
> must go out and find the facts; she cannot wait for the facts to find
> her." Id. at 1054 (quoting Slovensky v. Friedman, 143 Cal. App.
> 4th 1518, 1528-29 (Cal. Ct. App. 2006) and omitting citations).

(Op. at 101, emphasis added.)

Plaintiffs contend that it is a triable factual question whether Ms. Clark's suspicion was

not reasonably based on the facts known to her, and thus that a duty to investigate was not

triggered.  (MRSJ Br. at 8, "Ms. Clark's premium increases did not provide a reasonable basis to

suspect Prudential's fraudulent nondisclosures – or, at least, [ ] a triable issue of material fact

exists here.")  As indicated above, the Court examined the record and considered Ms. Clark's

knowledge of the premium increases, concern of them and their unexplainable and shocking

nature, knowledge of the block closure by 1993, and confusion related to the list of factors

provided by Prudential to explain the rises.  The fraud is imbedded in those underlying facts.

Ms. Clark's continuous suspicion of Prudential only amplifies her suspicion of the fraud or that

she should have at least suspected the fraud.  California jurisprudence is clear that a plaintiff is

on inquiry notice "when the plaintiff suspects or should suspect that her injury was caused by

wrongdoing, that someone has done something to her."  Jolly, 44 Cal. 3d at 1110; accord Norgart

v. Upjohn Co., 21 Cal. 4th 383, 399, n. 4 (Cal. 1999); Platt, 522 F.3d at 1057-58.  (See also Op.

at 89- 94, 100-101.)  All of the generic elements were in place in 1993 when Ms. Clark suspected

or should have suspected that her injury was caused by the wrongdoing.[7]

---

[7]      Plaintiffs submit that "[i]t bears mention that although the Court focuses on statements
she made in 1993, Ms. Clark's premium increases at that time were subject to the 10% annual
cap and thus were not exorbitant on a year-over-year basis (though her premiums were above-
market)."  (MRSJ at 6, emphasis removed).  Notwithstanding that Ms. Clark's premium
increases were capped at 10% annually effective in 1990, Ms. Clark's testimony indicates that
she was nonetheless concerned about the unexplainable and shocking premium increases at that
time.  Moreover, her concern in 1993 is on the heels of her initial CHIP payment in 1978 and her

Plaintiffs argue that the Court should not rely on the reasoning of the Ninth Circuit Court of Appeals in Platt, which applied the relevant California state law of inquiry notice to a fraud claim.  Plaintiffs instead urge that the Court should rely on the reasoning employed by the California Supreme Court in Fox v. Ethicon Endo-Surgery, Inc., 35 Cal. 4th 797 (2005).  However, Fox is consistent with Platt:

> The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action.  The discovery rule does not encourage dilatory tactics because plaintiffs are charged with presumptive knowledge of an injury if they have 'information of circumstances to put [them] on inquiry' or if they have 'the opportunity to obtain knowledge from sources open to [their] investigation.'

Fox, 35 Cal. 4th at 807-808 (emphasis removed from original, internal citations and emphasis removed).  (See also Op. at 90-91.)  Moreover, as Prudential notes, Fox cites Jolly and Norgart repeatedly, and does not overrule them.  See, e.g., Fox, 35 Cal. 4th at 814 ("This court's decisions in Jolly and Norgart presuppose a situation in which the factual basis for a claim was reasonably discoverable through diligent investigation.  In both Jolly and Norgart, the court emphasized that the plaintiffs had ample reason to suspect the basis of their claims.  Indeed, the application of the discovery rule as articulated in this opinion would not have yielded a different result had it been applied in either Jolly or Norgart.").

The Court clearly did not overlook Fox, as Plaintiffs contend, but directly referenced it and the Court's reliance on it.  (See Op. 89, 90, 91.)  Nor is Fox persuasive upon a second look.  In Fox, the plaintiff initially filed a complaint for medical malpractice against the doctor and the treating hospital for negligence which resulted in complications in her gastric bypass surgery.

---

maintenance of CHIP through the eighties, when rising premiums were not capped.  (See Op. at 3, Figure 7.)

Ms. Fox then sought to amend the complaint to include a defective product claim against a manufacturer.  Subsequent to filing the malpractice claim, Ms. Fox deposed the physician and discovered for the first time that the stapler used in the surgery was the cause of her injury.  The court noted that neither the operative report nor the reparative operative report indicated that the stapler had malfunctioned or misfired.  Thus, knowledge of the cause for her injury arose during the normal course of discovery.  Fox found it to be "consistent with [ ] prior applications of the discovery rule to delay accrual of a products liability cause of action even when a related medical malpractice claim has already accrued, *unless* the plaintiff had reason to suspect that his or her injury resulted from a defective product.  More broadly stated, if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when the injury was actually caused by tortuous conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly discovered claim." Id. at 813 (emphasis added).

The California Supreme Court in Fox expressly limited its holding:  "Although we hold that plaintiff has shown that the defect in the products liability claim in her first amended complaint could have been cured, *we express no opinion on plaintiff's ability to prove that she should not have earlier suspected that her injuries were caused by a defective stapler.*" Id. at 811, n. 6 (emphasis added).  The express limitation in Fox rings the final-knell on Plaintiffs' contentions here.

As the Court previously addressed (Op. at 90.), in Norgart, wherein the delayed discovery rule was most recently discussed prior to Fox, the California Supreme Court explained "that by discussing the discovery rule in terms of a plaintiff's suspicion of 'elements' of a cause of action, it was referring to the 'generic' elements of wrongdoing, causation, and harm.  In so using the terms 'elements,' we do not take a hypertechnical approach to the application of the discovery

rule.  Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." Fox, 35 Cal. 4th at 807 (explaining Norgart); see also id. at 803.

Nor is Plaintiffs' dependence on Sime v. A.B. Malouf et al, a case arising from a Court of Appeal in California in 1949, persuasive here.  95 Cal. App. 2d 82 (1949).  Sime involved an active conspiracy in which the defendants there were involved with Mr. Sime in purchasing bonds and acquiring property, however failed to disclose to him that they owned a controlling interest in a corporation that was a party in their joint venture, and that they were in fact both buyers and sellers in the underlying transaction at issue.  Additionally, the defendants produced a fake purchaser who convinced Mr. Sime to sell his interest in the venture, resulting in acquisition of Mr. Sime's interest at a price far below its real value.  The Court of Appeal reasoned that it was a question of fact whether the means were available to Mr. Sime for the discovery of the frauds, and that the trial court's finding on that issue was a reasonable deduction from the evidence as a matter of law. Id. at 107.  Sime is not persuasive here because Mr. Sime "did not . . . even suspect" that the defendants had wronged him.  Id. at 105; accord  id. at 99 ("Sime did not suspect and could not have discovered" the concealed facts.)

Plaintiffs attempt to avoid Ms. Clark's dismissal from the action by arguing that a triable factual question is present as to whether her suspicion was not reasonably based on the facts known to her.  However, the record shows that Ms. Clark had reason to at least suspect that a type of wrongdoing had injured her, and that continuous suspicion was supported by her knowledge of the closed block, the escalating premiums, and Prudential's proffered reasons for the rises.  The record shows that this factually-supported suspicion was triggered in 1993,

approximately fifteen years prior to the filing of this suit.  No reasonable trier of fact could

conclude otherwise.  Prudential did not need to articulate the word "death spiral" for her to

suspect that a fraud was upon her.  As the Court reasoned, to allow otherwise, "litigants would

forever have the right to bring a [ ] fraud suit despite their suspicion of wrongdoing related to an

injury." (Op. at 95.)  The Court has not misconstrued any law or fact here, and the motion for

reconsideration will therefore be denied.

      Second, Plaintiffs argue that "the Court overlooked dispositive California and Ohio law

and made a clear factual error when it ruled that, as a matter of law, a reasonably diligent

investigation by Ms. Clark or Ms. Drogell – the second part of the inquiry notice test – could not

include inquiring of Prudential." (MRSJ Br. at 1.)  The excerpt at issue is the Court's finding that

"understandable, discovery will not be delayed where the plaintiff inquires the very persons he

suspects of wrongdoing." (Op. at 96.)[8]  Ample authority, in addition to that already cited by the

---

8      The full text of the Opinion provides:

        Plaintiffs argue that the limitations period did not run because a
reasonably diligent investigation would not have uncovered the
facts supporting the cause of actions, because the facts supporting
the fraud were inaccessible and in the sole possession of the
defendants.  (MSJ Opp. Br. at 13-14.)  "Without that information,
Plaintiffs could not allege a colorable claim against Prudential.
Such an inquiry would not have uncovered the death spiral and its
consequences." (Id. at 35.)  "Plaintiffs [expressly] submit that the
most that could be expected of a reasonably diligent investigation
by a CHIP policyholder is for the policyholder to contact
Prudential and inquire as to the reasons for his premium
increases." (MSJ Opp. Br. at 35.)  However, understandably,
discovery will not be delayed where the plaintiff inquires the very
persons he suspects of wrongdoing.  See Craggett, 92 Ohio App.
3d at 454-55 ("Once sufficient indicia of misrepresentation are
shown a party cannot rely on its unawareness or the efforts of the
opposition to lull it into a false sense of security to toll the period
of limitations."); see also Susan L. Thomas, 34 A Cal.

Court, support the premise that once a suspicion of a fraud arises, one cannot simply rely on repeated falsities of the opposition to delay discovery.  See, e.g., Doe v. Roman Catholic Bishop, 189 Cal. App. 4th 1423, 1433 (2010) (defendant's continued misrepresentations do not delay duty of inquiry, as "[m]isrepresentations are a part of every fraud cause of action"); Militsky v. Merrill Lynch, Pierce Fenner & Smith, Inc., 540 F. Supp. 783, 787 (N.D. Ohio 1980) (it was "not sufficient that Militsky continued to inquire of the very persons he suspected of wrongdoing, for this is not the type of reasonable diligence contemplated by the courts"); Silver v. Watson, 26 Cal. App. 3d 905, 911 (1972) (once plaintiff is on notice of potential fraud, defendant's "assertions of innocence thereafter cannot be regarded as 'concealment'" that would toll the running of the statute"); Garamendi v. SDI Vendome S.A., 276 F. Supp. 2d 1030, 1044 (C.D. Cal. 2003) ("[O]nce the Commissioner was on notice of his cause of action . . . supposed protestations of [defendant's] innocence could no longer toll the statute.").

The point of contention here is whether the facts were in the exclusive knowledge of Prudential such that Mss. Clark and Drogell could not have stumbled upon them to trigger suspicion.  This is a bit of a convoluted argument, however, because the Court has already found as a matter of law that the facts were in place to connect their suspicion of wrongdoing and

---

Jurisprudence (Third) Fraud § 59 (2012) ("[I]f a party who has undertaken to investigate the subject matter of a contract in which he or she is interested becomes aware of facts that tend to arouse suspicion, or if the party has reason to believe that any representations made to him or her in such connection are false or only partially true, it is the party's legal duty to complete the investigation, and he or she has no right to rely on statements of the other contracting party.").

(Op. at 96.)

discovery of their injury in order to trigger inquiry notice of the fraud, as described at length above.

Again, the delayed discovery rule is a narrow exception to the inquiry notice rule, and applies where the plaintiff "proves that a reasonable investigation at that time would not have revealed a factual basis for [a] particular cause of action." Fox, 35 Cal. 4th at 803. That was the case in Fox, supra at 26-27, where the patient had no reason to learn of a stapler's malfunction and the corresponding defective product claim until discovery proceedings on the negligence claim for complications which arose during surgery. That was also the case in Sime, detailed supra at 27-28, where a particularly active conspiracy was being perpetrated upon the plaintiff.

Plaintiffs argue that the case before the Court is similar to Sime because "the critical facts as to the nature of the fraud were reasonably available only from the defendant." (MRSJ Br. at 10.) Plaintiffs purport that "[a]t any rate, there is no general principle in California law that in a fraud case a plaintiff's reasonably diligent investigation may never be based on inquiries to the defendant. And even if such a distinction were to exist and turn on whether the pertinent information was reasonably available only from the defendant, it is impossible to conclude on this record that there exists no triable issue of material fact as to whether the pertinent facts about the death spiral in CHIP were readily available to Plaintiffs. All of this precludes summary judgment." (Id.)

Plaintiffs contend that this case is "on all fours" with Bossey v. Al Castrucci, Inc., 105 Ohio App. 3d 666 (1995). Therein, a car dealership repeatedly denied that the car had been involved in an accident prior to its sale. However, the purchaser of the car, Mr. Bossey, received opinions from technicians at a car shop indicating that it had. Then, a former employee of the car dealership informed Mr. Bossey that he knew the car was involved in an accident before Mr.

32

Bossey purchased it, and that this fact was known by numerous employees at the car dealership.
Mr. Bossey argued that he discovered the fraud upon the subsequent disclosure by the former
employee; the car dealership claimed that he first discovered the injury when he spoke to the
technicians at the body shop.    The trial court found in favor of the car dealership on that point,
however the Court of Appeal reversed and found that a genuine issue of material fact remained
for determination by the trier of fact as to when he discovered the fraud.

        The operative difference between the findings in <u>Sime</u> and <u>Bossey</u> is that Mss. Clark and
Drogell came upon *no new factual information* to uncover the fraud.  The record as to Mss. Clark
and Drogell is replete with evidence that they were suspicious of Prudential's averments based
on material facts which were already available to them, and which form the basis of the fraud
claim.  The only subsequent event was a confirmation by their attorneys over a decade later that
a fraud was abound based on the underlying facts.

        Third, Plaintiffs grasp at the final straw and argue that the Court "committed a clear error
of fact and law in finding that the investigation by Ms. Clark's attorney 'confirmed the existence
of the closed block and its connection with illness and escalating premiums' and, accordingly,
there was no triable issue of material fact as to whether Ms. Clark could reasonably have
uncovered the factual basis for her claims."  (RMSJ Br. at 1-2.)  Plaintiffs suggest that "[i]n order
for the Court to support its finding . . . the Court must make a finding that Mr. Goetz's
investigation was not a reasonable investigation.  And further, that a reasonable investigation
would have revealed the facts underlying the cause of action, i.e., the death spiral.  That finding
is absolutely essential to sustain the ruling and there has been no such finding and I submit there
can't be such a finding." (Tr. at 82:23-83:5.)

However, the relevant question is whether Ms. Clark's investigation would have revealed the factual basis for the cause of action. Her investigation in 1993 did just that. She did not need to know or understand the term "death spiral" in order to suspect and conclude that a fraud was being committed upon her. In the event that she had any uncertainty about her knowledge of the closed block status, the outstanding premium hikes, Prudential's representations in its form letters, and her continuous suspicion, she could have consulted with an attorney or individual reasonably proficient in insurance law, as she fully comprehended that Mr. Goetz was not. The same holds true for Ms. Drogell, whose investigation lead to the precise theory of her fraud claim as the Court has already described in full. (See Op. at 33-34, 105-106.)

It also bears mention that at least three cases arising from late eighties and early-nineties have been brought to the Court's attention which considered the same CHIP policy and closed-block/premium-hike phenomenon contested here. One was filed in California state court on May 3, 1991 (See Chud Ex. 43); the second was removed from the state court to the United States District Court in the Central District of California on May 23, 1990 (See Chud Ex. 44); and the third was decided by the Fifth Circuit Court of Appeals in 1987. See Tusa v. Prudential Ins. Co., 825 F.2d 69, 71 (5th Cir. 1987). In particular, the second case reflects facts and claims similar to those currently before the Court, where the plaintiff challenged excessive rate increases via fraud-based claims related to Prudential's failure to disclose the closed block status and the consequences thereof. Of significance, the plaintiff did not wait until after the steep premium hikes in 2001 to bring suit, but rather discovered injury, recognized the cause of action, and filed suit in or around 1990 to challenge monthly premiums which rose from $157.82 to $945.69. It also bears mention that the published opinion by the Fifth Circuit Court of Appeals in 1987 details the specific theory alleged here. See Tusa, 825 F.2d at 71; see also Op. at 18.

34

Mss. Clark and Drogell did not learn any new facts to form the fraud basis of their claims. They simply waited too long to file the claim.  Ms. Clark had already uncovered the factual basis of her claims in 1993, outside of the statute of limitations.  That her attorney at that time, whom she knew was not knowledgeable in insurance law, did not identify the correct legal theory here is inapposite.  The same is true as to Ms. Drogell as per her phone call with a Prudential agent on May 27, 2003, also outside of the statute of limitations.  The Court thus did not overlook a factual or legal issue that may alter the disposition of this matter, and the motion for reconsideration of the partial grant of summary judgment is denied.

## III.    CONCLUSION

In conclusion, Plaintiffs' motion for reconsideration of the order denying class certification, the motion for reconsideration the order granting summary judgment in part, and the motion to amend or alter the class, are denied because the Court did not overlook a factual or legal issue that may alter the disposition of this matter.

An order will be entered in accordance with this opinion.


**/s/Dickinson R. Debevoise**
**DICKINSON R. DEBEVOISE, U.S.S.D.J.**


**Dated:**  April 18th, 2013

35